## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SureFunding, LLC,[1] | Case No. 20-10953 (LSS) |
| Debtor. | **Objections Due: April 30, 2020 at 4:00 p.m. ET (extended to May 4, 2020 at 9:00 am ET for the Certain Noteholders motion); and May 5, 2020 at 4:00 p.m. ET for the UST Motion** |
| | **Hearing Date: May 12, 2020 at 10:00 a.m. ET** |
| | **Re: D.I. 14, 15, and 34** |

**DEBTOR'S OMNIBUS OBJECTION TO THE MOTIONS OF THE NOTEHOLDERS TO DISMISS THE DEBTOR'S CHAPTER 11 CASE; UNITED STATES TRUSTEE'S MOTION FOR AN ORDER DISMISSING OR CONVERTING THIS CASE TO CHAPTER 7 OR DIRECTING THE APPOINTMENT OF A TRUSTEE; AND MOTION OF THE NOTEHOLDERS TO EXCUSE COMPLIANCE WITH 11 U.S.C. § 543(a) & (b)**

The above-captioned debtor and debtor-in-possession (the "Debtor" or "SureFunding"), by and through its undersigned proposed counsel, objects (the "Objection") to (i) the Motion of the Noteholders to Dismiss the Debtor's Chapter 11 case filed by a group of noteholders (the "Certain Noteholders") (the "Certain Noteholders Motion") [D.I. 15]; (ii) the United States Trustee's (the "UST") Motion for an Order Dismissing or Converting this Case to Chapter 7 or Directing the Appointment of a Trustee [D.I. 34] (the "UST Motion" and together with the Certain Noteholders Motion, the "Motions to Dismiss"); and the Motion of the Noteholders to Excuse Compliance with 11 U.S.C. § 543(a) & (b) [D.I. 14] (the "543 Motion"). In support of this Objection, the Debtor states the following:

---

[1] The last four digits of the Debtor's taxpayer identification number is 7898. The Debtor's headquarters and service address is 6671 Las Vegas Blvd., Suite 210, Las Vegas, NV 89119.

109848952

**FACTUAL BACKGROUND**

1.      On April 14, 2020 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its business and manage its property as debtor-in-possession under sections 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). No official committee has been appointed in this chapter 11 case.

2.      The factual background relating to the commencement of this chapter 11 case is set forth in detail in the Declaration of Edward T. Gavin, CTP (the "Gavin Declaration") [D.I. 23]. The Gavin Declaration is incorporated into this Objection by reference, and is attached to this Objection as Exhibit A.

3.      On April 16, 2020, the Certain Noteholders filed their 543 Motion and Certain Noteholders Motion. On April 24, 2020, the UST filed the UST Motion.

4.      The Debtor had no need for traditional first day motions. For instance, the Debtor has no prepetition tax or wage obligations, and presently does not require the use of cash collateral or debtor-in-possession financing. However, the Debtor has moved ahead with other necessary tasks. On April 20, 2020, the Debtor filed its Application to Employ/Retain Gavin/Solmonese LLC as Chief Restructuring and Liquidating Officer Pursuant to 11 U.S.C. §§ 363 and 105 Effective as of the Petition Date (the "G/S Retention Application") [D.I. 24]; its Motion to Employ Certain Professionals Utilized in the Ordinary Course of Business Effective as of the Petition Date [D.I. 25]; and Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [D.I. 26]. On April 21, 2020, the Debtor filed its Application to Employ Fox Rothschild LLP as Counsel for the Debtor Effective as of the Petition Date [D.I. 27].

5.        On April 22, 2020, the Debtor filed its Motion for Entry of an Order Pursuant to

Bankruptcy Code Sections 501, 502, and 1111(a), Bankruptcy Rules 2002 and 3003(c)(3), and

Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form

and Manner of Notice Thereof [D.I. 31].

6.        The Debtor is current in its reporting requirements. On April 28, 2020, the Debtor

timely filed its schedules and statement of financial affairs [D.I. 41]. On April 29, 2020, the

Debtor timely filed its Initial Monthly Operating Report [D.I. 47]. On May 1, 2020, the Debtor

sat for its initial debtor interview with the Office of the United States Trustee.

7.        The Debtor intends to use this case to safeguard and collect its assets – including

significant litigation claims – and promptly to propose a plan that will ensure maximum

distributions are made to creditors.

**A.        The Debtor's Background**

8.        SureFunding is a private debt strategy company established in March 2014.

SureFunding invests or participates in small business loans, asset purchases, trade receivables,

advances, and credit facilities with multiple funding platform partners. Marketplace Capital

Strategies, LLC ("MCS") is an asset manager with a primary focus on financing non-bank

lenders and funding platforms. MCS is the manager of SureFunding. Jason and Justin Abernathy

(the "Abernathys") are the principals of SureFunding and MCS.

9.        The Abernathys established SureFunding as a mechanism by which the

Abernathys would invest their own capital. Starting in October 2015, the Abernathys opened the

company to outside participation from individuals or entities through the issuance of Notes.

SureFunding invested or participated in small business loans, asset purchases, trade receivable

purchases and advances, and credit facilities with multiple funding platform partners. Among

SureFunding's investments are ownership interests in trade receivables, real estate assets, and intellectual property portfolio royalty streams. Since 2017, SureFunding typically was not financing directly to borrowers; instead, SureFunding made its capital available to funding partners, who would use SureFunding's capital to provide factoring services for their borrowers.

10.     Pursuant to a Note Purchase Agreement, as amended, SureFunding issued notes and raised in excess of $34 million over time from individuals and entities interested in funding SureFunding's investments. The form Note Purchase Agreement is attached to this Objection as Exhibit B. The terms of these notes provided that the proceeds of the notes were to be used for working capital (in short, for investment and related expenses). As of September 2019, SureFunding was capitalized with approximately $34 million from noteholders (including the Abernathys' $1.8 million in note purchases) and an additional $3.4 million of equity from the personal assets of the Abernathys and their families. Critically, the Note Purchase Agreement governing the notes requires that the collateral agent for the notes, which is comprised in part of the seven "key purchasers" (noteholders holding $2 million in face value or more) (the "Collateral Agent") can only act unanimously. The Note Purchase Agreement provides that it is governed by Delaware law.

11.     SureFunding's revenue comes from participations in nine distinct investments:

a.  Tradepay Capital, LLC – SureFunding participated in individual trade receivables that Tradepay Capital purchased.  SureFunding participated up to 90% on each trade receivable purchase it participated in with Tradepay via ECP Holdings III, LLC.

b.  NCM Wireless, Inc. – SureFunding provided capital to NCM Wireless to purchase inventory in exchange for a short-term promissory note.

c.  Business Advance Participations – This is short to medium term advances/loans to small businesses against future debit card and other charge card receivables and future merchant sales.

d.  CreditPoint Financial, LLC – This is a non-Debtor related entity that invested SureFunding's capital in worker's compensation medical receivables.

e.  Great American Power Holdings, LLC – This is a promissory note and equity investment.

f.  Scidera, Inc. – This is a convertible promissory note to an unrelated entity that provides litigation funding.

g.  Sand Pharmacy – These are 6% and 4.8% participations in real estate equity investments.

h.  Music Royalties – This is a direct investment in the future revenue stream from an intellectual property portfolio.

**B.    The Tradepay Litigation**

**i.    Due Diligence and the Inception of the Tradepay Relationship**

12.    In September 2017, MCS was introduced to Tradepay Capital LLC ("Tradepay"), an international factoring company, as a potential favorable investment platform. On October 17, 2017, SureFunding had its first conversation with Tradepay. On October 23, 2017, SureFunding requested that Tradepay provide due diligence materials. On November 1, 2017, Tradepay sent SureFunding a due diligence package that included a marketing summary write-up on the business; invoice registers of all invoices factored from inception of the business in August 2016 through July 24, 2017; a copy of the Euler Hermes policy that insured the transactions; and a Tradepay participation summary. As discussions proceeded in November and December 2017, Tradepay furnished additional due diligence documents.[2]

---

[2] Documents provided included:  cash flow models; Tradepay operating agreements; DocuSign verifications; term sheets; organizational charts; key Tradepay management and employee presentations; all materials required by Congressional Bank for "know your customer" and compliance requirements; legal review by Goodwin Procter and formation of initial drafts of documents by Goodwin Procter; passports for all three owners of Tradepay; Tradepay's employee identification number; Tradepay's articles of incorporation; pricing studies and analyses; the application required by Congressional Bank for opening of the Tradepay account; and deposit account control agreement requirements

13.     SureFunding was not the only entity that conducted due diligence on Tradepay and its business. Euler Hermes, an international credit insurance company with a Standard & Poor's AA rating, provided coverage on Tradepay transactions and access to a portal with information showing Tradepay's buyers' (the "Buyers") creditworthiness and vetting information.

