## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SureFunding, LLC, | Case No. 20-10953 (LSS) |
| Debtor. | **Hearing Date: May 12, 2020 at 10:00 a.m. (ET)** |
| | **Re: D.I. 14, 15, 34 and 57** |

### NOTEHOLDERS' OMNIBUS REPLY IN SUPPORT OF THEIR
### (I) MOTION TO DISMISS THE DEBTOR'S CHAPTER 11 CASE AND
### (II) MOTION TO EXCUSE COMPLIANCE WITH 11 U.S.C. § 543(a) & (b)

The Noteholders[1] hereby file this Omnibus Reply in Support of Their (I) Motion to Dismiss the Debtor's Chapter 11 Case [D.I. 15] ("Motion to Dismiss") and (II) Motion to Excuse Compliance with 11 U.S.C. § 543(a) & (b) [D.I. 14] ("543 Motion") and in response to the Debtor's Omnibus Objection to the Motions of the Noteholders to Dismiss the Debtor's Chapter 11 Case, United States Trustee's Motion for an Order Dismissing or Converting this Case to Chapter 7 or Directing the Appointment of a Trustee; and Motion of the Noteholders to Excuse Compliance with 11 U.S.C. 543(a) & (b) [D.I. 57] (the "Debtor's Objection") and states as follows in support thereof:

#### PRELIMINARY STATEMENT

1.     The moving Noteholders represent two-thirds of the noteholder claims against SureFunding.  Since that motion to dismiss, total noteholders supporting dismissal of this case in favor of the pending Nevada receivership action now exceed 80 percent.  The secured noteholders represent 99% of the total claims against SureFunding.

---

[1]     Undefined capitalized terms used herein shall have the meaning given to them in the Motion to Dismiss unless otherwise so stated.

123232897

2.      Discovery in this case disclosed that the managers of SureFunding lacked authority to appoint the independent manager and the Chief Restructuring and Liquidation Officer ("CRLO") because such appointments were made after the Nevada Court entered the order appointing Michael Flanagan as receiver for SureFunding.    As a result, dismissal is a straightforward question of authority, in addition to the bad faith arguments raised in the motion.

3.      SureFunding's arguments that the Noteholders did not have standing to seek a receiver in the Nevada Court and that the Nevada Court applied the incorrect choice of law should not be countenanced here and clearly demonstrate SureFunding's attempt to skirt the Nevada Court because these arguments were never even raised by SureFunding with the Nevada Court prior to appointment of the receiver; and they are without merit.

4.      The bankruptcy case was undeniably filed in bad faith and does not serve a valid bankruptcy purpose.  This is a two-party dispute that can, and was, resolved in the Nevada Court before this case was filed.  SureFunding cannot confirm a plan in this case as it will never obtain the requisite support for a plan pursuant to the bankruptcy code requirements without the support of the Noteholders.  The filing of the bankruptcy case does not maximize SureFunding's assets in a manner that could not be done in the Nevada Court; and the exorbitant fees spent by SureFunding in this case already demonstrate that the receiver action is more cost effective.

5.      Eighty to ninety percent of SureFunding's asserts were lost to Tradepay; the balance includes a defaulted loan and other low revenue stream receivables that can just as easily be collected by the receiver as by the Abernathys.  The Tradepay litigation will be handled more efficiently and effectively by the receiver.  While SureFunding asserts a valid bankruptcy purpose is served because it can now bring chapter 5 causes of action in this bankruptcy case, it has failed

123232897

to identify any such action and the only possible actions listed in its schedules are against insiders of SureFunding and the very professionals SureFunding seeks to employ in this case.

6.     The conduct of SureFunding's current managers (the Abernathys) leading up to the bankruptcy filing, with respect to the bankruptcy filing and during this bankruptcy case demonstrates, at a bare minimum, gross mismanagement and self-dealing.  Not only did the Abernathys invest 80-90 percent of SureFunding's assets in a Ponzi scheme run by an India-based criminal ring (i.e., Tradepay) and fail to disclose the repeated Tradepay defaults to the Noteholders, the Abernathys, through their various corporate shells, took a $900,000 distribution *on the same day they stopped purchasing Tradepay receivables.*  They then turned around and sought to raise more money from noteholders.  The list of acts of mismanagement and self-dealing goes on.

