# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SureFunding, LLC, | Case No. 20-10953 (LSS) |
| Debtor. | **Hearing Date: May 12, 2020 at 10:00 a.m. (ET)** <br> **Related Docket Entries: ECF Nos. 24, 25, 26, 27 &** <br> **31** |

### DECLARATION OF PAIGE B. TINKHAM IN SUPPORT OF NOTEHOLDERS' OMNIBUS OBJECTION TO DEBTOR'S MOTIONS

I, Paige B. Tinkham, declare under the penalty of perjury, that the following is true and correct to the best of my knowledge:

1.      I am an attorney duly admitted to practice law in the States of Illinois and Michigan and a partner at the law firm of Blank Rome LLP.  I am admitted pro hac vice to appear in this action.

2.      Blank Rome LLP represents the Noteholders[1] and I submit this declaration in support of their Omnibus Reply in Support of their Motion (the "Motion") to: (i) Dismiss the

---

[1]      The "Noteholders" are Brett Hatton, an individual; Earl Coronel, an individual; Autumn Wind Global Multi-Strategies Fund, LP, a Delaware Limited Partnership; Damon Gersh, an individual; Jason Eckenroth, an individual; Sherri R. Sands, as trustee of the Sherri R. Sands Revocable Trust, a Florida Trust; Glickfield Capital Management, LLC fbo M. Glickfield Dynasty Trust, a Maryland Trust; Glickfield Capital Management, LLC fbo Cheryl Newmark, a Maryland Trust; Glickfield Capital Management, LLC fbo Marla Schram, a Maryland Trust; Carrickfergus Investments Limited, a British Virgin Islands Company; Stephane Carnot, as Trustee of the Carnot Family Trust, a District of Columbia Trust; Dorsey and Whitney Trust Co., LLC, as Trustee of the Dylan Taylor 2011 Grantor Trust, a South Dakota Trust; Eseco, LLC, a Michigan Limited Liability Company; Sequris Group, LLC, a Michigan Limited Liability Company; Matthew Briggs, as Trustee of the Briggs Management Trust; Michael Rubenstein, an individual; June Farmer, an individual; Thomas Carl Myers, an individual; Richard L. Rogers, an individual; Neal J. Glickfield, as Trustee of the Neal J. Glickfield 2018 Trust, a Maryland Trust; Lineage, LLC, a Virginia Limited Liability Company; Charles B. Chokel, as Trustee of the Charles B. Chokel Trust u/a 4/21/92, a New Hampshire Trust; Brian Gray, an individual; HFJ Investments I, LLC, a Texas Limited Liability Company; Patricia B. Jones, as Trustee of the Patricia B. Jones Revocable Trust, a Maryland Trust; John B. Shaw as Trustee of the John B. Shaw 2012 Family Grantor Trust; and 1086 LLC, a Maryland Limited Liability Company.

Chapter 11 Case filed by the Debtor SureFunding, LLC (the "Debtor" and "SureFunding"); and (ii) to Excuse Compliance wit 11 U.S.C. § 543(a) and (b).

3.      A true and correct copy of the rough transcript from the deposition of Justin Abernathy, dated May 4, 2020 is attached hereto as <u>Exhibit A-1</u>.

4.      A true and correct copy of SureFunding's Opposition to Plaintiff's Motion for Appointment of Receiver in Nevada Action ("Receiver Opposition"), is attached hereto as <u>Exhibit A-2</u>.

5.      A true and correct copy of the Nevada Court's Decision granting the Noteholder's Receiver Motion is attached hereto as <u>Exhibit A-3</u>.

6.      A true and correct copy of the Limited Liability Company Agreement for SureFunding is attached hereto as <u>Exhibit A-4</u>.

7.      A true and correct copy of the emails dated April 14, 2020 between Justin Abernathy and John Palmer are attached hereto as <u>Exhibit A-5</u>.

8.      A true and correct copy of the Second Amendment to the Limited Liability Company Agreement of SureFunding is attached hereto as <u>Exhibit A-6</u>.


Dated: May 7, 2020
       Chicago, Illinois

_____
Paige B. Tinkham

# Exhibit A-1

CONFIDENTIAL - FILED UNDER SEAL

Exhibit A-2

Electronically Filed
4/1/2020 2:55 PM
Steven D. Grierson
CLERK OF THE COURT

1  **OPPS**
   MARK J. CONNOT
2  Nevada Bar No. 10010
   mconnot@foxrothschild.com
3  COLLEEN E. MCCARTY
   Nevada Bar No. 13186
4  cmccarty@foxrothschild.com
5  **FOX ROTHSCHILD LLP**
   1980 Festival Plaza Drive, Suite 700
6  Las Vegas, Nevada 89135
   Telephone: (702) 262-6899
7  Facsimile: (702) 597-5503
8  Attorneys for Defendant Surefunding, LLC

9
                          **DISTRICT COURT**
10
                       **CLARK COUNTY, NEVADA**
11

12  BRETT HATTON, an individual, EARL
    CORONEL, an individual; AUTUMN WIND
13  GLOBAL MULTI-STRATEGIES FUND, LP, a
    Delaware limited partnership; DAMON GERSH,
14  an individual; JASON ECKENROTH, an
    individual; SHERRI R. SANDS, as Trustee of the
15  SHERRI R. SANDS REVOCABLE TRUST, a
    Florida trust; GLICKFIELD CAPITAL
16  MANAGEMENT, LLC FBO M. CLICKGIELD
    DYNASTY TRUST, a Maryland trust;
17  GLICKFIELD CAPITAL MANAGEMENT, LLC
    FBO CHERYL NEWMARK, a Maryland Trust;
18  GLICKFIELD CAPITAL MANAGEMENT, LLC
    FBO MARLA SCHRAM, a Maryland trust;
19  CARRICKFERGUS INVESTMENTS LIMITED, a
    British Virgin Islands company; STEPHANIE
20  CARNOT, as Trustee of the CARNOT FAMILY
    TRUST, a District of Columbia trust; DORSEY
21  AND WHITNEY TRUST CO., LLC, as Trustee of
    the DYLAND TAYLOR 2011 GRANTOR
22  TRUST, a South Dakota trust; ESECO, LLC, a
    Michigan limited liability company; SEQURIS
23  GROUP, LLC, a Michigan limited liability
    company; MATTHEW BRIGGS, as Trustee of the
24  BRIGGS MANAGEMENT TRUST; MICHAEL
    RUBENSTEIN, an individual; JUNE FARMER, an
25  individual; THOMAS CARL MYERS, an
    individual; RICHARD L. ROGERS, an individual;
26  NEAL J. GLICKFIELD 2018 TRUST,  a Maryland
    Trust; LINEAGE, LLC, a Virginia limited liability
27  company; CHARLES B. CHOKEL, as Trustee of
    the CHARLES B. CHOKEL TRUST U/A

28

Case No.:  A-20-812651-B
Dept. No.: XIII

**DEFENDANT SUREFUNDING, LLC'S
OPPOSITION TO PLAINTIFFS'
MOTION FOR APPOINTMENT OF
RECEIVER**

Date of Hearing:  April 2, 2020
Time of Hearing: 9:00 a.m.

1

4/21/92, a New Hampshire trust; BRIAN GRAY, an individual; HFJ INVESTMENTS I, LLC, a Texas limited liability company; PATRICIA B. JONES REVOCABLE TRUST, a Maryland Trust; JOHN B. SHAW as Trustee of the JOHN B. SHAW 2012 FAMILY GRANTOR TRUST; and 1086 LLC, a Maryland limited liability company,

Plaintiffs,

vs.

SUREFUNDING, LLC, a Delaware limited liability company,

Defendant.

Defendant SureFunding, LLC ("Defendant" or "SureFunding"), by and through its attorneys of record, Mark J. Connot and Colleen E. McCarty of Fox Rothschild LLP, hereby submits its Opposition to the Motion for Appointment of Receiver filed on Order Shortning Time by Plaintiffs' Brett Hatton, Earl Coronel, Autumn Wind Global Multi-Strategies Fund, LP, Damon Gersh, Jason Eckenroth, Sherri R. Sands as Trustee of the Sherri R. Sands Revocable Trust, Glickfield Capital Management, LLC FBO M. Glickfield Dynasty Trust, Glickfield Capital Management, LLC FBO Cheryl Newmark, Glickfield Capital Management, LLC FBO Marla Schram, Carrickfergus Investments Limited, Stephanie Carnot as Trustee of the Carnot Family Trust,  Dorsey and Whitney Trust Co., LLC as Trustee of the Dyland Taylor 2011 Grantor Trust,   Eseco, LLC, Sequris Group, LLC, Matthew Briggs as Trustee of the Briggs Management Trust, Michael Rubenstein, June Farmer, Thomas Carl Myers, Richard L. Rogers, Neal J. Glickfield 2018 Trust, Lineage, LLC,  Charles B. Chokel as Trustee of the Charles B. Chokel Trust U/A 4/21/92, Brian Gray, HFJ Investments I, LLC, Patricia B. Jones Revocable Trust, John B. Shaw as Trustee of the John B. Shaw 2012 Family Grantor Trust, and 1086 LLC ("Plaintiffs" or "Note Holders").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

This Opposition is made and based on the following Memorandum of Points and Authorities; the Declaration of Justin Abernathy attached hereto as **Exhibit A** and exhibits thereto; the Declaration of C.Tab Turner attached hereto as **Exhibit B**; the papers and pleadings already on file herein; and any oral argument the Court may permit at a hearing of this matter.

Dated this 1st day of April, 2020.

**FOX ROTHSCHILD LLP**


By:/s/ Mark J. Connot
    MARK J. CONNOT
    Nevada Bar No. 10010
    COLLEEN E. MCCARTY
    Nevada Bar No. 13186
    1980 Festival Plaza Drive, Suite 700
    Las Vegas, Nevada  89135
    Telephone: (702) 262-6899
    Attorneys for Defendant SureFunding, LLC


**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Plaintiffs' Motion for Appointment of Receiver ("Motion") contains more than four full pages of purported "Relevant Factual Background."  For the purposes of the Court's analysis, however, Defendant highlights the decisive facts contained therein, which are not reasonably in dispute: (1) SureFunding did not commit fraud, nor did Plaintiffs allege fraud in the underlying Complaint; (2) immediately after becoming aware of the fraud, SureFunding filed suit against those who did commit fraud, TradePay Capital, LLC ("TradePay") and its principals; (3), SureFunding is currently negotiating with TradePay's credit insurer to maximize the amount of coverage; and (4) SureFunding has engaged attorneys and other professionals, including independent business advisory firm FTI Consulting ("FTI"), to lead the effort to review expenses and maximize recoveries, communicate with the Note Holders, and wind down the company.  Further, just this week, at the Note Holders' previous request and urging, SureFunding expanded the scope of FTI's involvement and retained Michael Tucker as its Chief Restructuring Officer

("CRO").  In short, SureFunding has already assembled a formidable team of neutral, independent advisors to maximize recovery of the investments.  The appointment of a receiver at this juncture would only serve to frustrate those efforts, lengthen the time for any recovery, and greatly increase the expenses to do so.

As this Court is well aware, receiverships are a remedy of last resort, one that is disfavored by the Nevada Supreme Court.  And, while SureFunding appreciates that the Note Holders want to be paid as expeditiously as possible, nothing about the appointment of a receiver promises to advance that process.  To the contrary, appointment of a receiver would further delay recovery and deplete already limited resources, without any assurance of a more favorable outcome.  For all of these reasons, as more fully set forth below, SureFunding respectfully requests that this Court deny the Note Holders' Motion in its entirety.

## II.

## STATEMENT OF RELEVANT FACTS

While SureFunding disagrees with many of the factual assertions contained in the "Relevant Factual Background" set forth in the Motion, the strenuous debate over the merits of the allegations must be left for another day.  For the purposes of this Opposition, SureFunding instead focuses on the facts necessary for the Court to determine whether the drastic remedy of appointing a receiver is appropriate.  As set forth more fully below, SureFunding has taken decisive and comprehensive action, inclusive of the appointment of an independent CRO, to protect the Parties' interests and maximize recovery of the assets stolen by Tradepay and the liquidation of the remaining SureFunding portfolio.  Receivership here is not necessary or warranted.

### A.    SureFunding and Its Principals Invest in TradePay.

SureFunding is a private debt strategy company established in March, 2014.  See **Exhibit A** at ¶ 3.  SureFunding invests or participates in small business loans, asset purchases, trade receivables, advances and credit facilities with multiple funding platform partners.  *Id.*  The SureFunding portfolio is comprised of assets that are typically short term and high yield.  *Id.*  The SureFunding Note Purchase Agreement requires that note holders are senior secured.  *Id.*  Marketplace Capital Strategies, LLC ("MCS") is an asset manager with a primary focus on financing non-bank lenders and funding platforms.  *Id.* at ¶ 4.

4

1   MCS is the manager of SureFunding.  *See* **Exhibit A** at ¶ 4.  Jason and Justin Abernathy are the

2   principals of SureFunding and MCS.  *Id.* at ¶ 2.

3           In September, 2017, MCS was introduced to Tradepay, an international factoring company, as a

4   potential favorable investment platform and commenced due diligence.  *See* **Exhibit A** at ¶ 5.  Factoring

5   is a form of financing in which the factoring company purchases the accounts receivable of a business at a

6   discount and then expects to be repaid advanced funds, plus a premium, directly from the businesses'

7   customers.  An agreement was signed with Tradepay in February, 2018.  *Id.*  SureFunding raised in

8   excess of $34 million over time from investors under its Note Purchase Agreement.  *Id.* at ¶ 6.  Of that

9   amount, SureFunding invested approximately $28.7 million in Tradepay.  *Id.*  Justin & Lorna Abernathy

10  and Jason Abernathy have invested a combined approximately $7.3 million of personal wealth in entities

11  that have investments in Tradepay via SureFunding, SIA Unite, LLC (that includes the Abernathy's self-

12  directed IRA portfolios), and SureFunding V, LLC.  *Id.*  The capital SureFunding invested in Tradepay

13  was used to factor invoices across more than 150 Buyers.  *Id.* at ¶ 7.  Each Buyer qualified for credit

14  insurance from Euler Hermes, an international credit insurance company with an AA rating by Standard

15  & Poor's.  *Id.*  Between February, 2018 and September, 2019, SureFunding successfully completed 1,203

16  participations with Tradepay with an aggregate factored value of $95.4 million.  *Id.*

17          **B.      SureFunding Uncovers Fraud by TradePay and ███████████████████████.**

18          In October, 2019, Tradepay failed to pay 421 invoices, which at the time totaled approximately

19  $47.9 million in gross invoice value.  *See* **Exhibit A** at ¶ 8.  Of that amount, approximately 90.9% was

20  invested by SureFunding, approximately 3.1% was invested by SIA Unite and approximately 6.0% was

21  invested by SureFunding V.  *Id.*  During the course of investigating the non-payment, SureFunding

22  determined that Tradepay and its owners and operators had participated in a sophisticated and complex

23  fraudulent scheme devised and executed to obtain financing and investing dollars under false pretenses.

24  *Id.* at ¶ 9; *see also* **Exhibit B** at ¶ 9.  The scheme included breach of contract, lies, misrepresentations, the

25  use of false and fraudulent paperwork, the submission of false and fraudulent documents, secret collusive

26  relationships with buyers, sellers, or both, and the wiring of funds under false pretenses with false

27  amounts, including the laundering of funds.  *See* Motion at **Exhibit 1-B**.    All of these actions were taken

28  in an effort to unlawfully obtain funds under false pretenses.  *Id.*

██████████████████████████████████████████

██████████████████████████████████████████

██████████    *See* **Exhibit A** at ¶ 10.  Contrary to the rank speculation propounded by Plaintiffs in the Motion, SureFunding was in no way involved in the fraud perpetrated by Tradepay, and Plaintiffs have provided no evidence to the contrary.  *Id.* at ¶ 11.

   C.    **SureFunding Moves Swiftly to Recoup the Investments.**

   SureFunding has acted at all times in the interests of the Note Holders.  And, as not only a fiduciary but also as investors themselves, Justin Abernathy and Jason Abernathy are uniquely motivated to maximize recovery and minimize expenses.  On October 2, 2019, a Notice of Default was sent to Tradepay.  *See* **Exhibit A** at ¶ 12.  The following day, SureFunding advised the Note Holders in writing of Tradepay's default.  *Id.*  Thereafter, SureFunding moved swiftly to explore its options, and on October 10, 2019, SureFunding met with counsel in Florida to discuss possible legal action.  *Id.* at ¶ 13.  Less than two weeks later, on October 23, 2019, SureFunding filed suit against Tradepay for breach of contract, conversion, negligence, breach of fiduciary duty, fraud and misrepresentation, civil conspiracy and violation of deceptive trade practices.  *See* Motion at **Exhibit 1-B**.  SureFunding's Florida counsel, Mr. C. Tab Turner and his firm, specialize in complex money laundering cases that involve international banking.  *See* **Exhibit A** at ¶ 14.  And, for the SureFunding litigation, Mr. Turner has engaged a formidable team of private investigators and consultants who specialize in money laundering, forensic accounting and asset tracing and recovery in specific geographic regions relevant to pursuing Tradepay recoveries.  *Id.*  Wherever possible, SureFunding has engaged these professionals on a contingency fee basis.  *Id.*

   Contemporaneously with SureFunding's efforts to exercise all available legal remedies, MCS filed insurance claims with Tradepay's credit insurer, Euler Hermes.  *See* **Exhibit A** at ¶ 15.  Between October 11, 2019 and November 27, 2019, MCS filed on behalf of SureFunding and other invested entities 224 claims (consisting of 421 invoices) with Euler Hermes on invoices that Tradepay factored and the Buyer failed to pay.  *Id.*  The total amount of the claims is in excess of $47.9 million dollars.  *Id.* Communications with Euler Hermes are on-going and as recently as the week prior to this filing, counsel for SureFunding again engaged with counsel for the insurer regarding the resolution of its claims.  *See*

**Exhibit B** at ¶ 8.

Contrary to the assertions in the Motion, SureFunding has prioritized communication, cooperation and transparency with the Note Holders. *See* **Exhibit A** at ¶ 16. SureFunding provided, and continues to provide, frequent updates to the Note Holders and their counsel, along with access to thousands of pages of files, inclusive of corporate documents, portfolio information, business agreements and financial and banking information. *Id.* A representative of the Note Holders also has view access to SureFunding's bank account. *Id.* Further, as part of its liquidation efforts, SureFunding has successfully pursued repayment of existing investments. *Id.*

To further protect the interests of the Parties and at the urging of Ken Ottaviano, counsel for a majority of the Note Holders, SureFunding began interviewing potential candidates for the position of CRO, including three candidates suggested by Mr. Ottaviano. *See* **Exhibit A** at ¶ 17. During the selection process which took place in January, 2020, all four candidates, which included three firms and one sole practitioner, indicated they would require SureFunding to obtain directors and officers liability insurance ("D&O insurance") in order to serve as an officer of SureFunding. *Id.* At the conclusion of the interviews, SureFunding selected Kevin DeLuise with FTI for the CRO position, in large part because FTI was the most cost-effective of the three firms and had the most relevant experience for the SureFunding engagement. *Id.* at ¶ 18; *see also* **Exhibit A-1**.

