# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SureFunding, LLC,<br><br>            Debtor. | Chapter 11<br><br>Case No. 20-10953 (LSS)<br><br>**Related to Docket Nos. 15, 34** |

## BENCH RULING DELIVERED JUNE 1, 2020 ON:

## MOTION OF THE NOTEHOLDERS TO DISMISS
## THE DEBTOR'S CHAPTER 11 CASE (D.I. 15)

## AND

## UNITED STATES TRUSTEE'S MOTION FOR AN ORDER DISMISSING OR CONVERTING THIS CASE TO CHAPTER 7 OR DIRECTING THE APPOINTMENT OF A TRUSTEE (D.I. 34)

This is my ruling after an evidentiary hearing held on May 12, 2020. Initially, I note that a court must decide a motion to dismiss under § 1112(b) no later than 15 days after commencement of the hearing, unless the movant expressly consents to a continuance for a specific period of time or "compelling circumstances" prevent the court from meeting the time limits.[1] Here, I did not elicit the consent of the noteholders, nor did I expect to issue this decision outside the 15 day period allotted by the statute. But, compelling circumstances exist—in particular my calendar and commitments to other cases subsequent to the hearing on this matter as well as the time necessary to fully consider the record. Hence, I acknowledge that my ruling is five days late.

I have reviewed and considered all evidence admitted and arguments of counsel. Based on that, I have determined to suspend the proceedings in this bankruptcy case

---

[1] 11 U.S.C. § 1112(b)(3).

pending motion practice before the Nevada state court so that Judge Denton can hear and determine the matters that were before him immediately prior to the filing of the bankruptcy petition. Specifically, the bankruptcy case is suspended pending a decision on the debtor's motion for reconsideration of the April 7 decision and any motion practice on the April 14 Order appointing a receiver. I am not dismissing the bankruptcy case at this time.

**Background**

Based on the evidence submitted, I find the following facts:

- SureFunding LLC filed a voluntary bankruptcy case on April 14, 2020.
- SureFunding is a Delaware LLC with its principal place of business in Las Vegas, Nevada.
- SureFunding was founded by Jason and Justin Abernathy in 2014 as a private investment vehicle. The Abernathys are managers of SureFunding.
- SureFunding opened to outside investors in 2015. Many of these outside investors were family, friends or business acquaintances.
- SureFunding's investments are in short-term, high yield assets.
- Approximately 90% of SureFunding's investments were in factored receivables purchased through an entity known as TradePay Capital Inc. Those receivables were evidenced by hundreds of individual invoices.
- TradePay has defaulted on its agreements with SureFunding and owes SureFunding in excess of $47 million.

*Assets*
- SureFunding is liquidating, with the bulk of its assets at this point being litigation claims.
- On October 23, 2019, SureFunding and certain other entities associated with the Abernathys filed suit against TradePay and various individuals in state court in Miami-Dade County, Florida. The lawsuit sounds in breach of contract, conversion negligence, breach of fiduciary duty, fraud and misrepresentation, civil conspiracy and deceptive trade practices. While couched in this way, the Abernathys claim they and SureFunding are the victims of a massive fraud perpetrated by TradePay.
- SureFunding has also filed a claim with Euler Hermes in an amount in excess of $47 million under a Multi-Markets Credit Insurance Policy issued to Tradepay and under which SureFunding is a named beneficiary. On May 7, 2020, Euler Hermes denied the claim stating, among other things, that after significant diligence it was unable to verify the bona fides of the various receivables. Euler Hermes also cited extensively to the Florida litigation and takes the position that to the extent SureFunding is successful in the Florida litigation, the invoices submitted to Euler Hermes would not be covered under the insurance policy.

- SureFunding's remaining investments are in a collection of various assets, including worker's compensation medical receivables, a portfolio containing CVS real estate, litigation funding, music royalties and a note with NCM Wireless. These assets are in run off and Debtor has received about $142,000 in revenue from these investments since the bankruptcy filing.

*Potential Preference Actions*
- Debtor's Schedules also reflect $125,000 in payments made to non-affiliated entities (mostly professionals) and $75,000 made to affiliated entities within the 90 days prior to bankruptcy.
- The Schedules also reflect approximately $1,600,000 in payments made to insiders or affiliated entities in the year prior to the bankruptcy filing.

