**<u>EXHIBIT A</u>**

Third Amendment to Note Purchase Agreement

## THIRD AMENDMENT TO NOTE PURCHASE AGREEMENT

This **THIRD AMENDMENT TO NOTE PURCHASE AGREEMENT** (this "**Amendment**") is entered into as of January 17, 2019, by and among **SUREFUNDING, LLC**, a Delaware limited liability company with Delaware Secretary of State file number 5499098 and principal address of 6671 Las Vegas Blvd. S, Suite 210, Las Vegas, NV 89119 (the "**Company**"), the individuals and/or entiles listed as "Purchasers" on the signature pages attached hereto (each, an "**Amending Purchaser**," collectively, the "**Amending Purchasers**") and **CANTOR FITZGERALD SECURITIES** ("**CFS**").

**WHEREAS**, the Company and the Amending Purchasers desire to amend the terms of that certain Note Purchase Agreement, dated as of October 23, 2015 (as amended by that certain First Amendment to Note Purchase Agreement, dated as of February 3, 2016 and that certain Second Amendment to Note Purchase Agreement, dated as of February 16, 2016, the "Existing Agreement"), by and among the Company and the individuals and/or entiles listed as "Purchasers" on the signature pages thereto, as updated from time to time, and CFS desires to accept an appointment as Collateral Agent under the Existing Agreement as amended by this Amendment (the "**NPA**");

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged by the parties hereto, the parties hereto, intending to be legally bound, hereby agree as follows

1.      Definitions.  Capitalized terms used herein without definition have the meanings ascribed to such terms in the NPA.

2.      Amendment.   Upon the due execution and delivery of this Amendment to the Amending Purchasers by each of the signatories hereto, (a) the Existing Agreement shall be and hereby is amended to incorporate the changes reflected in Annex I hereto, and (b) each of the Notes issued prior to the date hereof shall be and hereby are amended to incorporate the changes reflected in the form of Note attached as Exhibit A to Annex I hereto.

3.      Representations and Warranties.  To induce the Amending Purchasers to enter into this Amendment, the Company represents and warrants that: (a) the Company has the limited liability company power and authority to execute, deliver and perform this Amendment and each other document, instrument, certificate or agreement executed in connection therewith, (b) this Amendment has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, and (c) no Event of Default or Default has occurred and is continuing or would exist after giving effect to this Amendment.

4.      Appointment and Joinder.

(a)      Pursuant to Section 7.01(a) of the NPA, the Amending Purchasers, constituting the Required Purchasers, hereby designate Cantor Fitzgerald Securities as the "agent" to whom the Company has granted, a security interest in, and pledges of, for the ratable benefit of the Purchasers, the Collateral, wherever located, whether now owned or hereafter acquired or arising,

and all proceeds and product thereof. Each Amending Purchaser hereby authorizes the Collateral Agent to take such action on its behalf under the provisions of the NPA and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Collateral Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.

(b)    By executing and delivering this Amendment CFS hereby (i) accepts the appointment contemplated by Section 4(a) and (ii) becomes a party to the NPA as the Collateral Agent thereunder. The Collateral Agent may perform any of its duties thereunder by or through its agents or employees and shall have the rights, responsibilities and immunities set forth in Exhibit C to the NPA.

(c)    No reference to this Amendment or the appointment and/or joinder contemplated hereby need be made in the NPA or in any Note or other document or instrument making reference to the same.

5.    Entire Agreement. The NPA and Notes outstanding from time to time, constitute the entire agreement between the parties with respect to the subject matter contained herein and supersede any other prior understandings or agreements concerning the subject matter hereof.

6.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

7.    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

[*SIGNATURE PAGE FOLLOWS*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment on the day, month and year first above written.

**SUREFUNDING, LLC**

By: _Jason Abernathy_ _____
        Name: Jason Abernathy
        Title: Manager

**CANTOR FITZGERALD SECURITIES**

By: _____
        Name:
        Title:

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment on the day, month and year first above written.

**SUREFUNDING, LLC**

By: _____
       Name: Jason Abernathy
       Title: Manager

**CANTOR FITZGERALD SECURITIES**

By: _____
       Name:        James Buccola
       Title:        Head of Fixed Income

[SIGNATURE PAGE TO THIRD AMENDMENT]

ANNEX I

**Conformed Agreement**

## NOTE PURCHASE AGREEMENT

This **NOTE PURCHASE AGREEMENT** (this "**Agreement**") was (1) made and entered into as of October 23, 2015, by and among **SUREFUNDING, LLC**, a Delaware limited liability company with Delaware Secretary of State file number 5499098 and principal address of 6671 Las Vegas Blvd. S, Suite 210, Las Vegas, NV 89119 (the "**Company**"), and the individuals and/or entitles listed on each signature page or joinder attached hereto as a "Purchaser" (each, a "**Purchaser**," collectively, the "**Purchasers**"), as updated from time to time, (2) first amended on February 3, 2016, and (3) second amended on February 16, 2016, and (4) third amended and joined by Cantor Fitzgerald Securities, as collateral agent for the Purchasers, on January 17, 2019.

**WHEREAS**, the Company is seeking to raise funds for working capital purposes through the offering of two-year Notes; and

**WHEREAS**, the Purchasers from time to time party hereto desire to advance funds in exchange for the issuance of such Notes.

**WHEREAS**, Cantor Fitzgerald Securities was appointed as Collateral Agent on January 17, 2019 and has the rights, responsibilities and immunities set forth on Exhibit C.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged by the Parties, the Parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### PURCHASE, SALE AND TERMS OF NOTES

1.01    The Notes.  The Company has authorized the issuance and sale to the Purchasers of the Company's notes in an aggregate principal amount of no less than $500,000; such notes shall be substantially in the form set forth as Exhibit A hereto and are herein referred to individually as a "**Note**" and collectively as the "**Notes**", which terms shall also include any notes delivered in exchange or replacement therefor.

1.02    Closing.

(a)    Subject to and in reliance upon the representations, warranties, covenants, terms and conditions of this Agreement, the Company agrees to issue and sell to the Purchasers, and the Purchasers, severally and not jointly, agree to purchase the Notes.

