# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SureFunding, LLC,<br><br>            Debtor. | Chapter 11<br><br>Case No. 20-10953 (LSS)<br><br>**Re: D.I. 147 and 150**<br><br>**Hearing Date: 10/17/2022 at 11 a.m. EDT** |

**DEBTOR'S OMNIBUS OPPOSITION TO UNITED STATES TRUSTEE'S MOTION FOR AN ORDER CONVERTING THIS CASE TO CHAPTER 7 OR APPOINTING A TRUSTEE [D.I. 147] AND NOTEHOLDERS MOTION FOR AN ORDER CONVERTING THIS CASE TO CHAPTER 7 [D.I. 150]**

Surefunding, LLC ("Debtor") hereby opposes the *United States Trustee's Supplemental Motion For an Order Converting This Case to Chapter 7 or Appointing a Trustee* [D.I. 147] and *Noteholders Motion for an Order Converting This Case to Chapter 7* [D.I. 150] (each a Motion to Convert, and collectively, the "Motions to Convert"). The Motions to Convert should be denied. In support of this opposition, the Debtor states as follows:

## Introduction

1. This case has been suspended by order of this Court for over two (2) years [D.I. 104]. Suspension of the Chapter 11 case was premised on the viability of a receivership action (the "Receivership") filed by certain noteholders (the "Breaching Noteholders") in the State of Nevada shortly before the Chapter 11 case was filed.

2. On January 13, 2022, the Nevada Supreme Court found that the Breaching Noteholders had no authority to sue for breach of contract or seek appointment of a receiver, and entered an order reversing the appointment of the receiver in the Receivership and remanded the case to the Nevada district court to enter an order discharging the receiver. On September 1, 2022, the Nevada district court held a hearing not only to discharge the Breaching Noteholders improperly appointed receiver but to vacate an earlier order that had improperly awarded in excess

of $370,000 in attorneys' fees to the Breaching Noteholders in connection with their *ultra vires* efforts to appoint the receiver.

3. To date – now some six weeks following that hearing – the Breaching Noteholders continue to refuse to agree to forms of order that would permit the Nevada district court to enter orders discharging the receiver and ordering them to disgorge the improperly awarded attorneys' fees to the Debtor.

4. Instead, the Breaching Noteholders – and the United States Trustee – who two years ago sought to *dismiss* the bankruptcy altogether as a bad faith filing (again premised on the viability of the Receivership litigation which has now been ruled to have been improperly filed), seek now to convert this Chapter 11 case to a case under Chapter 7.

5. At their core, the Motions to Convert are premised on factors the Court considered over two years ago – factors which, with the passage of time and by judicial order, have materially changed in favor of the Debtor. And while the Breaching Noteholders and UST would like to use them interchangeably, the factors addressed by the Court in its June 2, 2020 Bench Ruling [D.I. 103] (the "Bench Ruling") were examined by the Court while specifically inquiring as to the Debtor's "good faith" in connection with proposed motions to dismiss. They were not – and are not – factors appropriately considered by the Court when determining whether "cause" exists to convert a case under 11 U.S.C. §1112(b). And, in issuing its Bench Ruling, this Court made no findings as to any of the "cause" factors in Section 1112(b)(4).

6. Outside of those considered by the Court in rendering its "good faith" findings, nowhere in the Motions to Convert do the UST or the Breaching Noteholders identify any facts or factors that would support the involuntary conversion of the case to a Chapter 7 case. Rather, in the case of the Breaching Noteholders, they resort to outright misrepresentations to claim that they

are not bound by the Third Amendment to the Note Purchase Agreement ("Third Amendment") because the version submitted to the Court was an unsigned version of the document. Notably, Breaching Noteholders do not represent that they did not execute the Third Amendment (because that would be an outright falsehood, though they do encourage the Court to reach that conclusion on its own); nor do the Breaching Noteholders disclose to this Court that they were found to have waived the "unsigned document" argument by the Nevada Supreme Court when they raised it, unsuccessfully, during the Receivership appeal.

