## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SUREFUNDING, LLC.,[1] | Case No. 20-10953 (LSS) |
| Debtor. | |

## COMBINED DISCLOSURE STATEMENT AND PLAN
## OF LIQUIDATION OF SUREFUNDING, LLC. DATED JULY 13, 2023

Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Tara C. Pakrouh (DE Bar No. 6192)
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Email: ckunz@morrisjames.com
Email: jwaxman@morrisjames.com
Email: tpakrouh@morrisjames.com

*Counsel to the Debtor*
*and Debtor in Possession*

---

[1] The Debtor's mailing address is c/o Gavin/Solmonese LLC, 1007 N. Orange Street, 4th Fl. Suite 461. The last four digits of the Debtor's federal tax identification number is 7898.

16208205/2

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................3

**ARTICLE I. DEFINITION AND CONSTRUCTION OF TERMS** .........................................3

**ARTICLE II. BACKGROUND**........................................................................................15

    **2.01**    **General Background** ........................................................................15

    **2.02**    **The Debtors' Business**....................................................................15

    **2.03**    **The Tradepay Investments** ............................................................16

    **2.04**    **The Notes** .......................................................................................21

    **2.05**    **The Receivership Action** ...............................................................22

    **2.06**    **The Debtor's Bankruptcy Filing And The Suspension Of The Bankruptcy Case**........................................................................................................23

    **2.07**    **Reversal By The Nevada Supreme Court And Termination Of The Receivership** ..................................................................................24

    **2.08**    **Return To The Delaware Bankruptcy Court**................................25

    **2.09**    **Estimated Claims Against The Estate** ..........................................27

    **2.10**    **Assets Of The Estate**.....................................................................29

**ARTICLE III. CONFIRMATION PROCEDURES** .........................................................30

    **3.01**    **Confirmation Hearing Procedures** ...............................................30

    **3.02**    **Procedure For Objections**.............................................................30

    **3.03**    **Requirements For Confirmation** ..................................................31

    **3.04**    **Classification Of Claims And Equity Interests**............................31

    **3.05**    **Impaired Claims Or Equity Interests**...........................................32

    **3.06**    **Confirmation Without Necessary Acceptances; Cramdown**.......33

    **3.07**    **Feasibility** .....................................................................................34

    **3.08**    **Best Interests Test And Liquidation Analysis** .............................34

    **3.09**    **Acceptance Of The Plan**................................................................35

**ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES**................................................................35

    **4.01**    **Overview Of Classification.**...............................................35

    **4.02**    **Identification And Treatment Of Unclassified Claims**..................36

    **4.03**    **Identification Of Classes Of Claims**....................................37

    **4.04**    **Treatment Of Classified Classes, Rights To Vote, And Estimated Distributions**.................................................................38

    **4.05**    **Elimination Of Classes For Voting Purposes**...........................41

    **4.06**    **Controversy Concerning Classification, Impairment Or Voting Rights**...41

    **4.07**    **Insurance**..................................................................41

**ARTICLE V. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**................................................................41

    **5.01**    **The Plan May Not Be Accepted**.........................................42

    **5.02**    **The Plan May Not Be Confirme**.........................................42

    **5.03**    **Distributions To Holders Of Allowed Claims Under The Plan May Be Inconsistent With Projections**.............................................42

    **5.04**    **Objections To Classification Of Claims**................................42

    **5.05**    **Failure To Consummate The Plan**.......................................43

    **5.06**    **Allowance Of Claims May Substantially Dilute The Recovery To Holders Of Claims Under The Plan.**...........................................43

    **5.07**    **Plan Releases May Not Be Approved**..................................44

    **5.08**    **Certain Tax Considerations**.............................................44

**ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN**..................................44

    **6.01**    **Liquidation Of Debtor Through The Creation Of The Liquidating Trust**44

    **6.02**    **Causes Of Action**.......................................................47

    **6.03**    **Release Of Liens**........................................................47

    **6.04**    **Effectuating Documents; Further Transactions**.........................47

**6.05**   Records ................................................................................47

**6.06**   [Reserved] ...........................................................................47

**6.07**   [Reserved] ...........................................................................47

**6.08**   Transfer Of Privilege/No Waiver .........................................47

**6.09**   Final Decree .........................................................................48

**ARTICLE VII. EXECUTORY CONTRACTS**..........................................48

**7.01**   Executory Contract(S) And Unexpired Leases .....................48

**7.02**   Insurance Policies Are Not Executory Contracts .................48

**7.03**   Bar Date For Rejection Damages ..........................................48

**7.04**   Pre-Existing Obligations To The Debtor Under Executory Contracts And Unexpired Leases ..............................................49

**ARTICLE VIII. PROVISIONS GOVERNING RESOLUTION OF  CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN** .........49

**8.01**   Claim Objections ..................................................................49

**8.02**   Distribution Provisions ........................................................49

**ARTICLE IX. RELEASES, INJUNCTION, AND RELATED PROVISIONS**....................52

**9.01**   Releases By Debtor ..............................................................52

**9.02**   Releases By Third Parties ....................................................52

**9.03**   Exculpation And Limitation Of Liability .............................53

**9.04**   Injunction ............................................................................53

**ARTICLE X. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE** ..............54

**10.01**  Conditions Precedent To Confirmation ...............................54

**10.02**  Conditions Precedent To The Effective Date .......................55

**10.03**  Waiver Of Conditions ..........................................................55

**10.04**  Effect Of Failure Of Conditions ..........................................55

**10.05**  Filing Of Notice Of The Effective Date. ..............................55

**ARTICLE XI. MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN** .........55

    **11.01  Modification And Amendments** ...................................................55

    **11.02  Effect Of Confirmation On Modifications** ...............................56

    **11.03  Revocation Or Withdrawal Of The Plan** .................................56

**ARTICLE XII. JURISDICTION** ...........................................................................56

    **12.01  Bankruptcy Court Jurisdiction** ..............................................56

    **12.02  Limitation On Jurisdiction** .....................................................58

**ARTICLE XIII. MISCELLANEOUS** .....................................................................58

    **13.01  Exemption From Taxes** ............................................................58

    **13.02  Compliance With Tax Requirements** .....................................58

    **13.03  Defenses And Setoff** .................................................................59

    **13.04  Governing Law** ........................................................................59

    **13.05  Successors And Assigns** ...........................................................60

    **13.06  Transfer Of Claims And Equity Interests** .............................60

    **13.07  Post-Effective Date Service List** .............................................60

    **13.08  Notices** ......................................................................................60

    **13.09  Immediate Binding Effect** .......................................................61

    **13.10  Severability Of Plan Provisions** .............................................61

    **13.11  Exhibits** ....................................................................................62

    **13.12  Votes Solicited In Good Faith** .................................................62

    **13.13  Conflicts** ...................................................................................62

    **13.14  U.S. Trustee Fees** .....................................................................62

    **13.15  Implementation** ........................................................................62

    **13.16  No Admissions** .........................................................................63

16208205/2

## DISCLAIMER

EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE.  IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.  <u>THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN</u>.

THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTOR SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE

STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTOR AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTOR DISCLAIMS ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT AND SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTOR INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTOR'S CONTROL. ACCORDINGLY, THE DEBTOR'S FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTOR DOES NOT INTEND TO UPDATE OR REVISE ITS FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTOR AND ITS ADVISORS. ALTHOUGH THE DEBTOR AND ITS ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTOR AND ITS ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTOR'S SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTOR IS FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT OR RELEASE OPT-OUT ELECTION FORM, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH

2

**ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY. THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTOR.**

## INTRODUCTION

The above-captioned debtor and debtor-in-possession (the "Debtor"), hereby proposes this Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.

This combined plan and disclosure statement contemplates the establishment of a trust by and through which the Liquidating Trustee will liquidate the Debtors' assets, either through collection, litigation and collection, or both, for distribution to holders of Allowed Claims. This Plan contains, among other things, a discussion of (i) the Debtor's history and businesses, (ii) the events leading to this Chapter 11 Case, (iii) the Chapter 11 Case, (iv) risk factors, (v) a summary and analysis of this Plan, and (vi) certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## ARTICLE I.

## DEFINITION AND CONSTRUCTION OF TERMS

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (i) any capitalized term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (ii) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neutral, (iii) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (iv) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (v) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections,

3

articles, schedules, and exhibits of or to the Plan, (vi) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (vii) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (viii) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

As used in the Plan, the following terms have the following meanings:

1.1.    "**503(b)(9) Claims**" shall mean Claims arising under section 503(b)(9) of the Bankruptcy Code against the Debtor that were to be Filed against the Debtor on or before the General Bar Date.

1.2.    "**Abernathys**" shall mean Jason Abernathy and Justin Abernathy, the founders and managers of the Debtor.

1.3.    "**Abernathy Civil Action**" shall mean a certain civil suit first brought by the Receiver in the District Court of Clark County, Nevada against ECP Holdings III, LLC, Justin Abernathy, Jason Abernathy, Marketplace Capital Strategies, MCS US LLC, Marketplace Advisors, LLC, MPA US, LLC, and Goodwin Proctor LLP; Case No. A-20-825862.

1.4.    "**Administrative Claim**" shall mean any right to payment constituting a cost or expense of administration of the Chapter 11 Case as it relates to the Debtor under section 503(b) and 507(a)(2) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the Debtor's Estate, any actual and necessary costs and expenses of operating the Debtor's business, any indebtedness or obligations incurred by the Debtor after the Petition Date in connection with the conduct of its business, all compensation and reimbursement of expenses awarded or otherwise approved for payment by Final Order of the Bankruptcy Court under section 330, 503(b) or 1129(a)(4) of the Bankruptcy Code, any fees or charges assessed against the Debtor's Estate under section 1930 of chapter 123 of title 28 of the United States Code, all wages, salaries and health and other benefits on account of services rendered after the Petition Date, all post-Petition Date taxes, and all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date to the Effective Date but not beyond.

1.5.    "**Allowance Date**" means the date that a Claim or Equity Interest becomes Allowed.

1.6.    "**Allowed**" shall mean all or a portion of a Claim against the Debtor or an Interest in the Debtor (a) that has been listed by the Debtor in its Schedules as liquidated in an amount other than zero and not "disputed" or "contingent," and with respect to which no contrary Claim or proof of Interest has been Filed, (b) as to which no Objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any Objection has been settled, waived, withdrawn or denied by a Final Order, (d) which is not subject to section 502(d) of the Bankruptcy Code on the Effective Date, or (e) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest of the Debtor prior to the Effective Date, or the Liquidating Trustee on behalf of

4

the Debtor's Estate after the Effective Date or (iii) pursuant to the terms of this Plan. For purposes of computing Distributions under this Plan, a Claim or Interest that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim or Interest from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in this Plan.

1.7.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtor and its Estate within the meaning of section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all remaining files, books, and records of the Estate.

1.8.    "**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to this Chapter 11 Case.

1.9.    "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

1.10.    "**Bankruptcy Rules**" shall mean, when referenced generally, (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedures for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issues by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceedings therein, as the case may be; provided, however, when a specific Bankruptcy Rule is referenced (*e.g.,* Bankruptcy Rule 9019), such reference shall be to such Rule under the Federal Rules of Bankruptcy Procedure.

1.11.    "**Bar Date**" shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing proofs of Claim or proofs of Interest against the Debtor in the Chapter 11 Case for that specific Claim or Interest as set forth in the Bar Date Order.

1.12.    "**Bar Date Order**" shall mean the Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof entered by the Bankruptcy Court on December 22, 2022 [Docket No. 216].

1.13.    "**Business Day**" shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

1.14.    "**Cash**" or "**$**" shall mean legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and cash equivalents.

1.15.    "**Causes of Action**" shall mean all claims, counterclaims, crossclaims, actions, causes of action controversies, obligations, suits, judgments, damages, demands, debts, rights, preference actions, fraudulent conveyance actions and other claims or causes of action under

5

Chapter 5 of the Bankruptcy Code and other similar state law claims and causes of action, liens, indemnities, guaranties, suits, liabilities, judgments, accounts, defenses, offsets, powers, or privileges, licenses and franchises of any kind or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, arising in law, equity or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

      1.16.    **"Chapter 11 Case"** shall mean the Debtor's chapter 11 case, administered under Case No. 20-10953 (LSS) in the Bankruptcy Court.

      1.17.    **"Claim"** or **"Claims"** shall mean a claim or claims against the Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

      1.18.    **"Claims Objection Deadline"** shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, *provided however*, that the Liquidating Trustee may file one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

      1.19.    **"Class"** shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article IV of this Plan.

      1.20.    **"Collection Interests"** shall mean, collectively, (i) TradePay Litigation, (ii) MSB Litigation, (iii) Euler Hermes Litigation, (iv) Conversion Labs Collections, (v) NCM Wireless Collections, (v) Great American Power Holdings, LLC, (vi) Scidera, Inc. collections, (vii) Credit Point Financial Collections, and (viii) Business Advance Participations.

      1.21.    **"Collection Interest Proceeds"** shall mean the net proceeds due to the estates on account of the Collection Actions.

      1.22.    **"Confirmation Date"** shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

      1.23.    **"Confirmation Hearing"** shall mean the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

      1.24.    **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

      1.25.    **"Consummation"** shall mean the occurrence of the Effective Date.

1.26.    "**Contingent**" shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

1.27.    "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.28.    "**Debtor**" shall mean SureFunding, LLC.

1.29.    "**Disallowed**" shall mean with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtor which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtor or the Reorganized Debtor in, whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, Contingent or unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (vi) is evidenced by a proof of Claim or a proof of Interest which has been Filed, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, where a complaint for avoidance or an objection to such Claim has been filed, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim or a Disallowed Interest is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.30.    "**Disallowed Claim**" shall mean a Claim, or any portion thereof, that is Disallowed.

1.31.    "**Disallowed Interest**" shall mean an Interest, or any portion thereof, that is Disallowed.

1.32.    "**Disbursing Agent**" shall mean the Liquidating Trustee or any third party designated by the Liquidating Trustee to act as Disbursing Agent.

