**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| SUREFUNDING, LLC, | Case No. 20-10953 (LSS) |
| Debtor. | **Re: D.I. 487, 512** |
| | **Hearing Date: 5/9//24 at 2:00 p.m.**<br>**Obj. Deadline: 5/7/24** |

**THE ABERNATHY PARTIES' CORRECTED LIMITED OBJECTION TO
TRUSTEE'S MOTION FOR SPECIFIC AUTHORIZATION
TO USE FUNDS TO PAY LIQUIDATING TRUST EXPENSES**

CTJT Family Trust, HARRAY Holdings Trust, SCTOT, LLC, SureClick, LLC, Marketplace Capital Strategies, LLC, MCS US, LLC, Justin and Lorna Abernathy, the Justin Abernathy 2015 GRAT, Marketplace Advisors, LLC, Justin Abernathy, and Jason Abernathy (collectively, the "Abernathy Parties") hereby file this limited objection to the *Trustee's Motion for Specific Authorization to Use Funds to Pay Liquidating Trust Expenses* [D.I. 487; filed 3/11/24] (the "Motion"), which ostensibly was filed not to seek authority to pay liquidating trust expenses – because under the Plan documents, the Trustee already has this authority, but to rehabilitate his legitimacy by casting the Abernathy Parties as bad actors, and to ask the Court to exercise its equitable powers, pursuant to section 105 of the Bankruptcy Code, to require transparency in this case going forward. In support hereof, the Abernathy Parties state:

**PRELIMINARY STATEMENT**

Once the facts and background in this case were laid bare in the reply [D.I. 455; filed 12/18/23] to the Liquidating Trustee's objection [D.I. 434; filed 12/11/23] to the request for allowance and immediate payment of administrative expense claims incurred by certain of the Abernathy Parties, facts the Court ultimately agreed were so "perplexing, if not disturbing" that a

written decision rather than a bench ruling was warranted,[1] the Liquidating Trustee appears to have concluded that some damage control was in order.

There was no basis to file the six-page Motion other than to smear the Abernathy Parties.

The Liquidating Trustee agrees (after a one-paragraph legal "argument" that rules of construction apply to confirmation orders just like other orders): "Here, the Plan, the Confirmation Order, and Liquidating Trust Agreement unambiguously allow the Trustee to pay Liquidating Trust Expenses, including the Trustee's professionals, without Court approval." Motion ¶ 15.

But:

(1) The Abernathy Parties derailed this entire case when, "much to the surprise of the Trustee (and, apparently, everyone else in the case)", they filed enormous administrative claims, thereby rendering the case administratively insolvent. *Id*. ¶ 1.

(2) "The Abernathy Parties have created a 'between a rock and a hard place' position for the Trustee." *Id*. ¶ 3.

(3) The Abernathy Parties informally objected to the Liquidating Trustee's payment of his professionals. *Id*. ¶ 13.

(4) The Abernathy Parties likely will make the frivolous argument that the Motion is improper because it should have been brought as an adversary proceeding. *Id*. ¶ 17.

Wherefore, the Liquidating Trustee seeks an order from the Court "clarifying this issue" (*id*. ¶ 4) whether "the Plan, the Confirmation Order, and Liquidating Trust Agreement unambiguously

---

[1]     D.I. 494; filed 4/3/24.

allow the Trustee to pay Liquidating Trust Expenses, including the Trustee's professionals, without Court approval." *Id*. ¶ 15.

The Abernathy Parties of course do not object to the unambiguous language of the Plan documents, but do object to how the Trustee's retained professionals have operated thus far. Therefore, this limited objection is being filed to ask the Court to use its equitable powers to ensure transparency and accountability of estate fiduciaries and professionals going forward, especially in light of the teetering insolvency of this case that never was a good faith candidate for chapter 11 in the first instance.

## COUNTERSTATEMENT OF BACKGROUND

1.      The undisputed fact is that the Abernathy Parties[2] have been victims of an international fraud that has publicly been referred to by the Department of Justice and IRS as a complex and sophisticated financial fraud that is the subject of an ongoing criminal indictment in New York.  As the Managers of SureFunding -- and the largest investors -- this fraud devastated the Abernathy's both professionally and personally.

2.      In the wake of the fraud, the Abernathy Parties engaged and placed their trust in legal, restructuring, and financial advisor professionals. This misguided trust ultimately compounded the devastation because certain of the processionals manipulated and coerced the Managers into decisions that were self-serving and ultimately detrimental to the interests of SureFunding and its noteholders, such as convincing the Abernathys to place the entity into a chapter 11 bankruptcy case. These professionals exploited the Abernathy's vulnerable and dire

---

[2]      The term Abernathy Parties in this background section is used loosely, as not all of them were managers or investors.  For purposes of this response, which Abernathy Party is acting in which capacity is immaterial.

situation by misrepresenting facts and demanding ever more money and resources (that apparently did not need to be documented) to further their own agendas.

