### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*:<br><br>SUREFUNDING, LLC,<br><br>                       Debtor. | Chapter 11<br><br>Case No. 20-10953 (LSS)<br><br>**Obj. Deadline to Motion to Vacate: 5/31/24**<br>**Reply deadline: 6/24/24**<br><br>**Hearing date: TBD**<br><br>**Re: D.I. 488, 522** |

**THE ABERNATHY PARTIES' REPLY TO PRELIMINARY OBJECTION OF MORRIS JAMES LLP IN OPPOSITION TO MOTION OF CTJT FAMILY TRUST, HARRAY HOLDINGS TRUST, SCTOT, LLC, SURECLICK, LLC, MARKETPLACE CAPITAL STRATEGIES, LLC, MCS US, LLC, JUSTIN AND LORNA ABERNATHY, THE JUSTIN ABERNATHY 2015 GRAT, MARKETPLACE ADVISORS, LLC, JUSTIN ABERNATHY AND JASON ABERNATHY PURSUANT TO BANKRUPTCY RULES 9023 AND 9024 AND 11 U.S.C. § 105 TO VACATE AND/OR MODIFY ORDER APPROVING DEBTOR PROFESSIONALS' FINAL FEE APPLICATIONS**

      CTJT Family Trust, HARRAY Holdings Trust, SCTOT, LLC, SureClick, LLC, Marketplace Capital Strategies, LLC, MCS US, LLC, Justin and Lorna Abernathy, the Justin Abernathy 2015 GRAT, Marketplace Advisors, LLC, Justin Abernathy, and Jason Abernathy (collectively, the "Abernathys" or "Movants") hereby reply to the *Preliminary Objection of Morris James LLP* [D.I. 522; filed 5/31/24] (the "Objection" or "Obj.")[1] to the Movants' challenge of the *Omnibus Order Approving Debtor Professional's' Fee Applications* [D.I. 484; filed 2/26/24] (the

---

[1]    The Objection is styled "preliminary" and purports to reserve rights to supplement or alter the Objection. Obj. at 1 n.1. The Movants object to Morris James, or any of the other parties it purports to represent, supplementing the Objection without meeting the legal prerequisites to do so. The Movants reserve the right to file a sur-sur reply to any Sur reply Morris James will file. Undersigned counsel understands how absurd this

"Fee Order") and in further support to their *Motion to Vacate*[2]  [D.I. 488; filed 3/11/24] state as follows:

## PRELIMINARY STATEMENT

On April 14, 2020, convinced by counsel and other bankruptcy professionals, Jason Abernathy and Justin Abernathy agreed to put SureFunding into bankruptcy. There was nothing "extremely difficult" about this bankruptcy case. Opp. ¶ 1. There simply was an incessant fighting between, on the one hand, professionals purporting to act on behalf of SureFunding and, on the other, professionals purporting to act on behalf of certain SureFunding noteholders about who was right.

Ultimately, having spent millions of dollars of other people's money, it turned out neither was. The Nevada receivership was rescinded by the Supreme Court of the State of Nevada ruling the receivership action brought by the breaching SureFunding noteholders (styled "Plaintiff Noteholders" in the Plan) had been initiated without the requisite authority. In the Delaware venue, the Debtor initially passed its audition for rehabilitation on the basis that the Abernathys – the managers of the Debtor who were stripped of any managerial rights of the company concurrently with it filing for chapter 11 relief – were the largest victims of the Tradeplay fraud and thus were uniquely qualified to achieve the best recovery for the Debtor's creditors.   While this was true, once the funds in the Abernathys' retirement accounts had been exhausted and could no longer sustain the hemorrhaging professional fees, the professionals abandoned ship with the receivership in place and left it to the Abernathys, as owners of SureFunding, to appeal and ultimately win in the Nevada Supreme Court. This sent the action back to Delaware where, after more fighting by

---

[2]     Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Objection.

professionals, the case was kept on life support by (1) submitting it to mediation – an event to which neither the Abernathys nor the constituents for whose benefit the bankruptcy allegedly had been brought, SureFunding's noteholders, were not invited – and (2) cramming down a plan based on the false fiction the Abernathys were not, as Judge Horan had said, major victims of an investment fraud, but evil incarnate, whose years-long efforts to recoup lost funds to return them to the noteholders and getting the receivership vacated were, in Mr. Waxman's words, "flimsy … [to put it] kind[ly]" and "barely worth the paper that they are printed on, and I say that, recognizing that they are electronic."  This being said, the professionals' actions did not bring once dollar into the estate and only ran up cost to erode the dollars the Abernathys strove to protect.

This case, it turned out, never was brought for the benefit of the noteholders.  This came to light, after a plan was confirmed and after Final Fee Applications had been approved, when an independent fiduciary was handed the reins in this case.  On day one on his job, that independent fiduciary realized he was handed an administratively insolvent estate that could only save it from itself by concerting to chapter 7.  After two months working strenuously to prevent that from that happening, Mr. Murley shared with the Court: "we're $2 million administrative insolvent [d]ue to the way that the plan worked. … The trustee has authorized me to put together a motion to convert because we think that's the simplest, most elegant solution here."[3]

At this point, while still languishing in chapter 11, this case has been reduced to professionals wanting to spend more money to fight over money with little to no concern about the noteholders and recoveries from this point forward.  This Court remains hopeful that "there has got to be a way to resolve in some fashion the fee issues … [without] expensive …  discovery,

---

[3]    Feb. 29, 2024, Hr'g Tr. 20:18-19, 22:18-20.  Like Morris James, Movants "expressly reserve[] the right to take discovery … in connection with the Motion to Vacate. Opp. at 1 n.1.

and depositions, and, therefore, court hearings on basically attorney's fees." And the Abernathys would respectfully submit that the first step in that direction is to revisit the, in retrospect, improvidently granted Final Fee Order.

## FACTUAL AND PROCEDURAL BACKGROUND

***Based on Professional Advice, SureFunding Files for Chapter 11 Protection in this Court***

1.      On April 13, 2020, the day before this chapter 11 case was commenced, at the behest of the Plaintiff Noteholders, the District Court in Clark County, Nevada, appointed a receiver over the Debtor (the "Receiver").