14.     A number of banks also performed diligence on Tradepay and covered transactions. These include, among others, Congressional Bank, JP Morgan Chase, Bank of America, and a variety of large international banks in Hong Kong and Singapore. In short, Tradepay was not only vetted by SureFunding; Tradepay was vetted and judged creditworthy by Euler Hermes and a number of the world's leading banks.

15.     In February 2018, MCS Agent, LLC ("MCS Agent") signed an agreement with Tradepay. MCS Agent is the entity designated to receive payments from Tradepay as part of the trade factoring platform. Of the more than $34 million that SureFunding raised over time from investors under its Note Purchase Agreement, SureFunding invested approximately $28.7 million in participations in Tradepay factored receivables.

16.     Justin & Lorna Abernathy and Jason Abernathy have invested a combined approximately $7.3 million of personal wealth in entities that have investments in Tradepay via SureFunding, SIA Unite, LLC (which includes the Abernathy's self-directed IRA portfolios), and SureFunding V, LLC.

17.     The capital SureFunding allocated to the Tradepay platform was used to purchase participations in factored trade receivables across more than 150 Buyers. Each Buyer qualified for credit insurance from Euler Hermes. Between February 2018 and September 2019,

SureFunding successfully completed 1,203 participations with Tradepay with an aggregate factored value of $95.4 million.

18.      In May 2019, Mr. Dean Graham entered into a consulting agreement with MCS, LLC via JJK-3 Holdings, LLC to provide consulting services in accordance with professional standards. Dean Graham is one of the Certain Noteholders through his entity 1086, LLC. The company paid Mr. Graham $9,000 per quarter in monthly installments to consult with and advise the members of the Board and senior management on strategic options, debt, equity financing, operations, governance and growth. From May 2019 through October 2019, Mr. Graham provided these services, including services associated with the Tradepay platform, and was consulted on strategic decision-making options for the SureFunding portfolio. Among Mr. Graham's functions was to advise with regard to the concentration in trade receivables with Tradepay for SureFunding via ECP Holdings III and SureFunding V via ECP Holdings V and made recommendations regarding operations and strategic decisions.

## ii.      The Tradepay Fraud Comes to Light

19.      In late September 2019, Tradepay defaulted on payment obligations to MCS Agent from Tradepay buyers. At this time, Tradepay had 421 outstanding invoices totaling approximately $47.9 million in gross invoice value that went into default over the next two months. Of the principal amount invested in the outstanding invoices, approximately 90.9% was invested by SureFunding, approximately 3.1% was invested by SIA Unite and approximately 6.0% was invested by SureFunding V. During the course of investigating the non-payment, SureFunding determined that Tradepay and its owners and operators likely had participated in a sophisticated and complex fraudulent scheme devised and executed to induce SureFunding to participate in financing and invest dollars under false pretenses. The scheme appeared to include

lies, misrepresentations, the use of false and fraudulent paperwork, the use of aliases by one or more representatives, the submission of false and fraudulent documents, secret collusive relationships with buyers, sellers, or both, and the wiring of funds under false pretenses with false amounts, including the laundering of funds. SureFunding believes all of these actions were taken in an effort to unlawfully obtain funds under false pretenses.

20.     On October 2, 2019, MCS Agent sent a Notice of Default to Tradepay. The following day, SureFunding advised the Certain Noteholders and all noteholders in writing of Tradepay's default. SureFunding moved swiftly to explore its options, and on October 10, 2019, SureFunding met with counsel in Florida to discuss possible legal action against Tradepay and its affiliated companies and people.

21.     SureFunding also advised Congressional Bank—SureFunding's primary bank—of the allegations of fraud and of the default. At first, Congressional refused to believe that Tradepay's conduct was fraudulent because of the strict compliance process Congressional Bank had used in establishing the banking relationships. It was only after examining the transactions and evidence a bit further that Congressional Bank shared that it did appear that Tradepay had, indeed, been involved in fraudulent activity.

22.     On October 23, 2019, SureFunding, along with ECP Holdings III, LLC; ECP Holdings V, LLC; SureFunding V, LLC; MCS Agent, LLC; and Marketplace Capital Strategies LLC (together, in the context of the Tradepay Litigation, the "SureFunding Plaintiffs") filed suit against Tradepay and related parties in the Circuit Court of the Eleventh Judicial District of Florida, in and for Miami-Dade County, Florida, where it is pending under Case No. 2019-031155-CA-01 (the "Tradepay Litigation").

23.    The SureFunding Plaintiffs are represented by the law firm of Turner & Associates, P.A. Mr. Turner and his firm specialize in complex anti-terrorism finance litigation and money laundering cases that involve international banking and complex liability issues, among others. And, for the Tradepay Litigation, the Firm has access to a formidable multinational team of private investigators and consultants who specialize in money laundering, forensic accounting and asset-tracing and recovery in specific geographic regions relevant to pursuing Tradepay recoveries, primarily the Middle and Far East. Wherever possible and permissible, SureFunding has engaged these professionals on a contingency fee basis.

24.    On January 15, 2020, the SureFunding Plaintiffs filed an Amended Complaint in the Tradepay Litigation. The claims in the Tradepay Litigation Amended Complaint against Tradepay include (I) Breach of Contract; (II) Conversion; (III) Negligence; (IV) Breach of Fiduciary Duty; (V) Fraud and Misrepresentation; (VI) Civil Conspiracy; and (VII) Violation of the Florida Deceptive and Unfair Trade Practices Act. A copy of the Tradepay Litigation Amended Complaint is attached to this Objection as Exhibit C.

25.    In connection with its transactional relationship with the SureFunding Plaintiffs, Tradepay executed an irrevocable power of attorney (the "POA") in favor of MCS Agent. On April 23, 2020, the Florida court presiding over the Tradepay Litigation upheld the validity of the POA. As a consequence, the SureFunding Plaintiffs now have virtual control over Tradepay's servers, bank accounts, records, files, company cars, company apartments, company offices, rights, and legal standing to assert claims. Another consequence is that Tradepay will very likely be defaulted and judgment entered, permitting the SureFunding Plaintiffs to execute on any remaining assets.

D.    **The Nevada Litigation**

26.    Despite SureFunding's decisive action to recover the funds that Tradepay pilfered, on March 20, 2020, the Certain Noteholders kicked off a race to the courthouse to advance their own interests over the interests of all similarly situated creditors by commencing an action in the Nevada District Court in Clark County, Case No. A-20-812651-B (the "Nevada Litigation"). The Certain Noteholders filed an action against SureFunding alleging breach of contract as its single count, based on SureFunding's inability and failure to make payment on their notes. That failure is the result of the Tradepay theft of funds.

27.    Pursuant to the operative Third Amendment to Note Purchase Agreement ("Third Amendment") entered into by the parties, only the Collateral Agent may take action on behalf of the Debtor's noteholders with respect to the collateral. The Third Amendment is attached to this Objection as Exhibit D.  Cantor Fitzgerald had been the Collateral Agent under the Third Amendment. But on October 16, 2019, Cantor Fitzgerald resigned as Collateral Agent shortly after SureFunding notified Cantor Fitzgerald of the Tradepay fraud. The Third Amendment did provide a mechanism for replacement of the Collateral Agent upon its resignation.  However, these requirements never were met. Therefore the duties of Collateral Agent reverted to the Required Purchasers, which is defined as "the holders of a majority of the outstanding principal amount of the Notes at any time, such majority to include each Key Purchaser. Third Amendment § 8.01(f). A Key Purchaser is each purchaser that holds notes in an aggregate outstanding principal amount of $2,000,000 or more Id., § 8.01(d)). Because the Certain Noteholders do not include all Key Purchasers, any action that the Certain Noteholders direct to take to control of SureFunding is ultra vires.

28.    Undeterred, on March 24, 2020, the Certain Noteholders acting as if it held the authority of the Collateral Agent and, acting outside of the authority granted to them under Third

Amendment, filed an emergency motion in the Nevada Litigation to appoint a receiver (the "Receivership Motion"). This action was illicit because it was taken by some noteholders not constituting the Collateral Agent, ostensibly on behalf of all noteholders. Because they lacked the authority vested in the Collateral Agent to enforce the claim, the Plaintiffs in the Nevada Litigation were not real parties in interest with standing to sue under Rule 17 of the Nevada Rules of Civil Procedure. The refusal of certain Key Purchasers to join this action made the Certain Noteholders'[3] action in the Nevada Litigation ultra vires.

29.     In addition, even though the Notes have a Delaware choice of law provision, the Certain Noteholders improperly, and in an apparent attempt to avoid application of the Delaware Limited Liability Company Act, sought appointment of a receiver (the "Receiver") under Nevada Revised Statute 32.010. In fact, the motion to appoint a receiver does not once mention the fact that the Notes are governed by Delaware law.[4]

30.     On April 1, 2020, SureFunding responded to the Receivership Motion. On April 2, 2020, the court held a hearing on the Receivership Motion. On April 7, 2020, the court entered a decision granting the Receivership Motion and ordering the parties to submit an order. On April 10, 2020, even though SureFunding's counsel told the Certain Noteholders' counsel that SureFunding had comments on the proposed form of order, the Certain Noteholders submitted their form of order (the "Receivership Order")[5] to the court without waiting to receive

---

[3] Depending on context—and whether the designation of "Collateral Agent" would be beneficial or not—the Certain Noteholder group, which includes some of the key purchasers, contended that it either is acting as the Collateral Agent or as individual noteholders.