7.     SureFunding's purported retention of an independent manager and CRLO do not mitigate the bad acts of the Abernathys.  First, the appointments are ineffective.  But even if they were not, the related resolutions leave power with the Abernathys and the CRLO's engagement letter confirms his duties are limited to advising and consulting.  In addition, the independent manager and the CRLO can be fired at any time by the Abernathys.

8.     SureFunding's shenanigans and waste of its creditors' funds – hundreds of thousands of dollars since the Noteholders' March 23, 2020 receiver motion alone – must end. The case was filed in bad faith and should be dismissed for cause and with prejudice.  Even if the bankruptcy is not dismissed outright, Mike Flanagan, the receiver appointed by the Nevada Court, should remain in control of SureFunding and be excused from turning over assets in accordance with the Noteholders' 543 Motion and the case should be converted or a trustee appointed pursuant to the U.S. Trustee's motion [D.I. 34].  The Abernathys should be out.

123232897

**ADDITIONAL BACKGROUND**

9.      The history behind this bad faith bankruptcy filing and the wrongdoings of the managers of SureFunding are detailed in the Noteholders' Motion to Dismiss and are incorporated herein by reference.

10.     Since the filing of the Motion to Dismiss, Debtor has filed its schedules (the "Schedules") and statement of financial affairs ("SOFA") and the parties have conducted oral and written discovery.  (Schedules and SOFA at D.I. 41).  The Noteholders provide the following additional facts discovered since the filing of the Motion to Dismiss.

A.      **Additional Facts Regarding SureFunding's Pre-Petition Conduct.**

11.     The Debtor's SOFA disclosed a $900,000 equity distribution to the Abernathys' affiliate made by the Debtor on August 7, 2019.  (SOFA 4.7).  Even after they knew of the Tradepay default and used Noteholder funds to pay their own personal obligations, the Abernathys continued to raise money from the Noteholders claiming they were continuing to invest in Tradepay.  (Excerpt from Deposition Transcript of Justin Abernathy attached as Exhibit A-1 to the Declaration of Paige B. Tinkham filed herewith as Exhibit A at 41:9-23).

12.     The hiring of the Independent Manager and the CRLO does not absolve the Debtor of the Abernathys' influence.  The Abernathys have repeatedly attempted to create this guise since discovery of the Ponzi scheme by the Noteholders.  SureFunding told the Noteholders it was hiring Kevin DeLuise from FTI Consulting LLC ("FTI") as chief restructuring officer in January 2020. (Defendant SureFunding, LLC's Opposition to Plaintiff's Motion for Appointment of Receiver in Nevada Action ("Receiver Opposition"), attached to the Declaration of Paige B. Tinkham filed herewith as Exhibit A ("Tinkham Declaration") as Exhibit A-2, at 7).  However, the engagement agreement with FTI didn't provide FTI with any power as an officer.  Instead, FTI was only to

4

report to the managers of SureFunding – Justin and Jason Abernathy.  (FTI Engagement Letter attached as Exhibit A-1 to Receiver Opposition).  Then, after the receiver motion was filed (in March 2020), SureFunding informed the Nevada Court that it was instead hiring Michael Tucker of FTI as its CRO.  (Receiver Opposition at 8:9-14).  This was a misrepresentation.  No executed engagement letter with Tucker has been produced, and, to the Noteholders' knowledge, FTI never acted as CRO.

13.    The day of the bankruptcy filing, SureFunding appointed another CRLO.  Yet again, the CRLO duties set forth in the CRLO motion ("CRLO Motion") make clear that the CRLO is still only being hired to "assist, consult and advise" SureFunding.  (CRLO Motion [D.I. 24] at ¶ 10).  The CRLO has no authority to act independently.  Indeed, his retainer was paid by personal trusts of the Abernathys.  (Declaration of Edward T. Gavin, CTP In Support of Voluntary Petition [D.I. 23] ("Gavin Declaration") at ¶ 36).  There is no need to pay a professional $50,000 to $100,000 a month, plus expenses and indemnification, to act as a puppet for the Abernathys.  (Professional Compensation set forth in CRLO Motion at ¶ 12).  This charade further played out during the bankruptcy case when it became clear to the Noteholders that the CRLO does not have authority to make decisions on behalf of SureFunding.