Mr. Ottaviano, on behalf of the Note Holders he represents, played an integral role in working directly with FTI to determine the scope of FTI's engagement. *See* **Exhibit A** at ¶ 19. This included the following scope at Mr. Ottaviano's request: Prepare a recommended report/plan by April 30, 2020, for SureFunding and for delivery to the Note Holders that includes: (i) an accounting of all incurred expenses since October 1, 2019; (ii) a list of all assets and liabilities; (iii) a recommendation for an action plan and timeline to maximize the recovery of the non-Tradepay assets, including through liquidation where recommended; (iv) in consultation with SureFunding's counsel, prepare an analysis of the applicable insurance coverage regarding the Tradepay receivables and develop a strategic plan that considers recovery through a claims process and/or litigation and costs associated therewith; (v) in consultation with SureFunding's counsel, an analysis of the Tradepay litigation including the estimated probability of success, potential assets available to satisfy any judgements and the estimated costs associated therewith;

(vi) attempt to identify any other assets of SureFunding that can be liquidated and costs associated therewith; (vii) prepare a 12-month cash flow budget; and (viii) recommend to SureFunding options for the Noteholders, including, but not limited to, prompt distribution of any recoveries or participation in future recovery efforts. *See* **Exhibit A-2.**

On February 3, 2020, counsel for SureFunding notified Mr. Ottaviano that the D&O insurance policy required by FTI[1] was quoted at a cost of $250,000. *See* **Exhibit A** at ¶ 20. Given the significant expense, SureFunding's counsel asked Mr. Ottaviano to advise SureFunding of his clients' position regarding the D&O insurance and the installation of a CRO. *Id.* After a month without response, SureFunding retained FTI as a Financial Advisor on March 2, 2020. *Id.* Following the filing of the instant Motion, however, SureFunding moved to expand the scope of FTI's involvement and retained Michael Tucker as its CRO, pending underwriting of the D&O insurance policy. *Id.* ¶ 21. Mr. Tucker has regularly appeared in Nevada courts, both as a Financial Advisor and CRO, and brings to bear more than 30 years of extensive experience representing companies, creditors and parties in interest in restructuring and operational improvement situations. *See* **Exhibit A-3**.

## III.

## ARGUMENT

### A.    The High Standard for Appointing a Receiver.

Appointment of a receiver is "a harsh and extreme remedy which should be used sparingly and only when the securing of ultimate justice requires it." *Bedore v. Familian*, 122 Nev. 5, 11, 125 P.3d 1168, 1172 (2006); *Katz v. Incline Vill. Gen. Improvement Dist.*, 414 P.3d 300 (Nev. 2018) (affirming denial of receivership) *Hines v. Plante*, 99 Nev. 259, 261, 661 P.2d 880, 881–82 (1983) ("The appointment of a receiver *pendente lite* is a harsh and extreme remedy which should be used sparingly and only when the securing of ultimate justice requires it."); *Morand v. Superior Court*, 38 Cal. App. 3d 347, 350, 113 Cal. Rptr. 281, 283 (Ct. App. 1974) ("[T]he power to appoint a receiver is a delicate one which is exercised sparingly and with caution, and only in an extreme case under such circumstances as demand or require summary relief, and never in a doubtful case or where there is no necessity or occasion for the appointment.") (internal quotations omitted).

---

[1] The same type of policy that the other CRO candidates required to undertake the role of CRO.

Courts regard appointment of a receiver as "an extraordinary and harsh,' and 'delicate,' and 'drastic,' remedy to be used 'cautiously and only where less onerous remedies would be inadequate or unavailable."[2] *Morand v. Superior Court*, 38 Cal. App. 3d at 351, 113 Cal. Rptr. at 283–84. Receivership is a remedy of last resort. *See Bedore v. Familian*, 122 Nev. at 11, 125 P.3d at 1172 (2006); *Hines v. Plante*, 99 Nev. at 261, 661 P.2d at 882; *Sanad v. Bernini, Inc.*, No. 2:07-CV-00587PMPGWF, 2007 WL 2891436, at *4 (D. Nev. Sept. 28, 2007) (denying application for receiver). If another remedy could achieve the same outcome, the court should not resort to appointment of a receiver. *Bedore v. Familian*, 122 Nev. at 11, 125 P.3d at 1172; *Hines v. Plante*, 99 Nev. at 261, 661 P.2d at 882.

Appointing a receiver is a remedy of last resort because a receiver is costly, significantly impinges on the right of corporations to conduct their business affairs, and may "endanger the viability of a business." *Id.*; *A.G. Col Co. v. Superior Court in & for Santa Clara Cty.*, 196 Cal. 604, 613, 238 P. 926, 930 (1925) (finding no emergency necessitating receivership, which "required so harsh a remedy as the ousting of the regularly qualified and acting and financially successful officers of the defendant corporations."). "The existence of a receivership can also impose a substantial administrative burden on the court." *Id.* Because receivership is so extreme, an application for a receiver must be made on sufficient facts, not conclusory allegations. *See Nenzel v. Second Judicial District,* 49 Nev. 145, 241 P. 317, 320 (1925) (discussing predecessor to NRS 32.010 that is virtually identical to NRS 32.010); *Kazenercom TOO v. Turan Petroleum, Inc.*, No. SACV0959JVSMLGX, 2009 WL 10679983, at *2 (C.D. Cal. May 11, 2009) (refusing to grant application for receiver when it rested on conclusory allegations).

Further, in Nevada, "the appointment of receivers is controlled by statute." *Nenzel v. Second Judicial Dist. Court in & for Washoe Cty.*, 49 Nev. 145, 241 P. 317, 320 (1925). When the court acts beyond the authority vested in it by statute, the court is "without jurisdiction to appoint a receiver, and all proceedings therein are null and void." *Id.* (reversing the district court's order granting a receiver). When a statute provides for the appointment of a receiver, "the statutory requirements must be met or the appointment is void and in excess of jurisdiction." *Shelton v. Second Judicial Dist. Court*, 64 Nev. 487,

---

[2] Nevada derived its receivership law from California. *Cf.* Cal. Civ. Proc. § 564 with NRS 32.010 (identical as to NRS 32.010(1)-(6)); *see also Nenzel v. Second Judicial Dist. Court in & for Washoe Cty.*, 49 Nev. 145, 241 P. 317, 320 (1925) (discussing predecessor to NRS 32.010 that is virtually identical to the current version of NRS 32.010, and stating "[t]he statute just mentioned is taken from the California statute."). Accordingly, in the absence of Nevada precedent, California precedent is highly instructive.

494, 185 P.2d 320, 323 (1947).

**B.**     **The Harsh and Extreme Remedy of Receivership is Unwarranted.**

Applying these fundamental principles, it is clear that this Court should deny the Note Holders' Motion.  Contrary to the Note Holders' assertions that SureFunding is "taking no action to recoup those funds" (*see* Motion at 12:26 – 27), SureFunding has moved swiftly and decisively to protect the Parties' interests.  Since first becoming aware of Tradepay's fraud, SureFunding has taken the following steps to communicate with the Note Holders, protect its legal rights, and recoup the stolen funds:

- October 2, 2019:  Notice of Default was sent to Tradepay.

- October 3, 2019:  SureFunding notified the Note Holders of Tradepay's default. From that date forward, SureFunding has provided regular updates to the Note Holders regarding the status of the recovery efforts.

- October 11, 2019:  MCS, on behalf of SureFunding, filed its first insurance claims with Tradepay's credit insurer, Euler Hermes.

- October 23, 2019:  SureFunding filed suit against Tradepay in Florida for breach of contract, conversion, negligence, breach of fiduciary duty, fraud and misrepresentation, civil conspiracy and violation of deceptive trade practices. SureFunding filed an Amended Complaint on January 15, 2020.

- November 27, 2019:  MCS, on behalf of SureFunding, filed its final insurance claims with Euler Hermes.  Between October 11, 2019 and November 27, 2019, 224 claims were filed with Euler Hermes, valued in excess of $47.9 million. SureFunding continues to engage in active negotiations with Euler Hermes to resolve the claims.

- January 8, 2020:  SureFunding began the interview process for the selection of a CRO.  Between January 8, 2020 and January 24, 2020, SureFunding interviewed four candidates for the position, including three candidates identified by the Note Holders.

- January 25, 2020:  SureFunding notified the Note Holders' representatives of the selection of Kevin DeLuise with FTI for the CRO position.  Counsel for the Note Holders provided comprehensive feedback regarding the engagement of FTI.

- February 24, 2020:  SureFunding held a conference call with the Note Holders to introduce Mr. DeLuise and FTI, review the scope of FTI's engagement, and update the Note Holders on the active litigation efforts.

- <u>March 2, 2020</u>:  SureFunding finalized the engagement of FTI to serve as a financial advisor.

- <u>March 27, 2020</u>:  Following the filing of the instant litigation in Clark County, SureFunding expanded FTI's involvement and retained Michael Tucker to serve as the CRO, pending underwriting of the necessary D&O policy.  Mr. Tucker routinely serves as a CRO in Nevada courts.

- <u>March 28, 2020</u>:  Tab Turner conducted a meeting via telephone with Euler Hermes' counsel to further discuss reaching a resolution of SureFunding's insurance claims.

Although by no means an exhaustive list, the above-referenced bullet points make clear that SureFunding took immediate action upon learning of Tradepay's fraud and, at all times since, has aggressively pursued every avenue of relief.  Even as recently as late last week, SureFunding and its principals worked to expand SureFunding's relationship with FTI and retained Mr. Tucker as a CRO.  Mr. DeLuise and Mr. Tucker have already begun the transition process and are working cooperatively to ensure that Mr. Tucker is well prepared to assume the role.  Given the substantial efforts already under way to recoup the investments stolen by Tradepay, the appointment of a receiver at this juncture would result in the loss of significant forward momentum, essentially returning the Parties to square one.  SureFunding appreciates that the Note Holders are frustrated by the pace of the recovery process and the liquidation of the remaining SureFunding portfolio assets, but the appointment of a receiver now would only serve to slow the process further, resulting in significant harm to all involved.  For these reasons alone, Plaintiffs' Motion should be denied.

C.    **Plaintiffs' Legal Analysis is Flawed and Ultimately Unpersuasive.**

The Note Holders generally cite to provisions of Nevada law which ostensibly permit the appointment of a receiver, yet tellingly fail to provide the requisite legal analysis.  Indeed, none of the provisions cited by the Note Holders merit the appointment of a receiver under the facts and circumstances at issue herein.

1.    **There is no danger of losing, removing, or materially injuring SureFunding's remaining assets.**

The Note Holders have wholly failed to meet their burden to show that SureFunding's remaining assets are "in danger of being lost, removed or materially injured," as required pursuant to NRS

32.010(1).  Indeed, the Motion is devoid of any factual support to demonstrate a danger of harm to SureFunding's assets.  Instead, the Note Holders focus almost exclusively on the fraud committed by Tradepay and the events leading up to it, while at the same time acknowledging the significant steps undertaken by SureFunding to recoup the Note Holders' investment.  *See* Motion at 10:23-25; 11:9 and 17-18.  This is simply not a circumstance where the Note Holders have a reasonable fear that the remaining funds will suddenly disappear.  As detailed more fully in Section III(B) above, SureFunding has initiated legal action, filed hundreds of insurance claims, and retained experienced professionals, including a CRO, all in an effort to satisfy the Note Holders.  And, as investors themselves, the principals of SureFunding have proverbial skin in the game.  SureFunding is present, responsive, and wholly motivated to preserve the existing assets and maximize recovery of the stolen funds.  The Note Holders' failure to provide any evidence to the contrary should be fatal to their Motion.

### 2.  NRS 112.210 is inapplicable where SureFunding made no fraudulent transfers.

In the Motion, the Note Holders incorrectly rely on NRS 112.210(1)(c)(2) for the proposition that "Nevada law explicitly provides for the appointment of a receiver where the receiver is 'to take charge of the asset[s]' fraudulently transferred."  *See* Motion at 12:19-20.  While the statement of law itself may be correct, the Note Holders appear to conflate the fraud committed by Tradepay with a fraudulent transfer as defined in NRS 112.180(1)(a).  The statute provides in pertinent part:

> 1.  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (a)  With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (b)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (1)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (2)  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due.
> . . .

NRS 112.180(1)(a).

Notwithstanding that the Note Holders failed to provide any factual support or analysis for the application of NRS 112.210 to the instant matter, which alone should be fatal to their assertion, there

1  simply is no allegation that SureFunding made any transfers to Tradepay with the intent to defraud.  As

2  such, NRS 112.210 provides no legal basis herein for the appointment of a receiver.

3       **3.    The Note Holders' Reliance on *Gratitude Grp., LLC v. Hospitality Int'l. Grp.* is
        also misplaced.**

4

5       In their Motion, the Note Holders cite *Gratitude Grp., LLC v. Hospitality Int'l. Grp.*, for the

6  proposition that "it is not unique for a court to appoint a receiver where fraudulent conduct has resulted

7  in a contractual default."  2016 WL 8648852 (2016), *see also* Motion at 12:20-24.  Notwithstanding that

8  the Note Holders improperly seek to rely on a trial court decision that was later reversed in part by the

9  Nevada Supreme Court in an unpublished decision, they misstate the holding which simply

10 acknowledges that a receiver may be appointed in conjunction with a contractual default.  *See*

11 *Hospitality Int'l Grp. v. Gratitude Grp., LLC*, 387 P.3d 208, 2016 WL 7105065 (unpublished) (Nev.

12 2016).  To suggest that courts routinely appoint receivers in cases where, as here, the defendants are also

13 the victims of the fraud, is not only disingenuous, it is patently wrong.

14      **D.    <u>The Potential Receiver Identified Has No Applicable Experience</u>.**

15      Curiously, and without explanation, the Note Holders identify a potential receiver whose

16 professional experience is limited to matters involving long term care facilities.  *See* Exhibit 2 to the

17 Motion.  In the Motion, the Note Holders boast that their preferred choice, Michael F. Flanagan, served

18 as the receiver for a 225 bed skilled nursing facility in Las Vegas.  See Motion at 15:1-8.  And, even

19 more troubling, that appears to be the only Nevada matter on Mr. Flanagan's resume when the Note

20 Holders have selected Nevada as their chosen venue.  In the event this Court were to appoint a receiver,

21 which again, is not warranted, Mr. Flanagan is in no way the appropriate choice.  SureFunding is a

22 highly sophisticated private debt strategy company, not a health care facility.  While Mr. Flanagan may

23 very well be highly skilled in that arena, his experience is not applicable herein.

24 / /

25 / /

26 / /

27 / /

28 / /

# IV.

## CONCLUSION

For all of these reasons, Plaintiffs' Motion for Appointment of Receiver should be denied in its entirety.

Dated this 1st day of April, 2020.

**FOX ROTHSCHILD LLP**

By:/s/ Mark J. Connot
    MARK J. CONNOT
    Nevada Bar No. 10010
    COLLEEN E. MCCARTY
    Nevada Bar No. 13186
    1980 Festival Plaza Drive, Suite 700
    Las Vegas, Nevada  89135
    Telephone: (702) 262-6899
    Attorneys for Defendant SureFunding, LLC

14

1

**CERTIFICATE OF SERVICE**

2          Pursuant to NRCP 5(b), I certify that I am an employee of FOX ROTHSCHILD LLP and that on

3   the 1st day of April, 2020, I caused the above and foregoing **DEFENDANT SUREFUNDING, LLC'S**

4   **OPPOSITION TO PLAINTIFFS' MOTION FOR APPOINTMENT OF RECEIVER ON ORDER**

5   **SHORTENING TIME** to be served via the Court's electronic file and serve system, to the following:

6

7   Adam K. Bult, Esq.                              William J. Dorsey, Esq. (*pro hac vice* submitted)
    abult@bhfs.com                                  wdorsey@blankrome.com
8   Travis F. Chance, Esq.                          BLANK ROME LLP
    tchance@bhfs.com                                444 West Lake Street, Suite 1650
9   BROWNSTEIN HYATT FARBER SCHRECK, LLP            Chicago, IL 60606
    100 North City Parkway, Suite 1600              *Attorneys for Plaintiffs*
10  Las Vegas, NV 89106-4614
    *Attorneys for Plaintiffs*
11

12

13

14                                                  /s/ Natasha Martinez
                                                    An employee of Fox Rothschild LLP
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Active\109153598.v2-4/1/20

Exhibit A

## DECLARATION OF JUSTIN ABERNATHY

I, Justin Abernathy, declare under penalty of perjury under the laws of the State of Nevada that the following statements are true and correct:

1.      I am over the age of 18 years. This Declaration is made of my own personal knowledge, and, if called as a witness, I could and would competently testify thereto.

2.      I am a co-founder and principal of SureFunding, LLC ("SureFunding") and Marketplace Capital Strategies ("MCS"), along with my twin brother, Jason Abernathy.

3.      SureFunding is a private debt strategy company established in March, 2014. SureFunding invests or participates in small business loans, asset purchases, trade receivables, advances and credit facilities with multiple funding platform partners. The SureFunding portfolio is comprised of assets that are typically short term and high yield. The SureFunding Note Purchase Agreement requires that note holders are senior secured.

4.      Marketplace Capital Strategies, LLC ("MCS") is an asset manager with a primary focus on financing non-bank lenders and funding platforms. MCS is the manager of SureFunding.

5.      In September, 2017, MCS was introduced to Tradepay, an international factoring company, as a potential favorable investment platform and commenced due diligence. An agreement was signed with Tradepay in February, 2018.

6.      SureFunding raised in excess of $34 million over time from investors under its Note Purchase Agreement. Of that amount, SureFunding invested approximately $28.7 million in Tradepay. My wife, Lorna, brother, Jason, and I invested a combined approximately $7.3 million of personal wealth in entities that have investments in Tradepay via SureFunding, SIA Unite, LLC (that includes the Abernathy's self-directed IRA portfolios), and SureFunding V, LLC.