*Liabilities/Creditors*
- Debtor's list of 20 largest unsecured creditors is comprised entirely of holders of promissory notes issued by SureFunding.
- SureFunding issued promissory notes in varying amounts from several hundred thousand to several million dollars to its investors, which are all accredited investors. Collectively, the noteholders are owed approximately $34 million. I note the noteholders who filed the receivership action assert they are secured creditors.
- Debtor's schedules reflect minimal other creditors, owed approximately $170,000, largely consisting of professionals. Affiliated entities are also listed as creditors.

*Receivership Action*
- On March 20, 2020, certain noteholders owed approximately $23 million (or about 67% in amount of the outstanding notes) filed a breach of contract lawsuit in state court in Clark County, Nevada.
- On March 24, the noteholders moved for an appointment of a receiver to manage the liquidation of SureFunding's assets.
- The noteholders alleged in the motion to appoint a receiver the same allegations they make here:
    - that SureFunding's managers grossly mismanaged the business;
    - that instead of a diversified portfolio across industry and geography (and taking into account all relevant risk factors and seeking to avoid a single point of failure), SureFunding's managers purchased all of their factoring receivables through a single contact – TradePay—thus eliminating any benefits of diversity otherwise evidenced by the actual receivables purchased;
    - that beginning in April, 2019, TradePay failed to pay certain positions then due alleging that the failure was due to processing issues;
    - that without informing investors, SureFunding's managers agreed to exchange the unpaid invoices for different invoices with later maturity dates;
    - that successively larger exchanges occurred in July, August and September, 2019 with the exchanged receivables also maturing without being paid;
    - that while these exchanges were occurring, SureFunding was continuing to raise funds from investors.

3

- To be clear, I find based on the evidence presented that these exchanges did, in fact, occur and that investors were not contemporaneously informed of the exchanges.
- Judge Denton, who is the presiding judge in the Nevada litigation held a hearing on April 2, 2020 and took the matter under advisement.
- On April 7, 2020, Judge Denton issued a decision granting the receiver motion and approving Michael F. Flanagan, the noteholders' candidate, as the receiver. The decision stated however, that while it was the court's intended disposition, the court anticipated a further order to make the disposition effective as an order or judgment. The judge also contemplated "appropriate motion practice" if parties did not agree on the form of receiver order.
- On April 10, 2020, the noteholders submitted a form of order apparently without waiting for comments from SureFunding's counsel.
- On April 13 at 2:59 pm pacific time, Judge Denton entered his Order Granting Motion for Appointment of Receiver making effective his April 7 decision. The Order tasks Mr. Flanagan with taking immediate possession and full control of the Receivership Assets, which are all assets, operations and undertakings of SureFunding.

***Bankruptcy Filing***
- In October 2019, the Abernathys spoke with several prominent Delaware bankruptcy attorneys. They apparently determined not to proceed with bankruptcy at that time.
- At some point, however, SureFunding hired FTI as an advisor.
- On April 9, 2020, two days after Judge Denton's April 7, 2020 decision granting the receiver motion, Tom Horan reached out to Ted Gavin regarding CRO work for a client about to file bankruptcy.
- On April 10, Gavin had a call with Horan and Justin Abernathy. Gavin inquired whether the Abernathys were considering an independent director.
- Gavin recommended John Palmer of Tamarack Associates.
- Tom Horan reached out to John Palmer on April 10.
- Palmer spoke with Justin Abernathy on April 10 and Jason Abernathy on April 12. He also spoke with Gavin and read filings from the Nevada litigation.
- Palmer was retained as an independent director on April 13.
- At 1:15 pm eastern time on April 13, the board held a telephonic meeting at which all three board members were present, the board passed three resolutions:
  - Palmer was appointed to the Board;
  - A restructuring committee was formed and Palmer was appointed the sole member of the restructuring committee and was given the power to select a CRO;
  - Any manager could execute the agreement with the CRO upon Palmer's approval.
- The board meeting was adjourned at 1:30 pm.
- At 1:28 pm eastern time on April 13, Gavin received his engagement letter from one of the Abernathys. He signed and scanned it into his computer and sent it back later that evening.