(i)    The first closing (the "**Initial Closing**") of such purchase and sale, in amount equal to $500,000, shall take place on the date hereof or at such date and at such time as may be mutually agreed upon by the Company and Purchasers participating in such Closing.

(ii)     Additional Purchasers may purchase additional Notes from the Company in one or more subsequent Closings (each, a "**Subsequent Closing**"; the term "**Closing**" shall apply to each of the Initial Closing and any Subsequent Closing, unless otherwise specified); *provided*, that.  A Subsequent Closing may take place at any time and place as the Company and the Purchasers participating in such Closing consent to orally or in writing.

(b)     At each Closing, the Company will issue and deliver a Note to each Purchaser participating in such Closing, against payment of the purchase price therefor by check or wire transfer of immediately available funds in accordance with the instructions of the Company.

1.03     Terms.

(a)     The Notes shall bear interest as set forth in each Note; such interest shall be paid as set forth in each Note.

(b)     The principal amount of each Note shall be due and payable on the "Maturity Date" specified in such Note (as may be extended from time to time).

1.04     Prepayment.  At its option and upon prior written notice, the Company may prepay the Notes in whole at any time or in part from time to time, without premium or penalty, with any prepayments being applied pursuant to the terms of the Notes.

1.05     Maturity.  Any unpaid amounts of principal and interest due under the Notes shall be due and payable on the "Maturity Date" specified in such Note.  The passing of the Maturity Date shall not (i) relieve the Company of any obligation to any Purchaser under this Agreement, any such other agreement, instrument or document, or otherwise, until all the obligations hereunder and under each other Note Document are fully, indefeasibly paid and performed, or (ii) affect any right or remedy of any Purchaser, hereunder or under any, such other agreement, instrument or document.

1.06     Account.  The issuances of Notes made to each Purchaser shall be recorded in an account on the books of the Company bearing such Purchaser's name (the "**Account**").  There shall also be recorded in the Account all payments made by the Company in respect of the Notes, interest and expenses and other appropriate debits and credits as herein provided.  The Company shall upon request render and send to a requesting Purchaser a statement of the Account showing the outstanding aggregate principal balance of such Purchaser's Notes, together with interest and other appropriate debits and credits as of the date of the statement; such Purchaser shall be afforded a 30-day period to review such statement, during which it may makes specific written objections thereto which the parties hereto agree to address in good faith.

1.07     Disposition.  Each Purchaser agrees that the Notes must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration; the Company will make a notation on its transfer books to such effect.

## ARTICLE II

## CLOSING CONDITIONS

2.01    <u>Conditions to Purchasers' Obligations</u>.    The obligations of the Purchasers to purchase and pay for the Notes to be purchased by it at each Closing are subject to the following conditions:

(a)    <u>Representations and Warranties</u>.  Each of the representations and warranties of the Company set forth in <u>Article III</u> hereof shall be true and correct on the date of each Closing.

(b)    <u>Performance; Event of Default</u>.  The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing in all material respects.  As of such Closing, no Event of Default under and as defined under each Note has occurred and is continuing, and no Event of Default shall occur as a result of such Closing.

(c)    <u>Documentation at Closing</u>.  The Purchasers participating in the Initial Closing shall have received, prior to such Closing:  (i) a certified copy of the resolutions of the Board of Managers or similar governing body of the Company evidencing approval of this Agreement and the Notes, (ii) a certificate from a duly authorized officer of the Company stating that the representations and warranties of the Company contained in <u>Article III</u> hereof are true and correct as of the date of the applicable Closing, and that all conditions required to be performed by the Company prior to or at the applicable Closing have been performed, (iii) certified copies of the Company's organizational or formation documents, (iv) a certificate of incumbency, and (v) a Certificate of Good Standing (or equivalent certificate) for the Company from the Secretary of State of the State of Delaware.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to each Purchaser as of the date of any Closing in which such Purchaser participates, as follows, each of which representation and warranty is true and correct as of the date hereof and will be true and correct as of each Closing:

3.01    <u>Organization, Qualifications and Corporate Power</u>.  The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly licensed or qualified to transact business as a foreign entity and is in good standing in each jurisdiction in which the nature of the business transacted by it or the character of the properties owned or leased by it requires such licensing or qualification, except where the failure to be so licensed or qualified would not have a material adverse effect on the business or assets of the Company.  The Company has the limited liability company power and authority to own and hold its properties and to carry on its business as now conducted, to execute, deliver and perform this Agreement and each other document, instrument, certificate or agreement executed

**APP575**

in connection therewith (collectively with this Agreement and the Notes, the "**Note Documents**"), and to execute, issue, sell, deliver and perform the Notes.

3.02    Authorization of Agreements, Etc.

(a)    The execution and delivery by the Company of this Agreement and each other Note Document, the performance by the Company of its obligations hereunder and thereunder, and the issuance, sale and delivery of the Notes have been duly authorized by all requisite company action and will not (i) violate any provision of law, any order of any court or other agency of government, the formation and/or organizational documents of the Company, as amended and in effect as of the Closing, (ii) result in a violation of any provision of any indenture, agreement or other instrument to which the Company, or any of its properties or assets is bound, or (iii) conflict with, result in a material breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge, restriction, encumbrance, or, to the Company's knowledge, claim of any nature whatsoever upon any of the properties or assets of the Company, the result of any of which would have a material adverse effect on the business of the Company except in the case of clauses (i) and (iii) of this Section 3.02 to the extent that such conflict, violation, breach, default or event of default or acceleration or failure to obtain such consent, authorization or approval would not reasonably be expected to have a material adverse effect on the business, operations or financial condition of Company.

(b)    The issuance, sale or delivery of the Notes is not subject to any preemptive right of members of the Company that has not been waived or complied with or to any right of first refusal or other right in favor of any person that has not been waived or complied with.

3.03    Validity.  Each of this Agreement and each other Note Document has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.  The Notes, when executed and delivered in accordance with this Agreement, will constitute the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

3.04    Governmental Approvals.  No registration or filing with, or consent or approval of or other action by, any Federal, state or other governmental agency or instrumentality is or will be necessary for the valid execution, delivery and performance by the Company of this Agreement and each other Note Document or the issuance, sale and delivery of the Notes, other than filings pursuant to state securities laws (all of which filings have been or will be made by the Company) in connection with the sale of the Notes, if any.