7. To support their Motion to Convert, the Breaching Noteholders reference – without citing to a single fact – "substantial and continuing loss to the estate" and "absence of a reasonable likelihood of rehabilitation." Likewise, the UST cites nothing new to support his Motion to Convert, choosing instead to restate the Court's findings in the Bench Ruling with respect to good faith and rely upon a record made over 2 years ago, with no accounting for the changed circumstances that exist today.

8. Material among the changed circumstances that impact *both* Motions to Convert is the fact that the Receivership (i) upon which the Court premised its suspension order, and (ii) upon which the Court heavily relied to find that "litigation advantage" weighed in favor of the Breaching Noteholders and in favor of the UST on the issue of good faith, was specifically found by the Nevada Supreme Court to have been improperly filed. Not only does the reversal of the Receivership order materially alter this Court's findings on litigation advantage, it also materially alters the Court's determination that filing bankruptcy the day after entry of the Receivership order favored the Breaching Noteholders and UST. Indeed, on the facts borne out by present circumstances, this Court must find that the Chapter 11 case was filed by the Debtor in good faith and should deny both Motions to Convert. In addition, all of the Breaching Noteholders'

allegations relating to the propriety of the appointment of the Independent Manager and the CRO similarly fail, because the timing of those appointments relative to the entry of the order appointing the Receiver are no longer at issue – there was never a properly entered order appointing a Receiver, and there was never a properly appointed Receiver for purposes of that analysis.

## **Argument**

9. Two years ago, both the UST and the Breaching Noteholders moved to dismiss the bankruptcy on the grounds that the Debtor's Chapter 11 case had not been filed in good faith. This Court made certain findings – material among them that the Receivership sought by the Breaching Noteholders was viable – to find that the actions taken by the Debtor in part to prevent the Receivership evidenced that the Chapter 11 case was not filed in good faith. This Court, of course, did *not* dismiss the case at the time. Rather, this Court suspended the case under 11 U.S.C. § 305 to let the Debtor's objection to the Receivership pan out.

10. Now, realizing that the dismissal of the Receivership for the Breaching Noteholders' lack of standing sounds the death knell for any plausible argument that the Chapter 11 case was filed in bad faith, both Motions to Convert move for conversion of the case to a chapter 7 case pursuant to 1112(b) of the Bankruptcy Code. Conversion of a case from Chapter 11 to Chapter 7, however, requires both the Breaching Noteholders and the UST to establish "cause": "[on] request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *for cause* . . . ." 11 U.S.C. § 1112(b)(1).

11. "Cause" is defined in the bankruptcy code at section 1112(b)(4) and includes:

    A. Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

B. Gross mismanagement of the estate;

C. Failure to maintain appropriate insurance that poses a risk to the estate or to the public;

D. Unauthorized use of cash collateral substantially harmful to 1 or more creditors;

E. Failure to comply with an order of the court;

F. Unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

G. Failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedures without good cause shown by the Debtor;

H. Failure timely to provide information or attend meetings reasonably requested by the United States trustee (or bankruptcy administrator, if any);

I. Failure to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

J. Failure to file a disclosure statement, or to confirm a plan, within the time fixed by this title or by order of the court;

K. Failure to pay any fees or charges required under chapter 123 of title 28;

L. Revocation of an order of confirmation under section 1144;

M. Inability to effectuate substantial consummation of a confirmed plan;

N. Material default by the debtor with respect to a confirmed plan;

O. Termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

> P. Failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

See 11 U.S.C. § 112(b)(4).

12. The Breaching Noteholders only cite to factors (A) and (M) in support of their Motion to Convert. The Breaching Noteholders, however, cite to no facts and offer no evidence establishing cause requiring conversion of the case. The UST cites to factor (A) and "extreme acrimony." as grounds for cause. Both Motions to Convert must be denied.