1.33.    ""**Disclosure Statement**" shall mean this or any other disclosure statement Filed in support of the Plan, and distributed in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law, including any related any documents Filed in support hereof, as it may be altered, amended, modified or supplemented from time to time.

1.34.    "**Disputed**" shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.

1.35.    "**Disputed Administrative Claim, Priority Tax Claim, Priority Non-Tax Claims and Secured Claims Reserves**" shall mean the reserves established pursuant to Section 8.02 of this Plan, which reserve shall contain amounts relating to Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.

1.36.    "**Distribution**" shall mean any distribution made pursuant to the Plan by the Liquidating Trustee or another Entity acting as the Disbursing Agent, to the Holders of Allowed Claims.

1.37.    "**Distribution Date**" shall mean the date on which a Distribution is made pursuant to this Plan.

1.38.    "**Distribution Record Date**" shall mean the date established for determining the Holders of Allows Claims or Allowed Interests entitled to Distributions pursuant to the Plan, which shall be the Confirmation Date.

1.39.    "**Effective Date**" shall mean the first Business Day after the later of the date on which (a) all conditions in Article X of this Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

1.40.    "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.41.    "**Estate**" shall mean the estate of the Debtor created pursuant to section 541 of the Bankruptcy Code.

1.42.    "**Exculpated Parties**" shall mean as of the Petition Date through the Effective Date, and in each case in its capacity as such: (i) the Debtor, (ii) the Tamarack Manager and the Debtor's officers who served or were employed by the Debtor during the Bankruptcy Case, (iii) any professional retained by the Debtor by order of the Bankruptcy Court, and (iv) with respect to each of the foregoing, such Entities' successors and assigns *provided, however,* that with respect to any Person identified herein, such Person shall be considered an Exculpated Party solely to the extent that such Person participated in actions to which section 1125(e) of the Bankruptcy Code applies.  Exculpated Parties shall **not** include any of the following entities shall not include any of the following parties: either of the Abernathys, 2015 GRAT, Market Place Capital Strategies, LLC, CTJT Family Trust, HARRAY Holdings trust, and SCTOT LLC, Goodwin Proctor, or any of their respective affiliates.

1.43.    "**Executory Contract**" shall mean a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.44.    "**File**," "**Filed**," or "**Filing**" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case; provided, however, that with respect to proofs of Claim and proofs of Interest only, "Filed" shall mean delivered and received in the manner provided by the Bar Date Order or as otherwise established by order of the Bankruptcy Court.

1.45.    "**Final Administrative Claim Bar Date**" means the date that is 30 days after the Effective Date, which shall be the deadline for Filing requests for payment of Administrative Claims that arose after the Petition Date.

1.46.    "**Final Order**" shall mean an unstayed order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor or the Liquidating Trustee on behalf of the Estate (on or after the Effective Date), or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under rule 59 or rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

1.47.    "**General Bar Date**" shall mean January 30, 2023 at 5:00 p.m. (Prevailing Eastern Time) for certain Claims arising before the Petition Date, including 503(b)(9) Claims, Secured Claims, General Unsecured Claims, or Priority Non-Tax Claims as established by the Bar Date Order.

1.48.    "**General Unsecured Claim**" shall mean any unsecured Claim against the Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, or (iv) a Priority Non-Tax Claim.

1.49.    "**General Unsecured Claim Distribution Fund**" shall mean Cash available for distribution to the Holders of Allowed Class 2 Claims as determined by the Liquidating Trustee from time to time in accordance with Article VIII of this Plan. At any given point of measurement after the Effective Date, the General Unsecured Claim Distribution Fund shall be the amount of undistributed Cash held by the Liquidating Trust that is not required for (a) the payment of Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims; and (b) the establishment and funding of the Reserves (including any reserves for Disputed Claims and the Liquidating Trust Expenses) in accordance with Section 8.02 of this Plan.

1.50.    "**Goodwin Proctor**" means Goodwin Proctor, LLP.

1.51.    "**Governmental Unit**" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.52.    "**Governmental Unit Bar Date**" shall mean February 24, 2023, at 5:00 p.m. (Prevailing Eastern Time) as established by the Bar Date Order.

1.53.    "**Holder**" or "**Holders**" shall mean the legal or beneficial Holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

1.54.    "**Impaired**" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.55.    "**Impaired Class**" shall mean a Class of Claims or Interests that is Impaired.

1.56.    "**Insider**" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.57.    "**Interests**" shall mean the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person in the Debtor including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtor's stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtor or obligating the Debtor to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

1.58.    "**IRS**" shall mean the Internal Revenue Service.

1.59.    "**Liquidating Trust**" shall mean the trust established under the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

1.60.    "**Liquidating Trustee**" shall mean Alfred T. Giuliano, a trustee selected by the Debtor and the Noteholders. The terms of the Liquidating Trustee's compensation will be disclosed before the Confirmation Hearing.

1.61.    "**Liquidating Trust Agreement**" shall mean the trust agreement that establishes the Liquidating Trust and governs the powers, duties, and responsibilities of the Liquidating Trustee.  The Liquidating Trust Agreement shall be part of the Plan Supplement.

1.62.    "**Liquidating Trust Assets**" means all of the Estate's Assets transferred to the Liquidation Trust pursuant to section 6.01 hereof.

1.63.    "**Liquidating Trust Expenses**" shall mean the reasonable fees, costs and expenses of the Liquidating Trust's retained professionals, as determined in the reasonable discretion of the Liquidating Trustee. For the avoidance of doubt, U.S. Trustee Fees shall be considered a Liquidating Trust Expense.

1.64.    "**Local Rules**" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.65.    **"Net Collection Interest Proceeds"** shall mean proceeds from the collection from the following assets (i) TradePay Litigation, (ii) MSB Litigation, (iii) Euler Hermes Litigation, (iv) Conversion Labs Collections  (proceeds from the Receiver's exercise of warrants for common stock of Conversion Labs and the subsequent sale of that stock), (v) NCM Wireless Collections, (vi) Great American Power Holdings, LLC, (vii) Scidera, Inc. collection, (viii) Credit Point Financial Collections, (ix) Business Advance Participations, and (xi) unencumbered proceeds collected from (i) – (ix) in the possession of the Debtor on the Plan Effective Date.

1.66.    **"Noteholders"** shall mean holders of Notes as of March 25, 2023.

1.67.    **"Noteholder Breach of Contract Claim"** shall mean the claim of the estate against the certain Noteholders, as sought by the Debtor in Adversary Proceeding No. 23-50152.

1.68.    **"Noteholder Adversary Proceeding"** shall mean adversary proceeding 23-50152(LSS) commenced in the Bankruptcy Court against the Plaintiff-Noteholders arising from their breach of the TNPA.

1.69.    **"Notes"** shall mean those certain interest-bearing notes, as subsequently amended or modified, which were executed by the Debtor on or after October 23, 2015, pursuant to which, among other things, holders of the Notes provided consideration in exchange for an obligation by the Debtor to repay such amount, plus interest, and for which the Collateral Agent on behalf of the holders of such Notes purportedly received a security interest in certain of the Debtor's assets, including loans and participations made by the Debtor to its funding partners.

1.70.    **"Objection(s)"** shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

1.71.    **"Person"** shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.72.    **"Petition Date"** shall mean April 14, 2020, the date on which the Debtor commenced the Chapter 11 Case in the Bankruptcy Court.

1.73.    **"Plaintiff-Noteholders"** shall mean Brett Hatton, an individual; Earl Coronel, an individual; Autumn Wind Global Multi-Strategies Fund, LP, a Delaware Limited Partnership; Damon Gersh, an individual; Jason Eckenroth, an individual; Sherri R. Sands, as trustee of the Sherri R. Sands Revocable Trust, a Florida Trust; Glickfield Capital Management, LLC fbo M. Glickfield Dynasty Trust, a Maryland Trust; Glickfield Capital Management, LLC fbo Cheryl Newmark, a Maryland Trust; Glickfield Capital Management, LLC fbo Marla Schram, a Maryland Trust; Carrickfergus Investments Limited, a British Virgin Islands Company; Stephane Carnot, as Trustee of the Carnot Family Trust, a District of Columbia Trust; Dorsey and Whitney Trust Co., LLC, as Trustee of the Dylan Taylor 2011 Grantor Trust, a South Dakota Trust; Eseco, LLC, a Michigan Limited Liability Company; Sequris Group, LLC, a Michigan Limited Liability Company; Matthew Briggs, as Trustee of the Briggs Management Trust; Michael Rubenstein, an individual; June Farmer, an individual; Thomas Carl Myers, an individual; Richard L. Rogers, an individual; Neal J. Glickfield, as Trustee of the Neal J. Glickfield 2018 Trust, a Maryland Trust;

11

Lineage, LLC, a Virginia Limited Liability Company; Charles B. Chokel, as Trustee of the Charles B. Chokel Trust u/a 4/21/92, a New Hampshire Trust; Brian Gray, an individual; HFJ Investments I, LLC, a Texas Limited Liability Company; Patricia B. Jones, as Trustee of the Patricia B. Jones Revocable Trust, a Maryland Trust; John B. Shaw as Trustee of the John B. Shaw 2012 Family Grantor Trust; and 1086 LLC, a Maryland Limited Liability Company.

1.74.    "**Plan**" shall mean this entire document and all exhibits, schedules and related documents, whether annexed hereto or Filed in connection herewith, including the Disclosure Statement portions and the Plan portions, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

1.75.    "**Plan Supplement**" shall mean the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, and which shall be Filed in the Chapter 11 Case no later than _____, 2023.

1.76.    "**Priority Non-Tax Claim**" shall mean any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

1.77.    "**Priority Tax Claim**" shall mean a Claim or a portion of a Claim for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

1.78.    "**Pro Rata**" shall mean the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

1.79.    "**Professional**" shall mean any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code sections 327, 328, 363 pursuant to an Order of the Bankruptcy Court.

1.80.    "**Professional Fee Claims**" means all Claims of Professionals for fees and expenses incurred subsequent to the Petition Date.

1.81.    "**Professional Fee Bar Date**" shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be thirty (30) days after the Effective Date.

1.82.    "**Professional Fee Claims**" shall mean a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and on or before the Effective Date.

1.83.    "**Receivership Action**" shall mean the action brought in the District Court, Clark County Nevada (Case No. 20-812651-B) for breach of contract against the Debtor and for the appointment of a receiver commenced on March 2, 2020.

1.84.    "**Receiver**" shall mean Michael Flanagan, the receiver appointed by the Nevada District Court, and who was discharged as receiver on October 26, 2022.

16208205/2

1.85.   "**Released Party**" shall mean collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Estate, (c) the Debtor's managers and officers, and (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Person's Representatives, each in their capacities as such *provided, however,* that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against (i) any of the Debtor's Representatives that did not serve in such capacity on or after the Petition Date, and shall not under any circumstance include any of the following parties: either of the Abernathys, 2015 GRAT, Market Place Capital Strategies, LLC, CTJT Family Trust, HARRAY Holdings trust, and SCTOT LLC, Goodwin Proctor, or any of their respective affiliates.  Further, counsel for the Plaintiff-Noteholders shall be a Released Party except insofar as it may have any liability arising under or related to the Disgorgement Order.

1.86.   "**Releasing Party**" shall mean each Holder of a Claim who is (i) is not Impaired under the Plan or (ii) receives a copy of the Plan and who does not elect to "opt-out" by marking the appropriate box on such Releasing Party's respective Ballot and return the Ballot prior to the Voting Deadline.

1.87.   "**Reorganized Debtor**" means the Debtor, as it exists after the Effective Date.

1.88.   "**Representatives**" shall mean with respect to an Entity, all of that Entity's current and former affiliates, subsidiaries, officers, directors, managers, managing members, principals, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants, other representatives and such Entity's respective heirs, executors, estate, servants and nominees, in each case in their capacity as such.

1.89.   "**Reserves**" shall mean, collectively, the Disputed Administrative Claims Reserve, the Disputed Professional Fee Claims Reserve, the Disputed Priority Tax Claims Reserve, the Disputed Priority Non-Tax Claims Reserve, the Disputed Secured Claims Reserves, the Disputed General Unsecured Claims Reserve, the Liquidating Trust Expense Reserve, and any other reserves established by the Liquidating Trustee pursuant to Section 8.02 of the Plan.

1.90.   "**Schedules**" shall mean the schedules of Assets and Liabilities, schedules of Executory Contracts and Statements of Financial Affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time, which were filed on April 28, 2020 [Docket No. 41].

1.91.   "**Section 510(b) Claims**" shall mean any Claim for which a judgment has entered by Final Order or for which a stipulation has been reached thereby subordinating the Claim pursuant to Section 510(b) of the Bankruptcy Code.

1.92.   "**Secured Claim**" shall mean, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtor in and to property of the Estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of this Plan (subject to the

13

Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against the Debtor pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.93.    "**Solicitation Procedures Order**" shall mean this Court's Order approving the Debtor's Motion (i) Approving the Adequacy of Disclosures in the Plan of Liquidation, (ii) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (iii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, and Approving the Form Of Ballot And Solicitation Package, and (iv) Approving the Notice Provisions entered on _____ , 2023 [Docket No. ___].

1.94.    **Subordinated Claim**" shall mean any Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code or Final Order of the Bankruptcy Court.

1.95.    "**Tax**" or "**Taxes**" shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

1.96.    "**Tradepay**" means Tradepay Capital, LLC.

1.97.    "**Tradepay Receivables**" means any amounts due to the Debtor from Tradepay.

1.98.    "**Third Party Release**" shall mean the releases to be granted pursuant to the Plan as set forth in Section 9.02 hereof.

1.99.    "**Unclaimed Distributions**" shall mean any undeliverable or unclaimed Distributions.

1.100.    "**Unimpaired**" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.101.    "**Unimpaired Class**" shall mean a Class of Claims that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.102.    "**Unsecured Distribution Assets**" shall mean (i) proceeds of the estate's Causes of Action against the Abernathys and any Affiliates and against Goodwin Proctor, (ii) all other unencumbered assets; and (iii) any remaining Net Collection Interest Proceeds after payment of Allowed Class 3 Claims in full, including interest.