3.      Very specifically, the Abernathy Parties were misled into believing that an immediate chapter 11 filing was the only way to stave off the Nevada Receivership. Originally millions was the initial demand for doing so. The Managers of SureFunding had resisted filing bankruptcy for months and worked endlessly to ensure the preservation of capital for the benefit of the estate and Noteholders along with equity.  When pressed about  how much money they could get their hands on that night, and under insistent pressure from Fox Rothschild, Gavin Solmonese and Tamarack and Associates, the Abernathy Parties were convinced to liquidate their entire brokerage accounts and loan the money from other entities just to fund what they now know was an unnecessary  bankruptcy, all based on promises that the funds would only be necessary for a matter of days before it would promptly be returned.  The professionals literally led the Abernathy to cash in everything they had available with a misleading and false commitment that the money would be returned between 45 and 60 days.  The Abernathy's told them prior to funding if we did not have the funds back within that time frame then we would not be able to move forward with the filing.  Instead, they would pursue the appeal of the receivership in Nevada (concerning whether certain noteholders had the authority to put SureFunding into receivership in the first instance).  Ultimately, the Managers did pursue the Receivership appeal on their own without the support of Fox Rothschild (who resigned), and without the support of Gavin Solmonese.  The Managers funded the Receivership Appeal with funds outside of SureFunding that were never accounted for by SureFunding.  And ultimately, the appeal prevailed.

4.      For literally years, the Managers fought an uphill battle to obtain a recovery for the victims of the fraud, spending countless hours.  Tellingly, the Debtor did not reject the contracts with the Managers because they knew only the Managers could bring value into the estate.  Now, however, they are claiming "surprise" by ambush at the Managers asserting administrative claims for the tireless work they have done that has resulted in hundreds of millions of dollars in judgments that are worth little to nothing without further resources to collect.

5.      To add insult to injury, the Debtor's professionals drafted (and billed for drafting) a lengthy complaint to actually sue the Managers in this Court to recover allegedly fraudulent transfers; that suit was still-born.

6.      And to make matters worse, when this very case was sent to mediation, the Abernathys (who were still on the Debtor's board of directors) -- and Noteholders -- were denied a seat at the table and totally ignored.  To this day, they have been denied access to settlement documents, but from the bullet points in the Plan documents memorializing the key terms of the outcome of the mediation, what is crystal clear is that the only winners were not creditor constituencies, but only those professionals asserting fees for "administering" the Debtor (who took a haircut on fees just slim enough to keep the case out of administrative insolvency and obtained releases for all their "disturbing" pre-confirmation conduct), and the firm that represented the noteholders in the Nevada receivership, which not only got its fees paid but also successfully negotiated a release of liability for improperly bringing the receivership action to

begin with.  The only thing the Abernathy Parties were awarded was more promises to sue them.[3]

7.      For months now the Trustee has not provided his sign-off on a settlement reached in the Tradepay Litigation (commenced in 2019 and fully litigated without any assistance from the professionals in bankruptcy), despite repeated requests for simple approval.  All the other parties have signed off on the agreement, but the Trustee is holding up the final judgment, presumably so he can bill the estate for reviewing four years' worth of litigation before authorizing someone to sign for a judgment that includes monetary relief for Surefunding.

## ARGUMENT

8.      Too much in this case has been going on behind closed doors, without transparency, and without any apparent benefit to the Debtor's estate or its creditor constituencies.  This is so in spite the Debtor supposedly living in the proverbial fishbowl.  *In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006) ("One of the burdens of a bankruptcy filing is that, to a degree, the debtor's affairs become an open book. This openness has been accurately described as operating in a 'fishbowl.") (internal citation omitted).  This concept was largely eliminated in this case.  *Monthly* operating reports were batch-filed (e.g., 11/2022 to 2/2023 all were filed on March 23, 2023; 3/2023 to 10/2023 all were filed on November 9, 2023); same for *monthly* staffing reports (4/2020 to 5/2023 all were filed on August

---

[3]      The *pro rata* receivership distributions to Lorna and Justin Abernathy and their daughters' GRAT, placed by the Nevada receiver into a trust account-not assets of the Debtor's estate or the Liquidating Trust by any stretch of the imagination (or law, for that matter)-are being held hostage as per the terms of the Confirmation Order, "until the earlier of further order of the Court or expiration of the Claim Objection Deadline."  Confirmation Order ¶ 15.  Curiously, those escrowed funds not belonging to the Debtor are being held in a "Debtor-in-Possession" bank account.  *See* Initial Monthly Operating Report, D.I. 47, at page 3.