2.      Justin Abernathy and Jason Abernathy, the managers of the Debtor, were assured by the soon-to-be estate professionals that the receivership was "illicit"[4] and chapter 11 was preferable to a receivership, was in the best interest of the Debtor and the best avenue to achieve the best recovery for the Debtor's noteholders, including the Abernathys.  So, on April 14, 2020, this case was commenced.  Motions to dismiss, to convert, and for the appointment of a trustee, were vehemently opposed on those same grounds.[5]  The existence of potential avoidance actions was one reason why the Debtor argued the case should remain in bankruptcy here.[6] But, "[m]ost importantly, the Receiver would not have … the benefit of the Abernathys' involvement in efforts

---

[4]      *Debtor's Omnibus Objection to the Motions of the Noteholders to Dismiss the Debtor's Chapter 11 Case; United States Trustee's Motion for an Order Dismissing Or Directing the Appointment of a Trustee; and Motion of the Noteholders to Excuse Compliance With 11 U.S.C. § 543(A) & (B)* [D.I. 57; filed 5/4/20] (the "Omnibus Objection") ¶ 28.

[5]      *See, generally,* the Omnibus Objection.

[6]      *See id.* at ¶ 112 ("as discussed elsewhere in this Objection, one of the main benefits of this bankruptcy case that a receivership does not, is that the estate is empowered with avoiding powers. The CRLO will analyze and along with the independent manager determine what viable claims exist and will pursue those found appropriate."). Ultimately, Debtor's counsel failed to commence any avoidance actions prior to the expiration of the statute of limitations. The one avoidance action it did file, on the eve of the Plan Effective Date, was dismissed as time-barred, and the Liquidating Trustee would not pursue the action because it did not pass Rule 11 muster.

to generate recoveries from [pending] Euler Hermes and the Tradepay litigation. The Abernathys are personally motivated to do right by their friends and family who, like them, were defrauded. They are singularly focused on pursuing meaningful recoveries." *Id*. ¶ 63. *Also see Affidavit of Edward T. Gavin, CTP in Support of Voluntary Petition* [D.I. 23; filed 4/20/20].

3.      Based on the advice of estate professionals, Jason and Justin abdicated any say in the bankruptcy case, and an independent director, Mr. Palmer, was appointed with exclusive "authority over bankruptcy decisions."[7]

4.      On June 3, 2020, this Court entered the *Order Pursuant to 11 U.S.C. § 305(a)(1) Suspending All Proceedings in the Chapter 11 Case* [D.I. 104]. This followed a June 2 bench ruling "suspending proceedings in the bankruptcy case pursuant to section 305 pending the outcome of the Debtor's motion to reconsider in the Nevada Court and motion practice on the form of Receivership order. Once that is complete, the outcome of this bankruptcy case will become apparent. If the bankruptcy case remains in this court, all parties' rights with respect to conversion or a chapter 11 trustee are preserved." [D.I. 103].

5.      On January 13, 2022, the Nevada Supreme Court issued its *Order of Reversal and Remand*, holding that the Plaintiff Noteholders breached their noteholder agreements and lacked standing to bring their claims, including for the appointment of the Receiver, stripped the Receiver of its powers, and ordered the disgorgement of fees of Plaintiff Noteholders' counsel.[8]

---

[7]      *Id*. at ¶ 38 ("In anticipation of filing this case, the Debtor, which previously had two managers— Justin and Jason Abernathy—amended the Debtor's operating agreement to provide for an Independent Manager with authority over bankruptcy decisions. That Independent Manager is Tamarack Associates, Inc. which has designated John Palmer, CTP to represent it.").

[8]      D.I. 126-2, page 11 of 97 ("The Supreme Court not only reversed the order appointing a receiver, it held that Plaintiff Noteholders never had standing to bring the action in the first instance. Yet, they argue

(Cont'd on following page)

6.     On July 15, 2022, counsel for the Debtor represented to the Court that conversion to chapter 7 was "improper[.]" [D.I. 126; filed 7/15/22].

***Based on Representations made by the Debtor's Professionals to the Court, a Liquidating Plan Was Drafted and, After Various Revisions, Ultimately Confirmed***

7.     On Thursday, September 14, 2023, the Court held a hearing to consider the adequacy of the *Combined Disclosure Statement and Plan of Liquidation of SureFunding, LLC Dated August 4, 2023* (the "Plan"). Debtor's new counsel prefaced his pitch invoking John Milton: "Long is the way and hard, that out of Hell leads up to the light[.]" Sept. 14, 2023, Hrg. Tr. 6:11-14 (quoting Milton's Paradise Lost (1667), Satan, Book II, Lines 432-33).

8.     The Plan underwent several iterations. The original one was dated March 24, 2023. That version was amended on July 13 to reflect that the Plaintiff Noteholders and Debtor had participated in a mediation before Judge Shannon and lead to "a tentative settlement, subject to the resolution of certain issues[.]" D.I. 304 (July 13 plan) at § 2.10.

9.     On July 13, the Debtor filed a renewed *Motion for an Order (I) Approving on an Interim Basis the Adequacy of Disclosures in the Combined Disclosure Statement and Plan of Liquidation (II) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Plan and Disclosure Statement, and Approving the Form of Ballot and Solicitation Package, and (IV) Approving the Notice Provisions* [D.I. 306].

10.    In tandem with the July 13 version of the plan, on July 17, 2023, the Debtor filed the *Motion for Entry of an Order Authorizing the Use of Cash Collateral*. D.I. 310. That so-called

---

that they should be able to retain almost $400,000 in fees they incurred in this ill-fated, unsuccessful endeavor that breached their obligations under the TNPA. Under Nevada law, the order awarding them those fees must be vacated, and the fees disgorged. Indeed, that order is now void, as the Court lacked subject-matter jurisdiction to enter it.").

cash collateral motion sought permission to pay certain professionals, to wit, $501,692 to Gavin/Solmonese and $162,758 to the company that furnished the Debtor's first independent director, who sadly had passed by that time.

11.     On July 25, 2023, Movants objected to the adequacy of the July 13 disclosure statement. "All the terms of that settlement should be disclosed in the Plan. There should not be secret deals.  Negotiations in mediation are protected … but the ultimate resolution of issues, a settlement that affects all parties, should be disclosed.  For instance, … there is an agreement on professional fees. What is that precise agreement?" D.I. 312 ¶ 5. "The current version of the Plan does not attach a liquidation analysis." *Id*. ¶ 10.