[4] Under the Delaware Limited Liability Company Act. a receiver may be imposed over a Delaware limited liability company only "[w]hen the certificate of formation of any limited liability company formed under this chapter shall be canceled by the filing of a certificate of cancellation. . ." 6 Del. C. § 18-805. That condition is not met here.

[5] Because the Receivership Order was entered in contravention of applicable Delaware law, the Debtor contends it is void. See, e.g., Valley v. Northern Fire and Marine Ins. Co., 254 U.S. 348, 41 S. Ct. 116 (1920); State ex rel. Nenzel v. Second Judicial District, 49 Nev. 145, 241 P. 317, 320 (1925) ("When the court acts beyond the authority vested in it by statute, the court is "without jurisdiction to appoint a receiver, and all proceedings therein are null and void.").

SureFunding's comments. On April 13, 2020, the court entered the Receivership Order. The Receivership Order does not bar SureFunding from filing a bankruptcy petition for the company. In fact, it expressly contemplates the possibility that SureFunding would do so. See Receivership Order, ¶ 21.

31.    On April 10, 2020, SureFunding filed its Motion to Vacate, Alter, or Amend Decision for Appointment of Receiver and Request for Evidentiary Hearing on Shortened Time (the "Motion to Vacate").

32.    On April 14, 2020, the Debtor commenced this case. Because of this bankruptcy case, the Nevada Litigation is stayed and the Motion to Vacate has not yet been heard.

### E.    Euler Hermes Claims

33.    Starting in October 2019, as soon as the claims became eligible for reimbursement, and contemporaneously with SureFunding's efforts to exercise all available legal remedies, MCS Agent filed insurance claims with Euler Hermes. Turner & Associates also represents MCS Agent with respect to these claims. Between October 11, 2019 and November 27, 2019, MCS Agent filed with Euler Hermes, on behalf of SureFunding and other invested entities, 224 claims on 421 invoices that Tradepay factored and on which Buyers defaulted. The total amount of the claims is more than $47.9 million dollars. Communications with Euler Hermes regarding these claims are ongoing.

### F.    The Debtor Has Communicated with Noteholders and Acted to Safeguard Noteholders' Interests

34.    SureFunding and its principals have acted at all times in the interests of the noteholders. The Abernathys not only are fiduciaries but also are SureFunding's largest investors. The Abernathys are uniquely motivated to maximize recovery and minimize expense.

35.     Contrary to the assertions in the Certain Noteholders Motion, SureFunding has prioritized communication, cooperation, and transparency with the noteholders. SureFunding provided, and continues to provide, frequent updates to the noteholders and their counsel, along with access to thousands of pages of files, inclusive of corporate documents, portfolio information, business agreements, and financial and banking information. A representative of the noteholders also has and continues to have view access to SureFunding's pre-petition bank accounts. Further, SureFunding successfully has pursued—and continues to pursue—repayment of existing investments.

G.      **SureFunding, with the Cooperation of the Certain Noteholders, Retains a Financial Advisor**

36.     In January 2020, further to protect the interests of all parties and at the urging of counsel for the Certain Noteholders, SureFunding began interviewing candidates for the position of chief restructuring officer (a "CRO"), including three candidates suggested by counsel for the Certain Noteholders. During the selection process, all four candidates, which included three firms and one sole practitioner, indicated they would require SureFunding to obtain directors and officers liability insurance in order to serve as an officer of SureFunding. The Certain Noteholders did not agree to SureFunding paying the premium for directors and officers liability insurance, so SureFunding moved to engage a financial advisor instead of a CRO. At the conclusion of the interviews, SureFunding selected Kevin DeLuise with FTI for the financial advisor position, in large part because FTI was the most inexpensive of the three firms and had the most relevant experience for the SureFunding engagement.

37.     Counsel for the Certain Noteholders played an integral role in working directly with FTI to determine the scope of FTI's engagement. At counsel for the Certain Noteholders' request, the scope of work included preparation of a report to the Noteholders detailing certain

expenses and revenues of the company, to be provided to the noteholders by March 23, 2020,

and a detailed report/plan by April 30, 2020 for SureFunding and for delivery to noteholders.[6]

Days before the FTI report was due to be delivered to the noteholders, the Certain Noteholders,

without authority and without standing, filed the Receivership Motion.

### H.    Appointment of the Independent Director and CRLO

38.    In anticipation of filing this case, the Debtor, which previously had two

managers—Justin and Jason Abernathy—amended the Debtor's operating agreement to provide

for an Independent Manager with authority over bankruptcy decisions. That Independent

Manager is Tamarack Associates, Inc. which has designated John Palmer, CTP to represent it.

39.    Days before the Petition Date, FTI ceased to serve in the role of financial advisor,

necessitating the retention of a professional to fill the position of financial advisor.

40.    Therefore, Mr. Palmer authorized the Debtor to retain Gavin/Solmonese LLC

("G/S") to provide Edward T. Gavin, CTP as the Chief Restructuring and Liquidation Officer of

the Debtor (the "CRLO"). Mr. Gavin reports directly to Mr. Palmer. On April 20, 2020, the

Debtor filed the G/S Retention Application.

41.    Mr. Gavin is well-known to this Court. His firm has been engaged to provide,

among other services, the following:

        a.    Assist Debtor and Debtor's Counsel with preparation for the filing of the
           Bankruptcy Case;

---

[6] The scope of engagement called for: (i) an accounting of all incurred expenses since October 1, 2019; (ii) a list of all assets and liabilities; (iii) a recommendation for an action plan and timeline to maximize the recovery of the non-Tradepay assets, including through liquidation where recommended; (iv) in consultation with SureFunding's counsel, prepare an analysis of the applicable insurance coverage regarding the Tradepay receivables and develop a strategic plan that considers recovery through a claims process and/or litigation and costs associated therewith; (v) in consultation with SureFunding's counsel, an analysis of the Tradepay Litigation including the estimated probability of success, potential assets available to satisfy any judgements and the estimated costs associated therewith; (vi) attempt to identify any other assets of SureFunding that can be liquidated and costs associated therewith; (vii) prepare a 12-month cash flow budget; and (viii) recommend to SureFunding options for the Noteholders, including, but not limited to, prompt distribution of any recoveries or participation in future recovery efforts.

b.  Assessing Debtor's business, financial obligations, operational needs, assets, business plan, liquidation strategy, and operating forecasts, and assessing go-forward options with respect to same;

c.  Evaluating the Debtor's strategic and financial alternatives;

d.  Creating a liquidation plan to present to Debtor's stakeholders to address Debtor's repayment of its outstanding indebtedness;

e.  Advising the Debtor on developing, evaluating, structuring and negotiating the terms and conditions of a plan of liquidation;

f.  Communicating with the Debtor's stakeholders that may include, but are not limited to, the Debtor's vendors, customers, employees, lenders, creditor committees, along with Court officials, attorneys and other service providers, as required;

g.  Making employment related decisions following consultation with the Debtor's board, management, and counsel;

h.  Overseeing litigation related to claims asserted by and against Debtor;

i.  Monitoring daily cash allocation and cash management processes, including the preparation of reports to manage any budgets and associated financing;

j.  Assisting the Debtor in negotiations with creditors;

k.  Such other services as Debtor may reasonably request and Advisor may agree to perform, which may include, without limitation, advising the Debtor concerning obtaining additional financing, recruiting personnel, and the implantation of a turnaround plan.

42.    Since the Petition Date, Mr. Gavin has been hard at work fulfilling these tasks. In particular, Mr. Gavin has had numerous discussions with members of the Certain Noteholders group and noteholders who are not part of that group, about the Debtor's business, this bankruptcy case, and the Debtor's plans for maximizing recoveries to all creditors. Some of the Certain Noteholders have participated in calls with Mr. Gavin. Mr. Gavin is sharing information and engaging with all stakeholders in the Debtor, regardless of their alignment with any particular group of noteholders. All are welcome.

**I.    The Debtor's Assets**

43.    As of the Petition Date, the Debtor possessed cash in the amount of more than

$2.1 million. In addition, the Debtor, along with its co-plaintiffs, is pursuing the Tradepay

Litigation. The Debtor has a 90.93% interest in the proceeds of the Tradepay Litigation. The

Debtor also has revenue streams from a variety of other sources, such as real estate equity

investments, music royalty portfolios, and a number of other sources. Collectively, these revenue

streams are performing and are expected to generate returns for the next two to five years,

depending on the investment. The Debtor values its assets at $36,112,799.92. Critically, by

virtue of its status as a debtor, the Debtor's estate now possesses potentially meaningful causes

of action under chapter 5 of the Bankruptcy Code.