**B.    Additional Facts Regarding the Debtor's Lack of Authority to File this Case.**

14.    The Nevada receivership action was filed on March 20, 2020 followed by the Receiver Motion on March 24, 2020.  (Gavin Declaration at ¶ 32).  SureFunding filed an objection to the Receiver Motion on April 1, 2020 ("Receiver Opposition").

15.    SureFunding's arguments that the Noteholders did not have standing to seek a receiver in the Nevada Court and that the Nevada Court applied the incorrect choice of law should not be countenanced here and clearly demonstrate SureFunding's attempt to skirt the Nevada Court

123232897

because these arguments were never even raised by SureFunding with the Nevada Court prior to appointment of the receiver.  (*See generally*, Receiver Opposition).

16.     After a hearing, the Nevada Court granted the Noteholders' Receiver Motion and appointed Mr. Michael Flanagan as the receiver for SureFunding on April 7, 2020.  (Decision attached as <u>Exhibit A-3</u> to Tinkham Declaration.

17.     SureFunding thereafter filed a Motion to Vacate, Alter or Amend Decision for Appointment of Receiver and Request for Evidentiary Hearing on Order Shortening Time on April 10, 2020 (the "Motion to Vacate").  (Gavin Declaration at ¶ 33).

18.     Despite the pending Motion to Vacate, on April 13, 2020, the Nevada Court entered a detailed order laying out Mr. Flanagan's powers, compelling SureFunding's management to cooperate and turnover all assets and enjoining any interference with Mr. Flanagan (the "Receiver Order").  (Order Granting Motion for Appointment of Receiver [D.I. 15-2]).

19.     The Receiver Order provides that Mr. Flanagan is the receiver and manager of all assets, operations and undertakings of SureFunding (the "Receivership Assets").  (Receiver Order at ¶ 2).  Mr. Flanagan was granted immediate possession and full control of the Receivership Assets. (Receiver Order at ¶ 3).  Mr. Flanagan was granted authority to: (i) take and maintain all documents, books, records, papers and deposit accounts relating to the Receivership Assets; (ii) exclude SureFunding and its respective agents, servants, and employees wholly from the Receivership Assets, except as necessary to carry out its duties with respect to the notes; (iii) manage, operate, preserve, maintain and liquidate the Receivership Assets; and (iv) hold and exercise all privileges belonging to SureFunding, including any attorney-client privileges. (Receiver Order at ¶ 4).

20.     All persons in possession of Receivership Assets or any portion thereof were

123232897

required to turn over such assets to Mr. Flanagan.  (Receiver Order at ¶ 10).

21.     SureFunding was and is excluded from having possession or control of, or any right to, the Receivership Assets or money or other proceeds derived from the Receivership Assets unless and until the receivership is terminated and Mr. Flanagan is discharged.  (Receiver Order at ¶ 5).  SureFunding and all those acting in concert with it were ordered to comply with the Receiver Order and were enjoined and restrained from impeding or interfering in any manner with the exercise by the Receiver of its rights, powers, and duties thereunder.  (Receiver Order at ¶ 5).

22.     SureFunding did not comply with the Receiver Order.

23.     Instead, *after the Receiver Order was entered*, the managers of SureFunding proceeded to retain the Independent Manager and CRLO.

24.     While SureFunding claims to have had a telephonic meeting of managers to appoint the Independent Manager in the afternoon on April 13, 2020, SureFunding's limited liability agreement required all amendments thereto to be in writing.  (SureFunding Limited Liability Agreement attached to the Tinkham Declaration as Exhibit A-4).

25.     SureFunding's engagement agreement with the Independent Manager and the amendment to the SureFunding limited liability agreement to provide authority to the Independent Manager were not finalized until April 14, 2020.  (Email chain between J. Abernathy and J. Palmer dated April 14, 2020 attached to the Tinkham Declaration as Exhibit A-5 and Second Amendment to Limited Liability Company Agreement of SureFunding, LLC attached to the Tinkham Declaration as Exhibit A-6).

26.     The relevant consent of the managers appointing the CRLO is also dated April 14, 2020, the day under the Nevada Court entered its detailed order setting forth Mr. Flanagan's duties

7

123232897

as receiver.[2]  (*See* Unanimous Written Consent of the Managers of SureFunding, LLC [D.I. 1] at 5-7 appointing the CRLO).