7.      The capital SureFunding invested in Tradepay was used to factor invoices across more than 150 Buyers. Each Buyer qualified for credit insurance from Euler Hermes, an international credit insurance company with a AA rating by Standard & Poor's. Between February, 2018 and September, 2019, SureFunding successfully completed 1,203 participations with Tradepay with an aggregate factored value of $95.4 million.

8.      In October, 2019, Tradepay failed to pay 421 invoices, which at the time totaled approximately $34 million. Of that amount, approximately 90.9% was invested by SureFunding, approximately 3.1% was invested by SIA Unite and approximately 6.0% was invested by SureFunding V.

9.      During the course of investigating the non-payment, SureFunding determined that Tradepay and its owners and operators had participated in a sophisticated and complex fraudulent scheme devised and executed to obtain financing and investing dollars under false pretenses.

10.      ████████████████████████████████████████████

11.      SureFunding and its principals, including myself, were in no way involved in the fraud perpetrated by Tradepay.

12.      On October 2, 2019, a Notice of Default was sent to Tradepay. The following day, SureFunding advised the Note Holders in writing of Tradepay's default.

13.      Thereafter, SureFunding moved swiftly to explore its options, and on October 10, 2019, SureFunding met with counsel in Florida to discuss possible legal action. Less than two weeks later, on October 23, 2019, SureFunding filed suit against Tradepay for breach of contract, conversion, negligence, breach of fiduciary duty, fraud and misrepresentation, civil conspiracy and violation of deceptive trade practices. A copy of the Complaint is attached to the Motion at **Exhibit 1-B.**

14.      SureFunding's Florida counsel, Mr. C. Tab Turner and his firm specialize in complex money laundering cases that involve international banking. And, for the SureFunding litigation, Mr. Turner has engaged a formidable team of private investigators and consultants who specialize in money laundering, forensic accounting and asset tracing and recovery in specific geographic regions relevant to pursuing Tradepay recoveries. Wherever possible, SureFunding has engaged these professionals on a contingency fee basis.

15.      MCS filed insurance claims with Tradepay's credit insurer, Euler Hermes. Between October 11, 2019 and November 27, 2019, MCS filed on behalf of SureFunding and other invested

factored and the Buyer failed to pay. The total amount of the claims is in excess of $47.9 million dollars. Communications with Euler Hermes are on-going and as recently as the week prior to this filing, counsel for SureFunding again engaged with counsel for the insurer regarding the resolution of its claims.

16.     SureFunding has prioritized communication, cooperation and transparency with the Note Holders. SureFunding provided, and continues to provide, frequent updates to the Note Holders and their counsel, along with access to thousands of pages of files, inclusive of corporate documents, portfolio information, business agreements and financial and banking information. A representative of the Note Holders also has view access to SureFunding's bank account. Further, as part of its liquidation efforts, SureFunding has successfully pursued repayment of existing investments.

17.     To further protect the interests of the Parties and at the urging of counsel for a majority of the Note Holders, Ken Ottaviano, SureFunding began interviewing potential candidates for the position of CRO, including three candidates suggested by Mr. Ottaviano. During the selection process which took place in January, 2020, all four candidates, which included three firms and one sole practitioner, indicated they would require SureFunding to obtain directors and officers liability insurance ("D&O insurance") in order to serve as an officer of SureFunding.

18.     At the conclusion of the interviews, SureFunding selected Kevin Deluise with FTI for the CRO position, in large part because FTI was the most cost-effective of the three firms and had the most relevant experience for the SureFunding engagement. A true and correct copy of the engagement letter between SureFunding and FTI, and marketing materials entitled, About FTI: FTI Consulting Overview, are attached hereto as **Exhibit A-1**.

19.     Mr. Ottaviano, on behalf of the Note Holders he represents, played an integral role in working directly with FTI to determine the scope of FTI's engagement. A true and correct copy of an email sent by Ken Ottaviano to Kevin Deluise and others, dated January 29, 2020, which addresses the scope, is attached hereto as **Exhibit A-2**.

20.     On February 3, 2020, counsel for SureFunding notified Mr. Ottaviano that the D&O insurance policy required by FTI was quoted at a cost of $250,000. Given the significant expense, SureFunding's counsel asked Mr. Ottaviano to advise SureFunding of his clients' position regarding the D&O insurance and the installation of a CRO. After a month without response, SureFunding retained FTI as a Financial Advisor on March 2, 2020.

21.     Following the filing of the instant Motion, however, SureFunding moved to expand the scope of FTI's involvement and retained Michael Tucker as its CRO, pending underwriting of the D&O insurance policy. Mr. Tucker has regularly appeared in Nevada courts, both as a Financial Advisor and CRO. A true and correct copy of Mr. Tucker's curriculum vitae, along with his relevant experience in Nevada, is attached hereto as **Exhibit A-3**.

I declare under penalty of perjury under the laws of the State of Nevada (NRS 53.045), that the foregoing is true and correct.

Dated this ___1___ day of April, 2020.

JUSTIN ABERNATHY

1
Active\108982434.v1-3/26/20
109146378.v1

EXHIBIT A-1



Clifford A. Zucker
FTI Consulting, Inc.
3 Times Square, 10th Floor
New York, New York 10036
212 841 9355
Clifford.Zucker@FTIconsulting.com

PRIVATE & CONFIDENTIAL

March 2, 2020

SureFunding, LLC
6671 Las Vegas Blvd S
Las Vegas, NV 89119
Attention: Justin Abernathy

Re: SureFunding, LLC

Dear Mr. Abernathy:

1. **Introduction**

This letter confirms that we, FTI Consulting, Inc. ("FTI"), have been retained by you, SureFunding, LLC (the "Company" or "Client"), to provide certain financial advisory and consulting services (the "Services") set out below. This letter of engagement (the "Engagement") and the related Standard Terms and Conditions constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

2. **Scope of Services**

The Services, to be performed at your direction, are agreed to include the following:

- FTI will lead efforts to facilitate and advise the Client in its restructuring or orderly liquidation, and will provide input for litigation recovery efforts.
- Gain an understanding of the Client's business, portfolio of investments and pending or anticipated litigation.
- On or before March 23, 2020, deliver to the Noteholders a preliminary 13 – week cash flow budget ("Cash Flow Budget").
- Review and analyze all cash disbursement requisitions in connection with the Cash Flow Budget.
- Prepare a variance analysis report that compares actual activity to budget on a bi-weekly basis;
- Prepare a recommended report/plan by April 30, 2020, for the Client and for delivery to the Noteholders that includes: (i) an accounting of all incurred expenses since October 1, 2019; (ii) a list of all assets and liabilities; (iii) a recommendation for an action plan and timeline to maximize the recovery of the Non-Trade Pay assets, including through liquidation where recommended; (iv) in consultation with Company counsel, prepare an analysis of the applicable insurance coverage regarding the Trade Pay receivables and develop a strategic plan that considers recovery through a claims process and/ or litigation and costs associated therewith; (v) in consultation with Company counsel, an analysis of the Trade Pay litigation including the estimated

SureFunding, LLC                                                                         FINAL
March 2, 2020

> probability of success, potential assets available to satisfy any judgements and the estimated costs associated therewith; (vi) attempt to identify any other assets of the Company that can be liquidated and costs associated therewith; (vii) prepare a 12-month cash flow budget; and (viii) recommend to the Client options for the Noteholders including, but not limited to, prompt distribution of any recoveries or participating in future recovery efforts.

- Assist the Client in negotiations with Note Holders.
- Assist the Client in obtaining funding for the pursuit of litigation claims.
- Assist in other communications with the Client's creditors, governmental authorities and other parties in interest, including the Noteholders, in conjunction with the Client and Counsel.
- Other services as may be directed by the Client and mutually agreed to by FTI with reasonable notice to Note Holders.

FTI will provide Kevin DeLuise to lead the engagement. The Services may be performed by FTI or, upon notice to the Client, by any subsidiary of FTI, as FTI shall determine. FTI may also provide Services through its or its subsidiaries' agents or independent contractors subject to the Client's prior written consent. In addition, FTI may be asked by you to provide other services that are not included in this scope of Services referenced above. In that instance the Engagement Contract will be revised to include such services after providing reasonable notice to the Note Holder representatives. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees.

The Services, as outlined above, are subject to change as mutually agreed between us in writing.

FTI is engaged by the Client to provide financial advisory and consulting services only. All actions taken by FTI shall be subject to the Client and its management's final decision. Accordingly, while we may from time to time suggest options which may be available to you and further give our professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with the Client, its management and board of directors. FTI and its employees will not make any management decisions for the Client and will not be responsible for communicating information concerning the Client to the public, the Client's shareholders or others.

As part of the Services, FTI may be requested to assist the Client (and its legal or other advisors) in negotiating with the Client's creditors and equity holders and with other interested parties. In the event that we participate in such negotiations, the representations made and the positions advanced will be those of the Client and its management, not of FTI or its employees.

Notwithstanding anything to the contrary in this Engagement Contract, FTI and the Company hereby agree that the Note Holder Collateral Agent ("Collateral Agent") representatives may have discussions directly with FTI in their capacity as Collateral Agent for all Note Holders without the presence or consent of, but with prior notice to, the Company hereby instructs FTI to engage in discussions with the Collateral Agent regarding any and all issued reports or presentations prepared by FTI or any of its affiliates. FTI agrees to engage in full and open discussions regarding the reports and presentations with the Collateral Agent as requested from time to time, and the Company hereby authorizes the same. The Company reserves the right to be present in direct discussions at any time between FTI and any Noteholders and/or with the Collateral Agent representatives. The parties recognize that, in communicating with the Noteholders, FTI's obligations may extend beyond the scope of this Agreement

SureFunding, LLC
March 2, 2020

FINAL

if FTI must communicate/meet with each Noteholder. Nevertheless, all FTI communications provided to Collateral Agent Representatives shall be with such persons that certify to FTI that all Noteholders are either represented or are participating directly in all such communications. In the event counsel for any Noteholders participate in any such communications with FTI, counsel to the Company shall also participate. FTI agrees promptly and regularly to keep the Company informed of the substance of all such conversations with Noteholders and/or the Collateral Agent representatives.

3.  **Fees and Cash on Account**

    Monthly Fee

    For services rendered in connection with this assignment, the Client agrees to pay FTI a monthly, non-refundable advisory fee of $50,000 for months 1 and 2, and $25,000 for month 3.

    Unless terminated, fees in connection with this Engagement after the third month will be based upon the time incurred providing the Services, multiplied by our standard hourly rates, summarized as follows:

    | | Per Hour (USD) |
    |---|---|
    | Senior Managing Directors | $985 – 1,295 |
    | Directors / Senior Directors / Managing Directors | 735 – 905 |
    | Consultants/Senior Consultants | 415 – 660 |
    | Paraprofessionals | 150 – 280 |

    FTI understands that Client will be solely responsible for payment of its fees and expenses. As such, FTI will submit invoices for its fees and expenses incurred in connection with this Engagement directly to the Client. The name and address of the Client designee to receive and approve FTI's invoice is indicated on the signature page of this letter.

    Hourly rates are generally revised periodically. To the extent this engagement requires services of our International divisions or personnel, the time will be multiplied by our standard hourly rates applicable on International engagements. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

    In addition to the fees outlined above, FTI will bill for reasonable direct expenses which are likely to be incurred on your behalf during this Engagement. Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement, such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the engagement. FTI will get prior written authorization for expenses related to engagement in excess of $500.00. Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by you at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

    **Cash on Account**

    Upon retention, the Client will forward to us the amount of $50,000 to be applied to our initial invoice for professional fees, charges and disbursements for the Engagement. The Client will

SureFunding, LLC                                                           **FINAL**
March 2, 2020

forward to us $50,000 and $25,000 (plus expenses) on day 30 and day 60, respectively following the initial invoice date.

The Client agrees to promptly notify FTI if the Client or any of its subsidiaries or affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of FTI involved in this Engagement and agrees that FTI has earned and is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to FTI's former principal or employee that the Client or any of its subsidiaries or affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by FTI with respect to this Engagement.

If a dispute develops about our fees, the Client may be entitled under Part 137 of the Rules of the Chief Administrator of the New York Courts to arbitration of that dispute if it involves more than $150,000.

4.     **Terms and Conditions**

The attached Standard Terms and Conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. This agreement is subject to modification in the event of an anticipated bankruptcy filing.

5.     **Conflicts of Interest**

Based on the list of interested parties (the "Potentially Interested Parties"), provided by you, we have undertaken a limited review of our records to determine FTI's professional relationships with the Company. From the results of such review, we were not made aware of any conflicts of interest or additional relationships that we believe would preclude us from performing the Services. However, as you know, we are a large consulting firm with numerous offices throughout the United States. We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties. The FTI professionals providing services hereunder will not accept an engagement that directly conflicts with this Engagement without your prior written consent.

6.     **Acknowledgement and Acceptance**

Please acknowledge your acceptance of the terms of this Engagement Contract by signing both the confirmation below and the attached Standard Terms and Conditions and returning a copy of each to us at the above address.

If you have any questions regarding this letter or the attached Standard Terms and Conditions, please do not hesitate to contact Kevin DeLuise at 646-485-0590.

SureFunding, LLC                                                        FINAL
March 2, 2020

Yours faithfully,

FTI CONSULTING, INC.

By:   _____

Clifford A. Zucker
Senior Managing Director

Attachment – As stated

Confirmation of Terms of Engagement

**We agree to engage FTI Consulting, Inc. upon the terms set forth herein and in the attached Standard Terms and Conditions.**

By:   _____
Title:   Authorized Signor
Date:   March 2, 2020

Name and Address of SureFunding, LLC person designated to receive and approve invoices related to this Engagement:

| | |
|---|---|
| Name: | Justin Abernathy |
| Address: | 6671 Las Vegas Blvd S |
| | Las Vegas, NV 89119 |
| Phone: | (787) 406-8239 |
| Fax: | (202) 330-5484 |
| Email: | justin.abernathy@mcs.finance |

## FTI CONSULTING, INC.

## STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with SureFunding, LLC dated March 2 , 2020.  The Engagement letter and the Standard Terms and Conditions  (collectively the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.  The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

**1.    Reports and Advice**

1.1    **Use and purpose of advice and reports** – Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party, or refer to us or the Services, without our prior written consent, which shall be conditioned on the execution of a third party release letter in the form provided by FTI and attached hereto as Schedule A. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

**2.    Information and Assistance**

2.1    **Provision of information and assistance** – Our performance of the Services is dependent upon your providing us with such information and assistance as we may reasonably require from time to time.

2.2    **Punctual and accurate information** – You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required.  You shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3    **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof.  Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information.  Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period.  Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4    **Prospective financial information** - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information.  There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.  We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

3. **Additional Services**

3.1 **Responsibility for other parties** – You shall be solely responsible for the work and fees of any other party engaged by you to provide services in connection with the Engagement regardless of whether such party was introduced to you by us. Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters. Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you, other than our agents or independent contractors engaged to provide Services, without your written authorization.

4. **Confidentiality**

4.1 **Restrictions on confidential information** – Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's consent. Confidential information shall not include information that:

    4.1.1 is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

    4.1.2 is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

    4.1.3 is or has been independently developed by the recipient.

4.2 **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other party.

4.3 **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4 **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews.

4.5 **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

4.6 If this Engagement involves the processing of personal data as governed by Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016, the terms of the Data Protection Schedule attached hereto as Schedule B shall apply to this Engagement and it shall form an integral part of this Engagement Contract. In the event of a conflict between the terms of this Engagement Contract and the terms of Schedule B, the terms of Schedule B shall prevail in relation to the processing of such personal data. If such personal data is processed in connection with this Engagement, the Company shall notify FTI in writing before any personal data is disclosed to FTI.

## 5.  Termination

5.1    **Termination of Engagement with notice** – Either party may terminate the Engagement Contract for whatever reason upon written notice to the other party. Upon receipt of such notice, we will stop all work immediately. You will be responsible for all fees and expenses incurred by us through the date termination notice is received

5.2    **Continuation of terms** – The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

## 6.·  Indemnification, Liability Limitation, and Other Matters

6.1    **Indemnification** - The Company agrees to indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contractors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted (an "Adverse Determination"). The Company shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance. FTI agrees that it will reimburse any amounts paid in advance to the extent they relate directly to an Adverse Determination.

6.2    **Limitation of liability** - You agree that no Indemnified Person shall be liable to you, or your successors, affiliates or assigns for damages in excess of the total amount of the fees paid to FTI under this Engagement Contract. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

## 7.    Governing Law, Jurisdiction and WAIVER OF JURY TRIAL

7.1    **Governing Law** - The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof.

7.2    **Jurisdiction.** - The United States District Court for the Southern District of New York and the appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.

7.3    **WAIVER OF JURY TRIAL** – TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

**FTI CONSULTING, INC**
*Confirmation of Standard Terms and Conditions*

We agree to engage FTI Consulting, Inc. upon the terms set forth in these Standard Terms and Conditions as outlined above.

SureFunding, LLC

By: _____
    Justin Abernathy

    _____
    Authorized Signor
    Title

Date: _____March 2, 2020_____

**SCHEDULE A**

**STANDARD RELEASE LETTER**

[Nonclient Recipient Letterhead]

[Date]

FTI Consulting, Inc.

Dear Mr./Ms. _____:

_____ ("Client") has informed [name of recipient] that FTI Consulting, Inc. ("FTI") has performed certain procedures to assist Client in connection with the _____. We understand that the work performed by FTI was performed in accordance with instructions provided by Client and was performed exclusively for Client's sole benefit and use.

Client has requested that FTI provide [name of recipient] access to the report of its findings dated [date]. [name of recipient] acknowledges that this report was prepared at the direction of Client and may not include all procedures deemed necessary for the purposes of [name of recipient] and that certain findings and information may have been communicated to Client that are not reflected in the report.   [name of recipient] further acknowledges that (a) the report is being provided for informational purposes only; (b) the report shall not constitute, either expressly or impliedly, any representation or affirmation by FTI as to the accuracy, completeness and/or fairness of presentation of the Report or any statements or information contained therein; and (c) [name of recipient] will make any decisions based on its own investigation, due diligence and analysis, independent of, and without reliance on or reference to, the contents of the report or any other opinions or conclusions of FTI.

In consideration of FTI allowing [name of recipient] access to the report and, if requested by [name of recipient], discussing the report, [name of recipient] agrees that it does not acquire any rights as a result of such access that it would not otherwise have had and acknowledges that FTI does not assume any duties or obligations to [name of recipient] in connection with such access.

[name of recipient] agrees to release FTI and its personnel from any claim by [name of recipient] that arises as a result of FTI permitting [name of recipient] access to the report.  Further, [name of recipient] agrees not to disclose or distribute the report, or information received, orally or in writing from FTI to any other parties without FTI's prior written consent.