4

- Palmer became aware of the Receivership Order around 5:30 pm eastern time on April 13.
- Palmer called a board meeting for 7:30 pm that night at which a discussion was held. Palmer concluded at that board meeting that SureFunding needed to file bankruptcy and the Abernathys agreed. Palmer also determined he had authority to file the bankruptcy case notwithstanding the Receivership Order.
- Palmer testified that he authorized the filing of the bankruptcy case because:
  - not all noteholders filed the receivership action;
  - there were unsecured creditors to be considered;
  - there may be avenues of recovery not available in a state receivership, such as preferences;
  - the absolute priority rule needed to be respected;
  - the case was complicated;
  - and to take advantage of the automatic stay.
- Palmer also recognized the situation as a "classic case" of mistrust of the managers.
- The voluntary petition was filed on April 14 at 9:32 a.m.
- No relief was sought with the filing.

**Discussion**

This is a liquidating case. The remaining assets are causes of action to recover the value of the TradePay receivables and the run-off of Debtor's other investment assets. There are no employees and there is no business to reorganize around. Given the circumstances, it is inconceivable that any entity would seek to use SureFunding as an investment vehicle in the future.

Notwithstanding, a debtor may liquidate in a chapter 11 case. There is no prohibition against it. The question then, is whether, as the Noteholders contend, the case was filed in bad faith, or as the Noteholders and the UST contend cause exists under § 1112(b) to dismiss or convert the case.

The Noteholders contend that the voluntary petition was not filed in good faith. "Good faith is a predicate to the right to file a petition in bankruptcy... ."[2] When a debtor's good faith is called into question, the debtor bears the burden of showing that its filing was

---

[2] *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 297 (Bankr. D. Del. 2011).

made in good faith.[3] Whether the good faith requirement has been satisfied is a "fact intensive inquiry" in which the court must examine "the totality of facts and circumstances" and determine where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive."[4]

The Third Circuit has spoken on multiple occasions on the good faith determination focusing on two inquiries: (i) whether the petition serves a valid bankruptcy purpose, for example by preserving going concern value or maximizing the value of the debtor's estate and (2) whether the petition is filed to obtain a tactical litigation advantage. Maximizing the value of debtor's estate means seeking to create or preserve some value that would otherwise be lost outside of bankruptcy, nor merely distributed to a different stakeholder.

A desire to invoke powers conferred by the Bankruptcy Code does not itself establish good faith or a valid bankruptcy purpose; that desire is neutral constituting neither good faith nor bad faith. Further, as I recently held in my *Rent-A-Wreck*[5] decision, a valid bankruptcy purpose assumes an entity in distress. Unlike in *Rent-A-Wreck*, here, there is no question that the debtor is in financial distress.

The Noteholders acknowledge the general contours of the Third Circuit standard, but focus on the *Primestone* factors[6] in their papers and arguments. "[N]o single factor is determinative of a lack of good faith in filing a petition."[7]
I'll run through each.

---

[3] *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000).
[4] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004).
[5] *In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364 (Bankr. D. Del. 2018).
[6] *See In re Primestone Inv. Partners, L.P.*, 272 B.R. 554, 557 (D. Del. 2002) (noting factors).
[7] *Id.* (quoting *In re Tiffany Square Assocs., Ltd.*, 104 B.R. 438, 441 (Bankr.M.D.Fla.1989)).

**(1) single asset case:**

This is not a single asset case. SureFunding has approximately $2 million in cash on hand. SureFunding has litigation claims against Tradepay and insurance claims against Euler Hermes. And, SureFunding's remaining portfolio is in run off and needs to be collected. This factor favors Debtor.

**(2) few or no unsecured creditors:**

All noteholders' claims (including those who did not file the receivership motion) appear to be *pari passu*, all evidenced by promissory notes and based on the same Note Purchase Agreement. The Note Purchase Agreement grants the agent for the noteholders a security interest in all rights, title and interests in favor of or payable to SureFunding in respect of loan or participations made by SureFunding to its funding partners. A UCC-1 has been filed.