3.05    Taxes.  All federal, state and local tax returns with respect to the Company and its direct and indirect business operations which are required to be filed have been timely filed.  The Company has paid or caused to be paid to the respective taxing authorities all taxes as shown on such returns or on any assessments received by it to the extent that such taxes have become due. The Company knows of no proposed material tax assessment against the Company, and the Company is not obligated by any other agreement, tax treaty, instrument or otherwise to contribute

**APP576**

to the payment of taxes owed by any other person or entity. All material tax liabilities are adequately provided for or reserved against on the books of the Company.

3.06  Compliance with Laws.

(a)  To the knowledge of the Company, neither (i) the Company nor (ii) any officer or director of the Company has at any time on or prior to the date hereof been a party to any illegal acts constituting a felony, including bribes, kickbacks or other similar arrangements prohibited by any federal, state or local law (domestic or foreign).

(b)  To the best of the Company's knowledge, the Company is in material compliance with all laws, ordinances, rules, or regulations, applicable to it, of all federal, state or local governments or any instrumentality or agency thereof

3.07  Solvency; Judgments.

(a)  The Company is and, immediately following the consummation of the Closing will be able generally to pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business.

(b)  The value of the assets of the Company (both at fair value and present fair saleable value in each case calculated on a going concern basis) is greater than the total amount of liabilities (including contingent and unliquidated liabilities)

(c)  The Company does not have unreasonably small capital. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (in each case as interpreted in accordance with fraudulent conveyance, bankruptcy, insolvency and similar laws and other applicable law).

3.08  Judgments. There is no action, suit, proceeding or investigation pending or, to best of the Company's knowledge, threatened, against or affecting the Company before or by any court or arbitrator or any government authority that would reasonably be likely to have a material adverse effect on the Company's ability to perform its obligations under the Note Documents. To the best of the Company's knowledge, the Company is not in default with respect to any final judgment, writ, injunction, decree, rule or regulation of any court, arbitrator or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign. There is no material claim, action, suit or other proceeding pending or threatened against the Company or any of its assets.

3.09  Information; Portfolio Statements. Subject to any limitations stated therein or in connection therewith, all information furnished or to be furnished by the Company pursuant to the terms hereof, when taken as a whole, will not, at the time the same is furnished, contain any untrue statement of a material fact and will not omit to state a material fact necessary in order to make the information so furnished, in the light of the circumstances under which such information is furnished, not misleading. The portfolio statements of the Company loans and participations previously furnished to such Purchaser are correct in every material respect, there has not been

any material adverse change in the financial condition of the Company portfolio of loans and participations since the date thereof that is not fully shown or provided for in said portfolio statement as at the date thereof except for obligations to perform after such date under contracts, purchase orders and other commitments incurred in the ordinary course of business.

3.10  <u>Indebtedness; Liens</u>.  To the best of the Company's knowledge, after reasonable inquiry, there does not exist any material default with respect to any indebtedness of the Company (including, without limitation, indebtedness for borrowed money, notes, instruments or other debt securities, but excluding, for the avoidance of doubt, the Notes) or an event which by the passage of time, the giving of notice, or both, would constitute such a default and which would give rise to a right to accelerate such indebtedness.  Such liabilities and obligations, individually or in the aggregate, are not reasonably expected to have a material adverse effect on the business, operations or financial condition of Company.

3.11  <u>Securities Act</u>.  The issuance of the Notes is being made pursuant to an exemption from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), and assuming that each Purchaser's representations and warranties in <u>Article IV</u> below, and the analogous representations and warranties of other purchasers of Notes, are true and correct, the issuance of the Notes is exempt from registration under the Securities Act.

3.12  <u>Margin Stock; Investment Company</u>.  The Company is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (as defined in Regulation U of the Securities Act).  The Company is not subject to regulation under the Investment Company Act of 1940, as amended.  The Company is not (i) an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, or (ii) controlled by any such company.

3.13  <u>Material Change</u>.  Since December 31, 2014, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a material adverse effect on the business, operations or financial condition of the Company.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

4.01  <u>Representations and Warranties</u>.  Each Purchaser represents and warrants to the Company that:

(a)  it has full power and authority to enter into and perform this Agreement in accordance with their respective terms, and it was not organized for the specific purpose of acquiring the Notes;

(b)  it has sufficient knowledge and experience in investing in companies similar to the Company in terms of the Company's stage of development so as to be able to evaluate the risks and merits of its investment in the Company and it is able financially to bear the risks thereof;

(c)     it has made an investigation of the Company and its business as it deemed necessary and has had an opportunity to discuss and review the Company's business, management and financial affairs with the Company's management as it deemed necessary;

(d)     the Notes being purchased by it are being acquired for its own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof or of any interest therein;

(e)     it understands that (i) the Notes have not been registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof or Rule 504, 505 or 506 promulgated under the Securities Act, (ii) the Notes must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, and (iii) the Notes will bear a legend to such effect;

(f)     this Agreement has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of it, enforceable in accordance with their respective terms; and

(g)     such Purchaser is an "accredited" investor as defined in Regulation D under the Securities Act and has such knowledge and experience with respect to investments such as the investment in the Notes contemplated by this Agreement that it is able to make an informed decision with respect to the risks and merits of such investment.

## ARTICLE V

## COVENANTS OF THE COMPANY

5.01    <u>Affirmative Covenants</u>.  The Company hereby covenants and agrees that, except as otherwise required hereby or as approved by the Required Purchasers in their sole discretion, from the date hereof until the date upon which all outstanding principal and accrued interest under the Notes are fully repaid pursuant to the terms of the Notes.

(a)     <u>Existence; Agreements</u>.  The Company shall comply with and perform, in all material respects, all of its obligations under the Notes Documents, and shall comply with all requests by the Required Purchasers which are consistent with the terms thereof.