**A.    The Bankruptcy case was filed in good faith**

13. This Court held in its Bench Ruling that the Debtor had filed its Chapter 11 case not in good faith. The decision was premised in no small measure on the viability of a Receivership filed by the Breaching Noteholders in Nevada. In critical part, this Court looked at certain *Primestone* factors in evaluating the Debtor's good faith. After discussing each of the *Primestone* factors, this Court concluded that such factors were inconclusive: "As applied here, the *Primestone* factors are inconclusive . . . ." Bench Ruling at 11. Nonetheless, the Court went on.

14. The Court considered whether the Bankruptcy served a valid bankruptcy purpose. The Court acknowledged that "When a debtor is not attempting to preserve going concern value through a restructuring, the petition can nonetheless serve a valid bankruptcy purpose if the bankruptcy maximizes the value of the estate." Bench Ruling at 11. The Court, however, discounted the Debtor's arguments that Chapter 11 maximized value and created efficiency "[because] the parties already have a forum in which to centralize disputes – *the Nevada court overseeing the receivership.*" Bench Ruling at 13. Viewing the Receivership as a valid alternative forum and discounting the Debtor's arguments was then – and is now – improper, especially now

6

that the Receivership was found to have been wrongly sought and obtained by the Breaching Noteholders and wrongly ordered by the Nevada district court.

15. Likewise, the Court also gave substantial weight to the idea that the filing of the bankruptcy case was solely a litigation tactic:

> Here, however, it is clear Debtor's actions on April 13-14 in appointing Gavin and Palmer, amending the LLC agreement, and filing for bankruptcy were all done as a result of the direct threat it perceived from the imminent receivership order .... The timing of the Nevada court's opinion, the subsequent rush to place Surefunding into the hands of strangers and the timing of the bankruptcy filing after the receivership order was entered lead to the inevitable conclusion that the petition was filed primarily to make ineffective the receivership order …. While the Debtor could have chosen to liquidate in bankruptcy back in October, 2019, it did not do so. Instead it chose to pursue state court and non-bankruptcy remedies to collect its assets. The Nevada court receivership proceeding is another form of state law remedy and is sufficient here to accomplish the task.

Bench Ruling at 14.

16. On this record, the Court concluded that the Debtor had not met its burden to show good faith with one significant caveat: "Having concluded that Debtor has not met its burden to show good faith, it should also be clear that my conclusions (on the whole) assume the existence of the Nevada receivership as an alternative forum." Bench Ruling at 14.

17. Clearly, the viability of the Receivership was the foundation of the Court's Bench Ruling. No less than two of the *Primestone* factors considered by the Court were found to weigh in favor of the Breaching Noteholders precisely because of the existence of the Receivership. And the Court's findings with regard to both the "valid bankruptcy purpose" and "tactical litigation advantage" evaluations were also tainted by the illegitimate Receivership. Now, with the Nevada Supreme Court having definitively ruled that the Receivership was wrongfully filed by the Breaching Noteholders and wrongly ordered by the Nevada district court, all of those factors (i.e. the two *Primestone* factors and the Third Circuit principals) weigh soundly in favor of the Debtor.

7

No longer is the Debtors' good faith "inconclusive;" it is conclusive. Having established that the bankruptcy case was filed in good faith, the Debtor turns now to the Motions to Convert.

**B.     Breaching Noteholders have no standing to bring the Motion to Convert**

18.     First, the Breaching Noteholders, while creditors, are not "parties in interest" with respect to the Motion to Convert. While the Debtor does not dispute that each Breaching Noteholder may be a creditor of the Debtor, not all creditors are vested with standing for all purposes. *See Singleton v. Wulff,* 428 U.S. 106, 112 1976 (standing involves two-step inquiry; first, whether litigant has been sufficiently injured and second, whether he is the proper proponent of the rights he seeks to assert). In *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 650 (2d Cir. 1988), the Second Circuit found that an objecting creditor did not have standing to raise direct objections of classes of creditors of which it was not a member.

19.     Here, the Breaching Noteholders have no power to act individually to seek conversion or appointment of a trustee. Seeking to convert the case or appoint a trustee is unquestionably an action pertaining to their collateral. The Motions to Convert in essence seek the same relief before this Court that the Breaching Noteholders sought, and failed to obtain, in Nevada. This is the crux of the entire dispute – the Breaching Noteholders seek to impose their hand-picked fiduciary over the estate, a right that they do not possess under the contracts between the Breaching Noteholders and the Debtor.