1.103.    "**U.S. Trustee**" shall mean the office of the United States Trustee for the District of Delaware.

1.104.    "**U.S. Trustee Fees**" shall mean fees payable pursuant to 28 U.S.C. § 1930.

16208205/2

1.105. "**Voting Agent**" shall mean Stretto, Inc. or any successor appointed by the Bankruptcy Court.

1.106. "**Voting Deadline**" shall mean _____, 2023, at 4:00 p.m. (prevailing Eastern time), the date and time by which ballots to accept or reject the Plan must be received by the Voting Agent in order to be counted, as set forth by the Solicitation Procedures Order.

## ARTICLE II.
## BACKGROUND

### 2.01    General Background

As more fully set forth herein, the Debtor is a private debt strategy company established in March 2014. SureFunding was originally established as a mechanism by which its founders, brothers Jason and Justin Abernathy, would invest their own capital.  Starting in 2015, SureFunding began accepting funding from third parties through the issuance of notes.

### 2.02    The Debtors' Business

Starting in October 2015, SureFunding's owners opened the company to outside participation from individuals or entities through the issuance of notes. SureFunding invested or participated in small business loans, asset purchases, trade receivable purchases and advances, and credit facilities with multiple funding platform partners. Among SureFunding's investments are ownership interests in trade receivables, real estate assets, and intellectual property portfolio royalty streams. Since 2017, SureFunding typically was not financing directly to borrowers; instead, SureFunding made its capital available to funding partners, who would use SureFunding's capital to provide financing services for their borrower.

Pursuant to a Note Purchase Agreement, as amended, SureFunding issued notes and raised in excess of $34 million over time from individuals and entities interested in funding SureFunding's investments. The terms of these notes provided that the proceeds of the notes were to be used for working capital (in short, for investment and related expenses). As of September 2019, SureFunding was capitalized with approximately $34 million from noteholders (among whom are the Abernathys' with $1.8 million in note purchases) and an additional $3.4 million of equity from the personal assets of the Abernathys and their families.

Surefunding was marketed to investors as a "private debt strategy" to "achieve fixed income-like returns while generating current yield." Using notes to raise money (as more fully described below), SureFunding invested or participated in small business loans, asset purchases, trade receivable purchases and advances, and credit facilities with multiple funding platform partners. SureFunding portfolios were comprised of assets that were intended to be short-term and high yield.

As of the Petition Date, SureFunding's assets include participations in nine distinct investments:

> a. Tradepay Capital, LLC – SureFunding participated in the financing of individual trade receivables that Tradepay Capital purchased. SureFunding participated up to

15

90% on each trade receivable purchase in which it participated with Tradepay via non-debtor affiliate ECP Holdings III, LLC.

b. NCM Wireless, Inc. – SureFunding provided a working capital loan to NCM Wireless to purchase inventory in exchange for a short-term promissory note.

c. Business Advance Participations – These are short- to medium- term advances/loans to small businesses against future debit card and other charge card receivables and future merchant sales.

d. CreditPoint Financial, LLC – This is a non-Debtor related entity that invested SureFunding's capital in worker's compensation medical receivables.

e. Great American Power Holdings, LLC – This is a promissory note and equity investment.

f. Scidera, Inc. – This is a convertible promissory note to an unrelated entity that provides litigation funding.

g. Sand Pharmacy – These were 6% and 4.8% participations in real estate equity investments.

h. Music Royalties – This was a direct investment in the future revenue stream from an intellectual property portfolio.

i. Conversion Labs Stock – the debtor was owner of Common Stock Purchase Warrant No. 2019-003 which SureFunding could exercise to purchase 2,283,609 shares of common stock for an exercise price of $0.28 per share.

The most significant of these investments was the Debtors' investment in the Tradepay receivables.

### 2.03    Corporate Structure

Prior to 2017, SureFunding made investments of capital across seven platform companies for the purchase of future credit card, debit card, and other charge card receivables, and future merchant sales. These investments are managed and serviced by two non-Debtor entities, Marketplace Capital Strategies, LLC (a Puerto Rico LLC) and MCS US, LLC (the "MCS Entities"). MCS US, LLC was formed in 2017 and is used to pay expenses incurred in the United States for Marketplace Capital Strategies, LLC. Both MCS Entities are owned or controlled by the Abernathys. SureFunding is the investment vehicle managed by the MCS Entities. The MCS Entities also are wholly owned or controlled by the Abernathys. Marketplace Capital Strategies serves as the manager of SureFunding and non-debtor SureFunding V, LLC.

In and after 2017, new entities were created to facilitate the Debtor's investment and lending relationship with Tradepay Capital LLC ("Tradepay"), a non-affiliate of the Debtor. Tradepay purportedly facilitated credit relationships between multi-national sellers and buyers. SureFunding purchased up to 90% participation in factored receivables purportedly sourced

16

through the Tradepay platform. Tradepay, as the lead investor in the trade receivables, purportedly purchased the trade receivables and retained 10 to 15% of each trade receivable on Tradepay's balance sheet. Tradepay charged a servicing fee to the entities that participated on the balance of the 85% to 90% of the trade receivables.

Three different entities hold claims in the unpaid trade receivables with Tradepay. SureFunding's portion of the unpaid trade receivables purchased with Tradepay as the lead is 90.93%. The other two participants are non-debtor entities SIA Unite, LLC and SureFunding V, LLC.

SIA Unite, LLC is a Delaware limited liability company and is an investment entity through which private capital from twenty-three parties, some controlled by the Abernathys and some unrelated parties, invested in the Tradepay relationship. SIA Unite, LLC's portion of the unpaid trade receivables purchased with Tradepay as the lead investor is 3.12%.

SureFunding V, LLC, a Delaware limited liability company owned by the Abernathys, was formed to invest funds borrowed from unrelated non-debtor Congressional Bank, LLC into participation in the Tradepay relationship. SureFunding V, LLC represents 5.95% of the unpaid trade receivables claims purchased from Tradepay

ECP Holdings III, LLC and ECP Holdings V, LLC (the "ECP Entities") are Delaware limited liability companies that function as special purpose entities through which the participations of SureFunding and SIA Unite, LLC (through ECP Holdings III) and SureFunding V, LLC (through ECP Holdings V, LLC) were distributed to Tradepay Capital, LLC pursuant to the terms of a Master Participation Agreement between the ECP Entities and Tradepay.

MCS Agent, LLC ("MCS Agent") is a Delaware LLC and is 100% owned by Marketplace Capital Strategies, LLC. MCS Agent was created in January 2019 to service payments from Tradepay under the Master Participation Agreement between Tradepay and the ECP Entities. Because the sources of funds invested into the Tradepay relationship from SureFunding, SureFunding V, and SIA Unite are different, MCS Agent was created to ensure that payments to participants were not commingled and were made according to the respective participations – specifically to allow for separation of funds due to ECP Holdings III (which funds ultimately would belong to SureFunding and SIA Unite, LLC) and ECP Holdings V (which funds ultimately would belong to SureFunding V, LLC).

The funds invested into Tradepay through ECP Holdings V, LLC are from the Abernathys contributed by SureFunding V, LLC. ECP Holdings V borrowed funds from Congressional Bank, which funds the Abernathy's personally guaranteed through a limited guaranty and invested them into the Tradepay relationship.    These investments increased the total amount affected by the Tradepay fraud but did not increase the loss to the Debtor's creditors.

SureClick, LLC ("SureClick") is a Virginia limited liability company owned by the Abernathys or their entities and was once the Abernathys' primary business pursuit.  SureClick provided entities, including the Debtor, shared resources such as internet hosting, expense advances and credit cards for the benefit and use of these entities. These advances were reimbursed

17

to SureClick in the ordinary course of business. SureClick PR, LLC is a Puerto Rico limited liability company formed in 2014 which employed Justin & Jason Abernathy in Puerto Rico.

ECP Holdings I, LLC is a non-debtor Delaware limited liability company. ECP Holdings I, LLC received funds from SIA Unite and SureFunding and used those funds to purchase a portfolio of workers compensation medical receivables as an investment through nondebtor entity CreditPoint Financial, LLC.

ECP Holdings II, LLC is a non-debtor Delaware limited liability company. ECP Holdings II, LLC received funds from SureFunding to purchase a 4.8% equity interest in Sand Pharmacy Portfolio 2017, LLC, a real estate investment portfolio. This investment has since been repaid in full.

CreditPoint Holdings, LLC is a non-debtor Delaware limited liability company formed in 2017. This entity owns 100% of the membership interests in non-debtor CreditPoint Financial, LLC, a Colorado limited liability company that received funds from ECP Holdings I, LLC to purchase and service a portfolio of workers compensation medical receivables.  CreditPoint Financial originally was an unrelated entity that was taken over by the Abernathys in December 2017.

### 2.04    The Issuance of Notes.

On and after October 23, 2015, each of the Noteholders executed the Notes with the Debtor. Between 2017 and the Petition Date, SureFunding made its capital available to funding partners, who would use SureFunding's capital to provide factoring services for their borrowers. Pursuant to the Note Purchase Agreement, as amended, SureFunding issued notes and raised in excess of $34 million over time from individuals and entities interested in funding SureFunding's investments. The terms of these notes provided that the proceeds of the notes were to be used for working capital (in short, for investment and related expenses). As of mid-2019, SureFunding was capitalized with approximately $34 million from Noteholders (including the Abernathys) and $5.2 million from the personal assets of the Abernathys and their families.

 The Third Amended Note Purchase Agreement ("TNPA") sets forth the rights and responsibilities of the parties to which the Plaintiff and each Defendant was a party, including Paragraph 11 of Exhibit C to the Note Purchase Agreement, which provides as follows:

> Resignation by the Collateral Agent. The Collateral Agent may resign from the performance of all its functions and duties under this Agreement and the other transaction documents at any time by giving 30 days' prior written notice to the Company and the Purchasers. Upon any such notice of resignation, the Required Purchasers shall appoint a successor Collateral Agent hereunder. If a successor to the Collateral Agent shall not have been so appointed within said 30-day period, the Required Purchasers shall hold the rights and obligations of the Collateral Agent hereunder until such time, if any, as the Required Purchasers appoint a new successor to Collateral Agent as provided above. Such resignation shall take effect upon the earlier of (i) the appointment of a successor agent in accordance with the terms of this paragraph, or (ii) the effective date of such resignation. The Collateral

Agent shall continue to serve until the effective date of the resignation or until its successor accepts the appointment, but shall not be obligated to take any action hereunder.

Further, paragraph 12 of Exhibit C to the Note Purchase Agreement provides as follows:

<u>Rights with Respect to Collateral</u>. Each Purchaser agrees with all other Purchasers and the Collateral Agent (i) that it shall not, and shall not attempt to, exercise any rights with respect to its security interest in the Collateral, whether pursuant to any other agreement or otherwise (other than pursuant to this Agreement), or take or institute any action against the Collateral Agent or any of the other Purchasers in respect of the Collateral or its rights hereunder (other than any such action arising from the breach by such person of this Agreement) and (ii) that such Purchaser has no other secured rights with respect to the Collateral other than as set forth in this Agreement. Upon the acceptance of any appointment as Collateral Agent hereunder by a successor agent, such successor agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring agent and the retiring agent shall be discharged from its duties and obligations under this Agreement. After Collateral Agent's resignation or removal hereunder as Collateral Agent, the provisions of this Exhibit C shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent.

The TNPA distinguishes two groups of investors: (i) noteholders who have an aggregate principal amount of at least two million dollars as "Key Purchasers," ("<u>Key Purchasers</u>") and (ii) noteholders of a majority of the outstanding principal amount and, in all cases, including each Key Purchaser, are "Required Purchasers" (<u>Required Purchasers</u>"). Further, the TNPA vests the authority to initiate action with respect to the collateral in a collateral agent, who is required to obtain approval from the Required Purchasers before initiating any action under the TNPA.

On May 16, 2019, Cantor Fitzgerald Securities, the collateral agent appointed pursuant to the TNPA (the "<u>Collateral Agent</u>"), filed a financing statement with the Delaware Secretary of State, in which it asserted a security interest over the following collateral.: "All rights, title and interests in favor of or payable to the Debtor in respect of loans or participations made by the Debtor to its funding partners, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and product thereof." It is unclear whether, as a matter of law, the financing statement was sufficient to perfect a security interest in any of the Debtor's assets.

In October 2019, Cantor Fitzgerald Securities resigned as the Collateral Agent, and the Required Purchasers elected not to appoint a new one.

### 2.05    Events Leading to the Commencement of This Case

In September 2017, MCS was introduced to Tradepay, alleged to be an international factoring company with offices in Miami, New York and Mumbai, as a potential favorable investment platform and commenced due diligence. In February 2018, ECP Holdings III, LLC signed an agreement with Tradepay. SureFunding raised in excess of $34 million over time from

investors under its Note Purchase Agreement to fund working capital. Of that amount, SureFunding invested approximately $28.7 million in Tradepay.

Tradepay allegedly provided short-term financing for exports to Singapore, Hong Kong and Dubai based on the invoices of products already accepted by importers (the "Tradepay Receivables"). Tradepay allegedly represented to one or both of the Abernathys, who then allegedly represented to investors that "Tradepay deals with an existing network of clients (exporters) who are established businesses with years of experience (and financial records to show it) exporting." On or about February 2, 2018, Tradepay entered into a master participation agreement with ECP III and MCS, drafted by SureFunding's legal counsel, Goodwin Proctor, by which ECP III would loan SureFunding's money to Tradepay for alleged investment in Tradepay Receivables.

At all times relevant, Goodwin Proctor was legal counsel to SureFunding with respect to all aspects of the master participation agreement, including negotiation and drafting, but Goodwin Proctor did not provide for SureFunding to be a signatory to the master participation agreement. Based upon the advice of Goodwin Proctor, the Abernathys did not make SureFunding a signatory to the master participation agreement, notwithstanding that SureFunding was the principal entity loaning the money. To the best of the Debtor's knowledge, neither were SIA Unite nor SureFunding V made signatories to the master participation agreement.