11, 2023; 5/2023 to 11/2023 all were filed on December 11, 2023). And somehow Gavin/Solmonese LLC, the Debtor's Chief Restructuring & Liquidating Officer, paid themselves $501,000.000 in fees from the Debtor's Debtor-in-Possession account of which it was in charge in August 2023, without Court approval. *See* 8/23 MOR at 3 [D.I. 416; filed 11/09/23].[4]

9.      The estate professionals' behind-the-scenes (self-)dealings, that never should have occurred in the first instance, must stop. In order for them to stop, transparency is needed, including from the Liquidating Trustee, who inherited a certain amount of estate funds and was written a blank check in the Plan documents to spend the estate funds on whatever fees and expenses he deems appropriate, at his own and sole reasonable discretion. Motion ¶¶ 6-7 (quoting from Confirmation Order ¶ 23 and Plan ¶ 1.63).[5]

10.     This blank check must be checked, particularly in light of the history of the case and its uncertain future. *Recall last status conference here*. Section 105 provides authority for this Court to impose checks on the Liquidating Trustee's spending power under the Plan documents.

---

[4]      This amount appears to have been deducted from the Debtor's bank account on account of 46 so-called "Staffing Reports/Fee Notices" spanning the period April 30, 2020, to April 30, 2023, that all were docketed by Debtors' counsel on August 11, 2023. Some of the "Staffing Reports/Fee Notices" contained so-called "notices" that provided for a 14-day objection deadline. There is no evidence that the "Staffing Reports/Fee Notices" ever were served and, if so, on whom. There is no proposed order granting the "Staffing Reports/Fee Notices", no notice for a hearing, nor a Certificate of No Objection and no order from the Court authorizing the use of Debtor funds to pay the amounts set forth in the "Staffing Reports/Fee Notices." The latter is not surprising, because the Court was never presented with any of the foregoing.

[5]      Unfortunately, the Plan was structured (and this by means is not the only plan structured this way) without any succession planning, i.e., the Liquidating Trustee steps into the shoes of the Debtors but does not inherit the research and institutional knowledge of previous estate professionals. There is no transition services agreement.

11.     "Section 105 of the Bankruptcy Code allows a bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP* (*In re BYJU's Alpha, Inc.*), 2024 Bankr. LEXIS 823, at *11 (Bankr. D. Del. Apr. 3, 2024) (citing 11 U.S.C. § 105(a))

12.     Section 105 provides in its entirety:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, ***or to prevent an abuse of process***.

11 U.S.C.S. § 105(a) (***emphasis*** added).  "§ 105(a) authorizes the bankruptcy court to fashion such orders as are required to further the substantive provisions of the Code. Section 105(a) gives the court general equitable powers, but only insofar as those powers are applied in a manner consistent with the Code." *Joubert v. ABN Mortg. Grp., Inc.* (*In re Joubert*), 411 F.3d 452, 455 (3d Cir. 2005) (internal citation and quotation omitted).

13.     The "goal of [the substantive provisions of the Bankruptcy Code is the] centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders*." In re New Century TRS Holdings, Inc.*, 407 B.R. 558, 571 (Bankr. D. Del. 2009) (internal citation and quotation omitted).  Accordingly, putting a check on the Liquidating Trustee's authority to pay himself and his retained professionals furthers the goals of the Bankruptcy Code.

14.     This check could take the form of the Liquidating Trustee filing monthly staffing and/or status reports and, unlike Gavin/Solmonese LLC, presenting them to the Court for review.

Another option would be to direct the Trustee to work in good faith with, rather than continue to antagonize and demonize, the Managers, to maximize a recovery to the Debtor's creditor constituencies.

15.     Given the apparent self-dealing of retained estate professionals and their blatant disregard of their duties, the Court's intervention is required to ensure the integrity of the bankruptcy process.

## CONCLUSION

Section 105 makes an arsenal of sticks and carrots available for the Court's exercise of its equitable powers.  For the reasons outlined above, the Abernathy Parties respectfully request that the Court employ or deploy any number of them before granting the Motion, and grant them such further and additional relief as is just and proper.

Respectfully submitted,

Dated: May 8, 2024
       Wilmington, Delaware

**KLEIN LLC**

*/s/ Julia Klein*
Julia B. Klein (DE 5198)
225 West 14th Street, Suite 100
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Counsel to CTJT Family Trust, HARRAY Holdings Trust, SCTOT, LLC, SureClick, LLC, Marketplace Capital Strategies, LLC, MCS US, LLC, Justin and Lorna Abernathy, the Justin Abernathy 2015 GRAT, Marketplace Advisors, LLC, Justin Abernathy and Jason Abernathy*