12.     On July 27, the Movants objected to the Cash Collateral Motion. D.I. 313.

13.     On August 1, 2023, the Court held a hearing on the Cash Collateral Motion and the adequacy of the July 13 disclosure statement.  The latter was denied, the Court agreeing with the Abernathys that more disclosures regarding mediation conducted "in a back room in this court"[9] had to be made, the former was approved over the Movants' objection on the condition that the Noteholders receive adequate protection.[10]

14.     To push through the professional fee/cash collateral deal reached without the Abernathys' input, Mr. Waxman, the Court having articulated a need for adequate protection that

---

[9]     Aug. 1, 2023, Hr'g Tr. 38:18 (counsel for the Plaintiff Noteholders speaking).

[10]    The Court offered the Debtor and Abernathys the opportunity to resolve the Abernathys objection, and a compromise was reached, as follows:

> MR. WAXMAN: Your Honor, I am pleased to report that we have a resolution with the Abernathys. They have agreed to the use of cash collateral, subject to two additions, which will be in the order. The first is a 506(c) waiver through 4/30, which is the date for the fees, and the second is a lien on the proceeds of the Goodwin Procter litigation. And that's for all -- and both are for all noteholders, that's not just for them.

*Id*. at 62:7-14.

typically accompanies *normal* cash collateral motions but that was conspicuously missing from this one, randomly tossed around a couple of potential security interests: the first one being the litigation against the Abernathys, which he represented to be a "$900,000 matter[.]"[11]  Then, as a toss-up,: "we [can] use the Goodwin Procter litigation instead."[12]

15.    Critically, despite the Court's approval of the use of cash collateral coupled with adequate protection, all rights were preserved to object to professional fees once their approval on a final basis would be sought:

> [MR. LEONHARDT:] Mr. Waxman correctly recited the terms of the deals that were reached. Just one other important term, I think it's evident, and that obviously all rights to object to fees are reserved when those fee apps are filed. This is just with respect to cash collateral today. So, you know, all those objections -- my understanding is all those objections are reserved and that Gavin will be putting in a final fee application.
>
> THE COURT: Okay, thank you.

*Id*. at 63:3-11.

16.    The operative Plan was filed on Monday, August 4, 2023, and, substantively (i.e., apart from the usual plan boilerplate), bears little resemblance to the original one dated March 24,

---

[11]        MR. WAXMAN: Your Honor, I think a resolution of this would be to give a security interest to the secured noteholders for the proceeds of the litigation against the Abernathys.

   THE COURT: It might be.

   MR. WAXMAN: That's a $900,000 matter, Your Honor. …

   THE COURT: It might be.

*Id*. at 37:3-10.  The Litigation Trustee later indicated there is no value to this litigation [D.I. 511; filed 5/6/24 at 3-4] and has all but abandoned it, not even bothering to show up for status conferences requested by the Nevada District Court.

[12]        Aug. 1, 2023, Hr'g Tr. 37:18-20.

or the July 13 version, for that matter.[13] It provided minimum disclosures concerning the settlement.

17.      It bears reiterating that the substantive terms of the Plan were the product of a mediation between the Debtor, represented solely by its estate professionals, and the Plaintiff Noteholders. The Abernathys, the managers of the Debtor,[14] were not permitted to be part of the mediation,[15] nor were they privy to the deals that were cut to make the Plan feasible, other than what was disclosed in the Plan itself.[16]  Those deals, in a nutshell, were a confidential settlement

---

[13]      *See* Aug. 1, 2023 Hr'g Tr. 6:1-6 ("[MR. WAXMAN:] … in mediation, the parties were able to reach a resolution which has led to the filing of the plan. There were some significant changes, Your Honor, and a revised plan was filed on July 13th and a blackline was attached showing the significant changes that were made as a result of the mediated settlement.").

[14]      Justin Abernathy and Jason Abernathy are the managers of the Debtor.  Plan § 1.2.

[15]      "[MR. LEONHARDT: … my clients wanted to be part of that mediation, they asked to be part of that mediation, but they were told not to. When they found out that the mediation resulted in a settlement, they invited to have a mediation with the professionals over the terms that were reached, but that request was declined." Aug. 1, 2023, Hr'g Tr. 25:7-11.  The noteholders were not permitted to be part of the process, either, except those who improperly had brought the receivership action and were represented by Blank Rome.

[16]      The estate professionals did not even want to include the essential terms of the settlement reached in the Plan because they did not want the Abernathys (or all of the noteholders) to know about them.  This, however, did not pass muster at the first disclosure statement hearing:

> THE COURT: […] Let's talk first about, I guess, the request that the settlement -- the terms of the settlement be expressly put forth somewhere in bullet point form, term sheet, something like that.
>
> MR. WAXMAN: Your Honor, it's in the plan.
>
> THE COURT: Why can't that be done? We went to mediation on this date, here's the resolution of it, blah, blah, blah, blah, and we've embodied it in the plan?
>
> MR. WAXMAN: That's fine, Your Honor. I mean, this is all an effort by the Abernathys to do whatever they can --
>
> THE COURT: I really don't want to hear --
>
> MR. WAXMAN: -- but I will --
>
> THE COURT: -- this back and forth --

(Cont'd on following page)

whereby the Debtors dropped their $3M lawsuit against the Plaintiff Noteholders[17] and, in exchange, the firm that had wrongfully brought the receivership in Nevada was paid its fees (with interest), it and all other professionals received releases, and the Abernathys were thrown under the bus.[18] Plan § 2.10.

18.    As to professional fees, the Debtor's counsel and CRO reduced their fees just enough to make the Plan confirmable and the releases Court-sanctioned.  The Abernathys never were apprised of the amount of fees the estate professionals asserted but understood from the revised Plan that they, (a), would be capped at an aggregate amount of $1.5 million, through and including April 30, 2023, and a budget for fees and expenses for certain professionals and costs through the effective date of the Plan.  *Id*. § 2.11 and n.3-4. And, (b), would remain subject to Court approval.  *Id*. at n.2.