**J.    Information Sharing with Noteholders**

44.    While Mr. Gavin has encouraged and fielded creditor inquiries, so has the Debtor

throughout its existence. For instance, the Debtor maintains an online repository of documents

and information and has provided all noteholders access, which access is tracked in an automated

log file that the Debtor monitors. Indeed, much of the information that the Certain Noteholders

complain of not having received has been readily available on this online repository for some

time. In addition, the Debtor has allowed Certain Noteholders' counsel and the putative

"Collateral Agent" representative online access to view transactions on the Debtor's prepetition

bank accounts. The Debtor's prepetition and postpetition practice has been to provide a high

level of transparency and abundant information to all noteholders and their professionals. As has

become clear, the Debtor can provide access to information, but cannot control whether the

noteholders and their professionals avail themselves of this information, or whether they share

that information consistently or accurately among all noteholders.

**K.    The Motions**

45.     On April 16, 2020, the Certain Noteholders filed the 543 Motion and the Certain

Noteholders Motion. On April 24, 2020, the UST filed the UST Motion.

46.     The Motions to Dismiss and the 543 Motion largely rely upon incorrect factual

allegations. As a consequence, the Certain Noteholders and the UST will fail to meet their

evidentiary burdens, and the Motions should be denied. Unfortunately, in the UST Motion, the

UST repeats, without evidence, a number of false allegations that the Certain Noteholders made,

apparently without any investigation of his own.

47.     A brief summary of certain incorrect factual obligations follows:

    a.  **Allegation:** "The Notes grant the Noteholders security interests in all assets of

        SureFunding. Those interests are properly perfected, first priority security

        interests." Certain Noteholders Motion, ¶ 17. **The Truth:** This statement

        inaccurately describes the collateral. Instead, the Note Purchase Agreement

        provides:

> 7.01 Grant of Security Interest. To secure the payment and performance of
> all of its obligations hereunder and under the Notes when due, the
> Company hereby grants to Cantor Fitzgerald Securities or such other agent
> as the Required Purchasers may designate from time to time in accordance
> herewith (such agent, the "Collateral Agent"), for the ratable benefit of the
> Purchasers, a security interest in, and pledges to such agent, for the ratable
> benefit of the Purchasers, the Collateral, wherever located, whether now
> owned or hereafter acquired or arising, and all proceeds and product
> thereof.

        Note Purchase Agreement, § 7.01. "Collateral" is defined as "all rights, title

        and interests in favor of or payable to the Company in respect of loans or

        participations made by the Company to its funding partners." Id., § 8.01(b).

        The UCC-1 that Cantor Fitzgerald filed in its capacity as Collateral Agent

        describes the collateral as "[a]ll rights, title and interest in favor of or payable

to the Debtor in respect of loans or participations made by the Debtor to its

funding partners, wherever located, whether now owned or hereafter acquired

or arising, and all proceeds and products thereof." Certain Noteholders

Motion, Exhibit C.

b.  **Allegation**: The Noteholders also have discovered that ECP-III invested 80 to

90 percent of the funds it received from SureFunding through a single entity,

Tradepay Capital LLC ("Tradepay"). Certain Noteholders Motion, ¶ 21. **The**

**Truth**: SureFunding participated with over 150 different Buyers with less

than a 3% concentration in any one Buyer, and each Noteholder was provided

monthly and quarterly reviews showing the same. The Certain Noteholders

incorrectly view Tradepay as a single borrower. It was not. Tradepay was the

platform through which SureFunding participated on factored trade

receivables to over 150 separate borrowers. ECP-III invested 100 percent of

the funds it received from SureFunding in participations in Tradepay factored

receivables.  ECP-III was organized as a special purpose entity through which

SureFunding and SIA Unite participated in Tradepay factored

receivables.  ECP-III filed its tax returns as a pass through entity allocating net

income to SureFunding and SIA Unite pro-rata based on each entity's

respective capital in ECP-III

c.  **Allegation**: "[T]he Abernathys made additional, undisclosed investments in

Tradepay through a second vehicle, ECP Holdings V, LLC ("ECP-V"), as

well as through a participation in ECP-III." Certain Noteholders Motion, ¶ 22.

**The Truth:** The Debtor is confounded as to why the Certain Noteholders

believe the Abernathys investing their own personal funds into the Tradepay
relationship is an indicium of wrongdoing. To the contrary, the funds invested
into Tradepay through ECP-V are equity funds from the Abernathys
contributed by SureFunding V, LLC. Additionally, ECP-V borrowed funds
from Congressional Bank, which funds the Abernathys personally guaranteed
through a limited bad boy guaranty, and invested them into the Tradepay
relationship. Investing their own funds, and borrowing to invest more funds
into the relationship on their own personal guaranties is an indication of how
strongly the Abernathys felt about the Tradepay relationship. It also means
that they have experienced a greater financial loss than any single noteholder.
Evincing how fundamentally the Certain Noteholders fail to understand the
relationship, they misstate the implications of the effect of these other
investments. These investments increase the total amount affected by the
Tradepay fraud, but did not increase the loss to the noteholders.

d.  **Allegation**: "The terms and conditions of the Abernathys' personal
investments were not disclosed to the Noteholders." Id. **The Truth:** The
Debtor is unaware of any request that such disclosure be made. However, the
Abernathys have always made clear that they started SureFunding with their
own family capital and their families are the biggest investors in SureFunding.

e.  **Allegation**: "[N]ot a single payment was made on any invoice purchased by
ECP-III after the April 2019 Swap." Id., ¶ 30. **The Truth:** This allegation
presumes that SureFunding should have known at the time of purchase of the
invoice by ECP-III that it was not going to repay prior to default. The invoices

purchased after the April 2019 Swap, which occurred on April 29, 2019, did

not come due for payment until July 7, 2019 and later.  Additionally, during

this time, ECP-III was receiving net collections that were growing each

month.  In May 2019, ECP-III received net collections of $6,845,234.89.  In

June 2019, ECP-III received net collections of $7,701,080.41.  In July 2019,

ECP-III received net collections of $7,978,980.55.  The net collections in June

2019 and July 2019 were the highest two collection months for ECP-III since

they began purchasing Tradepay factored receivables.

f.  **Allegation**: "Though SureFunding's principals did provide certain

information to the Noteholders beginning in October 2019, they failed to

answer satisfactorily a series of critical questions, including with regard to: (a)

the lack of documentation between SureFunding and ECP-III; (b) the lack of

due diligence in connection with the Tradepay investments; (c) the decision to

continue funding Tradepay and raise money after the April 2019 Swap and

lack of investigation; (d) the failure to disclose the "swaps" and increased risk

to the Noteholders; (e) the lack of progress on insurance claims tied to the

losses (having previously claimed the investments were insured); (f) the lack

of director's and officer's insurance coverage for ECP-III and SureFunding;

(g) the lack of diversification in the portfolio, despite prior representations to

the Noteholders; and (h) the lack of due diligence by SureFunding, ECP-III, or

the Abernathys before investing $34 million of investor funds in Tradepay."

Id., ¶ 35. **The Truth:** With respect to (a), the lack of documentation between

SureFunding and ECP-III was shared with Collateral Agent representatives

20

proactively. As to (b), SureFunding relied upon legal counsel for the structure set up between SureFunding and ECP-III. SureFunding relied upon professionals, large commercial banks, Euler Hermes and Tradepay for the vetting of Buyers and the Tradepay business. This is described more fully elsewhere in this Objection. In respect of (c), SureFunding has described the April 2019 swap in great detail and on several occasions to the Collateral Agent representatives.  On April 23, 2019, there were 341 open invoices that Tradepay owed money on to the Debtor. Tradepay informed that 29 payments on 29 invoices had been held up and proposed doing a swap into new invoices. The swap was completed on April 29, 2019. The 29 old invoices were swapped into 24 new invoices.  The other 312 invoices of the 341 invoices that were open as of that date repaid over time between April 24, 2019 and August 7, 2019. Additionally, the 29 invoices that had a payment held up were swapped into 24 new invoices. 23 of the 24 invoices were paid between July 19, 2019 and August 19, 2019. During the period from May 2019 to July 2019, SureFunding continued to see increasing cash receipts from payments coming in after April 2019 through July 2019, with July 2019 being the largest month of cash collections for the Tradepay participations, as follows:

May 2019 - $6,845.234.86

June 2019 - $7,701,080.38

July 2019 - $7,978,980.55

With respect to (e), Euler Hermes has done everything possible to delay processing and payment of the insurance claims. Mr. Tab Turner has been in constant and consistent communication with Euler Hermes' legal counsel to work towards a resolution. A civil remedy notice of violations was filed with Florida Department of Financial Services on March 12, 2020, one for SureFunding and one by MCS Agent for Tradepay. This step is necessary to pursue civil remedies in Florida against Euler Hermes. With respect to (f), no noteholder ever asked to review or required that SureFunding or ECP-III have D&O insurance. With respect to (g), the SureFunding portfolio of trade receivables had broad diversification at the buyer level, by geography and industry. The diversification was disclosed to noteholders as was the fact trade receivables were being managed via Tradepay. MCS provided to the Noteholders charts starting with the 2018 Q4 SureFunding Portfolio Metrics that illustrated the broad diversification at the buyer level. These were updated each quarter as diversity grew. The largest buyer represented 2.17% of the total trade receivables outstanding at the end of June, which was stated in the 2019 Q2 SureFunding Portfolio Metrics provided to the Noteholders. The problem was that, as only later became known, Tradepay was fraudulent. With respect to (h), the amount invested in Tradepay was $28.7 million by SureFunding.