## C.    Additional Facts Regarding SureFunding's Assets, Creditor Constituency and Chapter 5 Causes of Action.

27.    The Debtor's Schedules state that it has $36,112,799.92 in assets and $40,194,391.23 in liabilities.  (Summary of Schedules, Parts 1 and 2).  The Debtor's scheduled assets with respect to the Tradepay litigation and insurance claims related thereto represent 80% of the Debtor's scheduled assets.  (Schedules A/B, Parts 11 and 12).

28.    The moving Noteholders represent two-thirds of the noteholder claims against SureFunding.  Additional noteholders who have subsequently joined the Noteholders in supporting dismissal raise the percentage of noteholders seeking dismissal to in excess of 80 percent. (Schedules E/F, Part 2 and Submissions of Support attached hereto as Exhibit B).

29.    Noteholders represent 99% of the total claims against SureFunding.  (Schedules E/F, Parts 2 and 4).  The Debtor's non-noteholder claims only total approximately $567,000, of which $566,000 are claims of insiders of the Debtor and professionals that the Debtor seeks to retain in this case.  (Schedules E/F, Part 2).

30.    All of the transfers made by the Debtor in the 90 days before bankruptcy are to insiders of the Debtor or to professionals the Debtor seeks to retain as ordinary course professionals in this case.  (SOFA, Part 2).

---

[2] SureFunding's engagement agreement with the CRLO, dated April 13, 2020, also post-dates the entry of the Nevada Court's decision to appoint Mr. Flanagan as receiver (entered on April 7, 2020).  (*See* Engagement of Gavin Solmonese LLC [D.I. 24-3] and Affidavit of Thomas M. Horan in Support of Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Fox Rothschild, LLP as Counsel for the Debtor Effective as of the Petition Date [D.I. 27-3] ("Horan Affidavit") at ¶ 9).

<u>ARGUMENT</u>

**I.     The case was filed in bad faith.**

31.     As set forth in detail in the Motion, the Third Circuit has set forth two essential elements for a "good faith" bankruptcy filing: (i) the case serves a valid bankruptcy purpose *e.g.,* by preserving a going concern or maximizing the value of the debtor's estate; and (ii) the case was not filed for a mere tactical advantage.  *In re 15375 Memorial Corp.*, 589 F.3d 605, 618 (3d Cir. 2009).

32.     The Debtor claims this case was filed to serve a valid bankruptcy purpose because (i) it "halts the dismantling of resources for the benefit of certain creditors at the expense of others," (ii) the "Debtor and its management have institutional knowledge that no receiver or third party possibly can duplicate," and (iii) the Debtor now has access to causes of action under Bankruptcy Code chapter 5.  (Objection at ¶ 55).

33.     The Debtor does not argue that there is a going concern value here to preserve through a chapter 11 case.  The Debtor admits that its only assets are litigation involving the Tradepay claims and collecting on small revenue stream investments.  Thus, the Court must analyze whether the petition might reasonably "maximize the value of the bankruptcy estate."  *In re Integrated Telecom Express, Inc*., 384 F.3d 108, 120 (3d Cir. 2004).  "To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy."  *Id*.  The Debtor does not argue that there is some value that would otherwise be lost outside of bankruptcy because it cannot.  Indeed, resolution of litigation, the Debtor's only real asset, is not maximized within a bankruptcy case.  *Id*. at 125.  The receiver was appointed over SureFunding for the benefit of all creditors.  The Debtor has not shown any benefit to any set of creditors by appointment of the receiver to the detriment of other creditors.

9

The Debtor further hasn't identified any chapter 5 causes of action it may bring in this case aside from the payments made in the 90 days prior to the filing.  According to the Debtor's schedules, the only transfers made in that time were to insiders of the Debtor and the professionals it seeks to retain in this case.  It's clear, there is no maximization of value in this bankruptcy case as compared to the Nevada receivership action.

34.    SureFunding also clearly filed this bankruptcy case for a mere tactical advantage. It filed the bankruptcy petition hours *after* the Nevada Court formally appointed the receiver and set forth his powers.  It was a naked petition that included no typical "first day" motions.  The bankruptcy filing's only purpose was to prevent the receiver from performing his duties through the automatic stay.