Acknowledged by [name of recipient] representative:

By:    _____
          (Name of Company official

Title:    _____

Date:    _____

<u>**SCHEDULE B**</u>

<u>**FTI CONSULTING DATA PROTECTION SCHEDULE**</u>

This Data Protection Schedule ("**Schedule**") forms part of the contract for services to which it is an attachment (the "**Contract**") between the client party identified in the Contract (the "**Client**") and the relevant FTI Consulting group entity identified in the Contract ("**FTI**").

1.    <u>Definitions</u>

1.1    In this Schedule, unless otherwise defined herein, all defined terms shall have the meaning set out in the Contract.

1.2    In this Schedule, the following terms shall have the meanings set out below:

1.2.1    "Data Protection Laws" means applicable legislation protecting the personal data of natural persons and governing the processing of that data, including in particular the GDPR and any national legislation which supplements the GDPR, together with binding guidance and codes of practice issued from time to time by relevant supervisory authorities;

1.2.2    "GDPR" means the General Data Protection Regulation (EU) 2016/679;

1.2.3    "Personal Data", "Process", "Controller", "Processor", "Data Subject", "Supervisory Authority" and "Personal Data Breach" shall have the meanings given to them in the Data Protection Laws; and

1.2.4    "Standard Contractual Clauses" means the standard contractual clauses for the transfer of personal data to controllers established in third countries which do not ensure an adequate level of protection as set out in Commission Decision C(2004)5721, as updated, amended, replaced or superseded from time to time by the European Commission

2.    <u>Controller Terms</u>

2.1    FTI and the Client will each act as separate and individual Controllers in relation to any Personal Data (including, without limitation, Personal Data relating to any of the Client's workers, FTI's workers, any litigation or arbitration opponent or customer or vendor or transaction partner) Processed by the Client or FTI to deliver the services set out under the Contract.

2.2    FTI and the Client will each comply with its own respective obligations under the Data Protection Laws in relation to their Processing of Personal Data under the Contract. In particular, the Client will ensure that any disclosures of Personal Data to FTI are lawful, and, in each case where necessary under the Data Protection Laws, the Client has notified and secured the consent of the relevant Data Subjects.

2.3    FTI may appoint Processors as required to deliver the services, who will process the Personal Data on FTI's behalf and at FTI's direction. Further, FTI may disclose Personal Data to other Controllers where necessary to deliver the services (including, but without limitation, law firms, accountants, other third party experts and any member of the FTI Group), or pursuant to a legally binding written request, an

order or request of a court of competent jurisdiction or any governmental or regulatory authority or where disclosure is required by applicable law or regulation.

2.4    The Client acknowledges and agrees that FTI is located outside of the European Economic Area, and that certain Processors or Controllers engaged by FTI under paragraph 2.3 may also be located outside of the European Economic Area. In respect of onward transfers by FTI to other Controllers or Processors, FTI will take steps in accordance with the Data Protection Laws to ensure an adequate level of protection for the Personal Data Processed by such Processors or Controllers. In particular, the Client acknowledges that FTI may transfer Personal Data to FTI Consulting, Inc. in reliance upon its certification under the EU - US Privacy Shield scheme.

2.5    The Client acknowledges that FTI's email records are replicated onto a Microsoft 365 Cloud system in the United States of America and the Client hereby consents that any Personal Data that is provided to FTI by email will be replicated accordingly. To the extent that the Client wishes to transmit certain information or data to FTI and the Client objects to that data being replicated in accordance with this paragraph, the Client will use a communication or transmission method other than e-mail or will use an alternative e-mail system.



# About FTI: FTI Consulting Overview

*January 2020*

# FTI Consulting: Experts with **Impact**

FTI Consulting is an independent global business advisory firm dedicated to helping organizations manage change, mitigate risk and resolve disputes. Due to our unique mix of **EXPERTISE, CULTURE, BREADTH OF SERVICES and INDUSTRY EXPERIENCE,** we have a tangible impact on our clients' most complex opportunities and challenges.

## Definitive Expertise

- **Who's Who Legal: Consulting Experts (Most Recognized),** *Law Business Research Ltd.* (2016 - 2019)
- **Best Of National Law Journal: Hall of Fame** *National Law Journal* (2017 – 2019)
- **#1 Restructuring Advisor**, *The Deal* (2007-2019)
- **Gold SABRE Award, Healthcare Providers,** *The Holmes Report* (2019)

## A Culture That Delivers

- **Practical** in our communication and approach to outcomes
- **Judicious** in complex, multi-party situations
- **Collaborative** with clients and colleagues
- **Professional** in our commitment to work with the highest caliber

| | | |
|---|---|---|
| **5,400+** Employees | **550+** SMDs | **$4.4B** Market Cap.[1] |
| **81** Cities | | **27** Countries |
| Advisor to **95** of the world's top **100** law firms | **49** of Fortune Global **100** corporations are clients | Advisor to **8** of the world's top **10** bank holding companies |

## Comprehensive Services

- **Financial**
- **Legal**
- **Operational**
- **Transactional**
- **Political & Regulatory**
- **Reputational**

## Industry Experience

- Construction & Environmental
- Energy Power & Products
- Financial Institutions
- Healthcare & Life Sciences
- Insurance
- Mining & Mining Services
- Real Estate
- Retail & Consumer Products
- Telecom, Media & Technology



(1) Number of total shares outstanding as of October 17, 2019, times the closing share price as of October 24, 2019.

# Definitive Expertise

**America's Best Management Consulting Firms**

*Forbes*
**(2016 - 2019)**

**Global M&A Public Relations Firm of the Year**

*M&A Atlas Awards, Global M&A Network*
**(2017 - 2018)**

**#1 Crisis Management Firm**

*The Deal*
**(2017 – 2018)**

**Who's Who Legal: Arbitration Expert Firm of the Year**

*Law Business Research*
**(2015 - 2019)**

**Gold Winner: Public Relations Agency of the Year**

*PR World*
**(2019)**

**Top Intellectual Property Litigation Consulting Services Provider**

2018 Best of the NLJ, *ALM Media Properties*
**(2016 – 2019)**

**Corporate Counsel: Top Service Provider in the Legal Industry**

*ALM Media Properties*
**(2016 – 2018)**

**Global Turnaround Consulting Firm of the Year**

M&A Atlas Awards, *Global M&A Network*
**(2018 - 2019)**

**#1 Cybersecurity Provider**

*Corporate Counsel*
**(2016 – 2017)**

**#1 IT Consultant Services**

Corporate Counsel Best of 2018, *American Lawyer*
**(2018)**

**GAR: Expert Witness Firms' Power Index**

*Law Business Research*
**(2019)**

**Consulting Magazine's Best Firms to Work For List**

*ALM Media Properties*
**(2018)**



## What We Do/Comprehensive Services



# Comprehensive Services

Viewed in aggregate, FTI Consulting is unmatched in the breadth of expertise we bring to bear on our clients' behalf.

     

| Financial | Legal | Operational | Political & Regulatory | Reputational | Transactional |
|---|---|---|---|---|---|
| We partner and advise with management teams, boards of directors, creditors, investors and lenders across the valuation creation life cycle to manage cash flow, liquidity forecasts, accounting and financial reporting, activist shareholders and financial communication needs.<br><br>Our teams take an industry first approach, bringing veteran practitioners and former industry executives to bear on the most complex commercial challenges and opportunities facing companies today. | We provide independent dispute advisory, expert testimony, international arbitration, investigative, data governance, e-discovery and forensic accounting services to the global business and legal community.<br><br>Our experience in high stakes litigation and complex financial investigations enables us to get to an appropriately scaled response quickly. | We help clients across the corporate life cycle overcome operational impediments and navigate the complexities of doing business in disrupted industries.<br><br>Working with executive management, boards of directors and investors, we provide the objectivity, data-driven analytics and hands-on solutions and develop and implement plans of action that deliver sustained results. | FTI Consulting and its subsidiary, Compass Lexecon, work with clients to ensure that relevant regulations are economically sound, assess whether regulatory and compliance obligations are being met, perform public policy studies, implement robust systems and controls, protect their businesses from risks associated with political change and provide confidence to all key stakeholders that their business is well-controlled.<br><br>Our clients span from individual companies to trade associations to governmental agencies in many jurisdictions around the globe. | We help clients use their communications assets to protect, enhance and develop their business interests with key constituencies.<br><br>Our experienced professionals can help clients manage crises, navigate market disruptions, articulate their brand, stake a competitive position and preserve their permission to operate. | Our definitive expertise across the deal life cycle and diverse industries enables us to maximize outcomes for our clients in acquisitions, IPOs, divestitures, integrations, carve-outs and capital markets activities. We advise corporate and financial clients and their advisors and regulators to structure, conduct due diligence, integrate, value and communicate all the while responding to a broad range of commercial demands. In addition, Compass Lexecon, an FTI Consulting subsidiary, works with private parties and government agencies to evaluate the likely effects of proposed mergers and acquisitions on prices, costs and competition. |



5

# Comprehensive Services:
# Financial Overview



We partner and advise with management teams, boards of directors, creditors, investors and lenders across the valuation creation life cycle to manage cash flow, liquidity forecasts, accounting and financial reporting, activist shareholders and financial communication needs.

Our teams take an industry first approach, bringing veteran practitioners and former industry executives to bear on the most complex commercial challenges and opportunities facing companies today.

## COMPREHENSIVE SERVICES

| Accounting | Business Transformation | Communication | Data | Disputes | Turnaround & Restructuring | Valuation |
|---|---|---|---|---|---|---|
| • ABL Field Audits<br>• Accounting Advisory<br>• Actuarial Consulting<br>• Forensic Accounting | • Interim Management<br>• Office of the CFO | • Capital Markets Communications<br>• Restructuring & Financial Issues Communications | • Data & Analytics | • Commercial Disputes<br>• Collateral Analysis<br>• Contentious Insolvency<br>• Fraud & Complex Financial Investigations<br>• Shareholder Activism<br>• Receiver, Examiner, & Trustee Services | • Bankruptcy<br>• Turnaround & Restructuring | • General Valuation<br>• Intellectual Property Valuation |

## DEFINITIVE EXPERTISE

| | |
|---|---|
| **Global Turnaround Consulting Firm of the Year**<br><br>*Global M&A Network*<br>**(2015 - 2019)** | **#1 U.S. Restructuring Advisor**<br><br>*The Deal*<br>**(2017 - 2019)** |
| **Transaction of the Year**<br>*Turnaround Management Association*<br>**(2017)** | **UK Transaction and Tax Valuation Advisory Firm of the Year**<br><br>*ACQ Global Awards*<br>**(2017)** |
| **Turnaround Consulting Firm of the Year \| Global**<br><br>*Turnaround Atlas Awards*<br>*Global M&A Network*<br>**(2015-2019)** | **200+** Interim executive positions **100+** C-Suite roles **30+** Chairman / CEO positions **65+** CFO positions |

## OUR **IMPACT**

**OFFICE OF THE CFO**

One of the largest equipment rental companies in North America's Treasurer engaged FTI Consulting's Office of the CFO (OCFO) to mitigate risks for as it became a new public company. FTI Consulting's OCFO experts assisted with: creating the Asset Backed Lending Model; designing organizational structures and reporting lines; reconciling loss runs and allocation of premiums/costs by branch location; executing budget planning and development; designing cash management desktop procedures for Sarbanes-Oxley compliance; and developing processes and frameworks to support the standalone enterprise. The Treasurer won the **Adam Smith Award**, an accomplishment recognized as the ultimate benchmark of achievement in treasury.

**Mexican Ministry of Energy**
**ELECTRICITY MARKET REFORM**

The Mexican Ministry of Energy needed help enabling transformation of their national electricity system to competitive market in order to attract private investment, reduce costs and increase renewable energy capacity. FTI Consulting prepared a report on the competitive electricity market and educated top Mexican officials about the best practices worldwide for the organizational structure and governance of electricity markets. The Mexican Ministry of Energy used the report as a blueprint for implementing its electricity market reform. Their electricity markets are in operation today.

**FRAUD & COMPLEX FINANCIAL INVESTIGATIONS,**
**GENERAL VALUATION**

Our client sought information regarding the sales activities of a publicly traded U.S.-based company's Chinese operations. According to the company's financials, the Chinese market was a significant contributor to its underlying revenue. Our on site work and investigation revealed that the majority of locations were not active stores, and those that were active were too small to be generating the amount of sales reported by the company. Shortly after presenting the client with our findings, the Chinese government announced that it was investigating the company's business practices, which resulted in a significant fall in the company's stock price.

**INTERIM MANAGEMENT**

FTI Consulting provided management support after a live events conglomerate filed for Chapter 11 bankruptcy in 2016 including staffing a Chief Restructuring Officer and interim CEO. The team assisted with obtaining interim financing, establishing cash management practices, negotiating with creditors, developing communications plans and executing on all reporting requirements. The firm and its creditors agreed upon a plan under which approximately $400 million of prepetition debt was equitized or otherwise eliminated from the balance sheet. The reorganization plan also included the sale of non-core assets and cost savings initiatives and other restructuring measures.



6

# Comprehensive Services: Legal Overview



We provide independent dispute advisory, expert testimony, international arbitration, investigative, data governance, e-discovery, digital and forensic accounting services to the global business and legal community. Our experience in high stakes litigation and complex financial investigations enables us to get to an appropriately scaled response quickly.

## COMPREHENSIVE SERVICES

| Communications | Data and E-discovery | Dispute Advisory | Subject Matter Expertise |
|---|---|---|---|
| • Crisis Communications<br>• Litigation Communications & Special Situations | • Cybersecurity<br>• Data Analysis<br>• Data Preservation & Collection<br>• Digital Forensics<br>• Information Governance, Privacy & Security | • Accounting Advisory<br>• Bankruptcy & Avoidance Litigation<br>• Contentious Insolvency<br>• Dispute Advisory<br>• Expert Testimony<br>• Forensic Accounting Investigations<br>• International Arbitration<br>• Investigations<br>• Litigation Intelligence<br>• Monitor & Receiver Services<br>• Trial Services<br>• Valuation | • Business Insurance Claims<br>• Business Interruptions<br>• Contracts Disputes<br>• Construction Disputes<br>• Hart-Scott-Rodino Investigations & Antitrust Litigation<br>• Intellectual Property<br>• Labor & Employment Dispute Resolution<br>• Product Liability Litigation<br>• Securities Litigation |

## DEFINITIVE EXPERTISE

| | |
|---|---|
| **Top Intellectual Property Litigation Consulting Services**<br><br>*ALM Media Properties* **(2016 – 2019)** | **#1 Global Risk & Investigations services provider**<br><br>*ALM Media Properties* **(2017)** |
| **#1 Cybersecurity Provider**<br><br>Corporate Counsel Best Of, *American Lawyer* **(2016 – 2017)** | **Who's Who Legal: Arbitration Expert Witnesses** (Most experts recognized)<br><br>*Law Business Research Ltd.* **(2011-2019)** |
| **Best of National Law Journal, Hall of Fame**<br><br>*American Lawyer* **(2017 - 2019)** | **Leader Worldwide E-Discovery Services**<br><br>*IDC MarketScape* **(2017)** |

## OUR IMPACT

### COMPUTER FORENSICS, CYBERSECURITY

FTI Consulting was hired to investigate a number of associated web hosting providers suspected of supporting malicious cyber campaigns related to bank and advertising fraud. Our role was to identify technical connections to the web hosting providers' infrastructure using proprietary and third-party threat intelligence tools. As part of our investigation, we researched the plaintiff's businesses to understand network infrastructure. We also used machine learning and sophisticated data aggregation, correlation, and analytic techniques to map 1.4M IP addresses and 350K URL's associated with the plaintiff's hosting infrastructure back to historical malicious applications and botnet activity. A code review identified malicious applications identified commonalities and attribution to nation state sponsored malicious cyber campaigns. Our findings provided step-by-step examples showing systemic evidence of malicious cyber activity supported and facilitated by client's business.

### CRISIS COMMUNICATIONS

A European-based multinational company retained FTI Consulting to change the narrative surrounding pesticide regulation in Europe. FTI Consulting developed a compelling position that served to defend the company's license to operate, debunked many of the myths peddled by the industry's adversaries, and engaged in a longer-term dialogue with key stakeholders to educate them on complex issues such as minimum residue levels, endocrine disruption and weed resistance. The company launched a successful campaign that was able to educate and inform key decision makers on approving crop protection active substances for the market and effectively demonstrated the company's role as an engaged corporate citizen working to develop solutions to some of the world's most pressing issues.

### EXPERT TESTIMONY

A Guatemalan company specializing in power generation terminated its relationship with a China based global eco-development solutions firm on a coal-fire power plant project. The firm completed the project and sought to collect $308 million in costs incurred by the previous Chinese partner at the International Court of Arbitration of the International Chamber of Commerce in Singapore. The Virginia law firm of Varela, Lee, Metz & Guarino engaged FTI Consulting to review the actual costs incurred and projected to be incurred by the Guatemalan firm on the project after contract termination. FTI's expert witness submitted reports and was cross-examined by opposing counsel. The International Court of Arbitration of the International Chamber of Commerce awarded the Guatemalan firm virtually all the $308 million in costs that it sought.



# Comprehensive Services: Operational Overview



**We help clients across the corporate life cycle** overcome operational impediments and navigate the complexities of doing business in disrupted industries.

Working with executive management, boards of directors and investors, we provide the objectivity, data-driven analytics and hands-on solutions and develop and implement plans of action that deliver sustained results.

## COMPREHENSIVE SERVICES

| Business Transformation | Communications | Interim Management | Turnaround & Restructuring |
|---|---|---|---|
| • Construction Advisory<br>• Office of the CFO<br>• Operational Transformation<br>• Performance Improvement | • Employee Engagement & Change Communications | • Interim Management | • Turnaround & Restructuring |

## OUR **IMPACT**

### PERFORMANCE IMPROVEMENT, OPERATIONAL TRANSFORMATION

A leader in patient safety solutions and a major university health system partnered with FTI Consulting to improve the patient access model. At the start of the partnership, the university health system had 32 appointment centers in eight different buildings staffed by nearly 200 employees using 15 unique organizational structures. FTI Consulting helped lay the groundwork for a centralized management structure. The consolidated access center uses new operating procedures and technologies which allows for better oversight with the flexibility to support growth in patient volume. This continuity led to a reduction in errors and improvements in recruitment and training. Patient and physician satisfaction has markedly increased and the university's Access Services is an integral contributor to their core mission of world-class patient care.