Debtors have listed the noteholders on their Schedules as unsecured creditors. I do not know a basis for the objection, but at this stage of the case, the objection is not of paramount importance. While I confess that I am not entirely certain what the noteholders' collateral consists of, it was granted by Debtors. The noteholders, therefore, are secured creditors at least until properly challenged.

Other than the noteholders, the Debtor has scheduled 8 unsecured creditors, 2 are affiliates and 6 are professionals. As a result, this factor favors movants.[8] At best (from Debtor's perspective) it is neutral.

---

[8] *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299 (Bankr. D. Del. 2011) (MFW) ("There are few if any unsecured creditors: the only ones the Debtors could identify are the professionals hired before the bankruptcy was filed (attorneys and financial advisors) but it appears that even they are not unsecured creditors because they were either paid by, or obtained retainers from, Gramercy before the filing.").

7

**(3) no ongoing business or employees:**

Although Gavin testified that he believes SureFunding is an operating company because "MCS has employees and provides services under agreement with the Debtor for things like employees," SureFunding is not actively making new investments, but instead is merely collecting upon investments already made. It is in the process of winding down and liquidating. And, SureFunding itself has no employees. This factor favors movants.

**(4) a petition filed on eve of foreclosure:**

Although not filed on the eve of a foreclosure, the petition was filed merely a day after the receivership order was entered. Just as filing a petition on the eve of foreclosure can be (but is not per se) indicative of a bad faith filing because it attempts to make ineffective or stop the foreclosure, filing a petition a day after a receivership order is entered can be indicative, (but not per se) indicative of a bad faith filing because it attempts to make ineffective or stop the receivership proceeding. The scenario here is sufficiently analogous for this factor to favor movants.

**(5) a two-party dispute which can be resolved in pending state court action:**

As I already stated, the Schedules list 53 Noteholders. Twenty-seven of those noteholders (just over one half in number) holding $24 million of the notes (two-thirds by amount) are the movants in this action and sought a receiver in Nevada. Other than noteholders, there are only 8 creditors and these creditors' claims are not scheduled as either disputed, contingent or unliquidated. Thus, it is not clear that there are any disputes with those creditors.

And, while three noteholders holding approximately $2.4 million in claims have appeared in this bankruptcy case through counsel and support Debtor's position that the

8

instant motions be denied, this difference of opinion as to where Debtor's assets are best liquidated does not really constitute a dispute with respect to the underlying noteholder claims themselves. While not a completely cohesive group in terms of strategy, I find it hard to believe that these three noteholders do not believe that Debtor is in default and that they are entitled to be paid now on their promissory notes. Had the original agent for the Noteholders not resigned this would be a two-party dispute. This factor favors movants.

**(6) no cash or income:**

The Schedules reflect, and Gavin testified, that Debtor currently has about $2 million in cash on hand. The evidence also reflects that Debtor has received about $142,000 in revenue from its investments since filing the petition. Thus, because there is cash and income, this factor favors Debtor.

**(7) no pressure from non-moving creditors:**

There is no evidence of pressure from non-moving creditors. At the hearing, Gavin was asked if there had been pressure from non-moving creditors. His first answer was no. Counsel attempted to rehabilitate, but Gavin was unable to articulate how there was pressure from any non-moving creditors. This factor favors movants.

**(8) previous bankruptcy petition:**

This factor favors Debtor because no previous bankruptcy cases have been filed.

**(9) prepetition conduct was improper:**

At the hearing, we heard allegations that the Abernathys failed to disclose the Tradepay exchanges while simultaneously continuing to solicit new investments. Falkenberry, however, was reluctant to state whether or not the Abernathys were complicit in TradePay's fraud. Further, in defense of his actions, Justin Abernathy testified that after

9

April 2019 and the failure to pay on certain factored receivables, TradePay continued to remit millions of dollars in respect of other factored receivables. At this time, and on this record, I am not prepared to determine the propriety of the Abernathys' conduct. This factor is neutral.

**(10) no possibility of reorganization:**

Debtor is liquidating. Additionally, it does not appear that Debtor will be able to confirm a plan absent the Noteholders' consent. The Noteholders are the only significant creditors, and sufficient noteholders in both number and amount are moving to dismiss this case. Accepting Debtor's position that the Noteholders hold unsecured claims, it is unclear, at the present time, how Debtor will be able to obtain an impaired accepting class to effectuate a cramdown, if necessary. Counting on a negotiated resolution in these circumstances does not satisfy this factor. Because there appears to be no possibility of reorganization, this factor favors movants.