(b)     <u>Prompt Payment of Taxes, Etc</u>.  The Company shall promptly pay and discharge, or cause to be paid and discharged, when due and payable (including any extensions available therefor), all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company or any subsidiary of the Company before they become delinquent and pay and discharge on or before their due date any and all other lawful claims and demands whatsoever, including, but not limited to, trade obligations; *provided, however*, that the Company shall be entitled to delay payment of such taxes, assessments, governmental obligations or other claims and demands so long as they or any of them are being diligently contested in good faith and by appropriate proceedings, appropriate reserves have been provided therefor by the Company and no lien is placed on any assets of the Company in

APP579

connection with such taxes, assessments, governmental obligations or other claims or demands so contested by the Company.

(c)    <u>Compliance with Requirements of Governmental Authorities</u>.    The Company shall duly observe and conform to all requirements of governmental authorities including, without limitation, those relating to the conduct of its business or to its property or assets.

(d)    <u>Use of Proceeds</u>.    The Company shall use the proceeds from the sale of the Notes as follows:  (i) for working capital and (ii) for the costs and expenses associated with the negotiation of this Agreement and the other Note Documents, and each consummated Closing.

(e)    <u>Note Documents</u>.    So long as any of the Notes are outstanding, the Company covenants and agrees with the Purchasers that it shall pay the principal of, premium, if any, and interest on each of the Notes, at the times and place and in the manner provided in the Notes.

(f)    <u>Future Indebtedness</u>.    The Company shall consult with the Required Purchasers prior to incurring or permitting to be outstanding any material indebtedness (other than additional Notes).

5.02    <u>Negative Covenants</u>.    The Company hereby covenants and agrees that, except as otherwise required hereby or as approved by the Required Purchasers in their sole discretion, from the date hereof until the date upon which all outstanding principal and accrued interest under the Notes are fully repaid pursuant to the terms of the Notes.

(a)    <u>Changes</u>.    The Company shall not change its entity name, adopt any trade names, or conduct its business under any trade name or style other than as hereinabove set forth, or change its chief executive office, or the present locations its books and records, without providing notice thereof to the Purchasers.

(b)    <u>Business</u>.    Unless approved in writing by the Required Purchasers, the Company shall not, in any material respect, deviate from the Company's line of business as currently conducted, other than those that are reasonably related, ancillary or complementary thereto.

**ARTICLE VI**

**COVENANTS OF THE PURCHASERS**

6.01    <u>Subordination; Repayment</u>.    Each Purchaser agrees that if requested it shall negotiate the subordination or repayment, as applicable, of its Notes in good faith on or prior to the incurrence of any additional material indebtedness (other than additional Notes).

6.02    <u>Further Assurances</u>.    Without limiting the foregoing, each Purchaser agrees to (a) execute and deliver to the company such subordination or intercreditor agreements or documents as the holders of any such indebtedness may reasonably require, and (b) take or cause to be taken such further actions as may be required by law or to carry out the terms of this Article VI, all at the expense of the Company.

**APP580**

## ARTICLE VII

## SECURITY INTEREST

7.01    Grant of Security Interest.  To secure the payment and performance of all of its obligations hereunder and under the Notes when due, the Company hereby grants to Cantor Fitzgerald Securities or such other agent as the Required Purchasers may designate from time to time in accordance herewith (such agent, the "**Collateral Agent**"), for the ratable benefit of the Purchasers, a security interest in, and pledges to such agent, for the ratable benefit of the Purchasers, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and product thereof. The Collateral Agent shall have the rights, responsibilities and immunities set forth in Exhibit C hereto, the terms of which are incorporated by reference into this Agreement.

7.02    Authorization of the Agent.  The Company hereby authorizes the filing of any financing statements or continuation statements, and amendments to financing statements, or any similar document in any jurisdictions and with any filing offices as the Required Purchasers may determine, in their sole discretion, are necessary or advisable to perfect or otherwise protect the security interest granted to the Purchasers herein and hereby specifically ratifies all such actions previously taken by the Required Purchasers.  Such financing statements shall describe the Collateral in the same manner as described herein.

## ARTICLE VIII

## MISCELLANEOUS

8.01    Certain Definitions.  As used herein:

(a)    "**Affiliate**" means, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by or is under common control with such specified Person, including, without limitation, any partner, officer, director, managing member or employee of such Person and any venture capital fund now or hereafter existing that is controlled by or under common control with one or more general partners or managing members of, or shares the same management company with, such Person.

(b)    "**Collateral**" means all rights, title and interests in favor of or payable to the Company in respect of loans or participations made by the Company to its funding partners.

(c)    "**Information**" means all information received from the Company or its Affiliates relating to the Company, its Affiliates or their respective businesses (including, without limitation, each Note Document and the information contained therein), other than any such information that is available to any Purchaser on a nonconfidential basis prior to disclosure by the Company or such Affiliate, as applicable.

(d)    "**Key Purchaser**" means each Purchaser that holds Notes in an aggregate outstanding principal amount of $2,000,000 or more.

(e)    "**Parties**" means, collectively, each party hereto from time to time.

9

(f)    "**Person**" means any individual or any corporation, limited liability company, association, partnership, limited partnership, trust or estate, or government (or any agency or political subdivision thereof), or other business or legal entity.

(g)    "**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

(h)    "**Required Purchasers**" means the holders a majority of the outstanding principal amount of the Notes at any time, such majority to include each Key Purchaser.

8.02    <u>No Waiver; Cumulative Remedies</u>.  No failure or delay on the part of any party to this Agreement in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

8.03    <u>Amendments, Waivers and Consents</u>.  Any provision in this Agreement to the contrary notwithstanding, changes in or additions to this Agreement or the Notes may only be made, and compliance with any covenant or provision herein or therein set forth may only be omitted or waived, if the Company (i) shall obtain consent thereto in writing from the Required Purchasers, and (ii) shall deliver copies of such consent in writing to any holders who did not execute the same; *provided*, that, no such consent shall be effective to postpone the date fixed for payment of the Notes or to reduce the principal and/or interest payable on any Note, without the consent of the holder thereof. For the avoidance of doubt, in the event of any conflict between this <u>Section 8.01</u> and the terms of any Note, such Note shall control.