20.     The Breaching Noteholders agreed – per their contract with the Debtor in the Third Amendment – to take no action with respect to their collateral unless they had unanimity in determining to take such action. As the Nevada Supreme Court held:

> The TNPA[1] distinguishes two groups of investors. First, the TNPA labels noteholders who have an aggregate principal amount of at least two million dollars

---

[1] The TNPA references the Third Amendment to the Note Purchase Agreement.

8

> as Key Purchasers. Second the TNPA describes the holders of a majority of the outstanding principal amount, including each Key Purchaser, as Required Purchasers. The TNPA vests the authority to initiate action with respect to the collateral funds to a Collateral Agent, who is required to seek approval from the Required Purchasers before initiating any action under the NTPA. After the collateral Agent resigned in 2019, the Required Purchasers elected not to appoint a new one. As a result, the Required Purchasers thereafter held the rights and obligations of the Collateral Agent under the TNPA. It is undisputed that respondents[2] hold the majority of Surefunding's outstanding debt and include all but one Key Purchaser.
>
> We conclude that respondents do not have standing to bring their claim. After the Collateral Agent resigned, the Required Purchasers acted as the de facto Collateral Agent per the TNPA. As such the Required Purchasers were obligated to acquire the consent of every Key Purchaser to initiate any action under the TNPA with respect to their collateral. While respondents hold a majority of Surefunding's principal, they are missing one Key Purchaser. Therefore, under the TNPA, respondents may not initiate a breach of contract with respect to the collateral.
>
> The parties freely contracted to include this limitation, and respondents do not allege that the TNPA is otherwise unconscionable, illegal or in violation of public policy.

Nevada Supreme Court Opinion at 3-4.[3]

21.     Having contractually agreed to take action on their collateral only upon unanimous consent, and failing to have received it, the Breaching Noteholders do not have standing to pursue their Motion to Convert. By attempting to prosecute their Motion to Convert, the Breaching Noteholders are attempting to assert rights of the non-consenting Noteholders who are necessary to obtain the required unanimity. That is what the Nevada Supreme Court ruled was not permitted by the Third Amendment – and this Court cannot consider that issue under the *Rooker-Feldman* doctrine. That doctrine bars litigants, like the Breaching Noteholders, from challenging state court orders in federal courts as a means of relitigating matters that already have been considered and decided by a court of competent jurisdiction. Federal courts, including bankruptcy courts, cannot

---

[2] The respondents are the Breaching Noteholders.

[3] A copy of the Nevada Supreme Court decision is attached hereto as <u>Exhibit A</u>.

exercise appellate review of state court decisions. *See Rooker v. Fidelity Trust Co.*, 263 U.S.413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

**C.   The Breaching Noteholders and UST Have Not Established Substantial and Continuing Loss to the Estate**

22.   The Breaching Noteholders and the UST seek conversion due to "substantial or continuing loss to the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).   The test under Section 1112(b)(4)(A) is a two-part test.  And both parts, i.e. substantial or continuing loss to the estate, and absence of a reasonable likelihood of rehabilitation, must be satisfied before the Section is satisfied.  "Both tests must be satisfied in order for cause to exist under this subparagraph to dismiss or convert the case under section 1112(b)(4)(A)." *Id*. *First Jersey National Bank v. Brown*, 951 F.2d 564,572 (3d Cir. 1991).

23.   "Substantial or continuing loss to the estate" is a forward-looking concept.  As Collier on Bankruptcy notes: this element "tests whether, *after* the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively declining asset values." Collier on Bankruptcy, 1112.04[6][a] (emphasis added).

24.   Absence of a reasonable likelihood of rehabilitation "tests whether there is any reasonable likelihood that the debtor, or some other party, will be able to stem the Debtor's losses and place the debtor's business enterprise back on solid financial footing within a reasonable period of time." Collier on Bankruptcy 112.04[6][a].