On April 23, 2019, Tradepay advised ECP-III that twenty-nine payments, that had been pledged to ECP-III, on invoices totaling $1,883,415 had been returned because of alleged processing issues and would not be paid on a timely basis. Tradepay suggested a solution in which Tradepay would allegedly swap out those invoices for different invoices with later maturity dates. ECP-III's principals agreed to and accepted this invoice "swap" (the "April 2019 Swap") and, but for a single invoice, all of the allegedly swapped invoices were paid in full. Thereafter, ECP-III continued to fund new invoice purchases. ECP-III was also still receiving consistent payments from Buyers in May, June and July. Net cash collections received by ECP-III during those three months were $6.8 million, $7.7 million, and $7.9 million, respectively. The June and July net collections of $7.7M and $7.9M were both new highs at the time for net collections received in a month.

In late September 2019, Tradepay failed to remit payments to MCS Agent, LLC from account debtors. At this time, Tradepay had 421 outstanding invoices, totaling approximately $47.9 million in gross invoice value that went into default over the next two months. All of these invoices were purchased after April 29, 2019.

During the course of investigating the non-payment, SureFunding determined that Tradepay and its owners and operators had orchestrated a sophisticated and complex fraudulent scheme devised and executed to obtain financing and investing dollars under false pretenses. The scheme included breach of contract, lies, misrepresentations, the use of false and fraudulent paperwork, the submission of false and fraudulent documents, secret collusive relationships with buyers, sellers, or both, and the wiring of funds under false pretenses with false amounts, including the laundering of funds. All of these actions were taken in an effort to unlawfully obtain funds under false pretenses.

On October 2, 2019, SureFunding sent a Notice of Default to Tradepay and later swept Tradepay's bank accounts, as it was entitled to do. The following day, SureFunding advised its noteholders in writing of Tradepay's default. Thereafter, SureFunding moved swiftly to explore all legal options, and on October 10, 2019, SureFunding met with counsel in Florida to pursue legal action.

As of the Petition Date, the Debtor had approximately $2,162,539.92 in cash.

## A.    The Tradepay Litigation

On October 23, 2019, SureFunding, along with ECP Holdings III, LLC; ECP Holdings V, LLC; SureFunding V, LLC; MCS Agent, LLC; Marketplace Capital Strategies LLC (together, in the context of the Tradepay Litigation, the "SureFunding Plaintiffs") filed suit against Tradepay and related parties in the Circuit Court of the Eleventh Judicial District of Florida, in and for Miami-Dade County, Florida, where it is pending under Case No. 2019-031155-CA-01 (the "Tradepay Litigation").

SureFunding's Tradepay litigation counsel, Mr. C. Tab Turner and his firm, specialize in complex insurance cases, anti-terrorism cases, and money laundering cases that involve international banking. For the Tradepay Litigation, Mr. Turner has retained professionals including private investigators and consultants who specialize in money laundering, forensic accounting, and asset tracing and recovery in specific geographic regions relevant to pursuing Tradepay recoveries. Wherever possible, SureFunding has engaged these professionals on a contingency fee basis.

On January 15, 2020, the SureFunding Plaintiffs filed an Amended Complaint in the Tradepay Litigation. The claims in the Tradepay Litigation Amended Complaint against Tradepay include (I) Breach of Contract; (II) Conversion; (III) Negligence; (IV) Breach of Fiduciary Duty; (V) Fraud and Misrepresentation; (VI) Civil Conspiracy; (VII) Violation of the Florida Deceptive and Unfair Trade Practices Act.

In connection with its transactional relationship with the SureFunding Plaintiffs, Tradepay executed an irrevocable power of attorney in favor of MCS, the entity designated to receive payments from Tradepay. On April 23, 2020, the Florida court handling the Tradepay Litigation upheld the validity of the irrevocable power of attorney. As a consequence, the SureFunding Plaintiffs, acting as Tradepay's attorney-in-fact, undertook efforts to secure information realting to Tradepay and its assets, including Tradepay's computer servers, bank accounts, records, files, company cars, company apartments, company offices, and attorneys. Another consequence is that Tradepay will be defaulted and judgment entered, permitting the SureFunding Plaintiffs to execute on these assets.

## B.    The FBI Investigation

On September 27, 2019, the Abernathys reported the fraud to law enforcement, and upon the Debtor's information and belief, as of the date of this filing, the Abernathys continue to cooperate closely with federal investigators and the United States Justice Department in what they understand to be an open and active investigation. The Debtor further understands that the Abernathys are not suspected of any involvement in perpetrating the Tradepay fraud and are

16208205/2

considered victims and has confirmed this with both the Federal Bureau of Investigation and the United States Attorney for the Eastern District of New York.

### C.    The Euler Hermes Claim

Contemporaneously with SureFunding's efforts to exercise all available legal remedies, MCS Agent filed insurance claims with Tradepay's credit insurer, Euler Hermes. The Debtor is a named beneficiary under that policy.

Between October 11, 2019 and November 27, 2019, MCS Agent, under the guidance of Mr. Turner and his team, filed on behalf of SureFunding and other invested entities 224 claims (consisting of 421 invoices) with Euler Hermes on invoices that Tradepay factored and the Buyers failed to pay. The total amount of the claims is in excess of $47.9 million dollars. The percentage interest of the $47.9 million claims from the three invested entities represented is 90.93% from SureFunding, 3.12% from SIA Unite, LLC, and 5.95% from SureFunding V, LLC.

Because Euler Hermes failed to timely pay those claims, MCS Agent has filed formal complaints with the Florida Department of Financial Services alleging unfair claims practices on the part of Euler Hermes, a necessary precursor to filing suit against Euler Hermes for bad faith conduct.

### 2.06    The Receivership Action

On March 20, 2020, certain Noteholders brought suit against the Debtor in the District Court (the "Nevada District Court") for Clark County Nevada (Case No. A-20-812651-B) (the "Breach of Contract Action").  At the time that the Plaintiff-Noteholders commenced the Breach of Contract Action, and at all times subsequent, the Required Purchasers acted as the de facto Collateral Agent under the TNPA. Because the Required Purchasers acted as the de facto Collateral Agent per the TNPA, the Required Purchasers were obligated to acquire the assent of every Key Purchaser to initiate any action under the TNPA with respect to their collateral, as the Required Purchasers held the rights and obligations of the Collateral Agent under the TNPA.   The Defendants did not obtain the assent of every Key Purchaser prior to commencing the Breach of Contract Action, and the plaintiff Noteholders have never obtained such assent of all Key Purchasers.

On March 24, 2020, without receiving the assent of all Key Purchasers as was required under the TNPA, the Plaintiff-Noteholders filed a motion for appointment of a receiver (the "Receivership Motion") in conjunction with the Breach of Contract Action. On April 8, 2020, the Nevada District Court entered an Order (the "Receivership Order") appointing Michael Flanagan as a receiver (the "Receiver"). On June 5, 2020, the Debtor moved to vacate the Receivership Order. On July 22, 2020, the Nevada District Court denied the motion to vacate the Receivership Order. On August 17, 2020, SureFunding, its owners, and its Independent Manager appealed the Receivership Order to the Supreme Court of the State of Nevada (No. 81639) (the "Nevada Supreme Court") and sought a stay of the Receivership Order pending appeal. The Nevada District Court denied the stay.  The Nevada Supreme Court later allowed the appeal to proceed in SureFunding's name and its owners and Independent Manager were removed as appellants.

On December 4, 2020, the Receiver commenced a civil action titled "SureFunding, LLC v. ECP Holdings III, LLC" (Case No. A-20-825862-B) (the "Abernathy Civil Action"), by and through which the Receiver asserted claims against the Abernathys, ECP Holdings III, LLC, Marketplace Capital Strategies, LLC, MCS US, LLC, Marketplace Advisors, LLC, MPA US, LLC (collectively, the "ECP Defendants"), and Goodwin Procter LLP for, among other things, breach of contract, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, tortious breach of the implied covenant of good faith and fair dealing, legal malpractice, and unjust enrichment.

On April 22, 2021, ECP Holdings III, LLC, Marketplace Capital Strategies, LLC, MCS US, LLC, Marketplace Advisors, LLC, and MPA US, LLC filed a motion to dismiss the Abernathy Civil Action which was granted by the Nevada District Court on June 7, 2021, without prejudice. On March 1, 2022, the Nevada District Court entered an Order granting Goodwin Proctor's motion to dismiss for lack of specific jurisdiction.

Since the termination of the Receivership and reinstatement of the bankruptcy proceedings, the Debtor intends to pursue the estate's claims against the Abernathys in the Abernathy Civil Action. To that end, the Debtor has retained Carlyon Cica Chtd. as special litigation counsel to the Debtor nunc pro tunc to November 30, 2022, to pursue the claims asserted in the Abernathy Civil Action, other than as against Goodwin Proctor, which is being pursued separately.

An action against Goodwin Procter has been commenced in the Superior Court for Sussex County in the Commonwealth of Massachusetts (Civil Action No. 2284CV01679) and, on May 22, 2023, the Bankruptcy Court entered an Order approving Milligan Rona Duran & King LLC as special counsel to the Debtor in that matter [Docket No. 288].

Upon information and belief, none of the Noteholders filed their own actions against any of the Abernathys, MCS, MCS US, MPA, MPA US, ECP, III, and Goodwin Proctor.

### 2.07    The Debtor's Bankruptcy Filing and the Suspension of the Bankruptcy Case.

At all times prior to April 12, 2020, the Abernathys were the only two members and directors of the Debtor. On April 13, 2020, the Board appointed Tamarack Associates, Inc., as represented by John C. Palmer, CTP as the independent member and director (the "Tamarack Manager"), and at 1:15 p.m. (eastern time) on April 13, 2020, the Board of Directors conducted a telephonic meeting, at which time the Board passed three resolutions: (i) the Tamarack Manager was appointed to the Board, (iii) a restructuring committee was formed and the Tamarack Manager was appointed the sole member of the restricting committee and was given the power to select a chief restructuring officer, and (iii) any manager could execute the agreement with the chief restructuring officer upon the Tamarack Manager's approval. At 1:28 p.m. (eastern time) on April 13, 2020, Edward T. Gavin, CTP of Gavin/Solmonese, LLC received his engagement letter from Justin Abernathy. He signed and returned it back that evening. On April 14, 2020, SureFunding's Managers executed a Second Amendment to the Limited Liability Company Agreement (the "LLC Agreement"), which, among other things, recited the three resolutions from the April 13, 2020 board meeting, and expressly provided that Tamarack Manager approved and directed the retention of Gavin/Solmonese, LLC as chief restructuring officer of the company.

16208205/2

On April 13, 2020, the Tamarack Manager became aware of the Receivership Order at approximately 5:30 p.m. (eastern time).  The Tamarack Manager called for a board meeting for April 13, 2020 at 7:30 p.m. (eastern time), during which time a discussion was held, and after the conclusion of the board meeting, the Tamarack Manager concluded that SureFunding needed to file for bankruptcy protection.  The Tamarack Manager also determined that he had authority to commence the Chapter 11 Case notwithstanding the Receivership Order. The Tamarack Manager authorized the filing of the Chapter 11 Case because (i) not all of the Noteholders filed the Receivership Action, (ii) there were unsecured creditors to be considered, (ii) there could be avenues of recovery not available in a state receivership, such as preferences, (iv) the absolute priority rule needed to be respected, (v) the case was complicated, and (vi) for the company to be able to avail itself of the protection of the automatic stay.

On April 14, 2020 at 9:32 a.m. (eastern time), the Debtor filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware.  As of the Petition Date, the Debtor had approximately $2,162,539.92 in cash.

On April 16, 2020, certain of the Noteholders filed a motion to dismiss the Chapter 11 case [Docket No. 15], and on April 24, 2020, the U.S. Trustee filed a motion to dismiss or convert the Chapter 11 case [Docket No. 36] (the "Motions to Dismiss").  On May 4, 2020, the Debtor filed an omnibus objection to the Motions to Dismiss [Docket No. 57].  On May 12, 2020, the Court conducted an evidentiary hearing with respect to the Motions to Dismiss and the Debtor's objection thereto and, on June 1, 2020, the Court issued its bench ruling, denying conversion or dismissal and suspending the case and granting relief from the automatic stay to permit the receivership and the debtor's motion to reconsider the order appointing the Receiver to continue. On June 1, 2020, following an evidentiary hearing, the Court entered an Order Pursuant To 11 U.S.C. § 305(a)(1) Suspending All Proceedings In The Chapter 11 Case [Docket No. 103].

Prior to the suspension of the Bankruptcy Case, on April 28, 2020, the Debtor filed its schedules and statements of financial affairs and, on May 22, 2020, conducted its meeting of creditors.

Additionally, on April 22, 2020, the Debtor filed a motion to establish a deadline to file proofs of claim [Docket No. 31] (the "Bar Date Motion").  The Bar Date Motion was not considered while the Bankruptcy Case was suspended.

### 2.08    Reversal by the Nevada Supreme Court and Termination of the Receivership

On January 13, 2022, the Nevada Supreme Court entered an Order of Reversal and Remand (the "Supreme Court Decision").  In the Supreme Court Decision, the Nevada Supreme Court stated "it is undisputed that [the Plaintiff-Noteholders] … include all but one Key Purchaser," and "[the Plaintiff-Noteholders] do not have standing to bring their claim. . . . [and could] not initiate a breach of contract with respect to the collateral."  In the Supreme Court Decision, the Nevada Supreme Court stated "the Required Purchasers were obligated to acquire the assent of every Key Purchaser to initiate any action under the TNPA with respect to their collateral… they are missing one Key Purchaser. Therefore, under the TNPA, [the Plaintiff-Noteholders] may not initiate a breach of contract with respect to the collateral." In the Supreme Court Decision, the Nevada

Supreme Court stated "Because respondents do not have standing to bring their substantive tort law claim, they are therefore barred from seeking the appointment of a receiver; NRS 32.010 only permits a district court to appoint a receiver where "an action is pending." The Supreme Court Decision reversed the judgment of the district court and remanded the matter to the Nevada District Court.