19.    The Plan also provided the Debtors' and Plaintiff Noteholders' consent to "use of cash collateral for payment of certain professionals' fees incurred prior to May 1, 2023."  *Id*. §

---

MR. WAXMAN: -- but I will --

THE COURT: -- I'm tired of it. I don't want to hear it, it's irrelevant. I'm working on a disclosure statement and usually with a disclosure statement what we do is we put it in.

MR. WAXMAN: We will do so.

THE COURT: Okay? So let's put that in.

*Id*. at 54:1-22.

[17]    Adversary Proceeding No. 23-50152 (LSS).  March 27, 2023, Hr'g Tr. 4:19-23 ("First, on Monday, March 20th, the debtor filed an adversary proceeding against the breaching noteholders for breach of contract, breach of good faith and fair dealing, and seeking damages, including subordination.").

[18]    "If you want money more than anything, you will be bought and sold. If you have a greed for food, you will become a loaf of bread. This is a subtle truth. Whatever you love, you are." Jalāl al-Dīn Muḥammad Rūmī, A Year With Rumi: Daily Readings.

2.10.  This was the "cornerstone for the plan"[19] and code for two of those professionals getting paid ahead of other administrative expense claimants without having to file a formal fee application.  Purposefully, the Plan, as drafted, had no reserves for other administrative claims, punting the issue of how to deal with those claims to the Liquidating Trustee, post-effective date.[20]

20.    The Plan was structured in such a way that it was impossible to ascertain the number or amount of administrative claims prior to, or at Plan confirmation. This is so because, under the Plan, the Final Administrative Claim Bar Date at *thirty days after the Plan Effective Date*. *See* Plan § 1.45. Consequently, it was impossible to ascertain the ability of the Debtor to pay administrative claims when due prior to, or at Plan confirmation.[21]

21.    The Opposition acknowledges this:

> Significantly, on the Effective Date, the estate had sufficient cash to pay all of the Debtors' professional fees sought by the Debtor Final Fee applications and the Retainer Administrative Claim in full. The estate did not (and does not) have sufficient funds to pay all administrative expenses, if the Additional Administrative Claims are included.

Opp. ¶ 7.

22.    On August 24, the Abernathys filed the *Motion for Allowance and Immediate Payment of Administrative Expense Claim and Reservation of Rights Motion for Allowance and Immediate Payment of Administrative Expense Claim and Reservation of Rights*. D.I. 384.

---

[19]    Aug. 1, 2023, Hr'g Tr. 14:8 (Mr. Waxman speaking).

[20]    [MR. WAXMAN:] There is no administrative expenses that are allowed under the plan. So, the debtor will wait and see when administrative expenses are requested. If its preconfirmation the debtor will review and determine what to do. If its post-confirmation that will fall to the liquidating trustee.

*Id*. at 11:10-15.

[21]    The Abernathys raised the feasibility issue at Plan confirmation but were overruled.  Opp. ¶ 7 n.4.

23.     On September 5, 2023, the Abernathy's objected to the Plan. D.I. 387.   The

opposition, states, in relevant part hereto:

> MCS, MCSUS, MPA and MPA US, LLC provided post-petition
> services to the Debtor pursuant to certain Agent Fee and Contingent
> Management Fee Agreements (the "Service Agreements"). The
> Service Agreements are listed as executory contracts in the Debtor's
> sworn to Schedules.
>
> ***MCS, MCSUS, MPA and MPA US, LLC anticipate filing a very
> substantial Administrative Claim before the Final Administrative
> Claim Bar Date*** (30 days after the Effective Date) (the "Service
> Agreements Admin Claim").
>
> If the Service Agreements are rejected, MCS, MCSUS, MPA and
> MPA US, LLC anticipate filing rejection damages claims. For the
> reasons set forth below, it is unclear how the Liquidating Trustee
> will monetize certain Causes of Action if the Service Agreements
> are rejected.
>
> ***If the Service Agreements are Being Rejected, It is Unclear How
> the Plan is Feasible***
>
> ***The Plan provides for the rejection of all Executory Contracts that
> are not expressly assumed. Plan at Section 7.01. It is unclear
> whether the Debtor intends to assume the Service Agreements. If
> they do, they must cure all defaults.*** *See* 11 U.S.C. § 365. The Plan
> and/or Confirmation Order need to make that clear and provide for
> some mechanism to resolve cure disputes.
>
> ***If the Service Agreements are rejected, it is not clear how this Plan
> is feasible. How does this Debtor anticipate liquidating all the
> Causes of Action without MCS, MCSUS, MPA and MPA US,
> LLC?***

Ex. B ¶¶ 3-5, 6 n.3, 43, 23 (***emphasis*** added).

24.     On September 14, 2023, the Court conducted a hearing regarding the adequacy of

disclosures submitted in connection with the solicitation of the Plan. D.I. 398. During that hearing,

new counsel to the Debtor, Morris James, acknowledged that the case had been stayed for an

extended period of time due to receivership motions in Nevada and appeals[22] and confirmed that a "lengthy but fruitful mediation before Judge Shannon had" resulted in the Plan.[23]  At that hearing, Mr. Gavin:

      a.   Confirmed that he had "substantial experience in insolvency matters[.]"[24]

      b.   Confirmed that his declaration in support of the plan was accurate.[25]

      c.   Confirmed it was made under penalty of perjury.[26]

    25.    The issue of administrative claimants being treated equally and paid *pari passu* (other than Gavin/Solmonese, which had already received $501,692 half a year prior to the administrative claim pool being ascertained) was raised the hearing and resolved as follows:

> MR. LEONHARDT: And so that's the ask, that there be one reserve. Let's not stop professionals from getting paid, but if they get paid more and there's an administrative shortfall, they have to throw the money back so that … all administrative creditors are treated the same.
>
> THE COURT: Okay. Mr. Waxman?
>
> MR. WAXMAN: Your Honor, if there's -- if the issue is simply payment, subject to disgorgement, that's not a problem. There are lots of cases. I think *Channel Master* is one that goes back probably 20 years now, that does the same thing. So we're fine with that.
>
> THE COURT: Okay. So you can work on language for that?
>
> MR. WAXMAN: We can work on language for that –
>
> THE COURT: Very good.