g. **Allegation**: "[T]he Abernathys and SureFunding did not take adequate steps to protect the Noteholders' interests and minimize losses to the Noteholders. For instance, the Abernathys used only SureFunding assets to pay attorney's

and expenses, rather than seeking contributions from the Abernathys' personal investment vehicles." Id., ¶ 36. **The Truth:** SureFunding is the largest participant in the Tradepay lending relationship, with 90.93% being SureFunding's stake, and the other 9.07% belonging to SIA Unite with 3.12% and SureFunding V with 5.95%. SureFunding has the vast majority of the funds to collect and would be expected to bear 90.93% of the cost of collection. To date, SIA Unite and SureFunding V have paid their pro-rata share of the cost of collection.

h. **Allegation**: "SureFunding also spent hundreds of thousands of dollars for attorneys and professionals and ignored input and suggestions from the Noteholders, the real parties in interest." Id., ¶ 37. **The Truth:** The Certain Noteholders' input and suggestions—which in at least one instance included demanding that the Debtor unilaterally take over physical possession of Tradepay's offices, files, and systems—were considered in due course. That management of the Debtor did not act on each of them does not mean they were not considered, and merely because a suggestion is made does not make it a sound suggestion. Spending "hundreds of thousands of dollars for attorneys and professionals," even if true, is a reasonable expenditure when tracing assets to prepare to litigate against numerous overseas parties to recover a $47 million fraud. It is a reasonable and necessary cost of collection. Additionally, the Debtor has incurred significant legal fees and related costs because of the Certain Noteholders' litigation approach.

i.  **Allegation**: "To date, little progress has been made on insurance claims or, for

that matter, the Tradepay litigation in which no preliminary injunctive or other

relief was sought." Id. **The Truth:** SureFunding swept the Tradepay bank

account before filing suit, which it had a right to do under the existing

agreements. Therefore, a preliminary injunction neither was necessary nor

warranted. On April 23, 2020, the Florida court entered an order in the

Tradepay Litigation putting SureFunding and its assets in control of Tradepay

and clearing the path for SureFunding to execute on these assets. In addition,

as the Debtor has advised the Certain Noteholders, claims have been made

against applicable insurance and negotiations with the insurer, Euler-Hermes,

are ongoing. The Debtor has cleared all obstacles to commencing litigation

against Euler Hermes.

j.  **Allegation**: "By October 2019, SureFunding was in liquidation and had

ceased normal business operations." Id., ¶ 38. **The Truth:** Tradepay is only

one of several business lines or investments that SureFunding has in its

portfolio. The majority of other assets are performing. One exception is a note

in default that was making regular weekly payments through February 2020,

at which time its business was effected by the COVID-19 shutdown. It is

incorrect to state that SureFunding was in liquidation. Instead, SureFunding

continues to service its non-Tradepay assets, and they continue to produce

revenue for SureFunding.

k.  **Allegation**: "The risk of loss included . . . $300,000 paid to the Abernathys'

management company." Id., ¶ 42; Declaration of William Dorsey, Exhibit A

to Certain Noteholders' Motion, ¶ 6. **The Truth**: In fact, the Debtor's management company has received payments since October 2019 solely for the reimbursement of expenses actually advanced for the benefit of SureFunding. This is how the companies operate in the normal course of business. Nonetheless, through their management company, the Abernathys continued their hard work with the Debtor without receiving any compensation.

## ARGUMENT

### A.    The Case Was Filed in Good Faith

48.    On a motion to dismiss a case under Bankruptcy Code section 1112(b), it is the debtor's burden to show its good faith in filing its petition. See In re Energy Futures Holding Corp., 561 B.R. 630, 639 (Bankr. D. Del. 2016). "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004) (citations omitted). When determining good faith, the focus is on (i) whether the petition serves a valid bankruptcy purpose and (ii) whether the petition is filed merely to obtain a tactical litigation advantage. Id., at 119–20.

49.    Because the Debtor filed this case with a valid bankruptcy purpose and for reasons other than merely obtaining a tactical litigation advantage, the case should not be dismissed and the Debtor should remain in possession of its business. In any event, as Judge Richard Posner notes, "[i]t is not bad faith to seek to gain an advantage from declaring

bankruptcy – why else would one declare it?" <u>In re James Wilson Assocs.</u>, 965 F.2d 160, 170

(7th Cir. 1992)

50.     When determining whether a case should be dismissed as not filed in good faith,

the court is to consider a number of factors:

> (a) Single asset case; (b) Few unsecured creditors; (c) No ongoing business or
> employees; (d) Petition filed on eve of foreclosure; (e) Two party dispute which
> can be resolved in pending state court action; (f) No cash or income; (g) No
> pressure from non-moving creditors; (h) Previous bankruptcy petition; (i)
> Prepetition conduct was improper; (j) No possibility of reorganization; (k) Debtor
> formed immediately prepetition; (l ) Debtor filed solely to create automatic stay;
> (m) Subjective intent of the debtor.

<u>In re Crown Village Farm, LLC</u>, 415 B.R. 86, 91 (Bankr. D. Del. 2009) (citing <u>In re Primestone</u>

<u>Inv. Partners</u>, 272 B.R. 554, 557 (D. Del. 2002)). After these facts have been developed, when

determining good faith, the focus is on (i) whether the petition serves a valid bankruptcy purpose

and (ii) whether the petition is filed merely to obtain a tactical litigation advantage. <u>In re</u>

<u>Integrated Telecom</u>, 384 F.3d 108 at 119–20. As the Third Circuit teaches, intention to file a

liquidating plan is a valid purpose in bankruptcy. <u>In re 15375 Memorial Corp.</u>, 400 B.R. 420, 427

(D. Del. 2009) (quoting <u>Integrated Telecom</u>, 384 F.3d at 120).

51.     Analyzing the <u>Primestone</u> factors in turn, it is apparent that these factors militate

in favor of a finding of good faith.

> a.  <u>Single asset case</u>: This is not a single asset case. As described in this
>
>     Objection and as set forth in the Debtor's schedules, the Debtor has interests
>
>     in a number of different assets.
>
> b.  <u>Few unsecured creditors</u>: Putting aside noteholders and the question of
>
>     whether or to what extent their claims are secured, there are few unsecured
>
>     creditors.

c. <u>No ongoing business or employees</u>: While a central purpose of the business was frustrated by the Tradepay theft, the Debtor continues to operate its other investments and collect on them. In addition, the Debtor, with the Abernathys' assistance and financing by certain of the Abernathys' related entities, is pursuing valuable claims against Tradepay while also pursuing its insurance claims against Euler Hermes. In addition, the Debtor continues to use the services of a management company to staff the Debtor and maintain its business and assets.

d. <u>Petition filed on eve of foreclosure</u>: This factor is inapplicable because there is no foreclosure.

e. <u>Two party dispute which can be resolved in pending state court action</u>: This case is not a two party dispute. Presently, the Debtor is involved in litigation with less than a majority of noteholders in the Nevada Litigation. Simultaneously, the Debtor is managing the Tradepay Litigation with success to date. Also, the Debtor is pursuing claims against Euler Hermes.

f. <u>No cash or income</u>: The Debtor has cash assets of over $2.1 million, plus regular income from its performing investments.

g. <u>No pressure from non-moving creditors</u>: In addition to the moving creditors, the Debtor is facing pressure from a majority of its noteholders to recover assets to pay their notes. Some of those noteholders favor the use of the bankruptcy process to enhance the chances of gaining the highest recoveries.

h. <u>Previous bankruptcy petition</u>: This is the Debtor's first petition.

i.  <u>Prepetition conduct was improper</u>: The Debtor was a victim of a sophisticated fraud. There is no serious allegation of improper conduct by the Debtor. In fact, the record demonstrates that the Debtor was proactive and behaved appropriately at all times.

j.  <u>No possibility of reorganization</u>: The Debtor is developing a strategy that will provide for a liquidating or reorganizing plan that will continue to monetize existing revenue streams for the benefit of creditors, while also pursuing recoveries through the Tradepay Litigation, the Euler Hermes claims, and any other causes of action that the Debtor's investigations might reveal. In any event, less than a month into the case, it is far too early to make an assessment that there is no possibility of reorganization.

k.  <u>Debtor formed immediately prepetition</u>: The Debtor was formed in 2014 and has been transacting business since then.

l.  <u>Debtor filed solely to create automatic stay</u>: The Debtor did not file solely to create the automatic stay. In fact, the Debtor first sought to retain a CRO months ago and has been assessing its restructuring and asset recovery options throughout that period.

m.  <u>Subjective intent of the debtor</u>: The Debtor's intent in filing this case was to provide for an orderly process for managing its ongoing investments, pursuing claims against Tradepay and Euler Hermes—and preventing the disruption to those efforts posed by the Certain Noteholders—and taking advantage of the unique means the Bankruptcy Code provides to advance these goals, such as being able to pursue chapter 5 causes of action. All these efforts are towards

the end of maximizing recoveries and minimizing costs, all to fulfill the

Debtor's fiduciary duties to its creditors and other stakeholders. The Debtor's

intent in filing this case is multifaceted and designed to serve the needs of

creditors, many of whom are friends and family of the Abernathys (and indeed

the Abernathys themselves) and is not merely a response to the Certain

Noteholders' illicit actions to gain an advantage for themselves to the

exclusion of other creditors.