35.    The Debtor further claims that consideration of the *Primestone* factors show it filed the case in good faith.  However, the Debtor only provides cursory statements with respect of the factors and factual analysis shows that these factors further demonstrate bad faith filing.

   a.  <u>Single asset case</u>: The Debtor's claim that it has interests in a number of different assets is misleading.  (Objection at ¶ 51(a)).  As demonstrated by the Debtor's own schedules, the Debtor's scheduled assets with respect to the Tradepay litigation and insurance claims related thereto represent 80% of the Debtor's scheduled assets.

   b.  <u>Few unsecured creditors</u>: The Debtor admits that are few unsecured creditors. (Objection at ¶ 51(b)).  And, as demonstrated by its schedules, its noteholders represent 99% of the total claims against SureFunding.  The Debtor's non-noteholder claims only total approximately $567,000, of which $566,000 are claims of insiders of the Debtor and professionals that the Debtor seeks to retain

123232897

in this case.

c.  <u>No ongoing business or employees</u>:  The Debtor admits that its only business is collecting on its investments and pursuing litigation against Tradepay.  These activities are a far cry from actual business operations that need to be protected by a bankruptcy filing.  These business activities can be pursued within or outside a bankruptcy case in the same fashion.

d.  <u>Petition filed on the eve of foreclosure</u>:  While there was no foreclosure here, the same reasoning should certainly apply that the bankruptcy filing was filed on the eve of the appointment of a receiver.  (Objection at ¶ 51(d)).  However, the case is even greater here because instead of being filed on the eve of the appointment of a receiver, it was filed after the appointment of a receiver, which fact further points toward a bad faith filing.

e.  <u>Two party dispute which can be resolved in pending state court action</u>:  The Debtor claims that this is more than a two-party dispute because less than a majority of the noteholders moved to file the receivership.  (Objection at ¶ 51(e)).  This statement is factually incorrect according to the Debtor's schedules which show that 65% of the Debtor's noteholders moved for a receivership and now more than 80% of the noteholders support dismissal of the bankruptcy case so that the receiver case can continue.

f.  <u>No cash or income</u>:  The Debtor claims it has over $2.1 million in cash but fails to address the Noteholders' claim of a senior security interest in such cash and/or show why such cash is not encumbered by their security interest. (Objection at ¶ 51(f)).  The Debtor has also failed, to date, to request this Court's

11

authority to use such cash collateral and the Noteholders have clearly informed the Debtor of their objection to any use of the cash.

g.  <u>No pressure from non-moving creditors</u>:  The Debtor claims that in addition to the moving creditors, it is facing pressure to recover assets to pay their notes and some of those noteholders favor the use of the bankruptcy process to enhance the chances of gaining the highest recoveries.   (Objection at ¶ 51(g)). As set forth above, the Debtor's noteholders represent 99% of its creditors and over 80% of those noteholders want this bankruptcy case dismissed.

h.  <u>Previous bankruptcy petition</u>:  This is the one of two factors the parties agree upon, no previous petition was filed. (Objection at ¶ 51(i)).

i.  <u>Prepetition conduct was improper</u>:  The Debtor claims there is no serious allegation of improper conduct by the Debtor.  (Objection at ¶ 51(i)).  This statement could not be further from the truth.  The Motion is replete with the improper pre-petition conduct of the Debtor and the Abernathys.  This includes gross mismanagement of the Tradepay investment, false and misleading statements to Noteholders seeking to raise funds in September 2019, waste of funds, and repeatedly putting their desire to remain in control of the company over the interests of the Noteholders.

j.  <u>No possibility of reorganization</u>:  The Debtor claims is it too early in the case to make an assessment that there is no possibility of reorganization.  (Objection at ¶ 51(j)).  Yet, the facts are clear, the Debtor will never be able to obtain the required votes for confirming a plan.  The Noteholders and their supporters hold over 80% of the claims, whether they are ultimately deemed secured or

123232897

unsecured, and are well over one half in number of the amount required for confirmation of a plan (there are 54 noteholders and less than 18 have not asserted a position on the matter). 11 U.S.C. § 1126. Moreover, any plan can only be a plan of liquidation. The Debtor has lost the vast majority of its assets by investing in a Ponzi scheme. There is nothing to reorganize.

k. <u>Debtor formed immediately prepetition</u>: This is the second of the factors the parties agree upon. (Objection at ¶ 51(k)).

l. <u>Debtor filed solely to create the automatic stay</u>. The Debtor misleadingly claims it did not file this case to invoke the automatic stay. It is clear from the dates of retention of the independent manager and CRLO that the Debtor solely filed this bankruptcy case due to the appointment of the receiver. (Objection at ¶ 51(l)).

m. <u>Subjective intent of the debtor</u>. The Debtor clearly filed this case because it was unhappy with the receiver order and the Nevada Court's refusal to appoint the Debtor's CRO candidate as the person in charge. Moreover, the Debtor admits that it filed this case to serve its creditors, many of whom are friends and family of the Abernathys and the Abernathys themselves. (Objection at ¶ 51(m)). The filing was clearly an attempt by the Abernathys to remain in control and prevent the discovery of their misconduct.