### INFORMATION GOVERNANCE

A company's C-suite realized it needed to get its data house in order and clean from its archive, migrate to new systems and develop and implement company-wide policies to successfully embrace the updated program. FTI Consulting's Information Governance, Privacy & Security (IG P&S) group was brought in to handle the challenge of managing 10 years of emails totaling hundreds of terabytes. In addition to extracting more than 1.5 billion emails from the legacy system IGP&S leveraged technology from Ringtail®, IBM, Nuix, Integro and Index Engines. This large and complex project helped the services company cost-effectively reduce its risk, get its legacy data in order, eliminate what it doesn't need and better protect and manage the data that is important. The legal team can better handle matters moving forward with updated e-discovery software and processes.

### OFFICE OF THE CFO

One of the largest equipment rental companies in North America's Treasurer engaged FTI Consulting's Office of the CFO (OCFO) to mitigate risks for as it became a new public company. FTI Consulting's OCFO experts assisted with: creating the Asset Backed Lending Model; designing organizational structures and reporting lines; reconciling loss runs and allocation of premiums/costs by branch location; executing budget planning and development; designing cash management desktop procedures for Sarbanes-Oxley compliance; and developing processes and frameworks to support the standalone enterprise. The Treasurer won the **Adam Smith Award**, an accomplishment recognized as the ultimate benchmark of achievement in treasury.

### OPERATIONAL TRANSFORMATION

U.S. Regulators mandated that a large, private U.S. bank fix their compliance program to address high employee turnover, anti-money laundering lapses, structural disorganization, and a history of regulatory enforcement actions. As monitor, FTI developed and executed a custom-tailored plan. We assessed the bank's compliance program, made a historical evaluation of policies, procedures and programs, and reviewed its change-management processes. Working closely with the bank and the regulator, we established a best-in-class compliance program, greatly reducing future compliance risks and the costs associated with regulatory action.

## DEFINITIVE EXPERTISE

| | |
|---|---|
| **8 of top 10 Private Equity International 300 are clients**<br><br>*Private Equity International* **(2018)** | **6th Largest Hospital Management Consulting Practice in the U.S.**<br><br>*Modern Healthcare* **(2018)**<br><br>**Global Turnaround Consulting Firm of the Year**<br><br>*Global M&A Network* **(2015-2019)** |
| **More than 200 interim operating positions filled** | **30+ Chairman/CEO Positions** |
| **100+ C-suite Roles** | **65+ CFO Positions** |





# Comprehensive Services:
# Political & Regulatory Overview

FTI Consulting and its subsidiary, Compass Lexecon, work with clients to ensure that relevant regulations are economically sound, assess whether regulatory and compliance obligations are being met, perform public policy studies, implement robust systems and controls, protect their businesses from risks associated with political change and provide confidence to all key stakeholders that their business is well-controlled. Our clients span from individual companies to trade associations to governmental agencies in many jurisdictions around the globe.

Our experts, many of whom have held critical positions in government and academia, have years of experience in assisting our clients in making complex decisions involving regulatory challenges.

## COMPREHENSIVE SERVICES

| Data and E-Discovery | Economic | Political Advisory | Regulatory Advisory | Public Affairs & Government Relations |
|---|---|---|---|---|
| • Collections & Computer Forensics | • Antitrust & Competition<br>• Analysis of Proposed Legislation<br>• Economic Impact and Other Modeling<br>• Healthcare Economics<br>• Public Policy Advisory | • Country Assessments<br>• Geopolitical Intelligence | • Anti-Money Laundering<br>• Anti-Corruption Investigations & Compliance<br>• Financial Institution Regulation & Governance<br>• Government & Public Contracts<br>• Governance, Regulation, & Compliance<br>• Information Governance & Compliance<br>• Regulatory Disputes & Enforcement<br>• SEC Advisory & Consulting | • Government Investigations<br>• Public Affairs Research & Opinion Polling<br>• Public Affairs Support of Business Strategies<br>• Public Policy Advisory |

## OUR **IMPACT**

### DEFINITIVE EXPERTISE

**Compass Lexecon had the Most listings in WWL: Competition – Economists**
*Law Business Research Ltd.* (2017-2018)

**Former Chief Economist of the UK Competition Commission**

**Former Chief Economist from the FTC**

**6 Former Deputy Attorneys General for Antitrust of the U.S. DOJ**

**1st Chief Economist of the new Competition Commission of Hong Kong**

**Two former Chief Economists from the SEC**

### FORENSIC COLLECTIONS

An Israeli company was under investigations by US regulators. The law firm called FTI Consulting on Thursday for a Monday data review. FTI's forensic collections team immediately deployed to Israel to conduct on-site collection and culling of 8 custodians. The dataset-totaling over half a million documents primarily in Hebrew- was available to the legal team for review on Relativity by the following Monday. FTI also conducted a quick search term report across the custodians, and uncovered and corrected an issue that was returning incorrect results. This workaround corrected a Windows issue, and created custom workflows to enable a more efficient Relativity Review.

### MERGER REGULATORY APPROVAL

Compass Lexecon assisted one of the world's leading suppliers of potash and producer of fertilizing minerals in obtaining regulatory approval for their $36 billion merger of equals, which creates the largest crop nutrient company in the world. Between the two companies, they produce roughly half of all potash in North America. Compass Lexecon showed through detailed econometric and other analyses that the proposed merger would not harm competition to supply potash in the United States because of global competition. The Federal Trade Commission cleared the merger without requiring any divestitures. The merger was also cleared with minimal divestiture requirements in China and India.

### COMPLIANCE MODEL

FTI Consulting assisted the United States' largest for- profit hospital system, in crafting and negotiating a Corporate Integrity Agreement ("CIA") that has become a model for all subsequent large-scale CIAs.

The government accepted our approach, which emphasizes front-end prevention rather than back-end detection.

FTI Consulting subsequently worked the firm to conduct an annual Post CIA Review in support of its Internal Audit and Regulatory Compliance functions.

### Mexican Ministry of Energy
### ELECTRICITY MARKET REFORM

The Mexican Ministry of Energy needed help enabling transformation of their national electricity system to competitive market in order to attract private investment, reduce costs and increase renewable energy capacity. FTI Consulting prepared a report on the competitive electricity market and educated top Mexican officials about the best practices worldwide for the organizational structure and governance of electricity markets. The Mexican Ministry of Energy used the report as a blueprint for implementing its electricity market reform. Their electricity markets are in operation today.





# Comprehensive Services:
# Reputational Overview

> **We help clients use their communications assets to protect, enhance and develop** their business interests with key constituencies.
>
> Our experienced professionals can help clients manage crises, navigate market disruptions, articulate their brand, stake a competitive position and preserve their permission to operate.

## COMPREHENSIVE SERVICES

| Corporate Reputation | Financial Communications | Public Affairs & Government Relations |
|---|---|---|
| • Corporate Profile Building & Thought Leadership<br>• Crisis & Reputational Risk<br>• Digital & Creative Communications<br>• Media Relations<br>• Strategy Consulting & Research | • Activism & Corporate Governance<br>• IPO & Capital Raising Communications<br>• Investor Relations & Capital Markets Research<br>• Mergers & Acquisitions Communications<br>• Restructuring & Financial Issues | • Government Investigations<br>• Public Affairs Research & Opinion Polling<br>• Public Affairs Support of Business Strategies<br>• Public Policy Advisory |

## DEFINITIVE EXPERTISE

| | |
|---|---|
| **Gold Winner Public Relations Firm of the Year**<br><br>*PR World*<br>**(2019)** | **Global M&A Public Relations Firm of the Year**<br><br>*M&A Atlas Awards,*<br>*Global M&A Network*<br>**(2017 - 2018)** |
| **Gold SABRE Award Healthcare Providers**<br><br>*The Holmes Report*<br>**(2019)** | **Global Leader in PR Agency Rankings**<br><br>*The Holmes Report*<br>**(2014 - 2018)** |

**Communications Firm of the Year**

10TH Annual International M&A Awards,
*The M&A Advisor*
**(2018)**

## OUR **IMPACT**

**CRISIS COMMUNICATIONS**

FTI Consulting was retained by the world's largest offshore drilling contractor, to provide crisis communications counsel and execution for the accident and sinking of its mobile offshore drilling unit in the Gulf of Mexico. Within two months, their share price was down 50%, and its value proposition was in danger of being erased. Our team drove the multifaceted communications effort, ensuring close engagement with employees, journalists, investors, analysts, Policymakers and other stakeholder groups. After navigating the company through the critical "make or break," we effectively rebuilt the company's reputation.

**CORPORATE REPUTATION**

Following several years of expansion in Latin America, a major internet-related services and products firm faced reputational and regulatory headwinds as the company worked to build the region's digital infrastructure. FTI Consulting helped develop a proactive public outreach campaign in Colombia, highlighting the positive role the company plays in driving the country's economic growth and developing its digital ecosystem. As a result, digital advertising increased 31%, and they were positioned as a key advocate for expanding the country's digital infrastructure.

**GLOBAL GROWTH**

FTI Consulting has been a trusted strategic advisor to a firm which is a Chinese collective multinational consumer electronics and home appliances company over many years. This firm has leveraged FTI Consulting to elevate visibility of their firm in international markets with English-language messaging and management and crisis communications support.

Through strategic communications, their global acquisitions have been widely embraced by stakeholders. For a major appliance company acquisition, a combination of sound corporate communications, investor relations and public affairs strategies contributed to a successful outcome in a challenging political climate. The deal faced no hurdles from the U.S. government and ultimately became one of the most important and successful China/U.S. transactions to close in 2016.





# Comprehensive Services:
# Transactional Overview

Our definitive expertise across the deal life cycle and diverse industries enables us to maximize outcomes for our clients in acquisitions, IPOs, divestitures, integrations, carve-outs and capital markets activities. We advise corporate and financial clients and their advisors and regulators to structure, conduct due diligence, integrate, value and communicate all the while responding to a broad range of commercial demands. In addition, Compass Lexecon, an FTI Consulting subsidiary, works with private parties and government agencies to evaluate the likely effects of proposed mergers and acquisitions on prices, costs and competition.

## COMPREHENSIVE SERVICES

| Antitrust & Competition Economics | Investment Banking | Communications | Data | Due Diligence | Transaction Services |
|---|---|---|---|---|---|
| • Compass Lexecon<br>• Antitrust & Competition Economics | • Fairness & Solvency Opinions<br>• Investment Banking | • Capital Markets Communications<br>• M&A Communications | • Second Requests<br>• Securitization Back-Up Management | • FTI Comply<br>• Due Diligence | • Accounting Advisory<br>• Carve-Out Advisory<br>• M&A Integration<br>• Structured Finance<br>• Tax<br>• Transaction Advisory<br>• Valuation |

## OUR **IMPACT**

### DEFINITIVE EXPERTISE

| | |
|---|---|
| **Vanguard Status for Transaction Advisory Services**<br>*ALM Intelligence*<br>**(2016)** | **Who's Who Legal: Arbitration Expert & Competition Economist of the year,** *Law Business Research Ltd*<br>**(2015 – 2017)** |
| **Who's Who Legal: Competition Economics Firm of the Year,** *Law Business Research Ltd.*<br>**(2015 - 2019)** | **#1 Crisis Management Services Firm**<br>*The Deal*<br>**(2017 - 2018)** |

One of the **Best Competition Economics Firms in the World,** *Global Competition Review – Economics20 (2017 - 2019)*

**IPO-RELATED COMMUNICATIONS AND INVESTOR & MEDIA RELATIONS**

FTI Consulting executed a successful comprehensive communications plan for a firm which is the leading online destination for automobile consumers in China. This Chinese company was looking to go public on a U.S. exchange: Their stock rose 75% on the first day of trading; extensive and high-quality media coverage was garnered in international and Chinese media; print and broadcast coverage was secured with top outlets; and several major global investment banks initiated coverage of the firm.

**CYBERSECURITY**

The liquidators of a group of foreign-domiciled bank subsidiary companies in administration were facing allegations of fraud and theft following a multi-billion dollar bank failure. FTI Consulting was retained to support several complex litigations potentially occurring in multiple jurisdictions. We provided and managed a unique analytic research work stream across a huge inbound document production, and provided consulting support for millions of documents hosted in Ringtail. Also, a transactional database was built into a secure web tool. Using our advanced data analytics and workflows, the client was able to save millions of pounds in document review fees and build their defense in the most efficient and cost-effective way possible.

**MERGER INTEGRATION**

FTI Consulting partnered with an American multinational telecommunications and internet provider company to plan and execute on a merger integration strategy in its acquisition of another firm.

The FTI Consulting advisory role was then to design and plan an integrated product, network and IT roadmap, a fully integrated new sales force and the integration of all function across the organization. Due to the success of the integration execution, the combined company hit its synergy targets.

**MERGER SIMULATION**

Counsel for a world leader in communications, media and entertainment, and technology turned to Compass Lexecon to use merger simulation techniques to model the likely impact of the pending transaction on consumers of video and broadband internet services, both on a standalone and bundled basis.

The analysis showed that consumers would benefit from the merger due to the complementarity of services from both firms.
The Federal Communications Commission ("FCC") **approved the ~ $50 billion transaction**. The FCC described the merger simulation as "sophisticated" and "a very fine example of a merger simulation."





# Five Segments, One Purpose



**Corporate Finance & Restructuring**

FTI Consulting is **organized into five segments**, each of which is a global leader in its own right for one simple reason: our commitment to having a tangible, positive impact on how our clients' confront and manage change, risk and disputes.

**Technology**

**Economic Consulting**

**Strategic Communications**

**Forensic & Litigation Consulting**

## Corporate Finance & Restructuring

As a trusted partner to companies, boards of directors, investors, lenders and creditors around the world, the Corporate Finance & Restructuring segment is focused on delivering restructuring, business transformation and transaction solutions. Committed to our clients' success, our award-winning professionals address the full spectrum of financial, operational and transactional risks and opportunities across diverse industries. Included among our core strengths is providing expertise in guiding companies through the value-creation life cycle.



# The Five Segments of FTI Consulting



**CORPORATE FINANCE & RESTRUCTURING**

As a trusted partner to companies, boards of directors, investors, lenders and creditors around the world, the Corporate Finance & Restructuring segment is focused on delivering restructuring, business transformation and transaction solutions. Committed to our clients' success, our award-winning professionals address the full spectrum of financial, operational and transactional risks and opportunities across diverse industries. Included among our core strengths is providing expertise in guiding companies through the value-creation life cycle.

A global standard bearer in economic consulting, we provide law firms, corporations and government agencies with sophisticated analyses of complex economic issues to assist clients in understanding the challenges and opportunities they face. Our Economic Consulting practice, including our subsidiary Compass Lexecon, is involved in a wide range of engagements that provide critical insight and expert testimony in legal and regulatory proceedings, strategic decision making and public policy debates. We also have deep expertise in securities litigation, M&A and antitrust, risk management, valuation and international arbitration.

**ECONOMIC CONSULTING**

**FORENSIC & LITIGATION CONSULTING**

We provide the industry's most complete range of forensic, investigative, data analytic and litigation services. As an independent consulting firm, we have unmatched qualifications in all types of risk, dispute, investigations and litigation scenarios. We have extensive experience serving leading corporations, governments and law firms around the globe.

As a leading global communications consultancy with more than 30 years of experience advising management teams and boards of directors, we help clients communicate effectively to protect and enhance their business interests with key stakeholders. We have a comprehensive view of strategic communications with an integrated suite of services in financial communications, corporate reputation and public affairs in all the major markets around the world.

**STRATEGIC COMMUNICATIONS**

**TECHNOLOGY**

FTI Technology solves data-related business challenges, with expertise in legal and regulatory matters. As data grow in size and complexity, we help organizations better govern, secure, find, analyze and rapidly make sense of information. Innovative technology, expert services and tenacious problem solving provide our global clients with defensible and repeatable solutions. Organizations rely on us to root out fraud, maintain regulatory compliance, reduce legal and IT costs, protect sensitive materials, quickly find facts and harness organizational data to create business value.



# Global Location Map & Regional Slides



# Our Global Reach

With offices in every major financial center and every corner of the globe, we successfully serve our clients wherever challenges and opportunities arise.



**North America**

**Canada**
Calgary
Toronto
Vancouver

**United States**
Annapolis
Atlanta
Austin
Baltimore
Boston
Bowie
Brentwood
Charlotte
Chicago
Dallas
Denver
Great Neck
Houston
Indianapolis
Los Angeles
McLean
Miami
Milwaukee
New York

Oakland
Palm Beach
Pasadena
Philadelphia
Phoenix
Pittsburgh
Portland
Princeton
Redwood City
Rockville
Roseland
San Francisco
Santa Barbara
Seattle
Troy
Walnut Creek
Washington, D.C.
Wayne
Winston-Salem

**Latin America**

**Argentina**
Buenos Aires

**Brazil**
São Paulo

**Caribbean**
British Virgin Islands
Cayman Islands

**Colombia**
Bogotá

**Mexico**
Mexico City

**Europe, Middle East, Africa**

**Belgium**
Brussels

**Finland**
Helsinki

**France**
Paris

**Germany**
Berlin
Düsseldorf
Frankfurt
Hamburg
Munich

**Ireland**
Dublin

**Israel**
Tel Aviv

**Qatar**
Doha

**South Africa**
Cape Town
Johannesburg
Stellenbosch

**Spain**
Madrid

**United Arab Emirates**
Abu Dhabi
Dubai

**United Kingdom**
London
Stirling

**Asia**

**China**
Beijing
Hong Kong
Shanghai

**India**
Mumbai
New Delhi

**Indonesia**
Jakarta

**Japan**
Tokyo

**Korea**
Seoul

**Malaysia**
Kuala Lumpur

**Philippines** [1]
Manila

**Singapore**

**Australia**

Brisbane
Melbourne
Perth
Sydney

1. Affiliate



16

# EXHIBIT A-2

**From:** "Ottaviano, Kenneth J." <KOttaviano@BlankRome.com>
**Date:** January 29, 2020 at 10:29:02 AM CST
**To:** "DeLuise, Kevin" <Kevin.Deluise@fticonsulting.com>, ESECO-imap <eric@eseco.com>, "stephane@carnot.us" <stephane@carnot.us>, Neal Falkenberry <tnf@autumnwind.com>
**Cc:** "Zucker, Cliff" <Cliff.Zucker@fticonsulting.com>, "Knechtel, Karl" <Karl.Knechtel@fticonsulting.com>, Stuart Mones <smm@moneslaw.com>
**Subject: RE:  SureFunding**

\u-257 ?

Kevin:

Thank you for sharing the draft letter. I am providing comments on behalf of the Noteholders that I represent and not the Collateral Agent. Accordingly, I have removed non-clients from this email. Attached are a few comments to the actual letter. With that said, I think the real issue is with respect to the scope, so I provided the revised scope below. In addition, below is a paragraph that is essential to this engagement and is standard in a consulting engagement letter with secured creditors. This is subject to continuing review and additional comment by my clients. I am available to discuss with Stuart and you or just you whatever you guys prefer. Just let me know. I will make myself available with some advance notice. Thanks, Ken

Revised scope.