**(11) debtor formed immediately prepetition:**

Debtor was formed in 2015 and the petition was filed in 2020. This factor favors Debtor.

**(12) filing solely to invoke the automatic stay:**

Although there is an argument that SureFunding filed to take advantage of the automatic stay and thus make ineffective the receivership order, we heard evidence articulating reasons for filing other than taking advantage of the automatic stay, such as to take advantage of preferences and to place all noteholders on equal footing with equal rights. Thus, because it appears the filing was not done solely to invoke the automatic stay, this factor arguably favors Debtor.

**(13) subjective intent of the debtor:**

Again, at the hearing, we heard testimony from Palmer that he authorized the filing to, among other things, take advantage of the automatic stay, take advantage of chapter 5 avoidance actions, such as preferences, and place all noteholders on the same footing with the same rights, particularly with regard to their distribution rights. But, as importantly is the Abernathys' intent immediately leading up to the retention of Palmer and Gavin. This factor is neutral.

As applied here, the *Primestone* factors are inconclusive – but certain of the more important factors on the facts presented weigh in favor of Movants. Thus, I turn to the Third Circuit's overarching principles.

As I previously stated, the Third Circuit has identified two essential elements for a "good faith" bankruptcy filing. First, the bankruptcy petition must "serve[] a valid bankruptcy purpose."[9] Second, the bankruptcy cannot be filed "merely to obtain tactical litigation advantage."[10]

### *Valid Bankruptcy Purpose*

When a debtor is not attempting to preserve going concern value through a restructuring, the petition can nonetheless serve a valid bankruptcy purpose if the bankruptcy maximizes the value of the estate.[11] Maximizing value of the estate in chapter 11 through liquidation occurs when some value is otherwise lost outside of the bankruptcy.[12]

---

[9] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004); *See 15375 Memorial*, 589 F.3d at 618; *SGL Carbon*, 200 F.3d at 165.
[10] *Id.*
[11] *Integrated Telecom*, 384 F.3d at 120.
[12] *Id.*

11

Here, Debtor is attempting to liquidate in chapter 11. Thus, to determine whether the petition serves a valid bankruptcy purpose, the question becomes whether there would be some value obtained in bankruptcy that would otherwise be lost (not just distributed to a different entity) outside of bankruptcy, i.e., in the receivership.

Debtor argues that its management has the institutional knowledge that is required to successfully pursue asset recoveries in bankruptcy. Even if this is true, there is no reason why the Abernathys would not work cooperatively with the receiver to successfully pursue asset recoveries outside of bankruptcy. They have every incentive to do so, as they are themselves noteholders and as many of the noteholders are friends and family. Moreover, they seek to clear their good names. Mr. Abernathy's testimony in this regard was sincere. Thus, the "institutional knowledge" is not something that would cause value to be lost outside of bankruptcy.

Debtor further argues that there is the ability to utilize chapter 5 avoidance actions in bankruptcy but not outside of bankruptcy, particularly pointing to the potential preferences listed on their schedules. The schedules reflect $125,000 in payment to non-affiliated entities, mostly professionals, and $75,000 made to affiliated entities within the 90 days prior to the bankruptcy filing. The schedules further reflect approximately $1,600,000 in payments made to insiders or affiliated entities in the year prior to the bankruptcy filing.

Despite the potential availability of preferences, when considering the amount of debt owed to the Noteholders, approximately $34 million, and the total debt scheduled on Debtor's petitions, $40 million, it becomes clear that any value of the preferences to non-insiders (a potential of $125,000 before litigation cost) is de minimis. As to potential preferences against affiliates or insiders, as Noteholders point out, such transfers could likely

12

be pursued on a number of state-law theories, including fraudulent transfers under state law. And, as I pointed out in *Rent-A-Wreck*, bankruptcy is not necessarily needed to adjust matters among affiliated entities. Thus, it simply is not the case that there would be value lost outside of bankruptcy in these circumstances.