8.04    <u>Addresses for Notices, etc.</u>    All notices, requests, demands and other communications provided for hereunder shall be in writing (including e-mail communication) and mailed, sent via e-mail or delivered:

(a)    If to a Purchaser, at the address set forth on such Purchaser's counterpart signature page or joinder hereto or at such other address as to which such Purchaser may inform the other parties in writing in compliance with the terms of this <u>Section 8.04</u>.

(b)    If to the Company, SureFunding, LLC c/o Marketplace Capital Strategies, LLC, at 425 Road 693 PMB 310 Dorado, PR 00646, Attention: Operations Manager, e-mail: <u>Notice@mcs.finance</u>, or at such other address as shall be designated by the Company in a written notice to the Purchasers complying as to delivery with the terms of this <u>Section 8.04</u>, with a copy, which shall not constitute notice, to Goodwin Procter LLP, 620 Eighth Avenue, New York, New York 10018, Attention: James A Hutchinson, Esq., e-mail: jhutchinson@goodwinprocter.com.

All such notices, requests, demands and other communications shall be effective when mailed (registered mail, return receipt requested, postage prepaid) or, if sent by e-mail, when such fax or e-mail transmission has been confirmed, respectively, addressed as aforesaid, unless otherwise provided herein.

**APP582**

8.05    <u>Binding Effect; Assignment</u>.  Each Purchaser may assign its rights and obligations hereunder to its Affiliates; *provided*, that, such assignment of rights shall be contingent upon the assignor and assignee providing a written instrument to the Company notifying the Company of such assignment and the assignor agreeing in writing to be bound by the terms of this Agreement. The Company may not assign its rights and obligations hereunder without the consent of the Required Purchasers; provided, however, that the Company may assign this Agreement and the obligations thereunder to any Affiliate in connection with the re-domiciling of the Company's business to the jurisdiction of Puerto Rico. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

8.06    <u>Confidentiality</u>.  Each of the Purchasers agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and shall agree to keep such Information confidential), (b) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, provided that the Company is provided prompt notice of any such disclosure or request for disclosure to the extent permitted by law, (c) to any other party to this Agreement, (d) in connection with the exercise of any remedies hereunder or under any other Note Document or any suit, action or proceeding relating to this Agreement or any other Note Document or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this <u>Section 8.06</u>, to any assignee of, or any prospective assignee of, any of its rights or obligations under this Agreement, (f) with the written consent of the Company or (g) to the extent such Information (1) becomes publicly available other than as a result of a breach of this <u>Section 8.06</u> or (2) becomes available to any Purchaser on a nonconfidential basis from a source other than the Company.  Any Person required to maintain the confidentiality of Information as provided in this <u>Section 8.06</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

8.07    <u>Survival of Representations and Warranties</u>.  All representations and warranties made in this Agreement, the Notes or any other instrument or document delivered in connection herewith or therewith, shall survive the execution and delivery hereof or thereof.

8.08    <u>Prior Agreements</u>.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter contained herein and supersedes any other prior understandings or agreements concerning the subject matter hereof.

8.09    <u>Severability</u>.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

8.10    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

**APP583**

8.11    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

8.12    <u>Additional Purchasers</u>. Upon execution and delivery of a joinder agreement in the form attached hereto as <u>Exhibit B</u> by a Purchaser, which shall be attached hereto by the Company, such Person shall become an "Purchaser" hereunder with the same force and effect as if originally named as a "Purchaser" herein. The execution and delivery of any such instruments shall not require the consent of the other Purchasers.

[SIGNATURE PAGES FOLLOW]

**APP584**

**IN WITNESS WHEREOF**, the parties hereto have executed this Note Purchase Agreement on the day, month and year first above written.

[*SIGNATURE PAGES ON FILE WITH COMPANY*]

EXHIBIT A

**Form of Note**

(See attached)

THIS PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.  THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT.

## SUREFUNDING, LLC

## NOTE

Note #: _____

$_____                                          _____ __, 20__

**FOR VALUE RECEIVED**, **SUREFUNDING, LLC**, a Delaware limited liability company with Delaware Secretary of State file number 5499098 and principal address of 6671 Las Vegas Blvd. S, Suite 210, Las Vegas, NV 89119 (the "**Company**"), hereby promises to pay _____, a _____ with _____ and principal address of _____ (the "**Purchaser**"), on the second anniversary of the date hereof (or such later date as the Company and the Purchaser may agree to in writing from time to time) (the "**Maturity Date**") (subject to Sections 4 through 6), the principal sum of _____ Dollars ($_____) or such part thereof as from time to time remains outstanding, whichever is less; together with interest payable each quarter on the balance of principal remaining unpaid from time to time accruing on and from the date hereof at an annual rate equal to _____ percent (__%) per annum, subject to Section 7 hereof.  Interest shall accrue daily and be calculated based on a 360-day year of twelve 30-day months, but in no event shall the rate of interest exceed the maximum rate, if any, allowable under applicable law.

At the election of the Purchaser, either in writing or via e-mail, the Company shall pay all or a portion of such interest on any applicable due date by capitalizing such interest and adding such capitalized interest to the then-outstanding principal amount of this Note (such capitalized interest from time to time herein referred to as "**Capitalized Interest**").  Any Capitalized Interest on this Note shall be deemed for all purposes to be principal of this Note (including without limitation with respect to the accrual of interest on any Capitalized Interest amounts), whether or not this Note is marked to indicate the addition of such Capitalized Interest, and interest shall begin to accrue on Capitalized Interest beginning on and including the date on which such Capitalized Interest is added to the principal amount of this Note, and such interest shall accrue and be payable, together with the interest on the entire remaining principal amount, in accordance with the terms of this Note.

1.    Payment.  All payments on account of principal and interest shall be made in lawful money of the United States of America at the principal office of the Purchaser, or such other place as the holder hereof may from time to time designate in writing to the Company.  All payments by

the Purchaser under this note (this "**Note**") shall be applied first to any fees and expenses due and payable hereunder, then to the accrued interest due and payable hereunder and the remainder, if any, to the outstanding principal.