25.   In their Motion to Convert, the Breaching Noteholders do not allege, let alone establish, any evidentiary basis for this Court to determine that the estate has suffered any loss whatsoever, let alone *post-petition* substantial or continuing loss.  Indeed, the word "loss" appears only twice in their moving papers, once in connection with their "Preliminary Statement" and once in paragraph 8 when they cite the language of 11 U.S.C. 1112(b)(4)(A).  Nowhere in their moving

papers do the Breaching Noteholders show any facts constituting substantial or continuing loss, say what is being lost or say how such loss is continuing. Nor can they.

26.     It is not sufficient, as the Breaching Noteholders and UST argued over two years ago, to establish that the estate suffered loss before the petition date. If it were so, then every Chapter 11 case would be subject to conversion. Here, however, the Breaching Note holders make no effort to establish substantial or continuing loss to the estate *since* the Petition Date. Instead, they merely cite to a two-year old record, which, respectfully, was wrongly determined.

27.     Even if one were to look at the old record, however, the only "substantial" loss asserted by the Breaching Noteholders or the UST was the *prepetition* loss of funds relating to the fraud perpetrated against the Debtor which, of course, is not continuing today and has never continued post-petition. Under the law, that loss, occurring before the petition date, is irrelevant to the issue of whether there is substantial or continuing loss sufficient to convert a case.

28.     Likewise, the Breaching Noteholders' other two-year-old arguments don't establish substantial or continuing loss. Indeed, the examples of loss cited two years ago by the Breaching Noteholders included such things as approximately $300,000 paid to the Debtor's management company, $250,000 spent for consultants, and a $125,000 retainer to the Debtor's former legal counsel to defend against the Receivership (which was judicially determined to have been filed by the Breaching Noteholders without authority).

29.     As each of these payments occurred pre-petition,[4] none of these items constitute substantial or continuing "loss" within the meaning of 11 U.S.C. § 1112(b)(4)(A). Indeed, at least two of them – the retainers for consultants and the retainer to defend against an improper

---

[4] These payments were made long before either Mr. Palmer and Mr. Gavin became involved with the Debtor and neither was a recipient of any of the payments.

11

receivership – were both reasonable and necessary. That the consultants were not the Breaching Noteholders' choice, and the Breaching Noteholders did not want their improper Receivership challenged, does not establish that costs for these items constitute loss – either substantial or continuing. Taken to its extreme, it would be a strange outcome indeed for this Court to have suspended the case to allow the Debtor to challenge the Receivership but find that prepetition retainers paid to counsel to do so establish "cause" to convert the case, particularly when the Breaching Noteholders did not and do not possess the right to dictate the Debtor's use of cash absent the ability to act as the Collateral Agent, which they did not have two years ago and do not have now.

30. The UST's attempt to establish substantial or continuing loss fares no better. The UST cites to the pre-petition loss of approximately $35 million in a fraud perpetrated against the Debtor. But again, that loss, occurring prepetition, is irrelevant to establishing cause. In an effort to justify conversion, the UST notes that there will be litigation expenses associated with the chapter 11 case but acknowledges that those same expenses will be borne by the estate if the case is converted. The Debtor submits that getting a chapter 7 or other trustee up to speed and engaging new counsel will spare the estate nothing, will severely delay matters and be highly inefficient. Regardless, litigation expenses that would be incurred whether the case were a chapter 11 case or a chapter 7 case does not establish cause for conversion.

31. In sum, Debtor asserts that there are no post-petition substantial or continuing losses sufficient to establish cause for conversion under 1112(b)(4)(A).

32. Since neither the Breaching Noteholders or UST can establish a post-petition substantial or continuing loss, the "reasonable likelihood of rehabilitation" prong is irrelevant.