On April 28, 2021, during the pendency of the Receivership, the Nevada District Court granted a motion by the Receiver to allow the payment of $373,421.91 to the Plaintiff-Noteholders for legal fees and expenses. Thereafter, the Receiver remitted payment to certain of the Plaintiff-Noteholders and their counsel. On July 14, 2022, the Debtor filed a motion in the Nevada District Court to vacate the award of attorney's fees and to disgorge attorney's fees (the "<u>Disgorgement Motion</u>"). On August 6, 2022, the Nevada District Court entered an Order granting the Disgorgement Motion, which held each of the Plaintiff-Noteholders and their counsel jointly and severally liable for the return of the $373,421.91, plus interest, which under Nevada law is currently 9.5% (the "<u>Disgorgement Order</u>"). The Plaintiff-Noteholders have appealed the Disgorgement Order, which appeal remains pending

On October 26, 2022, the District Court for Clark County, Nevada entered a stipulation and Order terminating Receivership and Discharging the Receivership.

### 2.09    Return to the Delaware Bankruptcy Court

On October 17, 2022, the Bankruptcy Court entered an Order lifting the suspension of the proceedings in the Chapter 11 Case [Docket No. 171] (the "<u>Order Lifting Suspension</u>").

### A.    Motion to Dismiss or Convert the Chapter 11 Case

On September 27, 2022, the United States Trustee filed a Supplemental Motion to Convert Chapter 11 Case to a Case Under Chapter 7 [Docket No. 147], and the Plaintiff-Noteholders filed a Motion to Convert the case to Chapter 7 (collectively the "<u>Motions to Convert</u>"). On October 12, 2022, the Debtor filed an omnibus objection to the Motions to Convert [Docket No. 165]. On October 13, 2022, the Plaintiff-Noteholders filed Reply in Support of their Motion for an Order Converting this Case to Chapter 7 [Docket No. 166]. On October 17, 2022, the Bankruptcy Court conducted a hearing to consider the Motions to Convert and the Debtor's objection thereto.

On October 28th, the Court issued its ruling denying the motions, subject to one limited issue: Whether Mr. Palmer or Mr. Gavin were tainted by alleged dishonesty of the Abernathys such that they would be prevented from serving in their current capacities with the Debtor.

On December 14, 2022, the Court conducted an evidentiary hearing with respect to the open issue of any potential "taint" of Messrs. Palmer and Gavin. The United States Trustee did not pursue its Motion to Convert at the December 14, 2022 hearing. At the December 14, 2022 hearing to consider the Plaintiff-Noteholders' Motion to Convert and the Debtor's objection thereto, the Court received documentary evidence as well as testimony from Mr. Palmer, Mr. Gavin, and a representative of one of the Plaintiff-Noteholders, Neal Falkenberry. On January 20, 2023, the Court issued its ruling denying the Plaintiff-Noteholders' Motion to Convert. On

January 24, 2023, the Court entered an Order denying the Plaintiff-Noteholders' Motion to Convert [Docket No. 232] (the "Order Denying Conversion")

On February 7, 2023, the Plaintiff-Noteholders filed a notice of appeal of the Order Denying Conversion. That appeal remains pending before the United States District Court for the District of Delaware.

### B.    Bar Date

On April 22, 2020, the Debtor filed the Bar Date Motion. The Bar Date Motion was not considered while the Bankruptcy Case was suspended. On November 11, 2022, the Debtor filed an amended bar date motion. [Docket No. 183]. On December 22, 2022, the Court entered an Order approving the Bar Date Motion, and setting January 30, 2023 at 5:00 p.m (Eastern Time) as the deadline for all proofs of claim to be filed, and February 24, 2023 at 5:00 p.m (Eastern Time) as the Governmental Bar Date.

### C.    Retention of Gavin/Solmonese, LLC

On April 20, 2020, the Debtor filed an application for the retention of Gavin/Solmonese, LLC as Chief Restructuring and Liquidating Officer of the Debtor pursuant to Sections 363 and 105, effective as of the Petition Date [Docket No. 24] (the "Original G/S Application"). On May 4, 2020, the Plaintiff-Noteholders filed an objection to certain motions of the Debtor, including the Original G/S Application [Docket No. 56]. The Original G/S Application was not considered by the Bankruptcy Court until after the Order Lifting Suspension had been entered.

On September 30, 2022, the Debtor filed a Supplemental Declaration in Support of the Original G/S Application [Docket No. 156], and on October 13, 2022, the Plaintiff-Noteholders filed a supplemental objection to Original G/S Application [Docket No. 167].

On January 26, 2023, the Debtor filed an amended application to retain Gavin/Solmonese LLC as chief restructuring officer of the Debtor [Docket No 233] (as amended, the "G/S Application"). The sole difference between the Original G/S Application and the amended G/S Application was to reflect an agreement by Gavin/Solmonese, LLC to remove the monthly minimum fee which would reduce its fees given the lengthy period of little activity during the Suspension of the Chapter 11 Case. At a hearing on February 22, 2023, the Bankruptcy Court granted the G/S Application

At the conclusion of a hearing on February 22, 2022, to consider the Original G/S Application and the Plaintiff-Noteholders' objection thereto, the Bankruptcy Court stated that it would approve the G/S Application, and on February 28, 2023, the Bankruptcy Court entered an Order approving the G/S Application [Docket No. 255] (the "G/S Order").

On March 7, 2022, the Plaintiff-Noteholders filed a notice of appeal of the G/S/ Order. That appeal remains pending before the United States District Court for the District of Delaware.

### D.    Replacement of the Tamerack Manager as Independent Director

As noted above, on April 13, 2020, the Board of Managers appointed Tamarack Associates, Inc., as represented by John C. Palmer, CTP ("Mr. Palmer") as the independent director.  On April 20, 2023, Mr. Palmer passed away, leaving the Tamerack Manager unable to continue to provide services to the Debtor. Between April 20, 2023, the Board spoke with and considered multiple candidates to replace the Tamerack Manager.

On April 30, 2023, the Board conducted a telephonic meeting after which time, the Board appointed Hon. Kevin Gross (Ret.) to replace the Tamerack Manager.

### E.    Adversary Proceeding against the Plaintiff-Noteholders

On March 20, 2023, the Debtor commenced the Noteholder Adversary Proceeding, by and through which it asserted certain claims against the Plaintiff-Noteholders arising from their breach of the TNPA.  Specifically, the Debtor asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  By and through the complaint, the Debtor sought (1) general damages incurred by the Debtor as a direct and proximate result of the Noteholders' breach of the TNPA, including but not limited to legal fees and expenses incurred by the Plaintiff, and such other damages to be proven at trial; (2) pre-judgment interest at the highest legal rate; (3) post-judgment interest at the highest legal rate; and (4) attorneys' fees and costs of suit; (B) subordination of each of the Plaintiff-Noteholders' Claims to the claims of other creditors in the Chapter 11 Case; and (C) such other and further relief as the Court deems just and proper.

At the direction of the Bankruptcy Court, the Noteholder Adversary Proceeding has been held in abeyance, and the defendants in the Noteholder Adversary Proceeding were not required to file an answer or other responsive pleading while the Debtor and Noteholders attended mediation.

As more fully set forth herein, as part of the resolution set forth in the Plan, the Noteholder Adversary Proceeding will be dismissed with prejudice by the Liquidating Trustee upon the Effective Date, or as shortly thereafter as reasonably practicable.

### 2.10    Extension of Exclusivity, the Filing of a Combined Plan and Disclosure Statement and Mediation Between the Debtors and Noteholders

On February 23, 2023, the Debtor filed a motion to extend the exclusivity periods during which the debtor may file a plan and disclosure statement and solicit acceptances thereof pursuant to 11 U.S.C. § 1121(d) [Docket No. 249] (the "Exclusivity Motion").  On March 13, 2023, the Plaintiff-Noteholders filed an objection to the Exclusivity Motion [Docket No.265], and the Plaintiff-Noteholders filed a motion to terminate the exclusivity periods [Docket No. 266] (the "Plaintiff-Noteholder Termination Motion").  On March 21, 2023, the Debtor filed an omnibus reply in support of the Exclusivity Motion and in opposition to the Plaintiff-Noteholder Termination Motion [Docket No. 269].

On March 27, 2023, the Debtor filed a combined plan and disclosure statement [Docket No. 275] (the "March 27 Plan").

27

At the conclusion of the hearing on March 24, 2023 to consider the Exclusivity Motion and the Plaintiff-Noteholder Termination Motion and the oppositions thereto, the Bankruptcy Court granted the Exclusivity Motion and the Plaintiff-Noteholder Termination Motion, including striking Plaintiff-Noteholder Termination Motion from the docket. On March 29, 2023, the Bankruptcy Court entered Orders consistent with its ruling [Docket Nos. 281 and 282]. Additionally, at the conclusion of the March 24, 2023 hearing, the Bankruptcy Court directed that the Debtor and Plaintiff-Noteholders attend mediation before the Honorable Brendan L. Shannon, Bankruptcy Court Judge, and that the Noteholder Adversary Proceeding be stayed pending further order of the Court.

On May 1, 2023, the Debtor and Plaintiff-Noteholders attended mediation in-person before Judge Shannon.   At the conclusion of the May 1, 2023 mediation, the parties reached a tentative settlement, subject to the resolution of certain issues, including the classification and treatment of Noteholders' Claims, the mediated selection of the Liquidating Trustee, a limit to the amount of Professional Fees of the Debtor through April 30, 2023, a budget for fees and expense between May 1, 2023 and the Effective Date, the agreed-upon use of cash collateral (to the extent applicable) for payment of Professional Fees, and the dismissal of the Noteholder Adversary Proceeding.  Each of these terms necessitated amending the March 27 Plan.

Prior to and subsequent to the May 1, 2023 mediation, the Abernathys raised issues with respect to the March 27 Plan.  Most specifically, the Abernathys stated that the May 27 Plan did not accurately reflect the underlying facts of the case, and the Abernathys have specifically denied any liability to the estate, including any breach of fiduciary duty.

By and through this Plan, Debtor has revised the March 27 Plan to reflect the terms of the mediated settlement with the Plaintiff-Noteholders, and to reflect certain factual changes requested by the Abernathys.  **In considering whether to vote to accept or reject the Plan, all Creditors should rely upon this Plan, rather than the March 27 Plan.**

### 2.11    Estimated Claims Against the Estate

A total of forty-eight (48) proofs of claim, totaling $37,287,015.52 were filed in the Debtor's Chapter 11 case.  A copy of the Schedules and the claims register are attached hereto as **Exhibit A.**  In addition to the filed proofs of claim, the Debtor estimates that, as of July 1, 2023, the Debtor was liable for administrative expenses totaling approximately $2,900,000.[2]  The majority of such administrative expenses are subject to allowance by the Bankruptcy Court, and such amounts may be further reduced by any retainers received by professionals.[3]

---

[2]    At mediation, the Debtor and the Plaintiff-Noteholders agreed to an aggregate cap of $1.5 million for fees through and including April 30, 2023, and a budget for fees and expenses for certain professionals and costs through the effective date of the Plan.  All fees and expenses of estate professionals remain subject to Bankruptcy Court approval.

[3]    The retainers received by estate professionals were provided by non-Debtors for the Debtor's benefit and are not property of the Debtor's estate. The Debtor understands that the Abernathys do not agree with the application of the retainers to satisfy the estate's professional fee obligations, and they may object to the use of their property to satisfy estate obligations without their agreement.  All rights with respect to such issues are expressly preserved.

Furthermore, as of March 25, 2023, proofs of claims asserting unsecured claims of approximately $3,100,000 of unsecured Claims, and approximately $805,200 of priority Claims. Further, proofs of claim were filed by Noteholders asserting secured claims aggregating approximately $33,400,000, of which the majority are claims of Plaintiff-Noteholders.

The Debtor does not believe that it is liable for any Priority Claims, and there remains an issue of law whether Noteholders' Claims are secured.

### 2.12    Assets of the Estate

A.    **The Net Collection Interest Proceeds.**

The Debtor anticipates that, other than with respect to the Sand Pharmacy Portfolio (which was already fully liquidated), and Music Royalty Portfolio (and Conversion Labs warrants which were sold by the receiver), the Estate could realize value in the Net Collection Interest Proceeds sufficient to pay all creditors in full.  There are, however, significant issues with respect to the collectability of Net Collection Interest Proceeds, particularly any collection to be received on account of the Debtor's largest investment: the Tradepay Investments.  The Net Collection Interest Proceeds may be subject to a security interest by the Noteholders.

B.    **Claims and Causes of Action against the Abernathys, their related entities and Goodwin Proctor**

As noted hereinabove, the Debtor is a plaintiff in actions against the Abernathys and against Goodwin Proctor for, among other things, avoidance of pre-petition transfers of cash (as to the Abernathy defendants), and professional malpractice (as to Goodwin Proctor).  The Debtor believes that such claims are valid and that the Debtor will ultimately prevail at trial,[4] however there are always risks to litigation, and in particular with respect to the Abernathys and their affiliates, there may be an issue of collectability on account of any judgment ultimately received. These claims and causes of action are not subject to any party's security interest.

C.    **Noteholder Adversary Proceeding**

As more fully set forth hereinabove, on March 20, 2023, the Debtor commenced the Noteholder Adversary Proceeding.  The Noteholder Adversary Proceeding has been stayed at the direction of the Bankruptcy Court, and the defendants in the Noteholder Adversary Proceeding were not required to file an answer or other responsive pleading while the Debtor and Noteholders attended mediation.

As more fully set forth herein, as part of the resolution set forth in the Plan, the Noteholder Adversary Proceeding will be dismissed with prejudice by the Liquidating Trustee upon the Effective Date, or as shortly thereafter as reasonably practicable.

---

[4]    The defendants in these actions likely disagree with the Debtor's assessment with respect to the validity of the estate's claims.