*Id*. 65:13-66:2.

---

[22]     Sept. 14, 2023, Hr'g Tr. 5:25-6-6:7.

[23]     *Id*. 6:8-11.

[24]     *Id*. 16:7-11.

[25]     *Id*. 17:2-12.

[26]     *Id*. 18:4-6; 19:16-21.

***The Plan Was Confirmed, Became Effective, and an Independent Fiduciary Succeeded the Estate Processionals: the Liquidating Trustee; as Designed by the Estate Professionals, Administrative Expense Claims Are Being Lodged Post Effective Date***

26.      The Plan, as further amended, was confirmed on October 25, 2023. D.I. 404.

27.      On November 10, 2023, the Plan became effective, and Alfred T. Giuliano became the liquidating trustee (the "<u>Liquidating Trustee</u>").  This was a watershed moment, because an independent fiduciary succeeded the estate professionals in administering this case.

28.      Per the terms of the Plan, the deadline to file administrative claims was December 11, 2023.[27] *See* Plan § 1.45 ("Final Administrative Claim Bar Date" means the date that is 30 days after the Effective Date, which shall be the deadline for Filing requests for payment of Administrative Claims that arose after the Petition Date.).

29.      Consistent with the Final Administrative Claim Bar Date, on November 27, 2023, Morris James and other Debtor professionals timely filed their Final Fee Applications. *See* D.I. 428-433. Objections to the Final Fee Applications were due on December 14, 2023.  *Id.*  The deadline to object to the final fee application of Fox Rothschild LLP [D.I. 432] subsequently was extended *sine die*.

30.      Consistent with the Final Administrative Claim Bar Date, on December 11, 2023, Gavin/Solmonese timely filed its final fee application.  D.I. 442 (the "<u>G/S Final Fee Application</u>"). The deadline to object to its final fee application was January 5, 2024, but that deadline subsequently was extended *sine die*.

31.      Consistent with the Final Administrative Claim Bar Date, also on December 11, 2023, the Abernathys timely filed their administrative claims.  D.I. 445, 446, 453, 454.  The

---

[27]      December 10, 2023, or the thirtieth day after the Effective Date, was a Sunday.

Abernathy administrative claims aggregate to approximately $2,229,173.66. Opp. ¶ 7 (after accounting to duplicate administrative claims inadvertently filed).

32.    On the eve of the Final Administrative Claim Bar Date, the Liquidating Trustee objected to the Abernathys' *Motion for Allowance and Immediate Payment of Administrative Expense Claim*. D.I. 434.

33.    The Abernathys replied on December 18. D.I. 455.

34.    On December 19, 2023, the Debtor filed its *Notice of Filing of Proposed Omnibus Order Approving Debtor Professionals' Final Fee Applications*. D.I. 461.  The order attached to that notice provided for immediate payment of professional fees, "subject to disgorgement upon entry of an order after notice and an opportunity for hearing. *Id.*, Ex. 1 at 2.

35.    At a hearing on December 21, the Court considered the Final Fee Applications and the *Abernathys' Request for Allowance and Immediate Payment of Administrative Expense Claim*. Counsel for the Trustee set the tone for the hearing, declaring at the outset:

> So the trustee, Your Honor, came on the scene on November 13th [*sic*] when the plan went effective,[28] and I won't sugarcoat it, Your Honor, we think we have a problem. We think we're $2.4 million in the hole as far as the administrative expenses.

Dec. 21, 2023, Hr'g Tr. 4:12-16.  His culprit of choice? The Abernathys.

> What we didn't expect was to be peppered with, we think, $3.3 million of administrative claims from what I'll call the Abernathy group. Those were just filed last week, so this is an issue that we just saw last week. So that, we think, we need to make the Court aware of right away because it's an issue that we'll probably be dealing with early in the case and we think it also informs what the Court does today on fees.  And just to preview the trustee's position on fees, it has no issue with the allowance of the professional fees, but is taking the position that no fees should be paid unless and until we know that we're administratively insolvent.

---

[28]    The Plan went effective November 10, 2023. *See* D.I. 419; filed 11/13/23.

*Id*. at 4:23- 5:6-10.

36.    Debtor's counsel then began making the case for payment of professional fees by complaining about, among other things, the Abernathys having filed their administrative claims "[o]n the eve of the bar date for the administrative expense deadline." Opp. ¶ 12 (but not complaining about Gavin/Solmonese having filed the G/S Final Fee Application on the same eve and omitting to mention that counsel had structured the Plan for administrative claims to be filed *after* the Effective Date).  He also discounted those claims as "flimsy.  I think that's accurate but probably a little kind."  Dec. 21, 2023, Hr'g Tr. 65:20-1.[29]  The bashing of the Abernathys was only paused to make a request, "on behalf of all of the professionals whose fee applications are on for today, [that] the distributions be made, subject to disgorgement."  *Id*. 66:3-5.  Surprised, the Court asked why counsel asked for this "unusual" arrangement.  *Id*. at 66:6:11. The response: To get the funds under his belt before the end of the fiscal year:

> [MR. WAXMAN:] Your Honor, in this case, Morris James has been retained since, I believe, July of 2023. We haven't received a single cent in this case. […] And, Your Honor, it is two weeks before – less than two weeks before the end of fiscal year. We would prefer to receive payment, subject to disgorgement, confident that the Abernathys' administrative expenses are barely worth the paper that they are printed on, and I say that, recognizing that they are electronic.

*Id*. at 66:15-25.

---

[29]    [MR. LEONHARDT ADDRESSING THE COURT:] We're not the ones who chose to set the admin bar date after the effective date. The debtors were on notice of these claims. In our confirmation objection, I noted we intend -- my clients intended to submit substantial claims for the post-petition work they've done on rejected, executory contracts. So, I just -- I don't think it's fair to call surprise here, and we reserve all rights, and, you know, we certainly don't appreciate our claims being characterized so negatively by Mr. Waxman.

Dec. 21, 2023, Hr'g Tr. 70:14-23.