52.     As shown here, the Debtor's good faith in filing this petition is overwhelmingly

evident.

**B.    The Debtor Filed this Case with Valid Bankruptcy Purposes in Mind**

53.     The Debtor's consideration of bankruptcy as a means of managing its liabilities

and claims predates the Petition by several months when SureFunding retained FTI as a financial

advisor. As discussed in this Objection, FTI was selected collaboratively with the Certain

Noteholders. There are numerous valid bankruptcy purposes for this case.

54.     There is no debate that the Debtor's liabilities exceed its cash assets. Since the

Tradepay fraud, noteholders, including the subgroup that consists of the Certain Noteholders,

have been demanding payments on their notes.[7] There are approximately $39.6 million in

outstanding notes and just over $2.1 million in cash available.

55.     Proceeding in bankruptcy provides maximum optionality for the Debtor. It halts

the dismantling of resources for the benefit of certain creditors at the expense of others. It is far

---

[7] When seeking the imposition of their handpicked receiver, the Certain Noteholders sought to do what cannot be done under Delaware law, which it to impose a receiver over a Delaware limited liability company that is active and good standing. See 6 Del. C. § 18-805. The Certain Noteholders' choice of a Nevada court, and their failure to disclose to the Nevada court that the Notes are governed by Delaware law, suggests that the Certain Noteholders avoided venue in Delaware knowing the Delaware court would not impose a receivership over a Delaware limited liability company under these circumstances.

preferable for the Debtor to be before this bankruptcy court, where the Debtor can control the administration of its case for the benefit of all creditors, rather than for the Debtor's assets be dismantled for the benefit of the Certain Noteholders in Nevada. Indeed, the Debtor and its management have the institutional knowledge that no receiver or other third party possibly can duplicate. This knowledge is required successfully to pursue asset recoveries for the benefit of all creditors. This case also provides the Debtor with access to the powers of a debtor-in-possession and causes of action under Bankruptcy Code chapter 5.

56.    The Certain Noteholders' contention that this is a two-party dispute is wrong. The Debtor has over fifty noteholders who are seeking repayment.  The Debtor is simultaneously pursuing the Tradepay Litigation and the insurance claims against Euler Hermes. Facing battles on multiple fronts to recoup its losses and make noteholders whole the Debtor now has the ability to centralize all disputes in one location—this Court.

**C.    There is No Showing of Cause for Conversion of Dismissal Under Bankruptcy Code section 1112(b)(4)**

57.    Bankruptcy Code section 1112(b)(4) identifies factors constituting "cause" for conversion or dismissal of a case under chapter 11. These factors include the following:

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

58.    While the Certain Noteholders focus their attention on only one allegation of cause—substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation—none of these elements is met.

59.    Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation: The bankruptcy process is intended to augment the estate. The Certain Noteholders' false and careless allegations of mismanagement and extravagant spending—parroted by the UST—do not stand up under scrutiny. The Debtor is implementing a strategy that it is confident will result in maximum returns to creditors. Any allegation that there is no reasonable likelihood of rehabilitation is baseless. As an initial matter, the Debtor is less than a month into its case. It has already achieved a significant success in the Florida case against

Tradepay. But instead of offering support to the Debtor's efforts to advance the goals of the bankruptcy case, the Certain Noteholders have grossly run up the costs of administration of the estate and forced the Debtor to direct its resources to the litigation that the Certain Noteholders brought to the Debtor. The Certain Noteholders bear direct responsibility for any diminution of the estate caused by their litigation strategy. That the Certain Noteholders have acted without the proper authority as Collateral Agent and, therefore, have acted <u>ultra</u> <u>vires</u> and diminished the estate is a matter to be addressed in this bankruptcy case. The Debtor is confident in its strategy of proposing and confirming a plan in these cases and promptly exiting bankruptcy.

60.     While the Certain Noteholders assert that a receiver will be less expensive than administration of bankruptcy case, there is no evidence supporting that assertion. In fact, the Receivership Order gives the Receiver carte blanche to hire and compensate whatever professionals, employees, contractor, and advisors he chooses without the need to file fee applications. The Receiver merely is required to report regarding his own compensation, at unspecified intervals, without the need to report on compensation that the Receiver pays to others. Receivership Order, ¶ 16.

61.     In addition, the Receivership Order provides that the Receiver's compensation may be paid "as agreed upon in writing by the Receiver and the [Certain Noteholders]." <u>Id.</u> This order gives the Certain Noteholders, who act only for themselves and not as fiduciaries to all creditors, license to agree on a compensation arrangement with the Receiver without accountability, permission of the court, and without input from creditors other than the self-selected group of the Certain Noteholders. The Receivership Order provides far less transparency and accountability than the bankruptcy process does, and poses a danger of carving up the Debtor's assets.

62.     Dismissing this case also would harm creditors because the pending Motion to Vacate and any subsequent appeals and related litigation would further drain the Debtor's assets. This bankruptcy case serves the salutary bankruptcy purpose of preventing the estate from being picked apart by litigation.

63.     Most importantly, the Receiver would not have had the benefit of the Abernathys' involvement in efforts to generate recoveries from Euler Hermes and the Tradepay litigation. The Abernathys are personally motivated to do right by their friends and family who, like them, were defrauded. They are singularly focused on pursuing meaningful recoveries. No one has comparable knowledge about the events that transpired. No one is better positioned to bring money back to the victims. Bankruptcy provides a vehicle for the Debtor to pursue its goal of recovering the funds that were lost.

64.     Gross mismanagement of the estate: Neither the UST nor the Certain Noteholders allege that this factor has been met. The estate is managed by Mr. Gavin, the CRLO, who is a highly respected bankruptcy professional with a national reputation. He reports to a similarly reputed independent manager in Mr. Palmer. There is no suggestion of gross mismanagement. In fact, the truth is quite the opposite. The estate is in the hands of highly competent and well-known professionals.

65.     Failure to maintain appropriate insurance that poses a risk to the estate or to the public: There is no allegation that this factor has been met.

66.     Unauthorized use of cash collateral substantially harmful to 1 or more creditors: The Debtor does not believe it is using cash collateral of any creditor. It is the Debtor's view that it possesses sufficient cash reserves to meet its operating needs in this

case. No creditor has contended otherwise. Indeed, the Certain Noteholders do not make this contention in their Motion.

67.    <u>Failure to comply with an order of the court</u>: There is no allegation that this factor has been met.

68.    <u>Unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under chapter 11</u>: There is no allegation that this factor has been met. The Debtor timely filed its schedules and statement of financial affairs [D.I. 41] and Initial Operating Report [D.I. 47] on April 28 and 29, 2020 respectively.

69.    <u>Failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor</u>: There is no allegation that this factor has been met. On May 1, 2020, the 341(a) meeting of creditors was scheduled for May 22, 2020. The Debtor will appear. The Court has not ordered a Rule 2004 examination of the Debtor.

70.    <u>Failure timely to provide information or attend meetings reasonably requested by the United States trustee</u>: There is no allegation that this factor has been met. In fact, quite the opposite. The Debtor quickly responded to every request for information that the UST informally has made of the Debtor, and, in fact, proactively offered and provided documents and other information to the UST.

71.    <u>Failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief</u>: There is no allegation that this factor has been met.

72.    <u>Failure to file a disclosure statement, or to file or confirm a plan, within</u> <u>the time fixed by this title or by order of the court</u>: There is no allegation that this factor has been met. The deadline to file a disclosure statement or file and confirm a plan has not yet occurred.

73.    <u>Failure to pay any fees or charges required under chapter 123 of title 28</u>: There is no allegation that this factor has been met.

74.    <u>Revocation of an order of confirmation under section 1144</u>: This factor is inapplicable because no plan has yet been confirmed.

75.    <u>Inability to effectuate substantial consummation of a confirmed plan</u>: This factor is inapplicable because no plan has yet been confirmed.

76.    <u>Material default by the debtor with respect to a confirmed plan</u>: This factor is inapplicable because no plan has yet been confirmed.