## II. The Debtor Did Not Have Authority to File the Case.

36. The Nevada Court entered its decision to appoint the receiver on April 7, 2020 and its order detailing the receiver's duties on April 13, 2020.

37. Pursuant to the Receiver Order, Mr. Flanagan was granted immediate possession

13

and full control of the Receivership Assets. (Receiver Order at ¶ 3).  He was granted authority to: (i) take and maintain all documents, books, records, papers and deposit accounts relating to the Receivership Assets; (ii) exclude SureFunding and its respective agents, servants, and employees wholly from the Receivership Assets, except as necessary to carry out its duties with respect to the notes; (iii) manage, operate, preserve, maintain and liquidate the Receivership Assets; and (iv) hold and exercise all privileges belonging to SureFunding, including any attorney-client privileges. (Receiver Order at ¶ 4).

38.    All persons in possession of Receivership Assets or any portion thereof were required to turn over such assets to Mr. Flanagan.  (Receiver Order at ¶ 10).

39.    SureFunding was and is excluded from having possession or control of, or any right to, the Receivership Assets or money or other proceeds derived from the Receivership Assets unless and until the receivership is terminated and Mr. Flanagan is discharged.   (Receiver Order at ¶ 5).  SureFunding and all those acting in concert with it were ordered to comply with the Receiver Order and were enjoined and restrained from impeding or interfering in any manner with the exercise by the Receiver of its rights, powers, and duties thereunder.  (Receiver Order at ¶ 5).

40.    Accordingly, the only person that could file for bankruptcy on behalf of SureFunding was the receiver.  *Oil & Gas Co. v. Duryee*, 9 F.3d 771, 773 (9th Cir. 1993) (holding that after the appointment of a rehabilitator that had all the powers of directors, officers and managers of debtor, the only person that could file for bankruptcy was the rehabilitator).

41.    Nevertheless, the Debtor attempted to usurp the receiver's authority by scrambling to appoint the Independent Manager and the CRLO.

42.    While SureFunding claims to have had a telephonic meeting of managers to appoint the Independent Manager in the afternoon on April 13, 2020, SureFunding's limited liability

14

agreement required all amendments thereto to be in writing.

43.    The only written agreements appointing the Independent Manager and the CRLO are dated and effective as of April 14, 2020:

    a.   SureFunding's engagement agreement with the Independent Manager and the amendment to the SureFunding limited liability agreement to provide authority to the Independent Manager were not finalized until April 14, 2020; and

    b.   The consent of the managers appointing the CRLO is also dated April 14, 2020.

44.    In short, SureFunding did not have authority to appoint the Independent Manager or the CRLO, who then proceeded to file this bankruptcy case.

**CONCLUSION**

45.    For the foregoing reasons and as set forth in the Motion, Noteholders respectfully requests that this Court enter an order, in substantially the form attached as Exhibit 3 to the Motion to Dismiss, dismissing the above-captioned chapter 11 case pursuant to §§ 1112(b) and/or 305(a) of the Bankruptcy Code, with prejudice, and (ii) granting such other relief as may be just and appropriate.

Dated: May 7, 2020
Wilmington, Delaware

**BLANK ROME LLP**

By: */s/ Stanley B. Tarr*
Victoria A. Guilfoyle (No. 5183)
Stanley B. Tarr (No. 5535)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: guilfoyle@blankrome.com
     tarr@blankrome.com

-and-

Kenneth J. Ottaviano (admitted *pro hac vice*)
William J. Dorsey (admitted *pro hac vice*)
Paige B. Tinkham (admitted *pro hac vice*)

15

123232897

444 West Lake Street, Suite 1650
Tel:  (312) 776-2600
Fax:  (312) 776-2601
Email: kottaviano@blankrome.com
       wdorsey@blankrome.com
       ptinkham@blankrome.com

*Attorneys for the Noteholders*