- FTI will lead efforts to facilitate and advise the Client in its orderly liquidation and litigation efforts.
- Gain an understanding of the Client's business, portfolio of investments and pending or anticipated litigation.
- Review and approve any and all cash disbursements to or for the benefit of the Client and Noteholders.
- On or before February 7, 2020, deliver to the Noteholders a cash flow budget through March 31, 2020.
- Analyze and prepare a report/plan by March 27, 2020, for the Client and Noteholders that includes: (i) an accounting of all expenses since October 1, 2019; (ii) a list of all assets and liabilities; (iii) an action plan and timeline to maximize the recovery of the Non-Trade Pay assets through liquidation; (iv) an analysis of the scope and amount of applicable insurance coverage regarding Trade Pay and plan to maximize insurance recovery through claims process or litigation and costs associated therewith; (v) an analysis of the Trade Pay litigation including probability of success, potential assets available to satisfy any judgment(s), and time and costs associated therewith; (vi) identify any other assets of the Company that can be liquidated and costs associated therewith; (vii) prepare a 12-month cash flow budget; and (viii) provide options for Noteholders including, but not limited to, immediate distribution of any recoveries or participating in future recovery efforts.

- Assist the Client in negotiations with Note Holders.
- Review and approve the strategy regarding any pending or anticipated litigation that maximizes the recovery to the Noteholders.
- Assist in other communications with the Client's creditors, governmental authorities or other parties in interest in conjunction with the Client and Counsel.
- Other services as may be directed by the Client and mutually agreed to by FTI and the Note Holders.

This paragraph will need to be added to the letter.

Notwithstanding anything to the contrary in this Engagement Contract, FTI and the Company hereby agree that the Note Holders ("Note Holders") may have discussions directly with FTI without the presence or consent of, or notice, and the Company hereby instructs FTI to engage in discussions with the Noteholders regarding (i) any and all reports, term sheets, memoranda, advice, options, plans, information, presentations, progress reports, final written reports or other materials prepared by FTI or any of its affiliates and/or provided by FTI or any of its affiliates to the Company or any of its affiliates in connection with FTI's and its affiliates' performance of services under this Engagement Contract (collectively, the "Materials"), and any matters related thereto, and (ii) any matter concerning the Company and affiliates and their respective businesses, operations, assets or liabilities of which FTI or its affiliates has acquired knowledge as a result of its performance of services under this Engagement Contract.  FTI agrees to engage in full and open discussions regarding the foregoing matters with the Noteholders, as requested by the Noteholders from time to time, and the Company hereby authorizes the same.  In addition to the foregoing, notwithstanding anything in this Engagement Contract to the contrary, the Company hereby instructs FTI, and FTI agrees, to provide the Noteholders, at the Company's expense, with copies of any materials received or prepared by FTI, in each case in connection with FTI's performance of services under this Engagement Contract, including, without limitation, the Materials, and the Company hereby authorizes the same.  The Company and FTI hereby acknowledge and agree that they shall not make, or agree to

make, any modification, amendment or waiver of any of the terms or provisions of this Engagement Contract without the prior written consent of the Noteholders.

**Kenneth J. Ottaviano** | BLANKROME
444 West Lake Street | Suite 1650 | Chicago, IL 60606
1271 Avenue of the Americas | New York, NY 10020
O: 312.776.2511 | F: 312.264.2418 | M: 847.736.2207
kottaviano@blankrome.com

---

**From:** DeLuise, Kevin <Kevin.Deluise@fticonsulting.com>
**Sent:** Tuesday, January 28, 2020 10:26 AM
**To:** Ottaviano, Kenneth J. <KOttaviano@BlankRome.com>; ESECO-imap <eric@eseco.com>; stephane@carnot.us; Neal Falkenberry <tnf@autumnwind.com>; mark.teitelbaum@gmail.com; waynejam1@yahoo.com
**Cc:** Zucker, Cliff <Cliff.Zucker@fticonsulting.com>; Knechtel, Karl <Karl.Knechtel@fticonsulting.com>; Stuart Mones <smm@moneslaw.com>
**Subject:** RE: SureFunding

All,

Please find the draft FTI EL in the SureFunding matter. Please let me know if you have any comments or questions. Thanks, kjd

**Kevin J. DeLuise**
Managing Director
Corporate Finance and Restructuring

**FTI Consulting**
+1.646.485.0590 T
+1.201.741.2255 M
kevin.deluise@fticonsulting.com

3 Times Square | 10^(th) Floor
New York, NY 10036
www.fticonsulting.com

---

**From:** DeLuise, Kevin
**Sent:** Sunday, January 26, 2020 7:06 PM
**To:** 'Ottaviano, Kenneth J.' <KOttaviano@BlankRome.com>; ESECO-imap <eric@eseco.com>; stephane@carnot.us; Neal Falkenberry <tnf@autumnwind.com>
**Cc:** Zucker, Cliff <Cliff.Zucker@fticonsulting.com>; Knechtel, Karl <Karl.Knechtel@fticonsulting.com>; Stuart Mones <smm@moneslaw.com>
**Subject:** RE: SureFunding

EL in review. I expect it will be available for distribution before EOB tomorrow.

I will forward invite shortly.

Thanks for arranging.

kjd

**Kevin J. DeLuise**
Managing Director
Corporate Finance and Restructuring

**FTI Consulting**
+1.646.485.0590 T
+1.201.741.2255 M
kevin.deluise@fticonsulting.com

3 Times Square | 10th Floor
New York, NY 10036
www.fticonsulting.com

---

**From:** Ottaviano, Kenneth J. <KOttaviano@BlankRome.com>
**Sent:** Sunday, January 26, 2020 7:01 PM
**To:** DeLuise, Kevin <Kevin.Deluise@fticonsulting.com>; ESECO-imap <eric@eseco.com>; stephane@carnot.us; Neal Falkenberry <tnf@autumnwind.com>
**Cc:** Zucker, Cliff <Cliff.Zucker@fticonsulting.com>; Knechtel, Karl <Karl.Knechtel@fticonsulting.com>; Stuart Mones <smm@moneslaw.com>
**Subject:** [EXTERNAL] Re: SureFunding

I have copied Neal, Stephane and Eric on this email. Please send a dial in/invite. I defer to company counsel on who else should be invited. Also, what is the eta on a draft engagement letter? Thanks

**Ken Ottaviano**
**Blank Rome LLP**
**O: 312/776-2511**
**M: 847/736-2207**

On Jan 26, 2020, at 5:34 PM, DeLuise, Kevin <Kevin.Deluise@fticonsulting.com> wrote:

\u-257 ?Hi Ken,

Kevin DeLuise from FTI. I'm trying to arrange an introductory call with you and the Collateral Agents for tomorrow morning to discuss my role with SF.  I think you wanted to do it at 9:30 ET. Would you assist me me inviting those we need on the call? Also, I am available tonight or tomorrow morning for a one on one pre call at your convenience. Please let me know. Thanks kjd

Sent from my iPhone.
Please excuse thumb errors.

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

---

**********************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this

message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*********************************************************************************************

# EXHIBIT A-3



## Michael A. Tucker, CPA, CFE, CFF, CTP

Senior Managing Director – Corporate Finance

Michael.tucker@fticonsulting.com

**One Renaissance Square**
**Two North Central Ave.**
**Suite 1200**
**Phoenix, AZ 85004**
**Tel: (602) 744-7144**
**Fax: (602) 744-7110**

**Education**

B.S. in Accounting, University of Illinois

**Certifications**

Certified Public Accountant, Arizona and Missouri

Certified Fraud Examiner

Certified in Financial Forensics

Certified Turnaround Professional

**Professional Affiliations**

American Institute of Certified Public Accountants

Arizona Society of Certified Public Accountants

Missouri Society of Certified Public Accountants

Association of Insolvency Accountants

National Association of Fraud Examiners

Association of Bankruptcy Trustees

Turnaround Management Association

Michael Tucker is a senior managing director in FTI's Corporate Finance practice and is based in Phoenix. Mr. Tucker has extensive experience representing companies, creditors and parties in interest in restructuring and operational improvement situations (formal bankruptcy proceedings and out-of-court restructurings) during his 30+ year career. These services have included development and implementation of turnaround plans; development and review of business plans including the strategic realignment of business units; identification and assistance with selling of business units; development and implementation of cash management programs; operation and financial reporting; debt restructuring; and, negotiations with parties in interest. Mr. Tucker has been part of management teams as well as a chapter 11 Trustee and a Plan Administrator.

Mr. Tucker has also provided extensive services to businesses and law firms in dispute and litigation matters. These services have included consulting on a range of economic damages and financial and forensic issues, as well as matters involving antitrust, breach of contract and warranty, business interruption, dealer termination, fraud investigations, accountants' malpractice, lender liability, lost profits, and business valuations.

Mr. Tucker has previously provided accounting and audit services to a number of clients, having started his career at PricewaterhouseCoopers. In 2002, FTI Consulting purchased the Restructuring and Turnaround Group of PricewaterhouseCoopers where Mr. Tucker was a partner. Mr. Tucker's industry experience is very broad and includes, among others, manufacturing, distribution, healthcare, financial services, restaurant, real estate, gaming, retail and transportation.

## Range of Experience

### Reorganization and Related Consulting

- Assisted lender to single-asset real estate developer of approximately $175 million, 860 acre, 2400+ lot, single-family home development in assessing adequate protection of its first lien secured position under a proposed DIP priming loan and a cram down Plan of Reorganization. Services included analysis of uses of DIP loan cash, liquidation analysis, assessment of plan of reorganization cash flows, assisting counsel discovery and depositions, prepared expert report in opposition to DIP motion and assisted with negotiations between debtor and debtor's counsel to secure improved outcome from debtor's originally filed plan and proposed DIP loan.

- Financial advisor to a lender of confidential waste and recycling provider located in the Northeast. During the matter, FTI assessed the Company's liquidity and cash flow projections and advised the lender during sale of the company.

- Assisting a company in recycling business of bio solids and green waste with sale of the company.

- Hired by national staffing company to perform a quality of earnings report for its lenders and its restructuring process. Assisted with the refinancing and debt restructuring including managing the due diligence process.

- Currently assisting Bishop Gorman Development Corp in its Chapter 11 proceeding. Assistance includes preparation of cash collateral budgets, Plan projections, liquidation



CRITICAL THINKING
AT THE CRITICAL TIME™

analyses, reporting requirements, preference litigation and real estate valuations.

- Provided financial advisory services to secured lenders of a non-profit organization with 14 locations. Services included evaluation of the organization's real estate appraisals and market conditions, analyzed historical and projected cash flow and operating effectiveness of individual locations, assessed the company's financial restructuring plan and underlying assumptions, prepared liquidation analysis and provided guidance on strategic alternatives including potential debt restructuring and sale of assets.

- Provided advisory services to a 130 store retailer of multimedia entertainment and related products. Services included assisting with development of business plan and financial projections, same-store-sales and four-wall analysis, liquidity management including preparing a 13-week cash forecast, identification and implementation of $12M in cost reductions, preparation and navigation of a bankruptcy filing including negotiating a $90M DIP facility, sale of assets, claims review and estimation, wind-down of the company and confirmation of a Plan of Liquidation. Also assisted with the sale of an affiliated sports memorabilia distribution business and the sale and wind-down of a 39 store sister company.

- Served as financial advisor to Fuhu, Inc. a leading children's software maker and tablet company, prior to and during its Chapter 11 bankruptcy proceeding and 363 sale to Mattel, Inc. FTI's responsibilities included working with management in analysis of strategic alternatives in an effort to maximize enterprise value, assessed and implemented various cash management and budgeting procedures, implemented various cost cutting initiatives, led negotiations and discussions with key stakeholders for over $100 million in liabilities, prepared statements and schedules, assisted the management team with critical human resource issues, sale transition issues and assisting with the preparation of a liquidating plan.

- Served as financial advisor to the senior secured bondholders of a confidential waste disposal services provider in the Marcellus and Utica Shale regions during an out of court restructuring and sale process. FTI's responsibilities included analyzing strategic alternatives, development of a plan to take-over management of the Landfill in the event of a default, assessment of the Company's liquidity needs and review of its cash flow projections, and advising the trustee on the successful sale to a private equity buyer.

- Retained as the CRO for the US division of an international solar construction company which filed for bankruptcy. Upon the resignation of the CEO, Mr. Tucker became the interim CEO stabilizing the company and directing its sale to maximize value and preserve jobs. Additional work included applying for grants and rebates, resolving construction disputes, collecting on disputed receivable and converting other assets to cash. Upon the confirmation of a Plan, Mr. Tucker was appointed the Liquidating Trustee to pursue additional recoveries.

- Served as financial advisor to the Official Committee of Unsecured Creditors Ahern Rentals, Inc. a privately owned equipment rental company that was adversely affected by the 2007 economic downturn as a result of its construction-oriented customer base. FTI evaluated the terms of its post-petition credit facility, analyzed the affiliate equipment purchases and real property lease agreements, monitored the financial and operating results, evaluated the Company's valuations and plan of reorganization (as well as competing plans filed by other stakeholders) to determine feasibility of making proposed plan payments and fairness to creditors as well as evaluated proposed exit financing terms and pricing. The unsecured creditors obtained a 100% recovery with a waiver of all preference action against general unsecured creditors.

- Retained by the equity sponsor of a home alarm/security provider to provide guidance and to



lead management through the disposition of assets and the repayment of the secured lender in an out of court process. Work included overseeing the cash management system and 13 week cash flow projection model to effectively control vender payments and preserve liquidity as well assisting in the negotiations with potential asset buyers and developing a wind down plan as assets were sold.

- Provided financial advisory services to a top 10 home and business alarm/security provider. Services included providing guidance and assistance to management regarding separating services from a related entity, stabilization of the business, profitability improvement and sale of the business.  FTI also oversaw the cash management system and prepared a 13-week cash flow projection model to effectively manage liquidity, prepared a model used to forecast the financial performance of the business and managed the relationship between the equity sponsor, company and secured lender.  FTI also prepared a sell-side quality of earnings report and worked with management to address buyer requests and management presentations for the sale process.

- Served as financial advisor to ECOtality, Inc. prior to and during its Chapter 11 proceedings. FTI coordinated efforts to facilitate ECOtality's restructuring and sale efforts including developed financial projections, prepared statements and schedules, advised management on negotiations with existing lenders and creditors, reviewed debtor-in-possession financing term sheets and potential avoidance actions, assisted with preparation of debtor's plan of reorganization, sale transition issues and eventual wind-down of business.

- Retained as investment banker on sale of Western Funding, Inc.'s $34 million subprime auto loan portfolio in Las Vegas, NV.  FTI's services as investment banker in Chapter 11 sale process included development of financial projections, preparation of marketing materials, identified and contacted potential buyers, directed and coordinated the due diligence process, negotiated proposals received, led an auction which ultimately led to 34 overbids, as well negotiated asset purchase agreement with winning bidder.

- Retained as advisor to secured lenders of Commercial Real Estate Investment Fund which owned 25+ office buildings. Services included assessing borrower's long-term business plan in order to evaluate risk exposure to lenders under various restructuring alternatives. Work also included evaluating and analyzing property operations, sales and alternatives transactions.

- Provided financial advisory services to secured lenders of an 11 store supermarket chain. Evaluated financial performance of the Company and assisted in preparation of a business valuation.

- Served as financial advisor to a furniture manufacturer through its bankruptcy proceedings. Services included review of historical operations, preparation of weekly cash flow budgets, preparation of long-term financial projections, preparation of Plan of Reorganization and Disclosure Statement, assisted in multiple rounds of Debtor-in-Possession financing, preparation of liquidation and wind-down analyses, analysis of cash needs and ability to continue as a going concern, analysis of investments in accounts receivable and inventory, preparation of due diligence materials and assisted with sale of the company.

- Provided financial advisory services to special servicer regarding a $310 million personal guarantee claim in an individual joint chapter 11 case.  Services included analysis of debtors' plan of reorganization and a supporting disposable income and liquidation analysis, investigative services to identify undisclosed related entities and potential fraudulent pre and post petition transactions, assistance in review of the debtors' valuation reports and supporting



documentation and preparation of an expert rebuttal report, and assistance in preparation of an expert report regarding debtors' plan of reorganization.

- Provided financial advisory services to secured lender of two Westin resorts that filed chapter 11. Services included review of operating cash flows and assistance in negotiating upfront payment and on-going adequate protection payments, assistance in preparing expert report in support of secured lender's motion for relief from stay, performed analysis of the resorts past and projected financial performance, preparation of 1111(b) analysis, assessment of resorts' proposed plan of reorganization and supporting exhibits, assistance in preparation of expert report regarding appropriate interest rate, feasibility of proposed plan of reorganization and fairness of treatment of senior lenders claim and assistance in preparation of expert rebuttal report to the resorts' expert reports.

- Provided financial advisory services to the secured lender of a 50 store fast-food chain through its bankruptcy proceedings.  Services included review and analysis of the borrower's operations, evaluation of individual location performance including preparation of a four-wall analysis, review and analysis of the borrower's financial projections, identification and sensitivity analysis of the borrower's risks to achieve its financial projections, assessment of the borrower's and franchisor's bankruptcy proposals, analysis of claims, and other business and financial analysis.

- Served as financial advisor to the Equity Committee of Specialty Trust, a Reno-based real estate fund with book assets of over $200 million. Work included analysis of the loan and REO portfolios, review of historical financial statements and analysis of financial projections, analysis of short-term cash flows, assistance in obtaining DIP and exit financing, analysis of management fees paid to affiliated entities, forensic investigative services regarding loans made to insider borrowers, assistance in the appointment of a Chief Restructuring Officer and evaluation of plan projections and assistance with plan negotiations.

- Provided financial advisory services to a lender and the borrower/owner of several casinos and restaurants in Las Vegas. Work included review of the casinos' projected cash flows, participation in casinos' budget process, assistance with developing a profit improvement plan and advising the lender in negotiations with borrower.

- Retained by a local casino to assist in obtaining several forebearance agreements with its lender and evaluate profit improvement opportunities.

- Led a team providing a business valuation of a 50+ unit restaurant chain and franchisor for lender underwriting purposes.

- Served as financial advisor to the committee of unsecured creditors of NutraCea, an Arizona-based manufacturer of stabilized rice bran products. Work included review of NutraCea's operations and various manufacturing facilities; analysis of NutraCea's financial projections and need for additional financing; analysis of the sale of various manufacturing plants and other assets; analysis of potential joint venture agreements; analysis of feasibility post-confirmation projections and payments to creditors, and assisted in negotiating a consensual plan of reorganization that included a 100% payment to unsecured creditors.