Debtor also argues that chapter 11 maximizes value because it provides a forum in which to centralize all disputes, thus creating efficiency. To the extent that this factor should be considered, this factor does not weigh in favor of retaining the case here as the parties already have a forum in which to centralize disputes—the Nevada court overseeing the receivership. The Nevada receivership provides a centralized hub in which creditors can submit claims and receive distributions. Thus, it is not the case that a bankruptcy would maximize value that would otherwise be lost outside of bankruptcy due to the ability to centralize disputes.

*Litigation Tactic*

Courts have held that filing a bankruptcy petition during a pending receivership is not, per se, a litigation tactic.[13]

Here, however, it is clear Debtor's actions on April 13–14 in appointing Gavin and Palmer, amending the LLC agreement, and filing for bankruptcy were all done as a result of the direct threat it perceived from the imminent receivership order.

---

[13] *In re: THE SUNSHINE GROUP, LLC, Debtor. THE SUNSHINE GROUP, LLC Appellant, v. CITY OF DANA POINT; CALIFORNIA RECEIVERSHIP GROUP; MARK ADAMS, as State Court-appointed Receiver, Appellees.*, No. CC-19-1105-GSL, 2020 WL 1846940, at *7 (B.A.P. 9th Cir. Apr. 10, 2020); *See also Matter of Ofty Corp.*, 44 B.R. 479, 482 (Bankr. D. Del. 1984) ("The filing of a petition to avoid liquidation does not always constitute grounds for dismissal.").

The Nevada Court issued its opinion on April 7, 2020 informing the parties it intended to appoint a receiver and requesting the submission of an order to effect the appointment. This kicked off Debtor's race to amend the LLC Agreement, and appoint Palmer and Gavin before the receivership order was entered. In fact, Gavin and Palmer were first contacted on April 9 and 10, respectively and were unknown to Debtor before then. Debtor amended the LLC agreement and made the appointments of Palmer and Gavin on April 13, mere hours before the receivership order was entered. Furthermore, on April 13, only two hours after hearing news of the receivership order's entry, Palmer called a board meeting and concluded that Debtor needed to file bankruptcy. The timing of the Nevada court's opinion, the subsequent rush to place SureFunding into the hands of strangers and the timing of the bankruptcy filing after the receivership order was entered lead to the inevitable conclusion that the petition was filed primarily to make ineffective the receivership order.

While Debtor could have chosen to liquidate in bankruptcy back in October, 2019, it did not do so. Instead it chose to pursue state court and non-bankruptcy remedies to collect its assets. The Nevada court receivership proceeding is another form of state law remedy and is sufficient here to accomplish the task.

**Conclusions**

Having concluded that Debtor has not met its burden to show good faith, it should also be clear that my conclusions (on the whole) assume the existence of the Nevada receivership as an alternative forum. The Nevada court provides the opportunity for an orderly wind down under an experienced and qualified receiver and will permit collection

14

and distribution of Debtor's assets overseen by a court. I find no accretive value to liquidation in a bankruptcy proceeding.

But, Debtor has moved for reconsideration of Judge Denton's decision and presumably a vacating of the receiver order. The motion raises several legal grounds. If Judge Denton were to agree with Debtor and reverse his decision, an alternative forum would not exist. Further, as discussed during argument, the current Receivership Order has provisions that favor the plaintiff/noteholders in the Nevada action. This is not surprising as the plaintiffs are the parties seeking relief there. However, Judge Denton clearly anticipated motion practice on the form of the Receivership Order and neither Debtor nor the non-plaintiff noteholders have weighed in yet. Nor has the Receiver asked for any clarifications to the order.

Under these circumstances, I will withhold judgment at this time pending the continued proceedings in the Nevada action. It serves the interests of the creditors and the debtor better to suspend proceedings in the bankruptcy case pursuant to section 305 pending the outcome of the motion to reconsider in the Nevada Court and motion practice on the form of Receivership Order. Once that is complete, the outcome of this bankruptcy case will become apparent. If the bankruptcy case remains in this court, all parties' rights with respect to conversion or a chapter 11 trustee are preserved.

An order will enter consistent with this decision and permitting limited relief from stay to permit the Nevada receivership proceedings to play out.

Dated: June 2, 2020

Laurie Selber Silverstein
United States Bankruptcy Judge

15