2.      Transfer and Exchange.  The holder of this Note may, prior to maturity thereof, surrender such Note at the principal office of the Company for transfer or exchange.  Within a reasonable time after notice to the Company from such holder of its intention to make such transfer or exchange, and without expense to such holder, except for any transfer or similar tax which may be imposed on the transfer or exchange, the Company shall issue in exchange therefor another note or notes for the same aggregate principal amount as the unpaid principal amount of the Note so surrendered, having the same maturity and rate of interest, containing the same provisions and subject to the same terms and conditions as the Note so surrendered.  Each new note shall be made payable to such person or persons, or transferees, as the holder of such surrendered Note may designate, and such transfer or exchange shall be made in such a manner that no gain or loss of principal or interest shall result therefrom.  The Company may elect not to permit a transfer of this Note if it has not obtained satisfactory assurance that such transfer: (a) is exempt from the registration requirements of, or covered by an effective registration statement under, the Securities Act of 1933, as amended, and the rules and regulations thereunder, and (b) is in compliance with all applicable state securities laws, including without limitation receipt of an opinion of counsel for the Company, which opinion shall be satisfactory to the Company.

3.      New Note.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, the Company will issue a new note, of like tenor and amount and dated the date to which interest has been paid, in lieu of such lost, stolen, destroyed or mutilated Note, and in such event the Purchaser agrees to indemnify and hold harmless the Company in respect of any such lost, stolen, destroyed or mutilated Note.

4.      Other Notes.  This Note is one of several notes (together, the "**Notes**") of similar tenor issued and issuable by the Company on the date hereof and in the future pursuant to a certain Note Purchase Agreement dated as of October 23, 2015 between the Company, the Purchaser and Cantor Fitzgerald Securities, as Collateral Agent (as amended by the First Amendment to Note Purchase Agreement, dated as of February 3, 2016, as further amended by the Second Amendment to Note Purchase Agreement, dated as of February 16, 2016, as further amended by the Third Amendment to Note Purchase Agreement, dated as of January 17, 2019, as further amended or otherwise modified from time to time, the "**Note Purchase Agreement**").

5.      Prepayment.  The Company may prepay this Note, without premium or penalty, in whole or in part, with accrued interest to the date of such prepayment on the amount prepaid.

6.      Default.  Any of the following shall constitute an "**Event of Default**" under this Note:

        (a)      the dissolution or termination of business of the Company (other than, for the avoidance of doubt, in connection with the re-domiciling of the Company's business to the jurisdiction of Puerto Rico. Nothing, to the extent the successor in interest to the Company's business assumed the obligations hereunder and under the Note Purchase Agreement);

**APP588**

(b)    any petition in bankruptcy being filed by or against the Company or any proceedings in bankruptcy, insolvency or under any other laws relating to the relief of debtors, being commenced for the relief or readjustment of any indebtedness of the Company, either through reorganization, composition, extension or otherwise, and which, in the case of any involuntary proceedings shall be acquiesced to by the Company or shall continue for a period of 60 days undismissed, undischarged or unbonded;

(c)    the making by Company of an assignment for the benefit of creditors;

(d)    the appointment of a receiver of any property of Company which shall not be vacated or removed within 60 days after appointment; or

(e)    any material breach by the Company of the provisions of the Note Purchase Agreement or this Note, including the failure to pay any amounts under this Note when due.

After the occurrence of any such Event of Default, (i) the entire outstanding amount of principal and interest of this Note may become immediately due and payable upon written or electronic demand by the Purchaser, and (ii) any interest on the balance of principal remaining unpaid from time to time accruing on and from the date of and during the continuance of such Event of Default shall accrue at a rate equal to the interest rate in effect with respect to this Note, plus two percentage points (2%) per annum.

7.    <u>Governing Law</u>.  This Note shall be governed by and construed in accordance with the laws of the State of Delaware.

8.    <u>Miscellaneous</u>.

(a)    All payments by the Company under this Note shall be made without set-off or counterclaim and be free and clear and without any deduction or withholding for any taxes or fees of any nature whatever, unless the obligation to make such deduction or withholding is imposed by law.

(b)    No delay or omission on the part of the Purchaser in exercising any right under this Note shall operate as a waiver of such right or of any other right of the Purchaser, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  No right or remedy herein conferred upon or reserved to the Purchaser is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

(c)    The terms and provisions of this Note may be modified or amended only by a written instrument duly executed by the Company and by the Required Purchasers, which expressly refers to the Notes and modifies or amends all Notes in the same manner, which amendment shall be binding on and effective against all holders of the Notes then outstanding in accordance with Section 6.03 of the Purchase Agreement.  Notwithstanding the foregoing or anything to the contrary in the Note Purchase Agreement, any modification or amendment to the

principal amount of this Note, the interest rate payable hereunder, or the Maturity Date may be modified or amended only by a written instrument duly executed by the Company and the Purchaser, which amendment or modification need not be binding on or effective against any other holder of the Notes then outstanding under the Purchase Agreement.

(d)     The Company and every endorser or guarantor of this Note, regardless of the time, order or place of signing, hereby waives presentment, demand, protest and notices of every kind and assents to any permitted extension of the time of payment and to the addition or release of any other party primarily or secondarily liable hereunder.

(e)     Each of the Purchaser and any future holders of this Note agrees that no member, manager, director or officer of the Company shall have any personal liability for the repayment of this Note.

(f)     The Purchaser may assign this Note to an Affiliate (as defined in the Note Purchase Agreement) of such Purchaser.  Such assignee shall be deemed a "**Purchaser**" for purposes of this Note; *provided*, that such assignment shall be contingent upon the assignor and assignee providing a written instrument to the Company notifying the Company of such assignment.  Nothing in this Note, express or implied, is intended to confer upon any party other than the parties hereto, or their respective successors and permitted assignees, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided herein.

(g)     <u>Jury Waiver</u>.    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, COMPANY HEREBY KNOWINGLY AND VOLUNTARILY WAIVES TRIAL BY JURY AND THE RIGHT THERETO IN ANY ACTION OR PROCEEDING OF ANY KIND, ARISING UNDER OR OUT OF, OR OTHERWISE RELATED TO OR OTHERWISE CONNECTED WITH THIS NOTE.