12

**D.     The Breaching Noteholders Cannot Establish the inability to effectuate substantial consummation of a confirmed plan under 11 U.S.C. § 1112(b)(4)(M)**

33.     The Breaching Noteholders also claim that cause now exists to convert the case under 11 U.S.C. §1112(b)(4)(M). That section provides that cause to convert may exist due to the "inability of the Debtor to effectuate substantial consummation of a confirmed plan." "Substantial consummation is defined under 1101(2): "

Substantial consummation" means –

(A) Transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) Assumption by the debtor or by the successor to the debtor under the plan of the business or management of all or substantially all of the property dealt with by the plan; and

(C) Commencement of distribution under the plan.

34.     The Breaching Noteholders' moving under section 1112(b)(4)(M) is without merit. First, "cause" under that section presupposes that a Chapter 11 plan has been both filed and confirmed. Here, not only has a plan not been filed; the case has been suspended by order of this Court for more than two years. Second, once the Court lifts the suspension order, the Debtor should be afforded the full period available under the Bankruptcy Code to file a plan and seek its confirmation. Only if the plan is not promptly consummated thereafter would 1112(b)(4)(M) be remotely applicable.

35.     Prejudging the Debtor's ability to propose and confirm a chapter 11 plan (and ultimately substantially consummate it) is improper. In light of the Breaching Noteholders having breached their contractual agreements with the Debtor, the Debtor has various unliquidated damages claims that it will assert against the Breaching Noteholders. In addition, Breaching Noteholders have been ordered by the Nevada district court to disgorge over $370,000 in attorneys'

fees they were improperly awarded for pursuing their unlawful Receivership. In light of the Breaching Noteholders' actions adverse to the Debtor and the other creditors of the Debtor's estate, the Debtor believes it has ample grounds available to it to reach a consensual resolution with the Breaching Noteholders or, failing that, obtain an impaired consenting class and confirm a viable Chapter 11 plan over the objection of the Breaching Noteholders.

**E.     An independent fiduciary is already in place.**

36.    The Breaching Noteholders continue to repeat the refrain that they want an independent fiduciary to maximize value and pursue causes of action without the input of the Debtor's prior management or their chosen representatives. But there is no evidence that Mr. Palmer and Mr. Gavin are not independent. Indeed, even the Breaching Noteholders don't believe anyone "could or would quibble with Mr. Gavin's qualifications or Mr. Palmer's qualifications." Transcript, May 13, 2020, pp. 18 (Arguments of Mr. Dorsey).

37.    Moreover, to the extent there were or are questions regarding Mr. Gavin's independence, the Debtor submitted the *Supplemental Declaration of Edward T. Gavin, CTP, NCPM in Support of the Debtor's Application for Entry of an Order Authorizing the Debtor to Employ and Retain Gavin/Solmonese LLC to Provide a Chief Restructuring Officer and Related Services Pursuant to 11 U.S.C. §§ 363 and 105 Effective as of the Petition* Date [D.I. 156] (the "Supplemental Declaration"). As set forth in the Supplemental Declaration, Mr. Gavin has been vested with full and unfettered authority for the Debtor's liquidation (whether in or out of court) and including over litigation, management, strategic and financial alternatives, creating and prosecuting a plan, monitoring and managing daily cash allocation and cash management processes and the like. In short, Mr. Gavin is independent.

### F. Breaching Noteholders' "Uncertainty" Is Insufficient to Establish "Cause" for Conversion

38. Without citing to anything, the Breaching Noteholders at paragraph 16 of their Motion to Convert claim that the Debtor has made numerous attacks on the Noteholders "and taken questionable actions while this case was held in abeyance." It is impossible for the Debtor to meaningfully respond to assertions not based in fact. To the extent any actions of any kind were taken, such were taken after the Nevada Supreme Court ordered that the receivership be dismissed. There can be no question that, with the illegitimate receivership dismissed, Mr. Gavin, as CRO, and Mr. Palmer, as the independent director, had (and have) all appropriate authority to act on behalf of the Debtor and take actions on its behalf. That the Breaching Noteholders are somehow unsure whether Mr. Gavin had authority to act on behalf of the Debtor after the illegitimate receivership was dismissed does not establish cause for conversion of the Debtor's Chapter 11 case. To be clear, other than engaging and directing counsel for the Debtor, and cooperating with the Receiver on actions that the receiver has taken since the Nevada Supreme Court decision in order to provide a seamless transition from the Receiver to the Debtor, the Debtor's independent management has undertaken no actions, and certainly not actions that would be adverse to the interests of the estate.