**D.    Disgorgement of Amounts Paid to Plaintiff-Noteholders and Their Counsel**

Pursuant to the Disgorgement Order (which remains on appeal), the Debtor is entitled to the return of $373,421.91, plus interest, which under Nevada law is currently 9.5%.

**E.    Avoidance Actions and other Causes of Action**

The Estate may have claims and Causes of Action arising under chapter 5 of the Bankruptcy Code, including but not limited to 11 U.S.C. §§ 544, 547, 548, 549, and 550 or applicable nonbankruptcy law, including but not limited to the Uniform Fraudulent Transfer Act. The Estates's claims and Causes of Action are not subject to any party's security interest. As noted above, Noteholder Adversary Proceeding will be dismissed with prejudice by the Liquidating Trustee upon the Effective Date, or as shortly thereafter as reasonably practicable, and will not be an asset of the Liquidating Trust available for distribution to Holders of Allowed Claims.

**F.    Cash**

As of March 25, 2023, the Debtor was in possession of $3,045,094. Some or all of the Cash currently in the Debtor's possession may be subject to a security interest by the Noteholders. The Cash in hand on the Effective Date shall be used to pay Allowed Administrative Expenses and Allowed Priority Claims.

**ARTICLE III.**
**CONFIRMATION PROCEDURES**

**3.01    Confirmation Hearing Procedures**

On _____, 2023, the Debtor filed the Solicitation Motion, by and through which the Debtor sought approval of the Disclosure Statement and for approval of the procedures for the solicitation of the Plan [Docket No ____]. On _____, 2023, the Bankruptcy Court entered the Solicitation Procedures Order [Docket No. ___]. Among other things, the Solicitation Procedures Order, approved the adequacy of disclosures in the Disclosure Statement and set certain deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan and a hearing to consider approval of the Plan. The Confirmation Hearing has been scheduled for _____, **2023 at _____ _.m.** (prevailing eastern time) at which time the Bankruptcy Court will consider Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtor.

**3.02    Procedure for Objections**

Any objection to final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Plan must be made in writing and Filed with the Bankruptcy Court and served on the following parties so as to be actually received on or before _____, **2023 at 4:00 p.m. (prevailing Eastern time)** upon (a) counsel to the Debtor: Carl N. Kunz, III, Esquire and Jeffrey R. Waxman, Esquire (ckunz@morrisjames.com and jwaxman@morrisjames.com and (b) counsel to the Office of the United States Trustee, Timothy Fox, Esquire (timothy.fox@usdoj.gov) Unless an objection is

30

timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### 3.03    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 3.04    Classification of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtor is also required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtor believes that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A

HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 3.05    Impaired Claims or Equity Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, only Holders of Claims in Classes 2, 3, and 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims in Class 5 and Holders of Interests in Class 6 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, Holders of Claims in Class 1 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

16208205/2

Holders of Claims in Class 5 (Section 510(b) Claims) and Holders of Interests in Class 5 (Equity Interests) will not receive anything on account of their respective claims and interests and are therefore deemed to reject the Plan.  They are therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 2 (GENERAL UNSECURED TRADE CLAIMS), AND CLASS 3 (SECURED NOTEHOLDER CLAIMS).

### 3.06    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

A plan does not "discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtor believes that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a) <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) <u>Equity Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation

16208205/2

preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. As discussed above, the Debtor believes that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

### 3.07    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtor's Assets have principally been liquidated and the Plan provides for the distribution of all of the Cash proceeds of the Debtor's Assets to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtor has analyzed the ability of the Liquidating Trust to meet its respective obligations under the Plan. Based on the Debtor's analysis, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtor believes that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 3.08    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case were converted to chapter 7 under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class. See Liquidation Analysis attached as **Exhibit B** to this Plan.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtor believes that in a chapter 7 liquidation, there would be additional costs and expenses that the Estate would incur as a result of liquidating the Estate in chapter 7.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtor believes such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtor. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for Professionals) that are allowed in the chapter 7 case.  Conversion also would likely delay the liquidation process and ultimately distribution of whatever value remains in the Estate.

Accordingly, the Debtor believes that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Case was converted to a chapter 7 case, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

### 3.09    Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.  **THE VOTING AGENT MUST RECEIVE BALLOTS ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (EASTERN TIME) ON _____, 2023.**

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE OR PROMPTLY USE THE ONLINE VOTING OPTION. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, CONTACT THE UNDERSIGNED DEBTOR'S COUNSEL AT JWAXMAN@MORRISJAMES.COM.

### ARTICLE IV.

### CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES

### 4.01    Overview of Classification.

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Equity Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Equity Interest qualifies within the description of that Class; and (ii) the Claim or Equity Interest has not been paid, released, or otherwise compromised before the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative

Claims, Professional Compensation Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the following Classes.

**4.02    Identification and Treatment of Unclassified Claims**

(a)    <u>Administrative Claims</u>. On the Effective Date, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim: (a) Cash equal to the amount of such Allowed Administrative Claim; or (b) such other treatment as to which the Debtor or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(i) <u>Final Administrative Claim Bar Date</u>. Holders of Administrative Claims accruing from the Petition Date through the Effective Date, other than Professional Fee Claims, shall File with the Bankruptcy Court and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Claim Bar Date. Any such Claim not Filed by the Final Administrative Claim Bar Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Final Administrative Claim Bar Date and shall constitute notice of such Bar Date.  The Liquidating Trustee shall have one hundred and eighty (180) days (or such longer period as may be allowed by order of the Bankruptcy Court on motion of the Liquidating Trustee) following the Final Administrative Claim Bar Date to review and object to Administrative Claims.

(ii) <u>Bar Date for Applications for Professional Fees</u>. Professional Fee Claims are Administrative Claims and all applications for allowance and payment of Professional Fee Claims shall be Filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such Bar Date. The Professional Fee Bar Date shall be thirty (30) days after the Effective Date.

(iii) <u>Section 503(b)(9) Claims</u>.  For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims was the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Claims that arose between the Petition Date and the Effective Date is the Administrative Claim Bar Date, and neither deadline is extended by Plan nor the Confirmation Order.

Allowed Administrative Expenses shall be paid from Cash on hand on the Effective Date or as soon thereafter as is practicable, or if Allowed after the Effective Date, within five (5) days of being Allowed or as soon thereafter as is practicable.

(b)     Priority Tax Claims. On the Effective Date, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Debtor or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. Allowed Priority Claims shall be paid from Cash on hand on the Effective Date.

(c)     Administrative and Priority Claim Reserve. As set forth in Section 8.02 of this Plan, upon the Effective Date, the Liquidating Trustee shall establish reserves in Cash, in an amount sufficient for the payment of all Administrative Claims, Priority Tax Claims and other Claims and expenses (including Liquidation Trust Expenses) as deemed necessary in the reasonable discretion of the Liquidating Trustee Identification of Classes of Claims.

(d)     U.S. Trustee Fees. All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtor from Cash on hand on or before the Effective Date. From and after the Effective Date, the Liquidating Trust shall be responsible for payment of the fees assessed against the Debtor's Estate until such time as the Chapter 11 Case is closed, dismissed or converted. Notwithstanding anything to the contrary in this Plan, the U.S. Trustee shall not be required to File a proof of Claim for administrative expenses.

**4.03    Identification and Treatment of Classes of Claims**

(a)     Treatment of Priority Non-Tax Claims (Class 1). Each holder of an Allowed Priority Unsecured Non-Tax Claim against the Debtor shall receive, from the Consideration, on the Effective Date, on account of and in full and complete settlement, and release and in exchange for, such Allowed Priority Unsecured Non-Tax Claim, either Cash equal to the full unpaid amount of such Allowed Priority Unsecured Non-Tax Claim, or such other treatment as the Debtor, and the Holder of such Allowed Priority Unsecured Non-Tax Claim shall have agreed. Such amounts will be paid from Cash on hand on the Effective Date. **Such Claims are therefore unimpaired and not entitled to vote.**

(b)     Treatment of General Unsecured Claims (Class 2). Each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed General Unsecured Claims a pro rata distribution from the Unsecured Distribution Assets. Additionally, and solely to the extent that the Unsecured Distribution Assets is insufficient to pay all Allowed General Unsecured Claims in full, including interest, and all Allowed Noteholder Claims are paid in full, including interest, Holders of Allowed General Unsecured Claims shall receive proceeds from the Net Collection Interest Proceeds on a pro rata basis until such Allowed General Unsecured Claims are paid in full. **Class 2 General Unsecured Claims are impaired and entitled to vote.**

(c)     Treatment of Noteholder Claims (Class 3). Each Holder of an Allowed Noteholder Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim, a pro rata distribution from the Net Collection Interest Proceeds Additionally, and solely to the extent that the Net Collection Interest Proceeds is insufficient to pay all Allowed Noteholder Claims in full, including interest, and all Allowed General Unsecured

37

Claims are paid in full, including interest, Holders of Allowed Noteholder Claims shall receive proceeds from the Unsecured Litigation Distribution Fund on a pro rata basis until such Allowed Noteholder Claims are paid in full. Notwithstanding the foregoing, any Plaintiff-Noteholder that received reimbursement of attorney fees from the Receiver, which is subject to the Nevada District Court's disgorgement Order shall either be responsible for (i) return of the money, including applicable interest, or (ii) under the Amended Plan, shall have their distribution reduced on a dollar-for-dollar basis, including applicable interest. Further, any amounts reimbursed to Blank Rome will be divided pro rata and reimbursed by the Plaintiff-Noteholders. **Class 3 Noteholder Claims are impaired and entitled to vote.**

(d)    Treatment of Equity Interests (Class 4).  On or after the Effective Date, all Equity Interests shall receive all remaining funds after all Allowed Claims in Classes 1 through 3, including interest, have been paid in full. **Class 4 Equity Interests are impaired and entitled to vote.**[5]

### 4.04    Treatment of Classified Classes, Rights to Vote, and Estimated Distributions

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the amount of proofs of claims that are filed after the Bar Date, and the amount of Claims that exist after the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's best estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Debtor makes no representation as to the accuracy of these recovery estimates. The Debtor expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting,

---

[5] To be clear: neither the Debtor nor the Plaintiff-Noteholders believe that Equity Interests are impaired, however in order to avoid (or at least minimize the likelihood of) an objection by the Abernathys, the Debtor has agreed to provide that the Holders of Equity Interests can vote on the Plan. The right of the Plaintiff-Noteholders to object to whether Equity Interests are impaired and the right of Holders of Equity Interests to vote is expressly preserved.

Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

The Cash on hand on the Effective Date will be used to pay all Allowed Administrative Expenses and Allowed Priority Claims in full. Any remaining Cash on Hand after payment of all Allowed Administrative Expenses (after accounting for the Administrative Claim Reserves) and Allowed Priority Claims will be used to pay Allowed Noteholder Claims. The Unsecured Distribution Assets will be available for payment of Allowed Unsecured Claims in the first instance, and in the event that there are sufficient funds to pay Allowed Unsecured Claims in full, including interest, the balance of the Unsecured Distribution Assets will be available for payment of Allowed Noteholder Claims. The Net Collection Interest Proceeds will be available for payment of Allowed Noteholder Claims in the first instance, and in the event that there are sufficient funds to pay Allowed Noteholder Claims in full, including interest, the balance of the Net Collection Interest Proceeds will be available for payment of Allowed Noteholder Claims.

Only if all Allowed Priority Claims, Allowed Unsecured Claims and Allowed Noteholder Claims are paid in full, will Holders of Interest receive a distribution from the Liquidating Trust Assets.

Holders of Interests shall receive a distribution only after all Allowed Administrative Expenses and Allowed Claims are paid in full.

| Class/Designation | Plan Treatment | Voting Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| Class 1: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim at the option of the Debtor or the Liquidating Trustee, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtor and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. The source of funds for distributions on account of Allowed Priority Non-Tax Claims will be from Cash on hand on the Effective Date | Unimpaired; **Not entitled to vote** (deemed to accept Plan) | Approx. $0<br><br>Recovery: 100% |

| Class 2: General Unsecured Trade Claims | Each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed General Unsecured Claims a pro rata distribution from the Unsecured Distribution Assets. Additionally, and solely to the extent that the Unsecured Distribution Assets is insufficient to pay all Allowed General Unsecured Claims in full, including interest, and all Allowed Noteholder Claims are paid in full, including interest, Holders of Allowed General Unsecured Claims shall receive proceeds from the Net Collection Interest Proceeds on a pro rata basis until such Allowed General Unsecured Claims are paid in full | Impaired; **Entitled to vote** | Approx. $625,000.00  Recovery: 100% |
| Class 3 Noteholder Claims | Each Holder of an Allowed Noteholder Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim, a pro rata distribution from the Net Collection Interest Proceeds Additionally, and solely to the extent that the Net Collection Interest Proceeds is insufficient to pay all Allowed Noteholder Claims in full, including interest, and all Allowed General Unsecured Claims are paid in full, including interest, Holders of Allowed Noteholder Claims shall receive proceeds from the Unsecured Litigation Distribution Fund on a pro rata basis until such Allowed Noteholder Claims are paid in full. Notwithstanding the foregoing, any Plaintiff-Noteholder that received reimbursement of attorney fees from the Receiver, which is subject to the Nevada District Court's disgorgement Order shall either be responsible for (i) return of the money, including applicable interest, or (ii) under the | Impaired; **Entitled to vote** | Approx. $39,800,000  Estimated Recovery: |

| | | | |
|---|---|---|---|
| | Amended Plan, shall have their distribution reduced on a dollar-for-dollar basis, including applicable interest. Further, any amounts reimbursed to Blank Rome will be divided pro rata and reimbursed by the Plaintiff-Noteholders. | | |
| Class 4: Equity Interests | On or after the Effective Date, all Equity Interests shall receive all remaining funds after all Allowed Claims in Classes 1 through 3, including interest, have been paid in full. | Impaired **Entitled to vote** | Recovery: 0% |

### 4.05    Elimination of Classes for Voting Purposes

Any Class of Claims or Equity Interests that is not occupied as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes of voting on acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### 4.06    Controversy Concerning Classification, Impairment or Voting Rights

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy. Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes (i) the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of the Chapter 11 Case and (ii) any right to payment arising from an equitable remedy for breach of performance.