37.     To his credit, even the Liquidating Trustee took issue with that approach:

> MR. MURLEY: Begrudgingly, Your Honor, and for the record,
> Luke Murley on behalf of the trustee, begrudgingly, we think that
> the right approach here is that nobody gets paid. We could see that
> in – there's some universe where payment, subject to disgorgement
> could make it less bad, but practically, Your Honor, the trustee is
> seeing that as a huge problem. Because if we're in a situation where
> we're disgorging, we're essentially suing law firms later and then
> how much will we get back? Do we get to charge for our fees to do
> that? Proration issues, and we're also herding the cats of many
> professionals. So, while it sounds simple, payment to disgorgement,
> it is an administrative nightmare.

*Id*. at 68:12-24.

38.     As the Opposition aptly notes:

> At the Hearing, the Abernathys and the Liquidating Trustee each
> expressed concern with respect to the payment of the Final
> Applications, in light of the Abernathys' administrative expenses,
> which together with the Final Applications, exceeded the amount of
> cash in the Liquidation Trust. At the conclusion of the hearing, the
> Court approved the Final Applications, other than the $15,000
> requested by the Final S&W Application (which would be decided
> at a subsequent hearing), however, the Court denied the request for
> immediate Payment of those allowed fees and expenses.

Opp. ¶ 16.   In other words, the Court allowed the estate professional's administrative claims against the estate but denied the request for their immediate payment.

39.     On December 18, former counsel to the Debtor emailed a proposed form of implementing order to counsel to the Abernathys, who provided comments on December 26.  Opp. ¶ 15.

40.     On December 26, 2023, the Abernathy's lodged their opposition to the *Thirty-Fifth Through Forty-First Fee Statements of Gavin/Solmonese LLC, as Chief Restructuring Officer and Liquidating Officer for the Debtor*. D.I. 464.

41.     On February 21, 2024, that is, *two months after the Final Fee Applications had been approved subject to the Court's comments at the hearing*, former counsel to the Debtor *finally* (pun intended) submitted the Final Fee Order under certification of counsel. Opp. ¶ 16; D.I. 479.

42.     By order dated February 26, 2024, the Court approved the Final Fee Applications. D.I. 484.  This approval came with the proviso, however, negotiated by the Abernathys, Opp. ¶¶ 15-17, "that the Liquidating Trustee is not authorized to pay any amounts to the extent there is insufficient cash in the Liquidation Trust to pay all asserted administrative expense claims in full[.]" Fee Order at 2.

43.     On March 11, the Abernathys', through their withdrawing counsel, timely filed the Motion to Vacate. D.I. 488.   The Motion was filed as a "placeholder" motion at the direction of the Court to preserve the Abernathy's claims with respect to the Fee Order while they were trying to secure substitute counsel. The Motion specifically reserved all rights for the Abernathys to assert claims not included in the Motion itself.

44.     On April 3, 2024, the Court issued a Letter Ruling concerning the *Abernathys' Request for Allowance and Immediate Payment of Administrative Expense Claim*. D.I. 494.  In it, the Court expressed consternation and was disturbed about certain conduct by certain estate professionals.

45.     On April 10, 2024, the Court entered the *Order Granting in Part and Denying in Part Request for Allowance and Immediate Payment of Administrative Expense Claim* filed by the Abernathys. D.I. 503.

46.     On May 31, former Counsel to the Debtor, on behalf of all estate professionals, filed the Opposition. D.I. 522.

## **REPLY**

47.     Reconsideration of the Fee Order is warranted.  The Opposition contends it is not, because Movants allegedly "contend that the Court should vacate the Final Fee order for only one reason: "The Liquidating Trustee has stated his intention to convert this case to [sic] case under chapter 7.  This was not known when the Court approved the fees in December."  Opp. ¶ 18 (citing Motion to Vacate at ¶¶ 12, 15).

48.     While it is true that the Motion to Vacate is not as elaborate as it could have been, the Court knows it was filed as a placeholder[30] by Movant's former counsel who had to withdraw to serious family emergencies;[31] specifically reserved the Movants' right to raise further and additional argument through new counsel; and the statements on the record,[32] at which counsel

---

[30]     During the hearing on his firm's Motion to Withdraw, Mr. Leonhard stated, with respect to the Motion to Vacate:

> Your Honor told me to file it. If Your Honor tells me to do something, I am doing it, Your Honor, unless there is a real impediment or something that really concerns me. That was my understanding at the last hearing is I was to file a placeholder Rule 59 motion and preserve my clients' rights during the transition period. That is what I did.

March 27, 2024, Hr'g Tr. 12:4-10.

[31]     *See*, *generally*, Feb. 29 Hr'g Tr.

[32]     *See*, *e.g.*:

> [MR. LEONHARDT:] I know there was some reference about the discussion on the fee order. I would just note that it was peculiar to me that there was a delay between the December hearing when the fees were approved and when the professionals sought entry of that fee order was a couple of months. I wasn't sure why. And during that intervening period, we are hearing counsel to the liquidating trustee as an independent fiduciary, having taken a look at the case, saying this case might be right for conversion. In my view substitute counsel for my clients may have an argument or want to argue that that is a material change in fact that warrants reconsideration under Rule 59. So, all I want to do is preserve my clients' rights and mitigate any prejudice.

(Cont'd on following page)

who signed the Opposition was present, undermine any claim of "we don't know what is meant by that."

49.     For the reasons that follow, which demonstrate that certain critical and material facts were not made known to the parties or the Court when it was entered, the Court should reconsider and vacate the Fee Order.