77.    <u>Termination of a confirmed plan by reason of the occurrence of a</u> <u>condition specified in the plan</u>: This factor is inapplicable because no plan has yet been confirmed.

78.    <u>Failure of the debtor to pay any domestic support obligation that first</u> <u>becomes payable after the date of the filing of the petition</u>: This factor is inapplicable.

**D.    There is No Cause to Appoint a Chapter 11 Trustee**

**i.    Applicable Legal Standard Regarding the Appointment of a Trustee**

79.    Bankruptcy Code Section 1104(a) authorizes the appointment of a trustee under two circumstances:

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the

> number of holders of securities of the debtor or the amount of assets or liabilities
> of the debtor; or (2) if such appointment is in the interests of creditors, any equity
> security holders, and other interests of the estate, without regard to the number of
> holders of securities of the debtor or the amount of assets or liabilities of the
> debtor.

11 U.S.C. § 1104(a).

80.     "It is settled that the appointment of a trustee should be the exception,

rather than the rule." In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3d Cir. 1989)

(internal citations omitted); In re Marvel Enter. Grp. Inc., 140 F.3d 463, 471 (3d Cir.

1998). The "standard for § 1104 appointment is very high." Smart World Techs., LLC

v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 176 (2d Cir.

2005). Accordingly, the movant "must prove the need for a trustee by clear and

convincing evidence." Sharon Steel, 871 F.2d at 1226; see also Marvel, 140 F.3d at 471

(same).

81.     There is "a strong presumption" against the appointment of a trustee.

Marvel, 140 F.3d at 471. This "strong presumption" is based on the fact that there is no

need for a trustee in most cases because the debtor-in-possession already is a fiduciary for

the estate and has an obligation to refrain from acting in a manner that could damage the

estate. See Marvel, 140 F.3d at 471. "The strong presumption also finds its basis in the

debtor-in-possession's usual familiarity with the business it had already been managing at

the time of the bankruptcy filing, often making it the best party to conduct operations

during the reorganization." Id.

82.     Here, for the reasons stated below, the UST has failed to meet its burden

of showing by clear and convincing evidence that a chapter 11 trustee should be

appointed. Moreover, as the UST concedes, he "does not, at this juncture, have the

benefit of a thorough investigation into these matters . . ." UST Motion, ¶ 24. Undeterred

by his lack of investigation, the UST relies on the unsubstantiated representations of the

Certain Noteholders, engages in rank speculation, and levels incorrect and destructive

accusations about the Debtor and its management.

> ii.    **The Appointment of a Trustee is Not Warranted Because There Was no Prepetition Misconduct and None Will Take Place in Chapter 11**

83.    The UST argues that there is "cause" for the appointment of a trustee

while baselessly accusing the Debtor's prepetition management of "gross

mismanagement of its business affairs."  See UST Motion at ¶ 47. By the reckoning of

the UST, the Debtor is to blame for being unable to prevent the Tradepay fraud, even

though Euler Hermes and a large group of major international banks vetted and cleared

Tradepay. This, of course, is repugnant to any notion of justice and fairness. The UST has

done no investigation of his own, yet levels serious accusations.

84.    Ignoring the fact that many chapter 11 debtors who come to this Court do

so with a CRO in place (and with no objection by the UST), the UST argues that the

Debtor's appointment of an independent manager and CRLO "effectively demonstrate

that the Debtor needs an independent fiduciary to manage its affairs." UST Motion, ¶ 50.

There is no basis for this conclusion. In fact, the Debtor, recognizing the reality of its

situation, sought assistance of an independent director and appointed a CRLO to create

conditions for resolution of disputes and equitable treatment of creditors. The Debtor has

hired an experienced and well-respected CRLO to shepherd the Debtor through this case

and has added an independent manager who is solely responsible for all bankruptcy and

restructuring decisions. This dedication to openness and transparency, coupled with the

Abernathys' voluntary relinquishment of decision-making authority to third parties with whom they had no preexisting relationship, is a testament to their management skills and shows great awareness of the reality of the conflict they are addressing.

85.    Because there is no imaginable risk of negligence and fraud occurring during this case, "cause" under Bankruptcy Code section 1104(a) does not exist and there is no justification for the burden and expense of the appointment of a trustee.  See Kenneth N. Klee & K. John Shaffer, Creditors' Committees Under Chapter 11 of the Bankruptcy Code, 44 S.C. L. Rev. 995, 1045, 1049 (1993) (noting that "the incremental costs" of a chapter 11 trustee typically "outweigh[] the benefits" and "maximization of value rarely lies down this path").

86.    Furthermore, the Third Circuit has stated that there is a strong presumption against appointing an outside trustee because it is often unnecessary given that "[t]he debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization." Marvel, 140 F.3d at 471 (internal citations omitted).

87.    Now, with the additional governance safeguards the Debtor has implemented, along with the preexisting fiduciary duties of the Debtor, the UST Motion should be denied because there is simply no cause to appoint a chapter 11 trustee.

88.    Additionally, although the Motions to Dismiss contain various allegations of misconduct, the Debtor strenuously denies the allegations. The Abernathys were victims of the fraud like the rest of the Noteholders.  They lost more money than anyone else. Further, the Debtor acted swiftly in addressing the Tradepay fraud. In any event, the fact that the Abernathys are stepping aside to leave control of the bankruptcy process in

the hands of others should remove even the slightest concern. The Debtors, for all bankruptcy related matters, will be controlled solely by an experienced CRLO reporting to the independent manager. Accordingly, there is no more danger of misconduct here than there would be if a chapter 11 trustee were appointed.

### iii.    The Debtor's Current Management is Highly Competent

89.    There is "a strong presumption" against the appointment of a trustee, which stems from the "debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization." <u>Marvel</u>, 140 F.3d at 471. The Debtor's retention of a CRLO puts in place experienced financial advisors with the oversight of an independent manager. If the CRLO's retention is approved by this Court, the estate will have the benefit of an independent, knowledgeable, and fully engaged CRLO who will provide a steady hand to the Debtors' bankruptcy efforts. The CRLO also has the accounting skills necessary to help the Debtor to propose a plan.

90.    For these reasons, the appointment of a trustee is unwarranted under Bankruptcy Code section 1104(a)(1).

### iv.    Appointing a Trustee Decidedly is Not in the Best Interests of the Estate

91.    Bankruptcy Code section 1104(a)(2) envisions a "flexible standard" for the appointment of a trustee when to do so would serve the "the interests of the creditors, equity security holders, and other interests of the estate." <u>Sharon Steel</u>, 871 F.2d at 1226; <u>see</u> <u>also</u> <u>Marvel</u>, 140 F.3d at 474; <u>In re G-I Holdings, Inc.</u>, 385 F.3d 313, 320 (3d Cir. 2004) ("As <u>Sharon Steel</u> stated, the party asking for appointment of a trustee bears the

burden of persuasion by clear and convincing evidence.  This burden does not shrink or

shift.").

92.     In reconciling the "interests" standard with the "cause" standard, Collier

notes:

> The "interests" standard may initially seem less stringent than the "cause"
> standard.  After all, no showing of wrongful behavior on the part of management
> is required, as long as interested parties can show a meaningful benefit from the
> appointment of a trustee.  However, it is important to remember that the
> "interests" standard requires a finding that appointment of a trustee would be in
> the interest of essentially all interested constituencies."

7 COLLIER ON BANKRUPTCY ¶ 1104.02[d][ii] (Alan N. Resnick & Henry J. Sommer eds.,

16th ed.) (emphasis added).

93.     For all the reasons discussed at length in this Objection, the UST has not

met his burden of proving by clear and convincing evidence that the appointment of a

trustee is in the best interest of creditors.

94.     Accordingly, the interests of all constituencies weigh heavily against the

appointment of a chapter 11 trustee.

### E.     These Cases Should Not be Converted to Chapter 7

95.     Bankruptcy Code section 1112(b) governs motions to convert.  That

section provides that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall
> convert a case under this chapter to a case under chapter 7 or dismiss a case under
> this chapter, whichever is in the best interests of creditors and the estate, for cause
> unless the court determines that the appointment under section 1104(a) of a
> trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

96.     In determining whether to convert a case, Bankruptcy Code section

1112(b) requires the Court to undertake a two-step process in which the Court first

determines whether there is "cause" to convert or dismiss, and next decides whether appointment of a trustee, conversion, or dismissal furthers "the best interest of creditors and the estate."  See In re SGL Carbon Corp., 200 F.3d 154, 159 n. 8 (3d Cir. 1999); see also In re Lykes Bros. S.S. Co., Inc., 196 B.R. 586, 595 (Bankr. M.D. Fla. 1996) ("This requirement is in the conjunctive, and it clearly is the burden of the Movant to prove both of these elements.").

97.     Furthermore, under Bankruptcy Code section 1112(b)(2), a court must not convert a case to chapter 7 "if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor . . . establishes that—(A) there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2).