- Served as financial advisor to a franchise lender regarding the restructuring of approximately $15 million in loans to a borrower in the fast food industry. Services included review and analysis of the borrower's operations and cost-cutting initiatives; evaluation of individual location performance including preparation of a four-wall analysis; review and analysis of the borrower's financial projections; identification and sensitivity analysis of the borrower's risks to achieve its financial projections; assessment of the borrower's restructuring proposal, and



other business and financial analysis.

- Performed a valuation for a lender of a 50+ quick service restaurant chain.

- Served as financial advisor to a franchise lender regarding the restructuring of approximately $60 million in loans to a borrower in the fast food industry. Services included review and analysis of performance at 156 restaurants in four geographic markets, review and analysis of the borrower's historical financial statements, review and analysis of financial projections, review and analysis of management company processes and procedures, review of intercompany transfers, and assistance to counsel in pursuing various legal actions related to loan default and continued non-payment of loan.

- Served as financial advisor to the Chapter 7 Trustee and its Counsel in International Fibercom, Inc's bankruptcy. Work included various financial analyses, claims analysis, preference work and other administrative projects to wind down the estate.

- Served as financial advisor to the lenders of Breckenridge Food Group, a 100+ chain of casual and quick service restaurants. Work included analyzing and assessing the historical financial performance of operating units serving as collateral for lenders as well as the future viability of the operating units. Additional work included forensic accounting related to transfer of funds amongst numerous operating and non operating entities.

- Advised the bondholders and worked closely with management of a company that was engaged in design, manufacture, and marketing of an extensive line of furniture for food service, office, hospitality, healthcare and education markets. The bondholders converted their debt into the equity of the company. FTI provided financial and operational guidance including analysis of the company's 13 week cash flow projections, revenue/expense assumptions, model methodology, budget to actual comparisons and restructuring negotiations. FTI also analyzed on-time shipping issues facing the company, various initiatives developed to address the issues, underlying causes of shipping delays and effectiveness of existing initiatives. FTI visited the company's Chinese operations to gauge the company's ability to meet projected ramp-ups in production levels, to monitor the progress of the transition of production to China and to assess the underlying estimated profitability of furniture to be produced in China.

- Provided financial advisory services to Mortgages Ltd., Phoenix-based real estate lender that serviced a loan portfolio of over $900 million. Mortgages Ltd filed for chapter 11.  Work included preparation of a Plan of Reorganization to exit from bankruptcy; claims administration; analysis of monthly operating reports; preparation of a short-term budget; meeting with potential exit financing sources; review of the loan portfolio and offering advice to management on how to proceed with non-performing loans; analysis of the company's assets to maximize their value; preparation of asset liquidation and recovery analyses; analysis of substantive consolidation with related parties; forensic investigative services dealing with related party transactions, and assisting management with human resources issues.

- Provided financial advisory services to an equity holder of various entities developing three master planned communities in Southern California. The three master planned communities consisted of 600 acres near Paris, 800 acres in Temecula and 1,500 acres in Calimesa each in different stages of development. Analyzed market conditions, prepared proforma budget and cash flow schedules, evaluated various project returns based on development and market assumptions, consulted with current and prospective lenders and assisted in strategic planning to maximize the return to equity holders.

- Served as financial advisor to the unsecured creditors of Centrix Financial LLC, a sub-prime



auto loan servicer. Assisted in selling the loan-servicing portfolio and related assets, as well as performing various forensic analyses.

- Retained by Glass Products, LLC to lead the transaction carve out of Ford Motor group's entire Glass Operations business into a separate company. FTI was retained to perform the acquisition, operational and financial due diligence, including leading the planning and execution for creating a standalone company for all functional areas including manufacturing (3 plants in US and Mexico), national and international distribution system, and all functional areas including those that were previously performed on the divisions behalf by ACH: finance, legal, HR, and IT.

- FTI served as interim management to Syntax Brillian, the manufacturer of Olevia TV and Vivitar cameras. Mr. Tucker effectively served as assistant CRO directly assisting the CFO with various operational, financial and cash flow issues. He also directly assisted the CRO who became interim CEO in operational analysis and sale of Vivitar camera line and maximization of other company assets. Mr. Tucker also performed various forensic analyses due to alleged fraudulent sales and agreements with foreign suppliers.

- Served as financial advisors to the unsecured creditors committee of TFS Electronic Manufacturing Services, Inc. Work included assistance to the committee in the analysis of substantive consolidation issues; potential equitable subordination of intercompany claims; evaluation and analysis of avoidance actions, including fraudulent conveyances and preferential transfers, and other plan related issues.

- Provided financial advisory services to a loan servicer regarding the review of expense recovery procedures and processes for serviced loans. Work included analysis of the expense recovery procedure and processes, identification of expenses to be reimbursed, preparation of recovery analysis and recommendations for improved procedures.

- Served as chapter 11 Trustee in the bankruptcy of Mineral Mountain Mining Company, an Arizona corporation, with multiple acreages, various mining operations and numerous patent and unpatented mining claims. Work included investigation of various unusual transactions as well as marketing and selling real estate and other assets.

- Served as financial advisor for the Equity Committee of Diversified Trust Deed Fund, LLC ("USA Diversified"), an investment fund whose investments were serviced by USA Commercial Mortgage Company, another debtor. Work included review and assistance to the Committee in analyzing real estate and affiliate loans owed to USA Diversified; analyses related to the Debtors' potential DIP financing; review of the Debtors' short-term cash management procedures; review of various financial information and analyses of underlying real estate collateral and affiliate assets, and assistance with obtaining a consensual plan and sale of USA Commercial Mortgage Company's assets.

- Serving as reorganized USA Capital Diversified Trust Deed Fund, LLC ("DTDF") Administrator responsible for all fund operations and activities including servicing and collection of loans and other asset recovery efforts. Previously served as the financial advisor to DTDF during its bankruptcy proceeding performing various investigations and financial analyses for asset recoveries. Also assisted the U.S. Attorney's office which successfully obtained a criminal sentence against one of the owners who is in jail.

- Advised a secured lender of a home security business with over 10,000 contracts. Assistance included various financial analyses of the collateral and contracts and assistance with collection efforts and bankruptcy process and issues.



- Served as Financial Advisor to the Official Creditors' Committee of National Benevolent Association, a not-for-profit operator of Continuing Care Retirement Communities ("CCRC") and Special Care centers. We were retained to advise the committee in all aspects of the bankruptcy, including DIP financing, marketing and sale of the Companies' assets, analysis of the restricted funds of the Companies and assessment of the markets in which the Companies' facilities operated.

- Assisted several commercial real estate partnerships, owned by a national real estate entity, in chapter 11 proceedings.

- Assisted an $80 million private company in the high technology manufacturing services industry. Provided assistance with senior bank negotiations, cash flow forecasting and business planning issues.

- Served as the financial advisor to the unsecured creditors' committee of a retail chain of stores selling outdoor gear and camping equipment. Work included review of business plan and assistance with potential creditor recoveries and the formation of a plan of reorganization.

- Served as restructuring advisor to Styling Technology Corporation, a distributor, prior to and during its chapter 11 bankruptcy proceedings. Analyzed business operations, strategic options, cash flow and valuation of various business operations. Suggested various profit and operational improvements including billing and collection procedures, potential product brand extensions and working capital maximization. Also assisted in disposition of various assets and the wind down of the estate.

- Served as financial advisor to the unsecured creditors' committee of WilCare, Inc., an operator of retirement and nursing home facilities. Provided advice related to investigation of numerous potentially fraudulent transactions, review of operations, cash management and cash forecasts, negotiations with lenders and assisted in the sale process of existing facilities by a Trustee appointed by the court at the committee's request. Management sold lifetime deposits to residents, which were used at management's discretion. Several members of management and the shareholder were under criminal investigation with one going to jail.

- Assisted a $350 million public company in the electronic manufacturing services industry. Provided assistance with senior bank negotiations, cash flow forecasting and business planning issues.

- Served as financial advisor to Microage, a computer distributor and integrator, in its chapter 11 proceedings. Assisted in various financial analyses and other matters including schedule preparation, claims analysis and estimations, preferences, litigation matters, liquidation analyses and determination of alternatives to sale of the business.

- Served as financial advisor to the unsecured creditors' committee of Aerotech, a repairer of auxiliary power units for the aviation industry. Assistance included various financial and operational analyses including recovery alternatives and various negotiations.

- Provided accounting and financial advisory services to the official unsecured creditors' committee in the chapter 11 bankruptcy of Quorum International, Ltd., a multi-level marketing company. Advised the committee on the feasibility of the debtor's proposed plan of reorganization, liquidation analysis, motion to appoint a trustee, fraudulent conveyance of real estate assets and debtor operations. Also provided assistance to the committee's counsel in



preparation of deposition and trial testimony of key witnesses and experts.

- Assisted the secured lender of several syndicated real estate partnerships. Work included review of leasing and accounting procedures, as well as substantive forensic work related to actual rental collections and rent roll listings. Analysis resulted in allowing the lender to foreclose on the properties and in discovery of significant differences in reports that were relied upon by the lender to release the general partners from their letters of credit.

- Served as financial advisor to the unsecured creditors' committee of the Nu-Era Group, Inc., a distributor of retail fixtures (an S-Corporation). Advice related to analysis of operations, investigation of a check kite, potential preferences and fraudulent conveyances, and negotiating strategies and recovery alternatives.

- Assisted the unsecured creditors' committee of a bankrupt savings and loan and real estate developer. Assistance included accumulating relevant financial and non-financial information for each of its over 50 entities to enable the committee to understand the company's operations and the effects of any reorganization plan. Also assisted in determining the relationship between affiliated companies for the purpose of identifying preferential payments and fraudulent conveyances made prior to filing for bankruptcy.

- Served as the joint advisor to WinRock, a homebuilder subcontractor, and its largest supplier. Assessed operations and made suggestions for enhancements of operations resulting in increased cash flow. Analyzed required personnel needs for various tasks and recommended personnel changes. Reviewed purchasing procedures and inventory security procedures and recommended enhancements. Prepared weekly cash flow analysis and a plan to repay the supplier.

- Served as advisor to an investment group in relation to making an investment in an internet software and service distributor to allow the company to expand. Reviewed operations and the company's business plan making recommendations to both the investment group and the company.

- Assisted one of the largest creditors of a publicly traded mail order pharmacy in developing a plan of reorganization, in conjunction with the debtor, which would enable the creditor to purchase the company through a chapter 11 proceeding. Analyzed debtor's historic operations and recommended strategies that would enable the creditor to purchase the company while maintaining the large tax benefits that the company possessed. Developed a complex integrated financial model used to project future cash flows of the new company for valuation and planning purposes. Worked with the buyer on planned profit improvement opportunities and potential operational changes upon closing.

- Served as financial advisor to the unsecured creditors' committee of Triumph Corporation, an automotive parts manufacturer. Assistance included review of business plan, liquidation analysis, valuation of business and assistance with negotiations for creditor recoveries.

- Retained to analyze plan feasibility by Castle Megastore Corporation, a specialty retail chain.

- Financial advisor to Honeywell, Inc. in conjunction with a troubled supplier. Advice included review of supplier's operations, implications of the supplier's filing of bankruptcy and strategic alternatives. Assisted in the purchase of one of the supplier's plants and various financial analyses with regards to the renegotiated contracts.



- Served as advisor to the unsecured creditors' committee of Nevada Bob's Pro Shops, Inc. Analyzed the operations on behalf of the creditors to determine the value of the franchisee system. Worked with the company to determine how to improve operations of the company owned stores and which stores to close. Negotiated with the debtor as to payment recoveries for creditors.

- Assisted a secured creditor in the bankruptcy proceeding of Grand Sprinkler, a landscaping company. Work included review of business plan and feasibility to repay lenders loan.

- Served as advisor to the unsecured creditors' committee of Phoenix Memorial Hospital. Analyzed the hospitals assets to determine value of assets and whether a sale was in the creditors' best interest. Performed preference work and assisted with sale of hospital.

- Served as financial advisors to the unsecured creditors' committee of UpRight, Inc., an aerial work platform manufacturer. Assessed the debtor's operations, monitored transactions with affiliates, analyzed the feasibility of projections, assisted in settlement negotiations, and analyzed the plan of reorganization. Assisted plan agent with wind down issues including claims and preference issues.

- Served as advisors to the unsecured creditors' committee of Alta Gold, a mining company. Prepared analysis of the company's operations and worked with the company to determine how to maximize a return to the creditors.

- Provided fraudulent conveyance and preference analyses on behalf of a creditor group in Viscount Air Services, a charter airline.

- Served as financial advisor to AMERCO (U-Haul) and its board of directors during the board members' personal chapter 11 filing. Analyses included analysis of debtors' solvency, AMERCO's business and the feasibility of AMERCO to exercise a right of first refusal to repurchase shares required to be purchased by debtors.

- Provided financial consulting for a real estate developer on a multi-use land development (country club, golf course and residential sites). Engagement involved analysis of prospective cash flows for each development component, review of development costs and allocation of overhead to development components, restructuring of existing partnership to allow for admission of new partners through an equity offering, and preparation of management for negotiation with lenders.

- Served as financial and restructuring advisor to Santa Fe Gaming Corp. and Pioneer Hotel, Inc., in the Pioneer Hotel bankruptcy proceedings. Created detailed financial pro form model for feasibility purposes and liquidation analysis. Provided management with a variety of other bankruptcy and gaming consulting services.

- Assisted a large secured lender in UDC Homes' chapter 11 proceedings. Advice related to primary liens, bankruptcy issues and negotiations and value of claim because lender held a participation in a subdivision development. Assistance included contract analysis and determination of amounts due under the participation agreement.

- Provided accounting and financial advisory services to Megafoods Stores, Inc., a supermarket chain with stores in Texas and Arizona. Services included assistance in the preparation of a business plan, assistance with a marketing strategy, analysis of store profitability and closures,



working capital maximization, and other ongoing business and financial analyses.

- Served as financial advisor to the unsecured creditors' committee of Interco, Inc., owner of Converse and Florsheim shoes and Lane and Broyhill Furniture. Provided advice related to analysis and valuation of each operation, analysis and estimation of claims and evaluation and negotiations related to the plan of reorganization, potential claimant recoveries, and new debt instruments.

- Served as financial advisor to Valley Industries, Inc., a distributor and fabricator of steel pipe in a chapter 11 proceeding. Provided advice related to analysis of profitability of various divisions, liquidation and sale values and strategies to preserve the $50 million NOL in a reorganization.

- Worked for a "super" regional bank's management to create an offering document to be used to raise funds from other corporate entities for investment in a specialized small business investment corporation (SSBIC).

- Represented the unsecured creditors' committee of Lomas, Inc., a diversified financial services company. Work included monitoring and evaluating the mortgage banking subsidiary's operations as well as its proposed five-year business plan. Additional work included assisting the committee and its counsel with various other tasks, including analysis of real estate holdings and development of mortgage servicing software.

- Led a lender due diligence team in reviewing a syndicated loan facility of a furniture and footwear manufacturer.

- Conducted a hotel operation review and recommended improvements. Review included analyzing credit policies, collection procedures, purchasing policies, front desk operations, banquet and catering operations and other general accounting policies.

- Served as financial advisor to a 249 room luxury hotel. Work involved evaluating the hotel and negotiating with its lenders that resulted in restructuring its debt.

- Developed a computer model to assess the financial statement impact of acquiring different divisions of a candy company by another company in the same industry.

- Provided financial analysis of a zoological park's projected results of operations and financial position to determine the extent of borrowing capacity and discretionary cash flow available to fund capital projects.

- Provided special litigation services as well as served as claims agent to Unison HealthCare Corp. in their chapter 11 bankruptcy proceedings. Advised debtor on matters involving preferential transfers to insiders, as well as other litigation matters such as substantive consolidation. Created liquidation analysis as well as other analyses used in support of the plan of reorganization for this provider of skilled nursing homes and assisted living centers. In addition, served as claims and solicitation agent in the bankruptcy proceedings.

- Assisted the limited partners in the investigation of inter-company transactions and related attempts to drain financial resources from several partnerships controlled by common general partners. These partnerships ultimately filed for bankruptcy.

- Provided financial consulting services to the Trustee and the Trustee's counsel in the



fraudulent conveyance matters of Spartan Printing, a bankrupt printing company. Services included analyzing past LBO transactions with management and the ESOP, determining approximate value of the company at transaction date and compared to other appraisals and determination of insolvency. Advised counsel on valuation issues, cash flow projections, and other related fraudulent conveyance issues.

- Assisted management of a retailer of pet food, supplies and accessories in analyzing store profitability and return on invested capital. Analyses included analysis of how regional expenses and distribution expenses were allocated to stores to assess fully loaded store operating costs as well as components of investment in stores.

- Served as financial advisor for a bond Trustee and the bond insurer of a 182-bed, full service, acute care, not-for-profit community hospital. Assistance included analysis of hospital operations, financial condition and ability to repay debt obligations.

- Served as financial advisor to a franchise lender in the sale and wind down of a 600 location convenience store company. Assistance included various analyses on DIP repayment to franchise lender who also provided a DIP loan, sale proceeds analysis, claim calculations and other wind down and recovery analyses.

- Provided financial advisory services to a franchise lender regarding the restructuring of approximately $25 million in loans involving a borrower in the convenience store industry. Work included review and modification of a financial model provided by the borrower's financial advisor, preparation of sensitivity and loan impairment analyses and preparation of an FASB 114 calculation.

## Dispute and Litigation Matters

- Assisted the Chapter 7 Trustee with a documents raid and computer seizure related to a fraud where several hundred million dollars of investor funds were missing in preparation for and continued tracing of assets among many affiliated international entities and shareholder.

- Assisted numerous real estate partnerships and limited liability companies, along with their general partners/members, in determining whether one of the general partners/members was due certain fees and other amounts. Analysis included reviewing various entity agreements to determine if compensation was due to the general partner/member for various services along with analyzing the various responsibilities and obligations of the general partners/members in managing the affairs of the entities.

- Provided financial advisory services to counsel regarding dispute involving a major credit card company's alleged wrongful retention of funds. Work included interviewing key personnel, reviewing past work product of company employees, providing negotiation/strategy recommendations and assessment of company prepared settlement calculations.

- Provided financial advisory services to a franchise lender and their outside counsel in connection with secured creditor impaired property insurance policies. Reviewed various insurance, litigation, loan and securitization documents and conducted interviews of key personnel to fully understand the business and insurance claim-related issues. Prepared various insurance claim-related analysis for an arbitration proceeding.