(h)     [<u>Existing Note</u>[1].  The Company and, by its signature below, the Purchaser, hereby acknowledge and agree that this Note is issued in payment and satisfaction of the obligations of Company to Purchaser under that certain Note # [__] issued by the Company to Purchaser on [_____] pursuant to the Note Purchase Agreement (the "**Existing Note**").  The Existing Note shall be of no further force and effect upon the execution and delivery of this Note.]

[*SIGNATURE PAGE FOLLOWS*]

---

[1] To be included if note is being issued in cashless exchange for a prior note issued under the NPA.

**IN WITNESS WHEREOF**, the undersigned has caused this Note to be executed by its duly authorized officer as of the date first above written.

**COMPANY:**

**SUREFUNDING, LLC**

By: _____
     Name:
     Title:

EXHIBIT B

**Form of Joinder**

**JOINDER AGREEMENT**

_____ __, 20__

**IN WITNESS WHEREOF**, as of the date hereof, the joining Purchaser signatory hereto (the "**Joinder**"), hereby (a) joins in the execution of and becomes a party to that certain that certain Note Purchase Agreement, dated as of October 23, 2015 (as amended by the First Amendment to Note Purchase Agreement dated as of February 3, 2016, as further amended by the Second Amendment to Note Purchase Agreement dated as of February 16, 2016, as further amended by the Third Amendment to Note Purchase Agreement dated as of January 17, 2019, as further amended or otherwise modified from time to time, the "**NPA**"), by and among the **SUREFUNDING, LLC**, a Delaware limited liability company with Delaware Secretary of State file number 5499098 and principal address of 6671 Las Vegas Blvd. S, Suite 210, Las Vegas, NV 89119 (the "**Company**"), Cantor Fitzgerald Securities, as Collateral Agent, and the individuals and/or entitles listed on the signature pages attached thereto, as updated from time to time, (b) represents and warrants to the Company that each of the representations and warranties in Section 4.01 of the NPA are true and correct with respect to the Joinder as of the date hereof, (c) has the rights, benefits and obligations of a "Purchaser" (as defined in the NPA) under the NPA for all purposes thereof and in accordance with the terms and conditions set forth therein, and (d) ratifies the appointment of the Collateral Agent as to act as specified in the NPA.

**JOINING PURCHASER:**

*If Purchaser is an Entity:*

Print Name of Entity:  _____

Signature:  _____

Name of Authorized Signatory:  _____

Title of Authorized Signatory:  _____

*If Purchaser is an Individual:*

Signature:  _____

Print Name:  _____

*Address for Notices:*

_____
_____
_____

**APP592**

## Exhibit C

## Agency

1.    <u>Appointment</u>.    The Required Purchasers hereby designate Cantor Fitzgerald Securities as the Collateral Agent to act as specified herein and in this Agreement.  Each Purchaser shall be deemed to authorize the Collateral Agent to take such action on its behalf under the provisions of the Agreement and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Collateral Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Collateral Agent may perform any of its duties hereunder by or through its agents or employees, and in this connection, the Collateral Agent and any sub-agents appointed by the Collateral Agent pursuant to Section 13 for purposes of holding or enforcing any lien on the Collateral (or any portion thereof), or for exercising any rights and remedies thereunder at the direction of the Collateral Agent, shall be entitled to the benefits of all provisions of this Section 1, Section 14, and Section 15, as though such sub-agents were the Collateral Agent, as if set forth in full herein with respect thereto.

2.    <u>Nature of Duties</u>.    The Collateral Agent shall have no duties or responsibilities except those expressly set forth in this Agreement.  Neither the Collateral Agent nor any of its partners, members, shareholders, officers, directors, employees or agents shall be liable to the Purchasers for any action taken or omitted by it as such under this Agreement or hereunder or in connection herewith or therewith, be responsible for the consequence of any oversight or error of judgment or answerable for any loss, unless caused solely by its or their gross negligence, bad faith or willful misconduct as determined by a final judgment (not subject to further appeal) of a court of competent jurisdiction.    The duties of the Collateral Agent shall be mechanical and administrative in nature; the Collateral Agent shall not have by reason of this Agreement a fiduciary relationship in respect of the Company or any Purchaser; nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Collateral Agent any obligations in respect of this Agreement except as expressly set forth herein and therein.

3.    <u>Lack of Reliance on the Collateral Agent</u>. Independently and without reliance upon the Collateral Agent, each Purchaser, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Company in connection with the Company's obligations to such Purchaser, the transactions contemplated by this Agreement, and the taking or not taking of any action in connection therewith, and (ii) its own appraisal of the creditworthiness of the Company and its subsidiaries, and of the value of the Collateral from time to time, and the Collateral Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Purchaser with any credit, market or other information with respect thereto, whether coming into its possession before any obligations are incurred or at any time or times thereafter.  The Collateral Agent shall not be responsible to the Company or any Purchaser for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing of other persons delivered by the Collateral Agent in connection herewith, or for the execution, effectiveness, genuineness, validity, enforceability, collectibility, priority or sufficiency of this Agreement or for the financial condition of the Company or the value of any of the Collateral, or be required to make any inquiry concerning either the performance or observance of any of the

terms, provisions or conditions of this Agreement, or the financial condition of the Company, or the value of any of the Collateral, or the existence or possible existence of any default or Event of Default under this Agreement.

4.      Certain Rights of the Collateral Agent.  The Collateral Agent shall have the right to take any action with respect to the Collateral, on behalf of all of the Purchasers upon the written election of the Required Purchasers.  The Collateral Agent shall request written instructions from the Required Purchasers with respect to any act or action (including failure to act, but excluding matters of a purely administrative nature) in connection with this Agreement; if such instructions are not provided despite the Collateral Agent's request therefor, the Collateral Agent shall refrain from such act or taking such action; provided that if such action is not taken as a result of the failure to provide such written instruction, the Collateral Agent shall not incur liability to any Purchaser by reason of so refraining.  Without limiting the foregoing, (a) no Purchaser shall have any right of action whatsoever against the Collateral Agent as a result of the Collateral Agent acting or refraining from acting hereunder in accordance with the terms of this Agreement, and the Company shall have no right to question or challenge the authority of, or the instructions given to, the Collateral Agent by the Required Purchasers pursuant to the foregoing and (b) the Collateral Agent shall not be required to take any action which the Collateral Agent believes (i) could reasonably be expected to expose it to personal liability or (ii) is contrary to this Agreement or applicable law.