### G. Alleged Acrimony is Insufficient in this Case to Establish Cause for Conversion

39. Both the UST and Noteholders cite to perceived acrimony to justify conversion. But the claims of acrimony are misplaced. The UST cites to an "impasse . . . underscored by over two years of litigation ultimately leading to the current posture of the case." The Breaching Noteholders cite only to unspecified "numerous attacks." But both fail to acknowledge that the Receivership was filed improperly and that the Debtor has an obligation to its other creditors to oppose actions taken against it by parties without any standing to do so, particularly those actions

15

that affect and impair the interests and economic recoveries of other creditors, including the non-breaching noteholders.  Both also fail to note that the Court suspended the case as being in the best interests of creditors *so that the litigation could be pursued*.  Now that the Debtor has won the dismissal of the Breaching Noteholders' improper Receivership, the UST and the Breaching Noteholders want to use the fact of that litigation as evidence of acrimony justifying conversion.  The UST's and Breaching Noteholders attempts to do so should be rejected.

40. The UST's citation to *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cit 1998) for the idea that acrimony justifies conversion is hardly comparable.  In *Marvel*, the acrimony that was present was significant, and included, but was not limited to, disputes over financing including allegations that the debtors were "favoring their 'lender accomplices' to ensure that insiders obtained control of the debtor without competitive bidding.  Certain interests sought to take control of the board.  Stay relief was sought to allow foreclosure on bonds so pledged stock could be voted.  And the debtor sought TROs to prevent the board takeover.  Ultimately, the board takeover was permitted – placing board control in the hands of the debtor's significant creditor.  Thereafter, impasse continued in the form of multiple adversary proceedings and unconsummated settlements.

41. Those facts do not exist in the present case.  There has been only one Bankruptcy Court-contemplated litigation – challenging the Breaching Noteholders' improperly filed Receivership – that has now been resolved in the Debtor's favor.  Paraphrasing *In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir. 1996), cert. denied, 117 S.Ct. 51 (1996), this conflict does not go beyond the inherent conflicts under which all companies operate.

42. More than that, conversion of the case to chapter 7 solely on the basis of acrimony between a debtor and one or more parties sets a dangerous precedent.  By converting this case, the

16

Court will be incentivizing one or some creditors to vexatiously litigate matters in virtually every case before this Court, where a creditor does not like the debtor's management or thinks that it can control the process through a chapter 7. The fact that the Breaching Noteholders were proven incorrect by the Nevada Supreme Court in the first instance, and that they are now liable to the Debtor's estate for more than $370,000, plus the economic damages arising from their improperly sought breach of contract and Receivership litigation, makes their actions even more troubling.[5]

43. For all the foregoing reasons, both the Breaching Noteholders and UST have failed to establish that cause exists to convert this chapter 11 case to a case under chapter 7. And their attempts establish cause by (i) relying on this Court's Bench Ruling issued two years ago (on now stale facts), and (ii) the Breaching Noteholders making less than candid representations to this Court about whether they are bound by the Third Amendment, must fail.

WHEREFORE, the Debtor requests that that the Court deny the Motions to Convert.

Dated: October 12, 2022                    **MORRIS JAMES LLP**

*/s/ Carl N. Kunz, III*
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No.4159)
Jason S. Levin (DE Bar No. 6434)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
E-mail: ckunz@morrisjames.com
E-mail: jwaxman@morrisjames.com
E-mail: jlevin@morrisjames.com

*Proposed Counsel to SureFunding, LLC*

---

[5] It is eminently foreseeable that, if this Court were to convert the case to chapter 7, that the Breaching Noteholders would seek to elect a trustee who would forgive, in whole or in part, the Breaching Noteholder's liability to the Debtor arising from their breach of contract, at the expense of other creditors. Were this to occur, it would only give rise to protracted litigation against the trustee.