### 4.07    Insurance

Notwithstanding anything to the contrary herein, unless elected otherwise by the Liquidating Trustee, if any Allowed Claim is covered by an Insurance Policy, such Claim shall first be paid from proceeds of such Insurance Policy to the extent such proceeds are available, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

### ARTICLE V.
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER

41

INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**5.01    The Plan May Not Be Accepted.**

The Debtor can make no assurances that the requisite acceptances to the Plan will be received, and the Debtor may need to obtain acceptances to an alternative plan of liquidation for the Debtor, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

**5.02    The Plan May Not Be Confirmed.**

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

**5.03    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.**

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors, including specifically, the amount of Rejection Claims, and the amount of Governmental Contract Claims. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtor's estimates. If the total amount of Allowed Claims in a Class is higher than the Debtor's estimates, or the funds available for distribution to such Class are lower than the Debtor's estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.04    Objections to Classification of Claims.**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtor believe that all Claims and Interests have been appropriately classified in the

Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtor believes that under the Bankruptcy Rules, it would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtor believes that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

**5.05    Failure to Consummate the Plan.**

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

**5.06    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan.**

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors, including with respect to the Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of General Unsecured Claims under the Plan.

**5.07    Plan Releases May Not Be Approved.**

There can be no assurance that the releases, as provided in Article IX of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

**5.08    Certain Tax Considerations.**

There are a number of material income tax considerations, risks and uncertainties associated with the plan of liquidation of the Debtor described in this Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.01    Liquidation of Debtor through the Creation of the Liquidating Trust**

(a)    On the Effective Date the Debtor will transfer all of its Assets to the Liquidation Trust for Distribution in accordance herewith. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. Following the Effective Date, the Liquidation Trustee shall take all actions reasonably necessary to dissolve the Debtor under any applicable laws.

(b)    Appointment of Liquidation Trustee

Pursuant to the terms of the Mediated Settlement, the Debtor and the Noteholders will jointly select the Liquidation Trustee, and the Liquidation Trustee's duties shall commence as of the Effective Date.  The Liquidation Trustee shall administer the Liquidation Trust and shall serve as a representative of the Estate under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estate.

(c)    Establishment of a Liquidation Trust.

Pursuant to the Confirmation Order, the Liquidation Trust will be established.  The Liquidation Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections

44

671-677.  The Liquidation Trust shall be managed by the Liquidation Trustee.  The Liquidation Trust shall be administered in accordance with the terms of the Liquidation Trust Agreement.

Prior to the Effective Date, any and all of the Estate's Assets shall remain Assets of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the Liquidation Trust. The Plan provides the establishment of the Liquidating Trust, which will be funded by three sets of assets: (i) Cash on hand as of the Effective Date, (ii) Unsecured Distribution Assets, which will include Causes of Action which are specifically retained and the proceeds therefrom and (iii) Net Collection Interest Proceeds.  Under the Plan, and as more fully set forth herein, distributions on account of Allowed Claims will be made solely from the specific pool of assets identified herein until such Allowed Claims are paid in full, with interest.  In the event that Claims are paid in full, including interest, the remaining assets designed for payment of Allowed Claims of one Class of Claims, may be used to paid Allowed Claims for other Classes of Claims.  Only after all Allowed Claims are paid in full, including interest, will any assets be available for distribution on account of Interests.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidation Trust and the Liquidation Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidation Trust Agreement, compromise or settle any Liquidation Trust Assets. From and after the Effective Date, the Liquidation Trust and the Liquidation Trustee may commence, litigate, and settle any Causes of Action or Claims relating to the Liquidation Trust Assets or rights to payment or Claims that belong to the Debtor as of the Effective Date or are instituted by the Liquidation Trust and Liquidation Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidation Trust Agreement.  The Liquidation Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtor and its Estate, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth herein, no other Entity may pursue such Liquidation Trust Assets on or after the Effective Date.  As of the Effective Date, the Liquidation Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtor in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidation Trust Asset without the need for filing any motion for such relief.  On the Effective Date, the Debtor and the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall have established the Liquidation Trust pursuant hereto.  In the event of any conflict between the terms of this Article XII and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

(d)    Vesting of Liquidation Trust Assets.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtor shall be deemed, subject to the Liquidation Trust Agreement, to have automatically transferred to the Liquidation Trust all of its right, title, and interest in and to all of the Estate's remaining Assets, in accordance with section 1141 of the Bankruptcy Code, including

45

the Debtor's attorney-client privilege.  All such Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth herein and the expenses of the Liquidation Trust as set forth herein and in the Liquidation Trust Agreement with the exception that any party that has setoff rights against the Debtor will preserve those setoff rights as against the Liquidation Trust.  Thereupon, the Debtor shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust. For the avoidance of doubt, the Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets.

      (e)    <u>Responsibilities of the Liquidation Trustee</u>.

Responsibilities of the Liquidation Trustee shall include, but are not limited to:

    i.    Administering the implementation hereof, including the making of the Distributions contemplated herein;

    ii.    Marshalling, and liquidating the Debtors' assets;

    iii.    Conducting an analysis of any and all Administrative Expenses, Priority Claims, and Unsecured Claims and prosecuting objections thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and appropriate;

    iv.    Maintaining and administering reasonable and necessary reserves in accordance with the terms hereof;

    v.    Commencing, prosecuting, or settling claims and Causes of Action which are not encumbered by a security interest of the Noteholders;

    vi.    Recovering and compelling turnover of the Debtor's property which are not encumbered by a security interest of the Noteholders;;

    vii.    Paying Liquidation Trust Expenses;

    viii.    Abandoning any property that is not encumbered by a security interest of the Noteholders constituting the Estate's Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Administrative Expenses, Priority Claims and Unsecured Claims would not be feasible or cost-effective in the Liquidation Trustee's reasonable judgment;

    ix.    Preparing and timely filing such post-Effective Date operating reports as required;

    x.    Filing appropriate tax returns in the exercise of the Liquidation Trustee's fiduciary obligations;

    xi.    Retaining such Professionals as are necessary and appropriate in furtherance of the Liquidation Trustee's fiduciary obligations;

46

xii.        Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust, including winding down the Debtor's business affairs; and

xiii.       Preparing and filing a motion to close the Chapter 11 case.

## 6.02    Causes of Action

On the Effective Date, Causes of Action (other than the Released Causes of Action) shall be vested in and retained by the Liquidating Trust.  Following the Effective Date, except as otherwise expressly provided herein, or the Liquidating Trust Agreement, the Liquidating Trustee may assert, compromise or dispose of the Causes of Action.

## 6.03    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens against the property of any Estate will be fully released, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against any net proceeds of sales of such assets.  For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## 6.04    Effectuating Documents; Further Transactions

On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

## 6.05    Records

After the Effective Date, the Debtor shall transfer the Debtor's books and records in the Debtor's possession to the Liquidation Trust.

## 6.06    [Reserved]

## 6.07    [Reserved]

## 6.08    Transfer of Privilege/No Waiver

On the Effective Date, all of the Debtor's evidentiary privileges, including but not limited to the attorney/client privilege, shall be deemed transferred to the Liquidating Trustee and the Liquidating Trust.  The Plan shall be considered a motion pursuant to sections 105, 363 and 365

47

of the Bankruptcy Code for such relief. Upon such transfer, the Debtor and the Estate shall have no other further rights or obligations with respect thereto. Nothing herein shall be deemed a waiver of the Debtor's or the Estate's rights of privilege.

### 6.09    Final Decree

At any time following the Effective Date, the Liquidating Trustee shall be authorized to file a motion for entry of a final decree closing the Chapter 11 Case.

## ARTICLE VII.

## EXECUTORY CONTRACTS

### 7.01    Executory Contract(s) and Unexpired Leases

Except for any Executory Contracts or Unexpired Leases of the Debtor: (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to, and remains pending as of, Confirmation; (iii) that were previously assumed and assigned; or (iv) that are listed on the Schedule of Assumed Contracts and Unexpired Leases, each Executory Contract and Unexpired Lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Nothing herein is intended to affect the validity of contracts and leases entered into by the Debtor on or after the Petition Date, or the rights of the Debtor thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms. Nothing herein is intended to affect the validity of contracts and leases entered into by the Debtor on or after the Petition Date, or the rights of the Debtor thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms.

### 7.02    Insurance Policies Are Not Executory Contracts

The Insurance Policies shall not be considered Executory Contracts for purposes of subsection (a), above.

### 7.03    Bar Date for Rejection Damages

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor, its Estate, or the Liquidating Trustee, unless a Proof of Claim is filed with the Bankruptcy Court by no later than 30 days after the Effective Date; provided, however, that any counterparty or counterparties to an Executory Contract or Unexpired Lease with a Claim that arises or becomes Allowed on or after the Effective Date as a result of the rejection of such contract or lease shall have 30 days from the date the Claim arises or becomes Allowed to file a Proof of Claim on account of such Claim with the Bankruptcy Court, after which period any such Claim will be forever barred.

### 7.04    Pre-Existing Obligations to the Debtor Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtor under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtor expressly reserves and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods or services previously purchased by the contracting Debtor from counterparties to rejected Executory Contracts or Unexpired Leases.

## ARTICLE VIII.

## PROVISIONS GOVERNING RESOLUTION OF
## CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN

### 8.01    Claim Objections

(a)    **Right to Object to Claims.**  Notwithstanding anything to the contrary herein, and any requirements that may be imposed pursuant to Bankruptcy Rule 9019, except insofar as a Claim is Allowed under the Plan on and after the Effective Date, the Liquidating Trustee will have the authority, but not the obligation, to do any of the following with respect to any Claims or Interests: (1) file, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.  The Liquidating Trustee shall succeed to any pending objections to Claims filed by the Debtor prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim.

(b)    **Claims Objection Deadline.**  Objections to Claims must be filed with the Bankruptcy Court, and a copy of the objection must be served on the subject Creditor before the expiration of the Claims Objection Deadline; otherwise such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code.  The objection shall notify the Creditor of the deadline for responding to such objection.

(c)    **Claim Estimation.**  Pursuant to section 502(c) of the Bankruptcy Code, the Liquidating Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

### 8.02    Distribution Provisions

(a)    **Distributions to be Made**.  The Liquidating Trustee or the Disbursing Agent shall be responsible for making distributions required to be made under the Plan.

(b)    **Establishment of Reserves.**  On the Effective Date, and prior to making any Distributions, the Liquidating Trustee will establish and maintain a reserve of Cash from the Trust assets as it deems reasonably necessary to satisfy Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, Disputed Secured Claims, and Liquidation Trust Expenses.  Further, upon the Professional Fee Bar Date, the Liquidating Trustee shall establish a reserve in an amount that the Liquidating Trustee deems reasonably necessary to satisfy all Professional Fee Claims.  For the avoidance of doubt, upon the satisfaction of all Claims associated with the Reserves, the Liquidation Trustee will apply any remaining reserve funds to the General Unsecured Claim Distribution Fund and distribute such funds accordingly.

(c)    **Distribution Record Date.**  As of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date, the transfer registers for Claims shall be closed.  The Liquidating Trustee shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

(d)    **No Liability.**  The Liquidating Trustee shall only be required to act and make distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality or willful misconduct, the Liquidating Trustee shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtor as of the Distribution Record Date or any other date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

(e)    **Distributions on Account of Disputed Claims.**  Except as otherwise provided in a Final Order or as agreed by the relevant parties, distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Liquidating Trustee at such periodic intervals as the Liquidating Trustee determines to be reasonably prudent.  Allowed Administrative Claim will be on or as shortly after the Effective Date as is reasonably practicable.

(f)    **No Distributions Pending Allowance.**  Notwithstanding anything herein to the contrary: (a) no distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidating Trustee no distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

(g)    **Distributions in Cash.**  Any required Cash payments to the Holders of Allowed Claims or Interests shall be made by the Liquidating Trustee: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by

first-class mail (or by other equivalent or superior means as determined by the Liquidating Trustee).

(h)    **Timing of Distributions.** Except as specifically set forth in the Plan, the Liquidating Trustee may determine, in its discretion, the appropriate timing, amount, and cadence for distributions.

(i)    **Unclaimed Distributions.** Any entity which fails to claim any Cash within 90 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan, and the Liquidating Trustee shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the source of such distribution (*i.e.,* the Liquidating Trustee or the Distribution Reserve) free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived and forever barred against the Debtor, the Estate, the Liquidating Trustee, and the Liquidating Trustee, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against the any of the foregoing or to any Holder of a Claim to whom distributions are made.

(j)    **Delivery of Distributions and Undeliverable Distributions to Holders of Claims.** Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Liquidating Trustee, as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor have not received a written notice of a change of address prior to the Effective Date.

(k)    **Undeliverable Distributions.** The Liquidating Trustee shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein.  The Liquidating Trustee in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions.  Any distributions returned to the Liquidating Trustee as undeliverable or otherwise shall remain in the possession of the Liquidating Trust, until such time as a distribution becomes deliverable, and no further distributions shall be made to such Holder unless such Holder notifies the Liquidating Trustee of its then current address.  Any Holder of an Allowed Claim or Interest entitled to a distribution of property under this Plan that does not assert a claim pursuant to the Plan for an undeliverable distribution, or notify the Liquidating Trustee of such Holder's then current address, within 30 days of such distribution shall have its claim for such undeliverable distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtor, the Estate, the Liquidating Trustee, and/or the Liquidating Trustee or their respective property, and such distribution shall be deemed unclaimed property under Section 8.02(i).

16208205/2

(l)    **De Minimis Distributions.**  If any interim distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may withhold such distribution until a final distribution is made to such Holder.  If any final distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may cancel such distribution.  Any unclaimed distributions pursuant to this Section shall be treated as unclaimed property under Section 8.02(i) of the Plan.