***The Fee Order Must Be Set aside under Bankruptcy Rule 9024 Because It Was Granted Based on Facts that were Incomplete and Should Have Been, but were not, Disclosed to the Court***

50.     A motion for reconsideration pursuant to Bankruptcy Rule 9024, making Fed. R. Civ. P. 60 applicable to bankruptcy proceedings, should be granted if the moving party shows "mistake, inadvertence, surprise, or excusable neglect …" *In re Cain*, No. 18-12631 (BLS), 2023 Bankr. LEXIS 2300, at *3 (Bankr. Sep. 20, 2023).  Rule 60 also provides grounds for relief where there the judgment sought to be set aside, here, the Fee Order, was procured through "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party" or its application "prospectively is no longer equitable[.]" Fed. R. Civ. P. 60(b)(3) & (5).  It was "was designed to address mistakes attributable to special circumstances and not merely to erroneous applications of law." *Russell v. Delco Remy*, 51 F.3d 746, 749 (7th Cir. 1995). Finally, "the catch-all provision of Rule 60(b)(6) … permits a court to relieve a party from a final judgment

---

March 27, 2024, Hr'g Tr. 12:11-23; *also see id*. at 10:19-11:3 ("[MR. LEONHARDT:] I was a bit surprised to hear the surprise of the liquidating trustee to the universe of admin claims. […] And one might say it's surprising that debtor's counsel did not inform the liquidating trustee about these claims before they ever took the engagement, but the record on that will speak for itself and hopefully substitute counsel can delve more deeply into that."), 17:22-24 ("MR. JUSTIN ABERNATHY: Fees that have been billed against this case. They are providing no value to anybody that has actually lost money here."); Feb. 29 Hr'g Tr. 19:6-9 (("[MR. LEONHARDT:] "One of the theories might be, and I am not saying this is that, if the case is administratively insolvent it may question the reasonableness of fees incurred in proposing a plan.")

for 'any other reason that justifies relief.'" *Holland v. Holt*, 409 F. App'x 494, 497 (3d Cir. 2010)

(quoting Rule 60(b)(6)).[33]

51.    Initially, the Abernathy's had been convinced, by the Professionals, to believe that

bankruptcy was the only option and the best vehicle for SureFunding to maximize recoveries on

behalf of the noteholders and that they were in good hands here in Delaware.

52.    At a Status conference on April 21, 2020, the following colloquies were exchanged:

> MR. HORAN: Hello, Your Honor. This is Thomas Horan from Fox
> Rothschild, representing the debtor.
>
> […]
>
> Since -- well, just before the petition date, Your Honor, the debtor
> engaged Mr. John Palmer – who's on the line with us today -- as an
> independent manager with authority over bankruptcy decisions for
> the company. And at the direction of Mr. Palmer, the company
> engaged Gavin/Solmonese to provide Ted Gavin as the CRO for the
> company. And Mr. Gavin is also on the line, along with my partners
> Michael Sweet and Gordon Gouveia. So, today, Justin and Jason
> Abernathy remain as managers, but Mr. Palmer is running the
> bankruptcy case, along with Mr. Gavin, and the Abernathys are not
> involved with that management of the case.

April 21, 2020, Hr'g Tr. 4:19-20, 5:16-6:1.

> So how did we get here today? It all comes down to a story about a
> company called Tradepay. In 2017, SureFunding entered into a
> relationship with Tradepay, where the debtor invested
> approximately $28.7 million with Tradepay, who uses capital to
> receive -- to factor receivables from hundreds of different account

---

[33]    The Motion to Vacate also sought relief under Bankruptcy Rule 9023, making Fed. R. Civ. P. Rule 59(e) applicable to bankruptcy proceedings, which provides authority for the Court to alter or amend a judgment. "The purpose of a motion for reconsideration, we have held, 'is to correct manifest errors of law or fact or to present newly discovered evidence.'" *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). "[T]he purpose of a Rule 59(e) motion is to correct manifest errors of law or fact or to present newly discovered evidence." *Jenn-Ching Luo v. Owen J. Roberts Sch. Dist.*, No. 23-2143, 2024 U.S. App. LEXIS 6709, at *6 (3d Cir. Mar. 21, 2024) (internal citation and quotation omitted). Movants reserve all rights with respect to arguments raised under Bankruptcy Rule 9023.

debtors. And then, by April 2019, Tradepay had defaulted on its repayment obligations to the debtor.

The debtor undertook an intensive investigation and found that Tradepay and its owners and operators were engaged in what -- for short, what we would call a money laundering or fraud operation. And at that -- well, the debtors and the Abernathys had no involvement in this fraud, so the company here was a victim of Tradepay and Tradepay's principals.

The company moved pretty quickly to address its exposure. They swept all the money in the account associated with Tradepay and they filed suit in Florida State Court against Tradepay and its principals and associates. So, in an attempt to recoup the losses caused by Tradepay's fraud, they initiated that litigation. And the company, through its agent -- and then to be called MCS agent -- filed claims under an insurance policy with Euler Hermes that we believe covers this loss in full.

*Id*. 6:2-24.

And the main purpose of the bankruptcy case is to gather all assets available to pay creditors the maximum possible recovery, and to do that in an equitable fashion that comports with the Bankruptcy Code. The effect of the bankruptcy case is to stop the race to the courthouse by the Nevada receivership noteholders …

*Id*. 8:19-20.

[T]he end goal, Your Honor, likely is to propose a liquidation plan that, again, is going to comport with the requirements of the Bankruptcy Code and distribute assets equitably.

*Id*. 8:25-9:3 *See* **Exhibit A**.

53.     On May 4, 2020, in response to motions to dismiss or convert the case or send

SureFunding back to the receivership in Nevada, Judge Horan, on behalf of the Debtors, penned

an eloquent opposition, stating:

Most importantly, the Receiver would not have had the benefit of the Abernathys' involvement in efforts to generate recoveries from Euler Hermes and the Tradepay litigation. The Abernathys are personally motivated to do right by their friends and family who, like them, were defrauded. They are singularly focused on pursuing

meaningful recoveries. No one has comparable knowledge about the events that transpired. No one is better positioned to bring money back to the victims. Bankruptcy provides a vehicle for the Debtor to pursue its goal of recovering the funds that were lost.

D.I. 57 ¶ 63.

The Debtor does not believe it is using cash collateral of any creditor. It is the Debtor's view that it possesses sufficient cash reserves to meet its operating needs in this case. No creditor has contended otherwise.

*Id.* ¶ 66.

The Debtor has hired an experienced and well-respected CRLO to shepherd the Debtor through this case and has added an independent manager who is solely responsible for all bankruptcy and restructuring decisions. This dedication to openness and transparency, coupled with the Abernathys' voluntary relinquishment of decision-making authority to third parties with whom they had no preexisting relationship, is a testament to their management skills and shows great awareness of the reality of the conflict they are addressing.

*Id.* ¶ 84.