98.     As on a motion to appoint a trustee, when seeking conversion to chapter 7 under Bankruptcy Code section 1112, the movant is forced to carry a heavy burden in order for conversion to be ordered. "Conversion or dismissal . . . is a drastic measure . . . the harshness of conversion or dismissal mandates that it result only upon a strong evidentiary showing."  In re Dark Horse Tavern, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995).

99.     For the reasons stated in this Objection, there is no cause to convert this case to chapter 7, and even if such cause exists (which it does not), converting this case is not in the best interests of the creditors and this Estate.

**F.      The 543 Motion Should be Denied**

100.    In the 543 Motion, the Certain Noteholders seek an order providing that (i) the Receiver is excused from compliance with 11 U.S.C. § 543(a) & (b); (ii) the Receiver shall remain in possession and control of the Debtor's assets and governance during the pendency of this chapter 11 case; and (iii) the Receivership Order shall remain in full force and effect and shall be unaffected by the filing of this chapter 11 case. The 543 Motion should be denied.

101.    Bankruptcy Code section 543(d) provides:

(d)    After notice and hearing, the bankruptcy court—

(1)    may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property, and

(2)    shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

11 U.S.C. § 543(d).

102.    Accordingly, for the Receiver, who has not sought this relief, to be excused from compliance, the Court would need to find, under Bankruptcy Code section 543(d)(1), the interests of creditors would be better served by permitting a custodian to continue in possession, custody, or control of such property. A movant has the burden of proof. See, e.g., In re Skymark Properties II, LLC, 597 B.R. 391, 397 (Bankr. E.D. Mich. 2019). There is no evidence to support such a finding.[8] The Certain Noteholders do not even allege in the 543 Motion that the Receiver is holding property of the Debtor. Therefore, the 543 Motion is moot.

---

[8] Bankruptcy Code section 543(d)(2)'s elements are not met here, and therefore are inapplicable.

103.    "Generally, a state court receivership is terminated upon a bankruptcy filing by

the owner of the property . . ." In re Northgate Terrace Apartments, Ltd., 117 B.R. 328, 331

(Bankr. S.D. Ohio 1990) (denying motion to excuse compliance with turnover provisions of

Bankruptcy Code section 543). Accordingly, presumptively, if the Receiver does hold any assets

of the Debtor, its authority is terminated and the Receiver would be in violation of the automatic

stay for failing to turn over such assets to the Debtor.

104.    By the 543 Motion, the Certain Noteholders are attempting functionally to impose

a prohibited management scheme for the Debtor—a permanent receivership over the Debtor's

assets.[9] This is patently impermissible, as provided under Bankruptcy Code section 105(b). See

11 U.S.C. § 105(b) (". . . a court may not appoint a receiver in a case under this title"); In re

Plantation Inn Partners, 142 B.R. 561, 563 (Bankr. S.D. Ga. 1992) ("After consideration of the

statutory scheme of the Code and decisions cited to me I conclude that it is improper to vest a

state-appointed receiver with the long-term obligations of a debtor-in-possession . . . 11 U.S.C.

Section 105(b) expressly prohibits a Bankruptcy Court from appointing receivers in any case

under Title 11 . . . . [T]he provisions of Section 543(d) are intended to provide flexibility when

there is no useful purpose to be served by turnover, but are not intended to be used as a vehicle to

avoid turnover in the typical case.") See also In re Stratesec, Inc., 324 B.R. 156, 157 (Bankr.

D.D.C. 2004) (citing In re Plantation Inn, 142 B.R. at 563). "[T]o permit the Receiver to

indefinitely remain in possession and to vest him permanently with all the duties and powers of a

debtor-in-possession goes far beyond the limited relief envisioned by Section 543. To do so

would circumvent the prohibition of Section 105(b) against the appointment of receivers in lieu

of a debtor-in-possession or trustee. Clearly the Code contemplates that the long-term

---

[9] Paragraph 1 of the proposed order granting the 543 Motion reads "[t]he Receiver shall remain in possession and control of the Debtor's assets and governance during the pendency of this chapter 11 case."

administration of a Chapter 11 case will be managed by a trustee or debtor-in-possession, not a

hybrid created by judicial fiat." In re Plantation Inn, 142 B.R. at 564.

105.    Even assuming the Certain Noteholders can pass that barrier to the relief they

request, they cannot meet their burden required for the Court to grant the 543 Motion. To

determine whether a movant has met its burden of establishing grounds for a waiver of

Bankruptcy Code section 543 turnover requirements, courts consider a variety of factors that

include:

> (1) The likelihood of a reorganization;
>
> (2) The probability that funds required for reorganization will be available;
>
> (3) Whether there are instances of mismanagement by the debtor;
>
> (4) Whether turnover would be injurious to creditors;
>
> (5) Whether the debtor will use the turned over property for the benefit of its creditors;
>
> (6) Whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and
>
> (7) The fact that the bankruptcy automatic stay has deactivated the state court receivership action.

In re Skymark, 597 B.R. at 397 (citations omitted).

106.    The Certain Noteholders did not address these factors. However, the Debtor

applies them here and shows why the 543 Motion should be denied.

107.    The likelihood of a reorganization: This issues is addressed elsewhere in this

Objection. "Reorganization policy generally favors turnover of business assets to the debtor in a

[C]hapter 11 case." In re Orchards Vill. Invs., LLC, 405 B.R. 341, 352 (Bankr. D. Or. 2009). The

Debtor is confident that it will be able to confirm a plan that maximizes returns to creditors. Part

44

of that effort will depend upon being able to monetize the Debtor's claims and causes of action and continuing to monitor and receive returns on its non-Tradepay assets.

108.    The probability that funds required for reorganization will be available: The Certain Noteholders do not contend funds will not be available. Indeed, the Euler Hermes insurance proceeds and the likely proceeds of the Tradepay litigation provide such funds.

109.    Whether there are instances of mismanagement by the debtor: There is no allegation that the debtor-in-possession has mismanaged the estate. Unsupported accusations to the contrary, there similarly is no merit in the contention that SureFunding mismanaged its business before the Petition Date, as detailed in this Objection.

110.    Whether turnover would be injurious to creditors: There is no evidence at all that turnover would harm creditors. While the Certain Noteholders direct their accusations at the Abernathys, they have not contended and cannot seriously contend that Mr. Gavin and Mr. Palmer are incapable of ably carrying out their fiduciary duties to creditors.

111.    Whether the debtor will use the turned over property for the benefit of its creditors: Again, the Certain Noteholders make no argument regarding this issue. As a debtor-in-possession, the Debtor's central charge is to use estate property for the benefit of creditors. That is the overriding purpose of this bankruptcy case. Mr. Gavin and Mr. Palmer have unassailable qualifications; creditors can count on them to use any property that may be turned over for the benefit of the estate's creditors.

112.    Whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate: As discussed elsewhere in this Objection, one of the main benefits of this bankruptcy case that a receivership does not, is that the estate is empowered with avoiding powers. The CRLO will

analyze and along with the independent manager determine what viable claims exist and will pursue those found appropriate.

113.    <u>The fact that the bankruptcy automatic stay has deactivated the state court receivership action</u>: This factor, which the Certain Noteholders again do not address, militates in favor of denying the 543 Motion.

114.    Therefore, for all these reasons, the 543 Motion should be denied.

## CONCLUSION

115.    Like the Certain Noteholders, the Abernathys are victims of the Tradepay fraud. But unlike those noteholders, who are pursuing their own narrow interests, SureFunding sought to do what was best for all involved, retaining professionals who could bring SureFunding before this Court to effectuate a plan that has the best chance of allowing the recovery of funds to those who have lost so much. Through their wasteful motion practice, the Certain Noteholders attempt to distract the Debtor from obtaining any meaningful recovery while the Debtor's litigation strategy, including the Florida action, has begun to bear fruit.  Their motions should be denied.

116.    The UST Motion is, as the UST acknowledges, supported by no investigation. It is predicated on the baseless and debunked accusations of the Certain Noteholders. It, too, should be denied.

Wherefore, the Debtor respectfully requests that the Court deny the Motions and grant such other relief as is just.

[Signature page follows.]

Dated:  May 4, 2020

**FOX ROTHSCHILD LLP**

/s/ Thomas M. Horan
Thomas M. Horan (DE Bar No. 4641)
Daniel B. Thompson (DE Bar No. 6588)
919 N. Market St., Suite 300
Wilmington, DE 19899-2323
Telephone: (302) 654-7444
E-mail: thoran@foxrothschild.com
E-mail: danielthompson@foxrothschild.com

Michael A. Sweet (admitted pro hac vice)
325 California St., Suite 2200
San Francisco, CA 94104-2670
Telephone: (415) 364-5560
E-mail: msweet@foxrothschild.com

Gordon E. Gouveia (admitted pro hac vice)
321 N. Clark St., Suite 1600
Chicago, IL 60654
Telephone: (312) 980-3816
E-mail: ggouveia@foxrothschild.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*