- Assisted Blue Cross Blue Shield (BCBS) who was acting as a third party administrator in a suit by the Department of Labor. BCBS was retaining negotiated savings from providers and not



passing them on to the plan sponsors. Assistance included quantifying the discounts not passed on to the sponsors and assisting in the negotiation with each sponsor and the Department of Labor.

- Assisted international client with tracing funds from various international bank accounts as well as tracing funds into and out of various assets proving certain assets were purchased with stolen funds.

- Quantified purchase price dispute which resulted from financial statement fraud. Recreated financial records and activity from various sources to prove fraud to support a purchase price claim. Work involved tracing bank activity, a documents raid at a division, the copying of hard disks and servers, and the restoring of various files.

- Performed an investigation and quantification of amounts embezzled by the chief financial officer (CFO) of a privately held business. Work also included assisting the prosecutor and police detective in the criminal case and preparation of a database of transactions to track embezzled funds and their uses by the CFO.

- Provided investigatory accounting consulting services for a bank on enforcement of loan guarantees where the loan funds were deposited in the general partner's operating account instead of the partnership's bank account. Additional analysis related to obtaining facts surrounding the formation of multiple partnerships with similar names and partners and tracing of funds.

- Investigated an employee dishonesty claim submitted to an insurance company by a fixture distributor. Work included analysis of cash sales which were unaccounted for and checks written to third parties for the benefit of the employee.

- Appointed by the Sacramento, California Superior Court to value a 50 percent interest in a recycling business pursuant to California Corporation Code Section 2000.

- Provided deposition and trial testimony regarding the interpretation of accounting language in a contract and valuation of a cable company under different scenarios.

- Provided deposition testimony in a potential breach of lease matter analyzing potential lost profits and other related damages of a gas convenience store operator.

- Examined the damage claim of a Ph.D. economist that claimed price erosion, lost profits, and a royalty involving a patent on a toolbox. Examination of all of the facts showed price erosion was due to plaintiff's own competing products and that lost profits were vastly overstated.

- Assisted in a patent infringement case for a university holding medical products patent. Analysis included determination of lost sales (actual and conveyed) and lost profits.

- Quantified amounts due a lender under a land development participation agreement.

- Worked for a health benefits company in a dispute over payments to a physician's practice. Quantified amounts paid and due over several years under various contracts.

- Independently analyzed accounting treatment for a software license agreement.

- Assisted counsel representing a bank in a lender liability suit where the borrower alleged that the bank's failure to lend additional funds and restructure existing loans resulted in lost profits by the borrower.



- Assisted counsel in determining an oil company's lost profits and other costs related to a dealer's noncompliance with the dealership agreement. Dealer counterclaimed wrongful termination and damages under the Petroleum Marketing Practice Act.

- Provided forensic accounting assistance to a bank in defense of a lender liability suit resulting from the unwinding of a merger of two companies. Assistance included obtaining relevant facts through review of plaintiff's accountant's working papers, plaintiff records and correspondence, as well as bank loan procedures and documentation.

- Determined the amount due a commissioned salesperson, per an employment agreement, in a leasing business upon the salesperson's termination.

- Assisted in the development of a theory of damages and prepared an economic model to calculate lost revenues, associated costs and resulting lost profits for several gasoline stations as a result of claims made under the Petroleum Marketing Practice Act.

- Performed a review of potential business interruption losses to a restaurant for an insurance company while its client constructed a building across the street from the restaurant. Assisted the insurance company in negotiating a settlement in this matter.

- Managed a litigation consulting engagement involving the allegation of audit failure in connection with a firm's audit of an electric cooperative.

- Analyzed business interruption losses to a manufacturing facility of plastic products caused by the explosion of equipment. Developed an economic model to quantify business interruption losses, which included analysis of the industry, product markets and market share, sales price and cost structures, business plans and fragmented accounting records.

- Analyzed damages from a claim of fraudulent misrepresentation by an aviation fuel company against an airport. Analyzed the market and determined alternative theories that demonstrated the required additional market share the fuel company would have needed to produce a profit.

- Managed an antitrust matter that involved reviewing the pricing activities of a steel drum manufacturer to determine if the pricing exhibited traits reflective of alleged antitrust violations. Analyzed the manufacturer's cost structure and compared announced price increases to change in the cost of input to the manufacturing process. Also performed comparisons of prices and input costs to national averages.

- Assisted a consumer products company in resolving an antitrust matter, which resulted in a settlement with the Department of Justice. Analysis included determining pricing procedures, distribution methods, promotional discounts, and quantity discounts and calculating the increased revenues subsequent to the alleged date of conspiracy with its main competitor.

- Analyzed damages in a product liability dispute. Plaintiff, an Italian manufacturer, claimed past and future lost profits and damage to business value.

- Performed a review of potential business interruption losses to an animal hospital and a law firm due to fires.

- Determination of lost profits for a farm implement and equipment dealer resulting from the termination of an exclusive dealership agreement.

- Quantification of amounts due to the purchaser of a company under a purchase agreement indemnification clause. This included identification and accumulation of cost information and determination of whether such costs were indemnifiable. The quantification included



accumulating and analyzing environment and product liabilities in excess of $250 million.

- Analyzed damages in a breach of contract matter involving a candy company's lost profits due to an alleged defective installation of an integrated computer system (general ledger, phone system, inventory control, quality assurance, etc.). Determined alternative theories and critiqued damage claim including determining financial capacity limitations and other market and economic explanations for the company's decreased financial results.

- Analyzed business interruption damages to an insurance business following a personal injury to the majority owner.

### Employment History

- FTI Consulting, Inc.:  2002 to present

- PricewaterhouseCoopers,  Phoenix Office:  1995 to 2002

- PricewaterhouseCoopers,  St. Louis Office:  1985 to 1995





## Michael A. Tucker

## Financial Advisor Roles

## in Nevada

| Company | Role |
| --- | --- |
| Bishop Gorman Development Chapter 11 | Debtor Financial Advisor |
| Martifer Solar Inc. Chapter 11 | Chief Restructuring Officer and Interim CEO |
| Martifer Solar Liquidating Trust | Liquidating Trustee |
| Ahern Rentals Inc. Chapter 11 | Unsecured Creditors Committee Financial |
| Western Funding Inc. Chapter 11 | Investment Banker |
| Specialty Trust Chapter 11 | Equity Committee Financial Advisor |
| Confidential Casino 1 | Financial Advisor |
| Confidential Casino 2 | Financial Advisor |
| Confidential Casino 3 | Financial Advisor |
| Confidential Financial Institution | Lender Financial Advisor on a casino loan |
| Stateline Casino Chapter 11 | Debtor Financial Advisor |
| Pioneer Hotel Chapter 11 | Debtor Financial Advisor |
| Confidential Casino 4 | Lender Financial Advisor |
| Diversified Trust Deed Fund LLC (part of USA Commercial | Debtor Financial Advisor |
| Reorganized Diversified Trust Deed Fund LLC | Manager of Fund |
| MedNet Chapter 11 | Financial Advisor to the largest creditor and |
| Nevada Bobs Pro Shops Inc. Chapter 11 | Unsecured Creditors Committee Financial |
| Alta Gold Chapter 11 | Unsecured Creditors Committee Financial |
| American Pacific Financial Corporation Chapter 7 | Chapter 7 Trustee Financial Advisor |
| DC Solar Chapter 11 | Investor Funds Financial Advisor |
| Amerco (U-Haul) Board Members Chapter 11 | Amerco Financial Advisor |
| *Multibank, et. al, v. Georio Medici, et. al,* Clark County District | Expert Witness |

Exhibit B

**DECLARATION OF C. TAB TURNER**

I, C. Tab Turner, declare under penalty of perjury under the laws of the State of Nevada that the following statements are true and correct:

1.      I am an attorney with Turner & Associates, P.A. I am licensed by the State of Arkansas. I am a citizen and resident of Florida, over the age of 18, of sound mind, and fully competent to make this Declaration. I have been in practice for over 35 years. The bulk of my litigation experience is in tort litigation, insurance litigation, anti-terrorism litigation, and fraud litigation. I have been retained to represent SureFunding and affiliated companies[1] to investigate and, where deemed necessary, initiate litigation against those responsible for committing the fraud that resulted in the loss of the referenced Tradepay assets. The statements in this Declaration are based on my own personal knowledge, and, if called as a witness, I could and would competently testify thereto.

2.      Tradepay Capital, LLC ("Tradepay") is a Florida corporation founded 2016. Tradepay was founded and operated by Ritesh Shaw, Piyush Parasmal Rampuria, Pushpesh Kumar Baid a/k/a Piyush Kumar Jain a/k/a P.K. Jain a/k/a Pushpesh Jain, Mrinal Ojha, Atit S. Gandhi, and Patrick De Lisi. All of these individuals except Mr. De Lisi are citizens and residents of India who either reside or work in the greater Miami area as Tradepay.

3.      Tradepay represented itself to the public, including to SureFunding, as a "team of professionals with extensive knowledge and experience in international trade finance", including in the areas of financial services, specialty finance, and non-recourse factoring of trade receivables. The company further represented that it was led by an experienced executive management team with a successful track record of building a multi-million USD receivable finance business in emerging markets with offices in Miami and Mumbai. Tradepay sought to service the growth of export related businesses in India. Tradepay portrayed its expertise to include understanding the financial challenges entrepreneurs faced when presented with growth opportunities. As a result, Tradepay created what it described as a customized service offering, which was portrayed as

---

1   The companies include ECP Holding III, LLC; ECP Holdings V, LLC; SureFunding V, LLC; MCS Agent, LLC; Marketplace Capital Strategies, LLC; SureFunding, LLC; and SIA Unite, LLC.

allowing growing businesses to further expand with minimal operational restrictions, and gross factoring charges of 27%, a funding cycle of 90 days, and a cost of risk of 2%. Representing that it used a thorough and automated risk assessment process, Tradepay claimed the ability to provide flourishing SMEs swift and seamless access to finance, with technology being at the center of the plan. Tradepay primarily operated out of Miami, New York and Mumbai.

4.     Between 2017 and the present, SureFunding entered into a participation agreement with Tradepay that gave SureFunding the right and opportunity to participate in certain trade factoring agreements. In summary, Tradepay would from time to time enter into factoring agreements with Buyers and Sellers, and SureFunding would in turn purchase from Tradepay a participation in certain accounts purchased by Tradepay. Tradepay agreed to use "best efforts" to manage, service, administer, and enforce SureFunding's accounts in accordance with the standards of care, including the receipt, collection and realization of all payments due. Tradepay likewise undertook to underwrite, conduct appropriate due diligence on each Seller and account, and take all necessary steps in legal actions to protect SureFunding's monetary interests as to Sellers and Buyers. Tradepay similarly agreed to follow SureFunding's instructions in managing, servicing, administering and enforcing the accounts, including Tradepay agreeing to pay all costs, fees, and expenses associated with performance of the obligations. A Deposit Account Control Agreement ("DACA") in favor of SureFunding was likewise required in the depository institution holding the payment accounts.

5.     As of October, 2019, Tradepay had breached the applicable contracts by failing to pay approximately 421 invoices, which totaled $34,241.452.83, as of that time, but grows daily due to interest and penalties. During the course of investigating the non-payment, SureFunding determined that Tradepay and its owners and operators had participated in a sophisticated and complex fraudulent scheme devised and executed to obtain financing and investing dollars under false pretenses in a trade finance scheme involving factoring of trade receivables.

6.     On October 23, 2019, SureFunding filed suit in Miami-Dade County, Florida against Tradepay, Shaw, Rampuria, Baid, Ojah, Gandhi and De Lisi for breach of contract, fraud, breach of

fiduciary duty, conversion and deceptive trade practices. The lawsuit was in the initial pleading phase when the COVID-19 virus interrupted progress with the proceedings.

7.    A second matter my Firm was retained to investigate, manage and, if necessary, prosecute for SureFunding is an insurance matter involving *Euler Hermes North America* ("Euler Hermes"). On September 18, 2018, Euler Hermes issued a Multi-Markets Business Credit Insurance Policy, policy number 5106498, to Tradepay for the period October 1, 2018 to September 30, 2019. The policy covered non-recourse factored receivables only. SureFunding was a beneficiary under the policy pursuant to an endorsement issued as a "Bank/Lender Policy Beneficiary Endorsement". The referenced Policy was designed to cover, subject to its terms and conditions, losses on merchandise accounts receivables purchased by the Insured from a Client for Shipments made by the Client to a covered Buyer, without recourse. In other words, the policy provided coverage for "credit losses" for the non-payment of amounts due from Buyers.

8.    Between October 11, 2019 and November 27, 2019, claims were submitted by SureFunding to Euler Hermes under Policy 5106498 totaling $47,990,893.00 in covered claims. The claims were submitted to Euler Hermes, with Euler's assistance, and in compliance with the terms and conditions of the policy. Each claim submitted also included an "Estoppel Agreement" signed by the Buyer(s)/debtor(s) for each transaction verifying that the goods were delivered, the Buyers/debtors accepted the goods, and the Buyers/debtors had no defenses to non-payment. In this regard, Euler Hermes Policy #5106498 provides "Credit" insurance against covered credit losses in return for premium paid. Each credit loss relates to the non-payment of amounts due from a covered Buyer/debtor for the shipment and receipt of covered products made by Tradepay and SureFunding during the policy period. The parties are currently discussing resolution of the claims.

9.    In the course of my representation, I have reviewed thousands of pages of internal documents, conducted interviews with pertinent witnesses and parties, discussed the issues with law enforcement agencies, conducted extensive research of Tradepay, Tradepay associates and managers, and also Tradepay affiliated individuals and companies, including asset investigation. I have also started conducting depositions. I can verify that this was a sophisticated fraudulent

3

scheme carried out by Tradepay and its associates and affiliates. The breadth and depth of the scheme is still not fully developed. I can also verify that I have seen no evidence to support any speculation that SureFunding management was in any manner involved in the fraud. Although it is always easy for people with no information to make such allegations, the facts I have reviewed to date do not support such speculation.

I declare under penalty of perjury under the laws of the State of Nevada (NRS 53.045)[2], that the foregoing is true and correct.

Dated this 31st day of March, 2020.

_____
C. TAB TURNER

---

[2] NRS 53.045.  Use of unsworn declaration in lieu of affidavit or other sworn declaration.  Any matter whose existence or truth may be established by an affidavit or other sworn declaration may be established with the same effect by an unsworn declaration of its existence or truth signed by the declarant under penalty of perjury, and dated, in substantially the prescribed form.

4

109109100.v1

# Exhibit A-3

DECN                              DISTRICT COURT

                          CLARK COUNTY, NEVADA


BRETT HATTON, an individual, et al., )
                                     )
              Plaintiff(s),          ) CASE NO.    A-20-812651-B
                                     ) DEPT. NO.   XIII
vs.                                  )
                                     )
SUREFUNDING, LLC, a Delaware limited ) Date:   April 2, 2020
liability company,                   ) Time:   9:00 a.m.
                                     )
              Defendant(s).          )
_____)

**DECISION**

      THIS MATTER having come before the Court on April 2, 2020

for hearing on Plaintiffs' Motion for Appointment of Receiver, with

appearances as noted in the Minutes and to be included in the

proposed order to be submitted as directed hereinbelow;

      AND, the Court having heard the argument of counsel and

then taken the Motion under advisement for further consideration,

and being now fully advised in the premises;

      NOW, THEREFORE, the Court decides the subject Motion as

follows:

      Plaintiffs describe themselves as "Investors" based upon

their status as promissory note holders.  There appears to be no

question that Defendant has defaulted on the subject promissory

notes.

**MARK R. DENTON**
DISTRICT JUDGE

DEPARTMENT THIRTEEN
LAS VEGAS, NV  89155

Defendant also acknowledges, at page 7, line 7 of its Opposition, that Defendant is in the process of liquidation, but then goes on, at page 8, lines 11-14, to urge that Mr. Tucker, as a recently retained Chief Restructuring Officer, "...brings to bear more than 30 years of extensive experience representing companies, creditors and parties in interest in restructuring and operational improvement situations."

In this case, it appears that the situation is beyond restructuring and operational improvement, and is in the realm of liquidation.  In that context, Plaintiffs, as creditors, are certainly in a position to urge appointment of a disinterested receiver. And, even though there will be a significant cost in the short term, the long-term interest of protecting and marshaling the assets of Defendant for the benefit and protection of all concerned outweighs such short-term cost.  NRS 32.010(1); *cf*. NRS 86.5411.

All things considered, and without at this time addressing Plaintiffs' allegations of fraudulent transfers or misconduct against Defendant and its principals, including, without limitation, Plaintiffs' allegations that Defendant, when sued, could not rightfully engage counsel and pay a substantial retainer, the Court is persuaded that the affairs of Defendant and the magnitude of the likely meritorious claims of Plaintiffs warrant appointment of a receiver.  In addition, the person nominated by

2

1  Plaintiffs appears to be well qualified to undertake the

2  receivership.  The fact that most of his experience as a receiver

3  may be related to the health care industry does not detract from

4  his credentials in being able to understand and act relative to the

5  business issues involved in this case.  Accordingly, Plaintiffs'

6  Motion is GRANTED.

7       Counsel for Plaintiffs is directed to submit a proposed

8  order consistent with the foregoing and with briefing and argument

9  supportive of the same after submitting the same to opposing counsel

10 for review and signification of approval/disapproval.  Instead of

11 seeking to clarify or litigate meaning or any disapproval through

12 correspondence directed to the Court or to counsel with copies to

13 the Court, any such clarification or disapproval should be the

14 subject of appropriate motion practice.

15      This Decision sets forth the Court's intended disposition

16 on the subject, but it anticipates further order of the Court to

17 make such disposition effective as an order or judgment.

18      DATED this 7th day of April, 2020.

MARK R. DENTON
DISTRICT JUDGE

3

## CERTIFICATE

I hereby certify that on or about the date filed, this document was e-served or a copy of this document was placed in the attorney's folder in the Clerk's Office or mailed to:

BROWNSTEIN HYAT FARBER SCHRECK, LLP
Attn:  Travis F. Chance, Esq.

FOX ROTHSCHILD
Attn:  Mark J. Connot, Esq. /Colleen E. McCarty, Esq.

LORRAINE TASHIRO
Judicial Executive Assistant
Dept. No. XIII

4

MARK R. DENTON
DISTRICT JUDGE

DEPARTMENT THIRTEEN
LAS VEGAS, NV  89155

# Exhibit A-4

CONFIDENTIAL - FILED UNDER SEAL

# Exhibit A-5

CONFIDENTIAL - FILED UNDER SEAL

# Exhibit A-6

CONFIDENTIAL - FILED UNDER SEAL