5.      Reliance.  The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any notice, statement, certificate or other document (whether transmitted physically or by e-mail) signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and its duties hereunder and thereunder.  Anything to the contrary notwithstanding, the Collateral Agent shall have no obligation whatsoever to any Purchaser to assure that the Collateral exists or is owned by the Company or is cared for, protected or insured or that the liens granted pursuant to this Agreement have been properly or sufficiently or lawfully created, or enforced or are entitled to any particular priority.

6.      Permitted Subordination and Release.  The Required Purchasers may instruct the Collateral Agent to agree to release in whole or in part or to subordinate any Collateral to any claim or other actual or proposed security interest and may enter into any agreement with the Company to evidence such subordination.

7.      Exculpation.   The Collateral Agent and its officers, employees, attorneys and agents, shall not incur any liability whatsoever for the holding or delivery of documents or the taking of any other action in accordance with the terms and provisions of this Agreement, for any mistake or error in judgment, for compliance with any applicable law or any attachment, order or other directive of any court or other authority (irrespective of any conflicting term or provision of this Agreement), or for any act or omission of any other person engaged by the Collateral Agent in connection with this Agreement, unless occasioned by the exculpated person's own gross negligence, bad faith, willful misconduct or material breach of the terms of this Agreement; and each party hereto hereby waives any and all claims and actions whatsoever against the Collateral Agent and its officers, employees, attorneys and agents, arising out of or related directly or indirectly to any or all of such foregoing exculpated acts, omissions and circumstances.

8.      <u>Segregated Funds</u>.  Any funds held by the Collateral Agent hereunder need not be segregated from other funds except to the extent required by law.  The Collateral Agent shall be under no liability for interest on any funds received by it hereunder.

9.      <u>Rights and Remedies Not Waived</u>.  No act, omission or delay by the Collateral Agent shall constitute a waiver of the Collateral Agent's rights and remedies hereunder or otherwise.  No single or partial waiver by the Collateral Agent of any default hereunder or right or remedy that it may have shall operate as a waiver of any other default, right or remedy or of the same default, right or remedy on a future occasion.

10.     <u>Other Activities</u>. The Collateral Agent may generally engage in any kind of business with any party hereto or any subsidiary, representative, agent or Affiliate thereof as if it had not entered into this Agreement; the Collateral Agent and its Affiliates and their officers, directors, employees, and agents (including legal counsel) may now or hereafter be engaged in one or more other transactions with any party hereto or act as trustee, agent or representative of any party hereto (collectively, the "<u>Other Activities</u>") not the subject of this Agreement; without limiting the forgoing, Collateral Agent and its Affiliates and their officers, directors, employees, and agents (including legal counsel) shall not be responsible to account to any party hereto for such Other Activities.

11.     <u>Resignation by the Collateral Agent</u>.  The Collateral Agent may resign from the performance of all its functions and duties under this Agreement and the other transaction documents at any time by giving 30 days' prior written notice to the Company and the Purchasers.  Upon any such notice of resignation, the Required Purchasers shall appoint a successor Collateral Agent hereunder.  If a successor to the Collateral Agent shall not have been so appointed within said 30-day period, the Required Purchasers shall hold the rights and obligations of the Collateral Agent hereunder until such time, if any, as the Required Purchasers appoint a new successor to Collateral Agent as provided above.   Such resignation shall take effect upon the earlier of (i) the appointment of a successor agent in accordance with the terms of this paragraph, or (ii) the effective date of such resignation.  The Collateral Agent shall continue to serve until the effective date of the resignation or until its successor accepts the appointment, but shall not be obligated to take any action hereunder.

12.     <u>Rights with Respect to Collateral</u>. Each Purchaser agrees with all other Purchasers and the Collateral Agent (i) that it shall not, and shall not attempt to, exercise any rights with respect to its security interest in the Collateral, whether pursuant to any other agreement or otherwise (other than pursuant to this Agreement), or take or institute any action against the Collateral Agent or any of the other Purchasers in respect of the Collateral or its rights hereunder (other than any such action arising from the breach by such person of this Agreement) and (ii) that such Purchaser has no other secured rights with respect to the Collateral other than as set forth in this Agreement.  Upon the acceptance of any appointment as Collateral Agent hereunder by a successor agent, such successor agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring agent and the retiring agent shall be discharged from its duties and obligations under this Agreement.  After Collateral Agent's resignation or removal hereunder as Collateral Agent, the provisions of this <u>Exhibit C</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent.

**APP595**

13.    <u>Delegation of Duties</u>. The Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Note Document by or through any one or more sub-agents appointed by the Collateral Agent.  The Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Exhibit C shall apply to any such sub-agent and to the Related Parties of the Collateral Agent and any such sub-agent, and shall apply to their respective activities in connection with the Notes as well as activities as the Collateral Agent. The Collateral Agent shall have no responsibility for the conduct or negligence of any sub-agent appointed by it hereunder, except to the extent that the Collateral Agent acted with gross negligence or willful misconduct in the appointment of such sub-agent.

14.    <u>Indemnification by the Company</u>.  The Company shall indemnify the Collateral Agent (and any sub-agent thereof, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Company) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Note Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or (ii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Company, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Company against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Note Document, if the Company has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) result from a claim not involving an act or omission of the Company and that is brought by an Indemnitee against another Indemnitee (other than against the arranger or the Collateral Agent in their capacities as such).

15.    <u>Reimbursement by Purchasers</u>.  To the extent that the Company for any reason fails to indefeasibly pay any amount required under Section 14 of this Exhibit to be paid by it to the Collateral Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Purchaser severally agrees to pay to the Collateral Agent (or any such sub-agent), or such Related Party, as the case may be, such Purchaser's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Purchaser's applicable percentage at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Purchaser); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Collateral Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Collateral Agent (or any such sub-agent in connection with such capacity.

**APP596**