(m)    **Remainder Amounts After Final Distribution.**  After final Distributions have been made in accordance with the terms of the Plan, if the aggregate amount of Unclaimed Distributions and Undeliverable Distributions is less than $5,000, the Liquidating Trustee may each donate up to such amount to Delaware Pro Se Bankruptcy Foundation or the American Bankruptcy Institute's Anthony H.N. Schnelling Endowment Fund.

## ARTICLE IX.

### RELEASES, INJUNCTION, AND RELATED PROVISIONS

**9.01    Releases by Debtor**

**As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties in facilitating the administration of the Chapter 11 Case and other actions contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed forever released by the Debtor and Estate from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or the Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, the Estate or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, the Plan, the Disclosure Statement, or related agreements, instruments or other documents, including any rights or remedies under section 506 of the Bankruptcy Code, other than Claims or liabilities to the extent arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, actual fraud or willful misconduct, as determined by a Final Order.  None of the Abernathys individually, 2015 GRAT, Market Place Capital Strategies, LLC, CTJT Family Trust, HARRAY Holdings Trust, and SCTOT LLC, Goodwin Proctor, or any of their respective affiliates, shall be a Released Party.**

**9.02    Releases by Third Parties**

**To the extent allowed by applicable law, on, and as of, the Effective Date and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Released Parties shall be forever released from any and all claims, obligations, actions, suits, rights, debts, accounts, causes of action, remedies, avoidance actions, agreements, promises, damages, judgments, demands, defenses, and liabilities of any Releasing Party throughout**

the world under any law or court ruling through the Effective Date (including all claims based on or arising out of facts or circumstances that existed as of or prior to the Effective Date, including claims based on negligence or strict liability, and further including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise) that is in any way related to the Chapter 11 Case, the Debtor, the Estate (or their predecessors), or any of their operations or businesses; provided however that the foregoing release is granted only by the (a) Creditors and Interest Holders who are unimpaired, (b) Creditors who returned a Ballot and did not check the opt-out box on the Ballot, and (c) Creditors or potential Creditors (including those who were listed on the Schedules of Assets and Liabilities) who were sent a solicitation package but did not vote and did not return a Ballot with the opt-out box checked; provided further, however that the release provided in this Section shall not apply to any Creditor in category (c) above if the solicitation package was returned to the Debtor as undelivered, and that such Creditor did not otherwise file a Ballot; and provided further, however, that the release provided in this Section shall not extend to any claims with respect to criminal liability under applicable law, willful misconduct or bad faith under applicable law, or ultra vires acts under applicable law.

### 9.03    Exculpation and Limitation of Liability

(a)    The Exculpated Parties will neither have nor incur any liability to any entity for any claims or causes of action arising from any act taken or omitted to be taken between the Petition Date and the Effective Date in connection with, or related to (i) the Chapter 11 Case, (ii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, (iii) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, or (iv) the approval of the Disclosure Statement or confirmation or consummation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties will each be entitled to rely upon the advice of counsel concerning their duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

### 9.04    Injunction

(a)    From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any cause of action released or to be released pursuant to the Plan or the Confirmation Order.

(b)    From and after the Effective Date, to the extent of the releases and exculpation granted in sections 9.01 through 9.03 (inclusive), the applicable Releasing Parties or the parties who are bound by the exculpation shall be permanently enjoined from commencing or continuing in any manner against the Released Parties and the Exculpated Parties and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting

any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or exculpated or to be released or exculpated under this Plan.

(c)     Except as otherwise expressly provided in the Plan, the Plan Supplement, related documents, or for obligations issued pursuant to the plan, all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to the Plan or that are subject to the exculpatory provisions of section 9.03, are permanently enjoined, from and after the Effective Date, from taking any of the following actions: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such entities on account of or in connection with or with respect to any such claims or interests; and (iii) creating, perfecting or enforcing any encumbrance of any kind against such Entities or the property or Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests.

(d)     Except as otherwise provided in this Plan, or to the extent necessary to enforce the terms and conditions of this Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor shall be permanently enjoined from taking any of the following actions against any of the assets of the Estate or the Liquidating Trust or to be distributed under the Plan on account of any such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action, Cause of Action, or other proceeding; (ii) enforcing attaching, collecting, or recovering in any manner any judgment, award, decree, or Order; (iii) creating, perfecting or enforcing any Lien; (iv) asserting a setoff (except  to the extent such setoff was exercised prior to the Petition Date), or the right of subrogation of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing, in any manner or in any place, any action, Cause of Action, or other proceeding against any of the Estate's or Liquidating Trust's assets or assets to be distributed under this Plan that does not comply with or is inconsistent with the provisions of this Plan.

## ARTICLE X.

## <u>CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE</u>

### 10.01   Conditions Precedent to Confirmation

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03:

(a)     The Bankruptcy Court shall have entered an order approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)     The Bankruptcy Court shall have entered a Confirmation Order, approving the Plan, the in a form and substance reasonably acceptable to the Debtor.

### 10.02   Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03.

(a)     The Bankruptcy Court shall have entered an order, in form and substance acceptable to the Debtor, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(b)     All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(c)     No order of a court shall have been entered and remain in effect restraining the Debtor from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(d)     All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance, acceptable to the Debtor.

### 10.03   Waiver of Conditions

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived in whole or in part at any time by the Debtor.

### 10.04   Effect of Failure of Conditions

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor, any Holders of a Claim or Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Creditors  or Interest Holders or any other entity in any respect.

### 10.05   Filing of Notice of the Effective Date.

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court.

## ARTICLE XI.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN

### 11.01   Modification and Amendments

Except as otherwise specifically provided herein, the Debtor, which shall not be unreasonably withheld, reserves the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and Bankruptcy Rules and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in

55

section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves its rights to alter, amend or modify materially the Plan with respect to the Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article.  In addition, prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Allowed Claims or Interests.

### 11.02   Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the commencement of the solicitation of votes on the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 11.03   Revocation or Withdrawal of the Plan

The Debtor reserves the right to revoke or withdraw the Plan before the Effective Date.  If the Debtor revokes or withdraws the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtor against any other entity; (b) prejudice in any manner the rights of the Debtor, the Holder of any Claim or Interest or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other entity.

## ARTICLE XII.

## JURISDICTION

### 12.01   Bankruptcy Court Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over the Chapter 11 Case to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

(a)      To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest, including, without

limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b)     To ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)     To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)     To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(e)     To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any Plan Documents or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

(f)     To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor, the Estate, the Liquidating Trust, or the Liquidating Trustee;

(g)     To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtor, or the Estate that may be pending before the Bankruptcy Court on the Effective Date or that may be brought by the Debtor or the Liquidating Trustee, or any other related proceedings by the Liquidating Trustee, and to enter and enforce any default judgment on any of the foregoing;

(h)     To decide or resolve any and all applications for compensation;

(i)     To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

(j)     To decide issues concerning the federal or state tax liability of the Debtor which may arise in connection with the confirmation or consummation of the Plan or any Plan Documents;

(k)     To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Case; and

(l)     To enter an order closing the Chapter 11 Case when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

### 12.02   Limitation on Jurisdiction

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334, as well as the applicable circumstances that continue jurisdiction for defense and enforcement of the Plan and Plan Documents.  For the avoidance of doubt, however, such jurisdiction shall be deemed, by the entry of the Confirmation Order, to:

(a)      Permit entry of a final judgment by the Bankruptcy Court in any core proceeding referenced in 28 U.S.C. § 157(b) and to hear and resolve such proceedings in accordance with 28 U.S.C. § 157(c) and any and all related proceedings, including, without limitation, (i) all proceedings concerning disputes with, or Causes of Action or Claims against, any Person that the Debtor, the Estate, or the Liquidating Trust or any of their successors or assigns, may have, and (ii) any and all Causes of Action or other Claims against any Person for harm to or with respect to (x) any Estate Property, including conversion of Estate Property, or (y) any Estate Property liened or transferred by the Debtor to any other Person;

(b)      Include jurisdiction over the recovery of any Estate Property (or property transferred by the Debtor with Bankruptcy Court approval) from any Person wrongly asserting ownership, possession or control of the same, whether pursuant to sections 542, 543, 549, and/or 550 of the Bankruptcy Code or otherwise, as well as to punish any violation of the automatic stay under section 362 of the Bankruptcy Code or any other legal rights of the Debtor or the Estate under or related to the Bankruptcy Code; and

(c)      Permit the taking of any default judgment against any Person who has submitted himself or herself to the jurisdiction of the Bankruptcy Court.

### ARTICLE XIII.

### <u>MISCELLANEOUS</u>

### 13.01   Exemption from Taxes

(a)      The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; and (b) the creation, execution and delivery of agreements or other documents creating or evidencing the formation of the Liquidating Trust and any right or interest in the Liquidating Trust. Pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

### 13.02   Compliance with Tax Requirements

Notwithstanding anything to the contrary in this Plan, the Liquidating Trustee shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate.  The Liquidating Trustee shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements, including, without limitation, applying a portion of any distribution of Cash to be made under the Plan to pay

16208205/2

applicable withholding Taxes. Any amounts withheld pursuant to the immediately preceding sentence will be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such distribution. The Liquidating Trustee shall have the right, but not the obligation, to not make a distribution until the applicable recipient has made arrangements satisfactory for the payment of any Tax obligations. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, will apply to any interest on such Claim after the Petition Date. The Liquidating Trustee shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the Liquidating Trustee as a condition precedent to being sent a distribution. If a Holder of an Allowed Claim does not provide the Liquidating Trustee with an executed Form W-9, Form W-8 or other requested tax form within 90 days after the date of the Liquidating Trustee's initial request, the Liquidating Trustee may, in its sole discretion (a) make such distribution net of applicable withholding or (b) reserve such distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any distribution under the Plan, (ii) any such distribution shall revert to the source of such distribution (*i.e.,* the Liquidating Trust or the Distribution Reserve), for distribution on account of other Allowed Claims and (iii) the Claim of the Holder originally entitled to such distribution shall be irrevocably waived and forever barred without further order of the Bankruptcy Court. The rights and obligations of the Liquidating Trustee to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances is expressly preserved.

### 13.03   Defenses and Setoff

Nothing contained in this Plan shall constitute a waiver or release by the Debtor, the Estate, the Liquidating Trustee, or any Creditor or Interest Holder of any right or rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the Liquidating Trustee may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtor, the Estate, or the Liquidating Trustee may have against the Holder of such Claim or Interest.

### 13.04   Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

16208205/2

### 13.05   Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan or any Plan Document shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 13.06   Transfer of Claims and Equity Interests

Any transfer of a Claim shall be in accordance with Bankruptcy Rule 3001(e) and the terms of this Section.  Notice of any such transfer shall be forwarded to counsel for the Debtor and the Liquidating Trustee.  Both the transferee and transferor shall execute any notice, and the signatures of the parties shall be acknowledged before a notary public.  The notice must clearly describe the interest in the Claim to be transferred.  No transfer of a partial interest shall be allowed.  All transfers must be of one hundred percent (100%) of the transferor's interest in the Claim.

### 13.07   Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtor, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list.  With the exception of the Debtor and the U.S. Trustee, any Person desiring to remain on the Debtor's Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Debtor's Bankruptcy Rule 2002 service list.**

### 13.08   Notices

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtor and the U.S. Trustee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

    **(a)**    <u>If to the Debtor</u>

        SureFunding, LLC
        c/o Gavin/Solmonese LLC
        1007 Orange St., 4th Floor, Suite 461,
        Wilmington, DE 19801
        Attn: Ted Gavin, CTP, NCPM, Chief Restructuring Officer
        ted.gavin@gavinsolmonese.com

-and-

Morris James LLP
500 Delaware Avenue, Suite 1500,
Wilmington, DE 19801
Attn:    Carl N. Kunz, III, Esquire (ckunz@morrisjames.com)
        Jeffrey R. Waxman, Esquire (jwaxman@morrisjames.com)
        Tara Pakrouh, Esquire (Tpakrouh@morrisjames.com)

**(b)    If to the U.S. Trustee:**

Office of the U.S. Trustee
844 King St., Suite 2207
Lockbox 35
Wilmington, DE 19801
Attn: Timothy Fox, Jr., Esquire (timothy.fox@usdoj.gov)

### 13.09   Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 7062 and/or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, the Liquidating Trustee, any and all Holders of Claims and Interests (irrespective of whether such Claims or Interests are Allowed or Disallowed or were voted to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

### 13.10   Severability of Plan Provisions

If, before the Effective Date of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted so long as such term or provision is acceptable to the Debtor.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtor's consent; and (iii) non-severable and mutually dependent.

### 13.11   Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, to the extent not inconsistent with the Plan.  The Debtor reserves the right to amend the exhibits and schedules to the Plan any time prior to Confirmation.

### 13.12   Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e), the Debtor and its respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, including, if applicable, in the offer, issuance, sale and purchase of any Plan securities (if any) provided under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

### 13.13   Conflicts

If there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document, as applicable, shall govern and control.  If any provision of this Plan (including a Plan Supplement) conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

### 13.14   U.S. Trustee Fees

All fees due and payable pursuant to Section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtor on the Effective Date.  Any Quarterly Fees that come due after the Effective Date shall be paid by the Liquidating Trustee when due and payable.  The Debtor shall file all monthly operating reports due prior to the Effective Date when they become due.  After the Effective Date, the Liquidating Trustee shall file all monthly operating reports and quarterly reports with the Bankruptcy Court when they become due.  Until the earliest of the Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, the Liquidating Trust shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee for fees incurred on account of the Liquidating Trust.  The U.S. Trustee shall not be required to File any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

### 13.15   Implementation

The Debtor shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan and the Plan Documents, without further order from the Bankruptcy Court.

### 13.16   No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtor or the Estate with respect to any matter set forth herein, including, without limitation, liability on any Claim or Equity Interest or the propriety of the classification of any Claim or Equity Interest.

Dated:  July 13, 2023                                    **MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Tara C. Pakrouh (DE Bar No. 6192)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Email: ckunz@morrisjames.com
Email: jwaxman@morrisjames.com
Email: tpakrouh@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

16208205/2