Additionally, although the Motions to Dismiss contain various allegations of misconduct, the Debtor strenuously denies the allegations. The Abernathys were victims of the fraud like the rest of the Noteholders. They lost more money than anyone else. Further, the Debtor acted swiftly in addressing the Tradepay fraud. In any event, the fact that the Abernathys are stepping aside to leave control of the bankruptcy process in the hands of others should remove even the slightest concern. The Debtors, for all bankruptcy related matters, will be controlled solely by an experienced CRLO reporting to the independent manager.

*Id.* ¶ 88. Judge Horan concluded:

Like the Certain Noteholders, the Abernathys are victims of the Tradepay fraud. But unlike those noteholders, who are pursuing their own narrow interests, SureFunding sought to do what was best for all involved, retaining professionals who could bring SureFunding before this Court to effectuate a plan that has the best chance of allowing the recovery of funds to those who have lost so much.

*Id*. ¶ 115.  And the Gavin Declaration in support of the bankruptcy petition, attached again to the

opposition and attached hereto as **Exhibit B**, made the case look legitimate.

***Once an Independent Fiduciary, the Liquidating Trustee, Entered the Scene, Movants Learned
that the Case Was Not a Proper Candidate for Chapter 11; This New Evidence Warrants
Reconsideration of the Fee Order***

54.    Following the hearing on the Final Fee Applications on December 21, new facts

came to light, both informally and on the record. The new independent fiduciary, the Liquidating

Trustee, succeeding the estate professionals pursuant to the Plan on November 13, disagreed with

the former counsel to the Debtor not only about the estate professionals getting immediately paid.

55.    It turned out he also disagreed about this being a case under chapter 11.  Obviously,

there were no reserves that the Liquidating Trust Agreement required him to set aside, the recovery

of funds was questionable, and avoidance actions all were time-barred.  His counsel spent "two

months in extensive negotiations"[34] trying to broker "a proposal that allowed us to stay in this

Chapter 11 case.  Our view when making that proposal is this is kind of ugly, but as it gets us there

and there's not a whole lot of wiggle room."[35]

> [W]e're $2 million administrative insolvent due to the way that the
> plan worked. The plan went effective 30 days after the effective
> date, professional fees were to be filed and then regular admin
> claims were to be filed. The professional fees came out as we
> expected, based on the budgets. The administrative fees were much
> higher. And so we are, as it currently stands and have been for the
> last 60 days, $2 million administratively insolvent in this case. So
> what have we been doing since?

*Id*. 20:18-21:1.

> So not only we've been talking with the Abernathy, we've also
> talked with the professionals. And those discussions have been

---

[34]    Feb. 29, 2024, Hr'g Tr. 21:6-7.

[35]    *Id*. 22:10-13.

> about taking a deferral of an administrative fee, a waiver of the fee. We've been talking to all the professionals about this, but mainly talking with the larger dollar amount professionals. All that culminated over the course of two months in an extensive eight page term sheet that we delivered to the Abernathy's on February 7.

*Id.* 21:10-18.

> The trustee has authorized me to put together a motion to convert because we think that that is the simplest most elegant solution here. When you have a Chapter 11 administratively insolvent estate, we think that there is one way to make sure that whoever deals with this money has unquestionable statute of priority and that is a Chapter 7 conversion. We think that it makes no sense to the people who have skin in the game here, the professionals and the Abernathy's, but we think that is the only option.

*Id.* 22:18-25.

65.     To come back to the question Mr. Leonhardt asked, but this time in earnest:  If the Plan deliberately set the Debtor up for administrative insolvency and, according to the Liquidating Trustee, the "one way" and "only option" out of the post-effective mess is conversion to chapter 7, why should the estate professionals be rewarded for running SureFunding into the ground?  This question alone should give the Court pause to reconsider the fees it awarded them.  How did the estate professionals' actions preserve the value of or otherwise benefit the estate? One of the reasons the Gavin Declaration is the last exhibit to this Reply is that the representations therein stand in such stark contrast to where we are now.  If this case is converted, were the fees incurred in formulating and confirming it, based, among other things, the representation that it was feasible, reasonable?

66.     Of course, if this case converts, the "Abernathy's sole comment" that they bargained for in the Fee Order, Opp. ¶ 15, becomes meaningless.  This is so because there will be no Liquidating Trustee (as defined in the Plan).  There will be a Chapter 7 trustee, whose fees and expenses will take priority.  *Ross v. Kanaga* (*In re Darmstadt Corp.*), 164 B.R. 465, 468 (D. Del.

1994) ("Section 726(b) provides that in cases where the matter is converted from a Chapter 11 to a Chapter 7, certain Chapter 7 administrative expenses shall have priority over and be paid before certain Chapter 11 administrative expenses." *Ross v. Kanaga* (*In re Darmstadt Corp.*), 164 B.R. 465, 468 (D. Del. 1994); *In re Jughandle Brewing Co., LLC*, 2024 Bankr. LEXIS 1305, at *20 (Bankr. D.N.J. June 3, 2024) ("11 U.S.C. § 726 … provides strict guidelines as to the distribution of property of the estate in Chapter 7 cases"). This, in turn, will further dilute any recovery for administrative claimants, including the Abernathys.

## CONCLUSION

While admittedly motions to reconsider are sparingly granted, the extraordinary circumstances in this case, ranging from deliberately excluding the Debtor's managers from material negotiations to making material misrepresentations to the Court and creditor constituencies regarding the feasibility of the Plan, all of which informed granting of the Final Fee Applications, were unearthed only after an independent fiduciary entered the scene and assessed this case, warrant the relief requested in the Motion to vacate. None of those deliberate actions to mislead the management of the Debtor and a Plan proposed for the sole benefit of getting estate professionals paid, leaving no recovery to the Debtor's creditor constituencies, and no funds to the Liquidating Trustee to realize any recoveries, were present in the many cases that denied reconsideration. This is a case where extraordinary relief is warranted.

Wherefore, Movants respectfully request that the Motion to Vacate be granted, the Fee Order revisited, and that the Court grant them such other and further relief as is equitable and appropriate under the circumstances.

Dated: June 24, 2024            **KLEIN LLC**
    Wilmington, Delaware

           */s/ Julia Klein*
           Julia B. Klein (DE 5198)
           225 West 14th Street, Suite 100
           Wilmington, Delaware 19801
           (302) 438-0456
           klein@kleinllc.com

           *Counsel to Movants*